## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**AMANDA CIMILLO, etc., et al,**

      Plaintiffs,

vs.                           CASE NO.: 4:16-cv-00584-RH-CAS

**DIANE ANDREWS, et al,**

      Defendants.

_____/

## DEFENDANTS DIANE ANDREWS AND THE FLORIDA DEPARTMENT OF CORRECTIONS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Defendants Diane Andrews ("Andrews") and the Florida Department of Corrections ("FDC") (collectively "Defendants") move to dismiss those claims asserted against them, and specifically Counts II and IV against Andrews under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and against FDC in Count V under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and state as follows:

## I.      INTRODUCTION

Plaintiff's Complaint asserts a claim of common law civil conspiracy against Andrews in Count II, and a claim of conspiracy to violate § 1983 in Count IV; and a claim against FDC in Count V under Title II of the ADA ("ADA") and the Rehabilitation Act (RA).

Plaintiff's claims arise out of the death of Randall Jordan-Aparo ("Jordan-Aparo") on September 19, 2010 while an inmate at Franklin Correctional Institution (Franklin CI) in Carrabelle, Florida.

## II. ANDREWS' MOTION TO DISMISS COUNTS II AND IV

### A. STATEMENT OF ALLEGED FACTS

The allegations against Andrews are: (1) that she "filed a false Incident Report averring that the use of force against Randall Jordan-Aparo was in compliance with FDC regulations and policies" (*see* Complaint, ¶ 27); (2) that on the night Jordan-Aparo died Andrews went to Franklin CI and "instructed that no interviews be conducted of inmate witnesses . . . [which] was contrary to FDC policy . . ." (*id*, ¶ 35); (3) that she "disciplined" FDC employee Christina Bullins for writing letters to FDC officials based on information provided to Bullins by her brother (an inmate at Franklin CI at the time) regarding the death of Jordan-Aparo (*id*, ¶¶ 38, 40); (4) that she found the use of force on Jordan-Aparo "appears to be in compliance with the rules governing the use of force." (*id*, ¶ 39); and (4) that she ordered infirmary log to be amended at a later date.  *Id*, ¶ 20.

In Count V Plaintiff claims that Jordan-Aparo was "abused because of his disabilities" by FDC and its employees when he was "gassed . . . and denied medical treatment for injuries he suffered due to his disability, which was known

to [FDC] and its agents and employees." *Id*, ¶ 99.[1]  Plaintiff next claims that this

"abuse constitutes discrimination against individuals based on their disability in

violation of the Rehabilitation Act and Title II of the A.D.A." *Id*, ¶ 100. In

addition, Plaintiff claims that FDC and its employees "discriminated against

Jordan-Aparo by abusing him specifically because of his disease and excluding

him from treatment programs by subjecting him to discrimination . . . [including]

medical treatment when it was obvious and apparent that he was suffering from his

disability and FDC's agents and employees continued to gas Aparo and deny him

the medical treatment it was obvious he needed at the time." *Id*, ¶ 101.  Lastly,

Plaintiff claims that FDC's "deliberate indifference to ongoing discrimination

against Jordan-Aparo as a result of his disability, [he] suffered a horrific and tragic

death that could have and should have been avoided had [FDC] complied with the

Rehabilitation Act and Title II of the A.D.A." *Id,* ¶ 103.

---

[1] The only claim against FDC in Plaintiff's Second Amended Complaint is one for violations of Title II of the ADA and the Rehabilitation Act as set forth in Count V. (Plaintiff has asserted factual allegations against FDC in ¶ 63 which pertain to the claim of civil conspiracy however FDC is not named as a party in Plaintiff's claim for civil conspiracy in Count II.)

## B. <u>MEMORANDUM OF LAW</u>

## 1.   <u>STANDARD OF REVIEW</u>

In ruling on a motion to dismiss, the Court must accept the factual allega-

tions set forth in the complaint as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009),

and all reasonable inferences should be drawn in favor of the plaintiff.  *See Omar*

*ex rel. Cannon v. Lindsey*, 334 F.3d 1246, 1247 (11th Cir. 2003).  There are

however minimal pleading requirements that Plaintiff must satisfy (*Jackson v.*

*BellSouth Telecomm.*, 372 F.3d 1250, 1262-63 (11th Cir. 2004) such as alleging

facts which " 'give the defendant fair notice of what the ... claim is and the grounds

upon which it rests.' " *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam)

(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   In addition, a

plaintiff must allege "enough facts to state a claim that is plausible on its face."

*Twombly*, 550 U.S. at 570.  To demonstrate "facial plausibility" the Plaintiff must

plead "factual content [which] allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678

(citing *Twombly*, 550 U.S. at 556); *see Miljkovic v. Shafritz & Dinkin, P.A.*, 791

F.3d 1291, 1297 (11th Cir. 2015) (citation and footnote omitted).

A plaintiff does not meet these minimal standards in attempting to show

entitlement to relief by alleging "labels and conclusions, and a formulaic recitation

of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555

(internal quotations omitted); *see also Jackson*, 372 F.3d at 1262 (the Court

explained that "conclusory allegations, unwarranted deductions of facts or legal

conclusions masquerading as facts will not prevent dismissal") (internal citation

and quotations omitted).  Moreover, "the tenet that a court must accept as true all

of the allegations contained in a complaint is inapplicable to legal conclusions[,]"

which are simply "not entitled to [an] assumption of truth." *See Iqbal*, 556 U.S. at

678, 680.  Therefore, in ruling on a motion to dismiss, this Court must determine

whether the complaint contains "sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face[.]' " Id. at 678 (quoting *Twombly*, 550

U.S. at 570).

## C.  PLAINTIFF'S CLAIM OF CIVIL CONSPIRACY AGAINST ANDREWS IN COUNT II FAILS AS A MATTER OF LAW ON MULTIPLE GROUNDS

### 1.  PLAINTIFF'S CLAIM OF CIVIL CONSPIRACY AGAINST ANDREWS IS BARRED BY THE INTRA-CORPORATE CONSPIRACY DOCTRINE

In Count II of her Complaint Plaintiff claims that Andrews and the other

individual Defendants "acted as conspirators to cause and then conceal the death of

Randall Jordan-Aparo . . . [and that] the underlying tort, which formed the purpose

of a conspiracy, is murder or manslaughter." *See* Complaint, ¶ 71.  The facts

alleged against Andrews are limited to her actions *after* the death of Jordan-Aparo.

5

The Court in *Mancinelli v. Davis*, 217 So.2d 103 (Fla. 4th DCA, April 5, 2017) set forth a thorough recitation of the intra-corporate doctrine explaining that

> This doctrine, originally a product of antitrust law, provides that 'neither an agent nor an employee can conspire with his or her corporate principal or employer.'  *Richard Bertram, Inc. v. Sterling Bank & Trust*, 820 So.2d 963, 966 (Fla. 4th DCA 2002 (quoting *Lipsig v. Ramlawi*, 760 So.2d 170, 180 Fla 3d DCA 2000); *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir.2000) (en banc).  'This Doctrine stems from basic agency principles that 'attribute the acts of agents of a corporation to the corporation, so all of their acts acre considered to be those of a single actor.' *Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000) . . . Because a civil conspiracy requires 'an agreement between two or more parties,' *Lipsig*, 760 So.2d at 180, 'it is not possible for a single entity consisting of the corporation and its agents to conspire with itself,' *Dickerson* 200 F.3d at 767 (other citation omitted) . . . *Thus, the intra-corporate conspiracy doctrine, as a general proposition, precludes the claim of conspiracy against individuals and their corporation for wholly internal agreements to commit wrongful or actionable conduct.*

*Id*, 1036-37 (emphasis added).

The Court in *Mancinelli* also addressed the "personal stake" exception to the intra-corporate conspiracy doctrine which provides that "where an agent has a 'personal stake in the activities separate from the principal's interest,' the agent can be liable for civil conspiracy.'"  *Id*, at 1037 (quoting *Lipsig*, 760 So.2d at 181). Here, Plaintiff alleges that Andrews conspired with the other individual Defendants against Jordan-Aparo, but no facts are alleged showing that Andrews was at any

6

time acting in her own "'personal interest[], wholly and separately from'" the other individual Defendants. *Mancinelli*, *supra* (quoting *Microsoft Corp. v. Big Boy Distr. LLC*, 589 F.Supp.2d 1308, 1323 (S.D. Fla. 2008) (other citation omitted).

Rather, all of Andrews' alleged actions were done in her capacity as the Warden at Franklin CI, and no facts are alleged showing or suggesting that she had any interest separate or distinct from her duties as the Warden at Franklin CI, i.e., no "personal stake" as that term is defined for purposes of a claim of civil conspiracy.

Therefore, Plaintiff's claim of civil conspiracy against Andrews in Count II of her Complaint fails to state a claim as a matter of law, and her motion to dismiss should be granted on this ground alone.

## 2. PLAINTIFF'S CLAIM OF CIVIL CONSPIRACY AGAINST ANDREWS FAILS UNDER THE "COERCIVE FORCE OF NUMBERS" EXCEPTION

Plaintiff also brings her civil conspiracy claim in Count II against Andrews and the other individual Defendants under the alternative "coercive force of numbers" exception, and in support of this claim cites the cases of, *Margolin v. Morton F. Plant Hosp. Ass'n, Inc.*, 342 So.2d 1090 (Fla. 2d DCA 1977) and *Kee v. Nat'l Reserve Life Insurance, Co.*, 918 F.2d 1538, 1542 (11th Cir.1990).

The independent tort of civil conspiracy is "actionable where a plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual could not possess." *Buckner v. Lower Florida Keys Hospital Dist.*, 403 So.2d 1025, 1029 (Fla. 3d DCA 1981). "The gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." *Liappas v. Augoustis*, 47 So.2d 582 (Fla.1950).  Here, the "civil wrong", or underlying tort, in the instant case is the alleged killing or murder of Jordan-Aparo.

Plaintiff asserts that Andrews and the other individual Defendants are liable for the tort of civil conspiracy based on their "peculiar power of coercion" and "force of numbers" which allowed them to "cause and cover up Jordan-Aparo's death, and delay justice for the Plaintiff." *See* Complaint, ¶¶ 63, 71 (citing *Margolin* and *Kee*).

The defendants in *Margolin* were a group of anesthesiologists who the plaintiff-surgeon alleged had collectively refused to provide anesthesiology services to the plaintiff, which services were essential for plaintiff to perform surgeries at the defendant hospital. *Margolin*, 342 So.2d at 1092.  The Court held that "in order to prove an independent tort for conspiracy upon this basis, it must

be shown that there was some 'peculiar power of coercion of the plaintiff possessed by the defendants in combination which any individual standing in like relation to the plaintiff could not have had.'" *Id*, at 1092-93.[2]  The court explained that while "any one of the group could decline to render services to the plaintiff for whatever reason he might have . . . when all of them declined to do so, the effect [was] to preclude the plaintiff from conducting surgery at the Morton Plant Hospital."  *Id*, at 1093.

In the instant action, Plaintiff does not allege that Jordan-Aparo's death could only have been caused by Defendants acting together (i.e., by the "force of numbers"), as opposed to any of them acting separately.  *See Santillana v. Florida State Court System*, 2010 WL 2714233 *14 (S.D. Fla. 2010) (plaintiff's claim of civil conspiracy in an employment case failed because [the court] could not "conclude from the alleged facts that [plaintiff] alone could not have been terminated by one of the alleged conspirators acting alone.").

In *Kee*, the plaintiff-insurance salesman used questionable methods to sell insurance and when the defendants (life insurance companies) learned of it, "acted in concert to destroy [plaintiff's] business by informing the state commissioner of

---

[2] The court opinion did not provide a cite for this quotation, but does reference a Massachusetts case cited in *Snipes v. West Flagler Kennel Club, Inc.*, 105 So.2d 164 (Fla.1958), which quotes *DesLauries v. Shea*, (300) Mass. (30), 13 N.E.2d 932, 935 (1938), the case in which the above-quoted portion is found.

9

[his] alleged wrongdoings thus causing him to be investigated." *Id*, 918 F.2d at 1542.  The Court rejected plaintiff's argument that his conspiracy claim "should fall within the 'force of numbers exception'", and held that defendants' "concerted action 'must be different from anything that could have been accomplished separately.'" *Id* (quoting *Charruca v. Miami Jai-Alai, Inc.*, *Churruca v. Miami Jai-Alai, Inc.*, 338 So.2d 228, 230 (*quashed in part on other grounds*, *Churraca v. Miami Jai-Alai, Inc.*, 353 So.2d 547 (Fla.1977)).  The Court in *Kee* further held that because each life insurance company "could independently inform the insurance commissioner of its suspicions [and take other actions] . . . these independent acts taken together did not amount to something larger than the sum." *Id*.

Courts have made it clear that the "force of numbers" exception is "intended to be a narrow one".  *Kee*, 818 F.2d at 1542 (citing *Liappas v. Augoustis,* 47 So.2d at 583); *see Scutieri v. Chambers*, 386 Fed.Appx. 951, 965 n. 5 (11th Cir.2010) (quoting *Liappas v. Augoustis*, *supra*) (this exception is "very narrow . . . where 'the mere force of numbers . . . or other exception circumstances, gives rise to an independent tort.").  A review of the cases shows that the "force of numbers" exception is limited to claims of *economic loss* suffered by the plaintiff and caused by the collective efforts of defendants.  The Court in *Kee* described this type of

conspiracy as an "economic boycott".  *Kee*, 918 F.2d at 1542 (citing *American Diversified Ins. Servs. v. Union Fidelity Life Ins. Co.*, 439 So.2d 904, 906 (Fla. 2d DCA 1983).

Plaintiff's claim of civil conspiracy under the "coercive force of numbers" exception fails on the grounds that: (1) the facts alleged do not support a conclusion or inference that the death of Jordan-Aparo could only have been caused by the collective action of Defendants—as opposed to any individual Defendant acting separately; (2) the exception is limited to claims of economic loss and does not apply to claims involving the killing or murder an individual; and (3) courts have consistently noted that this exception is a "narrow" one, and Plaintiff's claim of civil conspiracy does not fall within this narrow exception.

Therefore, Plaintiff's claim of civil conspiracy in Count II under the "coercive force of numbers" exception fails as a matter of law, and Andrews' motion to dismiss should be granted on this ground alone.

### D.  PLAINTIFF'S CLAIM OF A CONSPIRACY TO VIOLATE 42 U.S.C. § 1983 AGAINST ANDREWS IN COUNT IV FAILS AS A MATTER OF LAW

Plaintiff claims that Andrews and the other individual Defendants conspired to violate § 1983 through the "deprivation and interference with the Plaintiff's right of court access by state agents who intentionally concealed the true facts

11

about the crime committed against Randall Jordan-Aparo to deny the Plaintiff her right access to the courts, in violation of the First Amendment, the Article IV Privileges and Immunities Clause, the Fifth Amendment, the Fourteenth Amendment, and Article I, § 21, of the Florida Constitution." *See* Complaint, ¶ 85.

This claim is also barred under the intracorporate conspiracy doctrine applied in federal cases which have held "that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1263 (11th Cir.2010) (quoting *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir.2000) (*en banc*).   In *Grider*, involving a § 1983 conspiracy claim, the Court held that "[U]nder the doctrine, a corporation cannot conspire with its employees, *and its employees, when acting in the course and scope of their employment, cannot conspire among themselves.*"  *Id* (quoting *McAndrew*, *supra*) (emphasis added); *see Rehberg v. Paulk*, 611 F.3d 828, 854 (11th Cir.2010) (intracorporate conspiracy doctrine barred a § 1983 conspiracy claim against police officers).  In *Dickerson v. Alachua County Commission*, 200 F.3d 761, 767 (11th Cir. 2000), the Court held that "[I]t is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself."  *See Tillman*

*v. Orange County, Fla.*, 519 Fed.Appx. 632, 636 (11th Cir.2013) (affirming

dismissal of § 1983 claim based on the intra-corporate conspiracy doctrine).

The United States Supreme Court in its recent Opinion in *Ziglar v. Abbasi*,

___ U.S. ___ , 2017 WL 2621317 (June 19, 2017), addressed the intracorporate

conspiracy doctrine and held that "an agreement between or among agents of the

same legal entity, when the agents act in their official capacities, is not an unlawful

conspiracy." *Id*, at *25.  The Court explained that a

> Conspiracy requires an unlawful act—and in particular an
> agreement to do an unlawful act—between or among two or
> more separate persons.  When two agents of the same legal
> entity make an agreement in the course of their official duties,
> however, as a practical and legal matter their acts are attributed
> to their principal.  And it then follows that there has not been
> an agreement between two or more separate people.

*Id* (citing *Copperweld Corp v. Independence Tube Corp.*, 467 U.S. 752, 769-771

(1984)).

Plaintiff has alleged that Andrews and the other individual Defendants "were

not acting within the scope and course of their employment, but were acting under

color of state law."  *See* Complaint, ¶ 63.  However, the facts alleged by Plaintiff

belie this conclusory assertion as it applies to Andrews given that all the acts

allegedly taken by her in furtherance of an alleged conspiracy, could only have

been done in her official capacity as the Warden at Franklin CI.  *See e.g.*, ¶¶ 27, 35,

38-40, and 48.   The Court in *Grider* addressed the meaning of acting "within the

scope and course of their employment" explaining that

> We recognize that one might reasonably believe that
> violating someone's constitutional rights is never a job-
> related function or within the scope of a police officer's
> employment. However, the question of whether a defend-
> ant acted within the scope of his employment is distinct
> from whether the defendant acted unconstitutionally. The
> scope-of-employment inquiry is whether the employee
> police officer was performing a function that, but for the
> alleged constitutional infirmity, was within the ambit of
> the officer's scope of authority (i.e., job-related duties) and
> in furtherance of the employer's business.

*Grider*, 618 F.3d at 1261.[3]   The Court in *Grider* borrowed from the analysis

applied in qualified immunity cases where courts "examine whether a public

official's acts fall within his 'scope of authority' and thus his 'discretionary

functions,' not whether he was authorized to commit an illegal act."  *Id*, n. 33

(citing *O'Rourke v. Hayes,* 378 F.3d 1201, 1205–06 (11th Cir.2004); *Holloman ex

rel. Holloman v. Harland,* 370 F.3d 1252, 1265–66 (11th Cir.2004); *Maggio v.

Sipple,* 211 F.3d 1346, 1350–51 n. 2 (11th Cir.2000); *Harbert Int'l, Inc. v. James,*

157 F.3d 1271, 1282–83 (11th Cir.1998) (the Court "look[s] to the general nature

of the defendant's action, temporarily putting aside the fact that it may have been

committed for an unconstitutional purpose, in an unconstitutional manner, to an

---

[3] *See Kornagay v. Burt*, 2011 WL 839496, **19-20 (N.D. Fla. 2011) (inmate-
plaintiff's § 1983 conspiracy claim against DOC officers barred by the
intracorporate conspiracy).

unconstitutional extent, or under constitutionally inappropriate circumstances."); *see also Sims v. Metro. Dade Cnty.,* 972 F.2d 1230, 1236 (11th Cir.1992) (the Court rejected the assertion that "any time a government official violates clearly established law he acts beyond the scope of his discretionary authority" as "untenable" explaining that "the question of whether the defendants acted lawfully [is distinct from] the question of whether they acted within the scope of their discretion")).

The actions alleged against Andrews in furtherance of the conspiracy are that she: (1) directed FDC inspectors and FDLE investigators not to interview inmates; (2) found that the use of force/chemical agents on Jordan-Aparo was "in compliance with the rules governing the use of force"; (3) took action against a FDC employee who was the sister of an inmate at Franklin CI because she reported information provided by her inmate-brother regarding the death of Jordan-Aparo; and (4) ordered an infirmary log to be amended at a later date. All of these alleged actions by Andrews could have only been undertaken within her "scope of authority" (i.e., "job duties") as the Warden at Franklin CI, and "in furtherance" of her employer—FDC. *See Grider, supra* ("performing a function that, but for the alleged constitutional infirmity, was within the ambit of [her] scope of authority (i.e., job-related duties) and in furtherance of [her] employer's business.").

Thus, the facts alleged in Plaintiff's Complaint establish that Andrews was acting at all times relevant to this action in her official capacity as the Warden at Franklin CI, and no facts have alleged showing or suggesting otherwise.

Therefore, Plaintiff's claim in Count IV that Andrews conspired to violate § 1983 fails as a matter of law, and her motion to dismiss should be granted as to Count V on this ground alone.

WHEREFORE, Defendants Andrews' motion to dismiss Counts II and IV of Plaintiff's Second Amended Complaint should be granted for all the foregoing reasons.

### III.  FDC'S MOTION TO DISMISS COUNT V OF PLAINTIFF'S COMPLAINT ASSERTING A CLAIM UNDER TITLE II OF THE ADA AND THE RA

### A.    STATEMENT OF FACTS ALLEGED

Plaintiff alleges that Jordan-Aparo had the disease known as Osler-Weber-Rendu, and for this reason he "should be considered a disabled adult . . ." *See* Complaint, ¶ 10.[4]  Plaintiff claims that "this disease is defined under the [ADA and RA]" and that based on its effects on a person so afflicted and FDC's "knowledge of these conditions and symptoms that [Jordan-Aparo] suffered from … a disability."  *Id*, ¶ 12.   In Count V Plaintiff alleges that Jordan-Aparo was "abused

---

[4] FCD will assume for purposes of this motion only that Jordan-Aparo had a disability.

because of his disabilities by FDC's agents and employees at Franklin CI . . . when

he was gassed and then denied medical treatment for injuries suffered due to his

disability, which was known to [FDC] . . . [which] denial of medical treatment . . .

was in spite of [his] disability . . . in violation of the [ADA]."  Plaintiff further

alleges that Jordan-Aparo was "discriminated against . . . because of his disease

and excluding him from treatment programs by subjecting him to discrimination . .

. when it was obvious and apparent that he was suffering from his disability and

FDC's agents and employees continued to gas [him] and deny him medical

treatment it was obvious he needed at the time."  *Id*, ¶¶ 99-100.

   Plaintiff's Complaint alleges multiple dates when Jordan-Aparo was seen by

medical personnel at Franklin CI beginning with June 30, 2010 when he presented

with "skin telangiectasia's which are dark spots appearing on the fingertips and

face . . . [and] are symptoms of Osler-Weber-Rendu disease."  *Id*, ¶ 14.  On July

21, 2010 Jordan-Aparo was seen in the infirmary "with blood in his mouth" and

told medical personnel that "blood [was] coming from his penis", his pulse was

"71", and after the "nurse 'reviewed [his] entire medical record'" concluded that

"he was faking and 'manipulating'."  *Id*, at ¶ 15.   For this reason, the nurse

"threatened [Jordan-Aparo] and indicated to him that if she can show that there is a

'manipulation game' going on she will file a disciplinary report."  *Id*.  Jordan-

Aparo's request to remain in the infirmary was denied, and he was sent back to a confinement cell.  *Id*, ¶ 16.  Plaintiff does not allege that Jordan-Aparo was *denied* medical care on June 30, 2010, and on July 21, 2010 she alleges that he was given a "urine dipstick study which produced abnormal results . . .", that he was "placed on observation status in an infirmary cell, with a note that he was given a seven (7) day supply of Cipro . . ." [and] was "ultimately transferred back to confinement. *Id*, ¶ 17).  The only request made by Jordan-Aparo on July 21, 2010 that was denied was his request to remain in the infirmary.

Plaintiff's timeline then moves to September 15, 2010 when Jordan-Aparo reported to the infirmary "after declaring an inmate medical emergency based upon back and flank pain, with a temperature of 102.4 and sent back to his housing unit." *Id*, ¶ 18.  Two days later on September 17, 2010, Jordan-Aparo again reported to the infirmary after "declaring an inmate medical emergency with left flank pain and pulse of 94 bpm [but] could not give a urine specimen based upon pain." *Id*, ¶ 19.  During this visit to medical, Jordan-Aparo was "charted as being disrespectful to the 'captain' and nurse for demanding to be taken to the hospital and advising the 'captain' and Nurse Goodwin that he was going to sue them." *Id*. Jordan-Aparo was then "transferred to a discipline dorm cell unit for showing disrespect without a doctor's order." *Id*.  Later that same day Jordan-Aparo again

declared a medical emergency and was seen in the infirmary where his pulse was "charted as 120 bpm", and he was then returned by wheelchair to his confinement cell.  *Id*, ¶¶ 19-20.  Later on September 17, 2010, Jordan-Aparo's medical chart shows that he "had passed out and fallen off the toilet and begged to be taken to the infirmary and then to the hospital; and he was taken to the infirmary again and then returned to his cell.  *Id*, ¶ 20.  Plaintiff alleges that "[a]t least one of Jordan-Aparo's visits to the infirmary on September 17, 2010 was not contained in the infirmary log-in, which was later amended at the direction of Warden Atkins on September 20, 2010, the day after Randall Jordan-Aparo died."  *Id*.

The following day, September 18, 2010, "[Jordan-Aparo] again declared another inmate medical emergency from his confinement cell and was seen at the infirmary [via wheelchair] . . . ," and reiterated his request to be taken to the hospital.  *Id*, ¶ 21.[5]  On that date his pulse was "reported to be 110 bpm . .  [and] [a]n EKG was performed . . . by a nurse (L.P.N.) who admitted she lacked proper training to administer an EKG [sic] interpret the EKG results."  *Id*.  Plaintiff alleges that notwithstanding a nurse's belief that "it looked normal to her . . . the EKG produced a machine read report that [Jordan-Aparo] was tachycardic at the time of the EKG test."  *Id*.  Plaintiff next alleges that on September 18, 2010 at

_____

[5] In the three-day period from September 15-18, Jordan-Aparo declared a "medical emergency" four times and was seen by medical personnel on each occasion.

"00:20 . . . [t]he nurse called physician and 'orders given' . . . [with] [n]o evidence of orders in the chart." *Id*. At this visit a nurse also "attempted to place the IV catheter (lactated ringers) twice without success . . ." which the nurse blamed on "[Jordan-Aparo] as not being cooperative . . . [and] advised Dr. Choudhary that she could not place the IV catheter." *Id*, ¶ 23. Several hours later Jordan-Aparo was "[s]till complaining of breathing problems" but the doctor was not called. *Id*, ¶ 24. The medical chart for September 18, 2010 shows that Jordan-Aparo had "advised Nurse Jones (aka Franklin) and the Captain that they will be sued for refusing to take him to the hospital." *Id*, ¶ 25. The medical records also show that Jordan-Aparo was "short of breath" however the doctor was not contacted, and he was "apparently transferred to a disciplinary dorm cell for 'disrespecting a nurse'." *Id*, ¶ 25. Also on September 18, 2010, Nurse Franklin, "who Aparo threatened to sue for failing to take him to the hospital, performed a 'Risk Assessment for the Use of Chemical Restraint Agents and Electronic Immobilization Devices' which stated in sum and substance that Randall Jordan-Aparo had 'no known medical conditions that would be exacerbated by the use of chemical restraint agents.'" *Id*, ¶ 26.

The following day, September 19, 2010 at 11:35a, "Colonel Timothy Copeland authorized the use of CNS gas on [Jordan-Aparo] outside of and

inconsistent with FDC policy . . . [and that Andrews] . . . filed a false Incident

Report averring that the use of force against [Jordan-Aparo] was in compliance

with FDC regulations and policies." *Id*, ¶ 27. According to a report of the use of

chemical agents, Jordan-Aparo was sprayed three times and then taken to the

infirmary for evaluation. *Id*, ¶ 28. At approximately 13:15, or approximately 45

minutes after being sprayed with chemical agents, Dr. Choudhary, Nurse Franklin,

and Nurse Riley were "unable to obtain a blood pressure reading from Randall

Jordan-Aparo by the use of both manual and automatic blood pressure cuffs. *Id*, ¶

29. "It appears that Choudhary and Riley attempted to take another blood pressure

from Randall Jordan Aparo again [sic] could not produce a blood pressure." *Id*.

Plaintiff alleges that an ambulance was not called to transport Jordan-Aparo to a

hospital, and he was returned to his confinement cell. *Id*. Plaintiff further alleges

that the "Emergency Room Report is false to the extent that it indicates that

[Jordan-Aparo] walked to the infirmary." *Id*. According to the post use of force

medical report, Jordan-Aparo was "'wheezing' and that there was 'motling [sp]

noted upper right posterior back' . . . [which] mottling may have been from post

mortem lividity resulting from Aparo lying on a rubber shower matt hours after his

death. Upon information and belief this lividity pattern is reflected in autopsy

photos without explanation." *Id*.[6]

---

[6] Plaintiff does not explain how this "mottling" seen on Jordan-Aparo on examina-

Plaintiff alleges that Jordan-Aparo was seen in medical after being sprayed with chemical agents, and then returned to his cell but "was not checked on by medical staff or institution staff every fifteen (15) minutes as required by FDC policies and procedures." *Id*, ¶ 32.  At approximately 17:30 on September 19, 2010 during a cell check on Jordan-Aparo, Correctional Officer Foxworth saw Jordan-Aparo "lying on the floor of his cell face down at 17:30 . . . [and] Foxworth supposedly stated that he advised [Jordan-Aparo] to stand up but Aparo supposedly advised C.O. Foxworth with a 'thumbs up' that he was on the floor of his cell because it was "cooler down there". *Id*, ¶ 33.  At 18:11 Jordan-Aparo "was found dead in his cell by C.O. Foxworth during a routine 18:00 security check." *Id*, ¶ 34. Plaintiff alleges that Andrews "arrived at the prison and instructed that no inter-views be conducted of inmate witnesses including inmates James Hamrick, Joseph Avram and Steven Whitsett . . . [which] directive that no interviews of inmates be conducted was contrary to FDC policy." *Id*, ¶ 35.

---

tion after being sprayed with chemical agents at 13:15 (per the Emergency Room Report) on September 19, 2010, and when he was still alive, could have been caused by "post mortem lividity resulting from [him] lying on a rubber matt *hours after his death*." *Id* (emphasis added).

### B.  MEMORANDUM OF LAW AND ARGUMENT

### 1.  STANDARD FOR A  PRIMA FACIE CLAIM
### UNDER TITLE II OF THE ADA AND UNDER THE RA

To state a claim under Title II of the ADA, Plaintiff must allege: "(1) that he is a 'qualified individual with a disability;' (2) that he was '*excluded from participation in or [...] denied* the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.' " *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (quoting 42 U.S.C. § 12132) (emphasis added); *see Brown v. Deparlos*, 492 F.3d 211, 215 (3d Cir.2012).  The standard for claims under § 504 of the RA are the same as those for claims brought under the ADA.  *See Cash v. Smith*, 231 F.3d 1301, 1305 n. 2 (11th Cir.2000).  Title II of the ADA applies to state prisoners. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998).

### 2.  FDC'S RULE 12(b)(1) MOTION TO DISMISS THE
### PLAINTIFF/MINOR CHILD'S CLAIMS UNDER THE ADA AND RA
### AGAINST FDC FOR LACK STANDING

"In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove United Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004).  Plaintiff has not alleged facts establishing that either she or the Minor Child (or the Estate) have standing to bring a claim under Title II of the ADA or the RA.

23

Plaintiff's claims under the ADA and RA are based on allegations that Jordan-Aparo was denied medical treatment at Franklin CI, and seeks monetary damages for his death.  However, Plaintiff does not allege that the Minor Child was personally discriminated against, or that she was denied or excluded from any services or benefits provided for under the ADA and RA.  For these reasons, the Plaintiff/Minor Child lack standing to bring a claim against FDC under the ADA or the RA.

In *McCullum v. Orlando Regional Healthcare System, Inc.*, 768 F.3d 1135 (11th Cir.2014), the Court held that a "non-disabled individual has standing to bring suit under the ADA, *only if* she was personally discriminated against or denied some benefit because of her association with a disabled person."  *Id*, at 1142 (citing 42 U.S.C. section 12182(b)(1)(E))(other citation omitted) (emphasis added). The plaintiffs in *McCullum* were the parents of a disabled child who was treated at the hospitals of defendants, and they asserted claims on behalf of the child and also their own individual claims under the ADA and RA seeking compensatory damages and injunctive relief for disability discrimination.  *Id*, at 1140-41.  The Court noted that the RA, as with the ADA, applied to persons based on their "disability"--who for that reason alone--were "'excluded from the participation in, [or] . . . denied the benefits of, or be subjected to discrimination under any program

of activity' covered by . . . 29 U.S.C. section 794(a)." *Id*, at 1143. The Court held

that a "party" under the RA is "'aggrieved' within the meaning of section [29

U.S.C.] section 794(a)(2) only if she suffers an injury because she was subject to

one of those types of conduct.'" *Id*, at 1143 (citing *Roberts v. Sea-Land Servs.,

Inc.*, ___ U.S. ___ 132 S.Ct. 1350, 1357 (2012) (other citations omitted). The

Court in *McCullum* summarized its holding stating that "the threshold for

associational standing under both the RA and ADA is the same: non-disabled

persons have standing to seek relief under either statute *only* if they were

personally excluded, personally denied benefits, personally discriminated against

because of their association with a disabled person." *McCullum*, 768 F.3d at 1143

(emphasis added). *See Popovich v. Cuyahoga County Court of Common Pleas*,

150 Fed.Appx. 424, 426-428 (6th Cir.2005) (daughter of disabled father lacked

standing to bring a claim under the ADA or RA because she had "not been denied

access to or participation in any of the public services covered by Title II."); s*ee

also Herrera v. Hillsborough County School Board*, 2013 WL 12156525 *3 (M.D.

Fla. 2013) (parents did not have standing to bring claim for the deprivation of their

child's rights under Title II of the ADA or the Rehab Act where they themselves

suffered no violation of their rights).

Likewise here, Plaintiff is attempting to assert claims under the ADA and RA on behalf of the Minor Child based on her "association" with her biological father (Jordan-Aparo), who was allegedly denied medical treatment at Franklin CI. But as in *McCullum*, Plaintiff has not shown that the Minor Child herself was at any time "personally excluded, personally denied benefits, [or was] personally discriminated against" because of her association with Jordan-Aparo.

Therefore, the Plaintiff and Minor Child lack standing to bring an *associational* claim against FDC under Title II of the ADA or the RA, and her claim in Count V is due to be dismissed as a matter of law for this reason alone.

### 3. FDC'S RULE 12(b)(6) MOTION TO DISMISS PLAINTIFF'S ADA TITEL II AND RA CLAIMS SHOULD BE DISMISSED ON THE GROUND THAT JORDAN-APARO WAS NOT DENIED ACCESS TO MEDICAL SERVICES OR CARE

To state a claim under Title II of the ADA, Plaintiff must allege: "(1) that he is a 'qualified individual with a disability;' (2) that he was '*excluded from participation in or [...] denied* the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.' " *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (quoting 42 U.S.C. § 12132) (emphasis added); *see Brown v. Deparlos*, 492 F.3d 211, 215 (3d Cir.2012).  The standard for claims under § 504 of the RA are the same as those for claims brought under the ADA.  *See Cash v. Smith*, 231 F.3d

1301, 1305 n. 2 (11th Cir.2000).  Title II of the ADA applies to state prisoners. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998).

The relevant time period of this action for purposes of Plaintiff's ADA and RA claims runs from September 15-19, 2010.  As set forth above in detail, Jordan-Aparo was seen multiple times by medical personnel at Franklin CI multiple from September 15-19, 2010.  *See e.g.*, Complaint, ¶¶18-19.  Moreover, Plaintiff has not alleged that Jordan-Aparo was denied or excluded from access to medical services during these four days, or at any other time while he was incarcerated at Franklin CI.  The only requests by Jordan-Aparo that was not granted by medical personnel at Franklin CI were his requests he be taken to the hospital.

In *Owens v. Florida Dept. of Corrections*, 602 Fed.Appx. 475 (11th Cir. 2015), a case involving an inmate's claim under Title II of ADA, the Court found that the inmate's claim was "not plausible" because his complaint "did not demonstrate that [he] was excluded from or denied the benefits of FDC services because of his disability."  *Id*, at 478-79 (citing *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir.2007)); s*ee also Harris v. Prison Health Services*, ___ Fed.Appx. ___ , 2017 WL 3616341 *7 (11th Cir., August 23, 2017) (the inmate-plaintiff was given "some treatment . . . [and] while [he] wanted other treatment, such as x-rays, immediately . . . [this] alone does not establish deliberate

indifference.") (citing *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir.1985) (the fact that "an inmate desiring different modes of treatment' does 'not amount to deliberate indifference" where the inmate received medical care.'").

Plaintiff has also not alleged facts that plausibly show that FDC medical or security personnel were deliberately indifferent to Jordan-Aparo's serious medical needs—in fact, Plaintiff was seen by medical personnel numerous times from September 15-19, 2010, including four occasions when he declared medical emergencies. The only "denial" alleged was Jordan-Aparo's request to be taken to the hospital, which even if true, would not by itself, be a violation of Title II of the ADA. *See Ganstine v. Buss*, 2011 WL 6780956, *4 (N.D. Fla.2011) (other citations omitted); *see also Owens* at 479 (inmate-plaintiff's motion to file proposed amended complaint denied on the grounds that it showed he "had access to medical services and used those services . . .").  The same is true in the instant action where the facts alleged in Plaintiff's Complaint show that he was not denied access to medical care or services at Franklin CI.

Therefore, the facts alleged in Plaintiff's Complaint fail to support a claim the ADA and RA against FDC, and Count VI of his Complaint should be dismissed as a matter of law.

28

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 7.1(F) of the N.D. Fla. Loc. R., I certify that this

memorandum complies with the length limitation set forth in Rule 7.1(F) because

it contains 6,630 words, as counted by Microsoft Word, excluding the items that

may be excluded under Rule 7.1(F), the font used in this motion is Times New

Roman 14-pont font.

**DENNIS, JACKSON, MARTIN & FONTELA, P.A.**


By*: William Peter Martin*
Peter@djmf-law.com
FL Bar ID No. 0843024
1591 Summit Lake Drive, Suite 200
Tallahassee, FL 32317
(850) 422-3345
(850) 422-1325 (Fax)
Attorney for Defendants Andrews and FDC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been furnished via electronic mail on this 8th day of September, 2017, to:

Steven R. Andrews, Esquire
The Law Offices of Steven R. Andrews
822 North Monroe Street
Tallahassee, Florida 32303
steve@andrewslawoffice.com
nsheffield@andrewslawoffice.com
ryan@andrewslawoffice.com
tewis@andrewslawoffice.com
Attorney for Plaintiff

Jeff Howell, Esquire
Phipps & Howell
P.O. Box 1351
Tallahassee, Florida 32302
jeff@phipps-howell.com
margaret@phipps-howell.com
Attorney for Defendants Franklin, Goodwin, Greene, Housholder and Riley

Brian C. Keri, Esquire
3375-H Capital Circle NE, Suite 4
Tallahassee, Florida 32308
brianckeri@earthlink.net
Attorney for Defendants Austin, Burch, Brown, Gillikin, Hamm, Hampton, Martina and Spangler

**DENNIS, JACKSON, MARTIN & FONTELA, P.A.**

By*: William Peter Martin*
Peter@djmf-law.com
FL Bar ID No. 0843024
1591 Summit Lake Drive, Suite 200
Tallahassee, FL 32317
(850) 422-3345
(850) 422-1325 (Fax)
Attorney for Defendants Andrews and FDC

30