# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**AMANDA CIMILLO, as**
**Personal Representative of the**
**Estate of RANDALL JORDAN-APARO,**
**Deceased, and MINOR CHILD APARO,**
**The Natural Child of Randall Jordan-Aparo,**
**By and Through Her Mother and Natural Guardian**
**Amanda Cimillo,**

  Plaintiffs,

**vs.**          **CASE NO. 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN,**
**MITCHELL BROWN, PATRICK BURCH,**
**MOHAMMAD SALMAN CHOUDHARY, M.D.,**
**A. JONES (aka LUCY FRANKLIN), SENIOR L.P.N,**
**CHAD EVANS GILLIKIN,**
**AMY GOODWIN, SENIOR L.P.N,**
**MARTHA GREENE, SENIOR L.P.N,**
**JAMES I. HAMM, KEVIN ALLEN HAMPTON,**
**PAMELA T. HOUSHOLDER, SENIOR R.N.,**
**JOSHUA MARTINA, OLA MELISSA RILEY,**
**SENIOR L.P.N, CHRISTOPHER SPANGLER, and**
**the FLORIDA DEPARTMENT OF CORRECTIONS,**
**an Agency of the State of Florida**

  Defendants.

_____/

## THIRD AMENDED COMPLAINT

  The Plaintiffs, Estate of Randall Jordan-Aparo, Deceased, by and through its Personal

Representative, Amanda Cimillo, and Minor Child Aparo, natural minor child of the deceased

Randall Jordan-Aparo, wrongful death beneficiary and individually, hereby sue Rollin Austin,

Mitchell Brown, Patrick Burch, Mohammad Salman Choudhary, M.D., A. Jones (aka Lucy

Franklin). Senior L.P.N., Chad Evans Gillikin, L.P.N, Amy Goodwin, Senior L.P.N, Martha

Greene, Senior L.P.N, James I. Hamm, Kevin Allen Hampton, Pamela T. Housholder, Senior R.N.,

A.R.N.P., Joshua Martina, Ola Melissa Riley, Senior L.P.N., Christopher Spangler, and the Florida

Department of Corrections, by and through their undersigned counsel and allege as follows:

### JURISDICTION AND VENUE

1.      Plaintiffs bring the following claims for: (1) direct violations of 42 U.S.C. § 1983

(the Eighth Amendment); (2) conspiracy to violate 42 U.S.C. § 1983; (3) Wrongful Death by

intentional murder (sections 782.04 and 95.11(10), Florida Statutes[1]); (4) Wrongful Death

Manslaughter (sections 782.04 and 95.11(10), Florida Statutes); and (5) the Pre-Death Pain and

Suffering of the Decedent Randall Jordan-Aparo, for which venue lies within the United States

District Court for the Northern District of the State of Florida (Tallahassee Division).

2.      Jurisdiction and venue are proper in the Northern District of Florida (Tallahassee

Division) in that the acts of misconduct occurred within the Northern District of Florida with such

acts causing or concealing the intentional death of the Randall Jordan-Aparo.

3.      This Court has jurisdiction over the claims asserted pursuant to Title 28 U.S.C. §

1331 and Title 28 U.S.C. § 1367.

4.      The applicable statute of limitations for all claims brought by the Plaintiffs is set

forth in section 95.11(10), Florida Statutes, which provides that the applicable statute of limitation

for claims brought under 42 U.S.C. § 1983 and section 768.16, Florida Statutes (the Florida

Wrongful Death Act) for intentional torts resulting in death is as described in sections 782. 04 and

782.07, Florida Statutes.  Section 95.11(10), Florida Statutes provides that claims brought by a

natural person for any intentional tort resulting in death by murder or the manslaughter of a

disabled adult may be commenced at any time.

---

[1] Section 95.11(10), Florida Statutes was enacted prior to the death of Randall Jordan-Aparo, and was in effect at the time of his death on September 19, 2010.

## THE PARTIES

### The Estate of Randall Jordan-Aparo and Minor Child Aparo

5.      Plaintiff, Amanda Cimillo, as Personal Representative of the Estate of Randall Jordan-Aparo, brings this action on behalf of the Decedent, Randall Jordan-Aparo (hereinafter "Aparo"), for violations of 42 U.S.C. § 1983, conspiracy to violate 42 U.S.C. § 1983, for the wrongful death of Aparo, pursuant to section 768.16, Florida Statutes and for the pre-death pain and suffering of Aparo. On February 23, 2010, Aparo recognized his paternity of Minor Child Aparo and recognized his responsibility for the support of Minor Child Aparo in CSE Case No.: 1193612489. Minor Child Aparo is a minor child and statutory survivor as defined by section 768.18(1), Florida Statutes.

6.      Plaintiff Minor Child Aparo, now age twelve (12), is the natural child of Amanda Cimillo and Randall Jordan-Aparo. Plaintiff Minor Child Aparo was born on February 8, 2004. Minor Child Aparo was six (6) years old at the time of her father, Aparo's, death.  Plaintiff Minor Child Aparo brings these constitutional claims, by and through her mother and natural guardian, Amanda Cimillo directly against the named Defendants[2] and should be considered sui juris for purposes of these claims as indicated below. The Plaintiffs have satisfied all administrative requirements to bring these claims or no administrative filings are required to maintain these claims.

---

[2] Minor Child Aparo brings her constitutional claims individually by and through her natural mother and natural guardian, Amanda Cimillo to the extent that there is confusion in the Eleventh Circuit as to what Plaintiff can recover in regards to Aparo's pain and suffering damages which occurred pre-death. The Florida Wrongful Death Statute provides that, with regards to Minor Child Aparo, Minor Child Aparo can recover pain and suffering damages from the date of her father's death forward.  The Florida Wrongful Death Statute does not provide, within its statutory scheme, for the recovery of Aparo's pre-death pain and suffering and by definition would not accrue to his estate in a wrongful death action under sections 786.16 et al., Florida Statutes. *See* Ryan C. Reese, *Student work, Rights Without Remedies; Why Limiting Damages Recoverable By The Decedent Renders The Florida Wrongful Death Act Inconsistent With 42 U.S.C. 1983*, 44 STETSON L. REV. 549 (2015).

7.     The Decedent Aparo was an orphan who was adopted with his brother and primarily resided in Pinellas and Hillsborough counties, Florida with his adopted father. The Decedent Aparo's natural parents committed joint suicide when Aparo was five years old.

8.     The Decedent Aparo had a criminal history of non-violent crimes, primarily possession of controlled substances (not with the intent to sell) and credit card fraud.

9.     On or about October 29, 2009, Decedent Aparo was remanded to the custody of the Florida Department of Corrections (hereinafter "FDOC"), after a plea to multiple counts of credit card fraud. The sentence imposed by a Circuit Court Judge in Pinellas County, Florida, was one year, seven months, 24 days (599 days) to be served at FDOC's Franklin Correctional Institution (hereinafter "FCI"). The Decedent Aparo was classified as a minimum security prisoner. With gain time, Aparo would have been required to serve approximately 509 days of that sentence at FCI. At the time of Decedent Aparo's murder/manslaughter, the Decedent was scheduled to be released approximately ninety (90) days after his death on September 19/20, 2010.  His release date at the time of his death was projected to be January 21, 2011. Other Defendant FDOC documents suggest that Aparo was to be released only two days after his murder/manslaughter.

10.     The Decedent Aparo suffered from a hereditary congenital blood disorder, known as Osler-Weber-Rendu disease. Osler-Weber-Rendu disease causes anemia, intermittent severe nose bleeds, shortness of breath and pulmonary complications making normal respirations difficult without the use of bronchial dilators. These pulmonary complications can result in low oxygen saturations. Persons suffering with Osler-Weber-Rendu disease may have a normal life expectancy with a median life expectancy of age 70.  However, this disease is serious, chronic, life threatening and substantially interferes with activities of daily living for persons suffering from such disease.

Thus, persons suffering from Osler-Weber-Rendu disease, including Aparo, should be considered a disabled adult for purposes of sections 825.101(3)[3], 782.07, and 95.11(10), Florida Statutes.

11.     Both at the time of the Aparo's commitment to FDOC and upon his death, the medical records in the possession of FDOC indicated repeatedly that Aparo suffered from Osler-Weber-Rendu disease, described as a "bleeding disorder".  In the past, Aparo had coughed up blood and lab studies conducted while at FDOC indicate that Aparo suffered from low oxygen saturations. On September 18, 2010, the day prior to his death, Aparo was suffering from severe shortness of breath and tachycardia (EKG-machine read) suggestive of a difficulty in breathing. Further, Aparo was suffering from severe back pain from at least September 15, 2010, up to and including the time of his death. Aparo repeatedly begged the nurses and correction officers at FCI to be admitted to the hospital from at least September 15, 2010, to the date and time immediately prior to his death.  *See infra*, Timeline of Events Leading to the Murder/Manslaughter of Aparo.

## TIMELINE OF EVENTS LEADING TO THE MURDER/MANSLAUGHTER OF APARO AND CRIMINAL ACTORS COMPLICIT IN THE DEATH AND COVER-UP OF APARO'S DEMISE

12.     **February 19, 2007**. It was well known within the FCI that Aparo suffered from Osler-Weber-Rendu disease. FDOC's medical records from the date of his confinement indicate Randall Jordan Aparo suffered from Osler-Weber-Rendu disease. This disease is a disability as defined under the Americans with Disabilities Act (hereinafter "ADA") and the Rehabilitation Act.[4] Osler-Weber-Rendu disease is a physiological condition affecting the respiratory system, musculoskeletal, digestive, hemic, skin, and endocrine. Aparo suffered from these symptoms.

---

[3] "'Disabled adult' means a person 18 years of age or older who suffers from a condition of physical or mental incapacitation due to a developmental disability, organic brain damage, or mental illness, or who has one or more physical or mental limitations that restrict the person's ability to perform the normal activities of daily living." § 825.101(3), Fla. Stat.
[4] *See* ADA, 42 U.S.C. § 12102(1), and Rehabilitation Act, 29 U.S.C. § 705(9).

FDOC had knowledge of these conditions and symptoms that Aparo suffered from as a result of his disability.

13.     **2009 incarceration**. When Aparo was incarcerated beginning on November 10, 2009, for a certain period of time he was placed at Jefferson Correctional Institution (hereinafter "JCI"). While at JCI, prison gangs tried to recruit Aparo to work with correctional officers to help sneak contraband, including cell phones, into JCI. These gangs told Aparo that they would hurt his friend if he did not help sneak the contraband into JCI. Aparo and his friend/co-informant went to the warden of JCI to inform him of the gang activity involving contraband and correctional officers and asked to be moved to a new prison. After Aparo and his co-informant provided the information, which led to the arrest of multiple individuals, they were both transferred out from JCI that same day. A MINS report was created by FDOC, which was accessible by anyone within FDOC, which suggested Aparo was an informant four months before his death. *See* Karen Rhew-Miller email dated June 24, 2014, attached hereto as **Exhibit A**.

14.     **June 30, 2010**. Aparo presented with skin telangiectasia's which are dark spots appearing on the fingertips and face which were noted in the medical records of FCI. (**Amy Goodwin, Senior L.P.N.**)[5] These dark spots are symptoms of Osler-Weber-Rendu disease. Employees of Defendant FDOC begin to show a bias towards Aparo and towards treating his disability when he presents to the medical unit with illnesses and injuries associated with Osler-Weber-Rendu disease and did not receive the treatment specific to alleviating these injuries which were associated with Osler-Weber-Rendu disease.

---

[5] The medical citations in this Amended Complaint are based in part upon the FDOC medical records as well as sworn statements of inmate witnesses who were in a position to observe Aparo on September 18th and 19th, 2010, from across the confinement block.

15.     **July 21, 2010**. **Time 10:30**. Aparo arrived at the infirmary at FCI after an inmate declared emergency. Aparo presented with blood in his mouth, urine and stated that there was blood coming from his penis.  His pulse was charted at 71 bpm which the medical records indicate was his baseline pulse.  The nurse "reviewed the entire medical record" of Aparo and came to the conclusion that he was faking and "manipulating".  The nurse threatened Aparo and indicated to him that if she can show that there is a "manipulation game" going on where he was complaining about symptoms associated with his disability, she will file a disciplinary report. Aparo requested to stay in the infirmary confinement area and the nurse replied "absolutely not". Aparo was then transferred back to a confinement cell. (**Amy Goodwin, Senior L.P.N.**). In fact, Aparo was stripped of thirty days gain time for this encounter. Employees of Defendant FDOC continue to show a bias towards Aparo and towards treating his disability when he presents to the medical unit with illnesses and injuries associated with Osler-Weber-Rendu disease, and he is accused of faking it to manipulate the system and docked gain time.

16.     **July 21, 2010. Time 10:30.** Aparo was given a urine dipstick study which produced abnormal results as follow:

        a.     Leukocytes;

        b.     Nitrates;

        c.     PH;

        d.     Blood.

17.     **July 21, 2010. Time 09:35 and 16:51.** Aparo was placed on observation status in an infirmary cell, with a note that he was given a seven (7) day supply of Cipro.  There is no clear indication in the medical records that he was actually provided Cipro. Aparo ultimately transferred

back to confinement. (**Pamela Householder, R.N.**); (**Order given by ARNP Lemon**). Cipro would not have treated his Osler-Weber-Rendu disease.

18.     **September 13 2010**: Defendant FDOC employee P. Lemon (ARNP) shows a bias against Randall Jordan-Aparo when she charts that Aparo was previously warned to quit picking his skin to cause bleeding of his body and fingers. This bias demonstrates a deliberate indifference to the serious medical needs of Aparo for medical services and the care and treatment of his Osler-Weber-Rendu disease.

19.     **September 15, 2010.** Aparo reported to the infirmary after declaring an inmate medical emergency based upon back and flank pain. With a temperature of 102.4, Aparo was sent back to his housing unit.  (**Pamela Housholder, Senior R.N.**). Falling does not cause a fever, and thus Defendant FDOC should have known that he had a serious infection, which was caused by his Osler-Weber-Rendu disease. Instead of specifically treating the disease in anyway, FDOC's medical staff merely ordered bedrest and Tylenol. Tylenol would only mask the fever and not treat Aparo's Osler-Weber-Rendu disease.

20.     **September 17, 2010. Time 14:15**. Aparo reported to the infirmary after declaring an inmate medical emergency with left flank pain and pulse of 94 bpm (mild tachycardia). He could not give a urine specimen based upon pain. Aparo was told to drink more water.  Aparo was charted as being disrespectful to the "captain" and nurse for demanding to be taken to the hospital and advising the "captain" and Nurse Goodwin that he was going to sue them. Aparo apparently was transferred to a discipline dorm cell unit for showing disrespect without a doctor's order. (**Amy Goodwin, Senior L.P.N.**)  This same entry was charted as a late entry on September 18, 2010. Ordering water in response to Aparo's declaration of a medical emergency is a wholly inadequate treatment for Aparo's Osler-Weber-Rendu disease on this date, especially based on his

continued drop in blood pressure, elevated pulse, and pain throughout his body and legs. No labs were taken, no x-rays were taken, and there was no referral to a doctor. The medical services provided to Aparo were objectively insufficient. This is a deliberately indifferent and reckless disregard for the treatment of Aparo's medical needs and disability. Had Defendant FDOC not shown a reckless disregard and deliberate indifference towards the serious medical needs of Aparo for the care and treatment of his Osler-Weber-Rendu disease, these symptoms would have clearly stood out as being associated with Osler-Weber-Rendu disease.

21.     **September 17, 2010.  Time 22:15.** Aparo reported to the infirmary after declaring another inmate medical emergency. Aparo's pulse was charted as 120 bpm. This pulse is clearly tachycardic, and two standard deviations above his baseline pulse observed previously in the infirmary.  He was transported back to medical infirmary via wheelchair. Correctional Officer Markeith Daniels (hereinafter "C.O. Daniels") transported Aparo by wheelchair to the infirmary at least twice late in the evening of September 17, 2010. C.O. Daniels was told by an inmate that Aparo was so sick that he had passed out and fallen off the toilet and begged to be taken to the infirmary and then to the hospital. C.O. Daniels, after reporting to his supervisor of Aparo falling off the toilet, again took Aparo to the infirmary, waited approximately 20 minutes and then took him back to his cell in the confinement unit. At least one of Aparo's visits to the infirmary on September 17th, 2010, was not recorded in the infirmary log-in, which was later amended at the direction of Warden Atkins on September 20, 2010, the day after Aparo died. C.O. Daniels was later fired on October 24, 2014 (for "insubordination") and has never been interviewed by investigators from FDOC, the Florida Department of Law Enforcement (hereinafter "FDLE"), or the Federal Bureau of Investigations (hereinafter "FBI") with regard to any Aparo investigation. (**Martha Greene, Senior L.P.N.**)

22.    **September 18, 2010. Time 00:10.** Aparo again declared another inmate medical emergency from his confinement cell and was seen at the infirmary. Aparo again requested that he go to the hospital. Aparo's condition was such that he was required to be taken by wheelchair to the infirmary. His pulse was reported to be 110 bpm. An EKG was performed on Aparo by a nurse (L.P.N.) who admitted she lacked proper training to administer an EKG interpret the EKG results. However, Greene advised that "it looked normal to her". In fact, the EKG produced a machine-read report that Aparo was tachycardic at the time of the EKG test. Tachycardia can result from a shortness of breath. (**Martha Greene, Senior L.P.N**).

23.    **September 18, 2010.  Time 00:20.** The nurse called a physician and "orders given". No evidence of orders[6] were in the chart.  (**Martha Greene, Senior L.P.N**)

24.    **September 18, 2010.  Time 00:30**. The nurse attempted to place the IV catheter (lactated ringers) twice without success. The nurse blamed the failure to place the IV catheter on Aparo not being cooperative. The nurse advised Dr. Choudhary that she could not place the IV catheter.  (**Martha Greene, Senior L.P.N.**)

25.    **September 18, 2010.  Time 02:20**. Aparo **"Still complaining of breathing problems"**.  Physician not called. (**Martha Greene, Senior L.P.N.**)

26.    **September 18, 2010.  Time 04:00**. (Charted as late entry.) Aparo advised Nurse Jones (aka Lucy Franklin) and the Captain that they will be sued for refusing to take him to the hospital. **Still short of breath**. Physician not called. Aparo apparently transferred to a disciplinary dorm cell for "disrespecting a nurse."[7] (**A. Jones aka Lucy Franklin, Senior L.P.N.**)

---

[6] This order referenced at 00:20 was most likely an order for the administration of an IV to Aparo containing lactated ringers.  Lactated ringers would normally be administered if dehydration or loss of electrolytes is suspected.  Further, it is not clear that any IV was ever attempted to be placed in Aparo as evidenced by the autopsy of the medical examiner which found no evidence of any treatments administered.
[7] There is a discrepancy in the various evidence as to whether Aparo threatened to sue Pamela Housholder on September 17, 2010 and again threatened to sue Nurse Jones aka Franklin on September 18, 2010, hours later.

27.     **September 18, 2010.  Time Unknown.**  The same nurse, Nurse Franklin, who Aparo threatened to sue for failing to take him to the hospital, performed a "Risk Assessment for the Use of Chemical Restraint Agents and Electronic Immobilization Devices" which stated in sum and substance that Aparo had "no known medical conditions that would be exacerbated by the use of chemical restraint agents." Clearly this assessment was false based upon Nurse Franklin's own charting on September 18, 2010.

28.     **September 19, 2010. Time 11:35**. Colonel Timothy Copeland authorized the use of CNS gas on Aparo outside of and inconsistent with FDOC policy.  Then, Diane Andrews, the Warden at FCI (hereinafter "Warden Andrews"), filed a false Incident Report averring that the use of force against Aparo was in compliance with FDOC regulations and policies.

29.     **September 19, 2010.  Time 11:35 to 12:35.** Sergeant James Hamm prepared a Report of Force Used indicating that beginning at 11:35 CNS gas was administered to Aparo three times and at 12:35 Aparo was taken to the infirmary for a Post Use of Force Physical.

30.     **September 19, 2010.  Time 13:15**. Dr. Mohammad Choudhary, Nurse A. Jones aka Lucy Franklin and Nurse Riley (approximately 45 minutes after the administration of CNS gas), Dr. Mohammad Choudhary charted in an Emergency Room Record after allegedly conducting the 13:15 Inmate/Post Use of Force Exam.  **The 13:15 Emergency Room Report stated that he (Choudhary) and Nurse Riley were unable to obtain a blood pressure reading from Aparo by the use of both manual and automatic blood pressure cuffs.  It appears that Choudhary and Riley attempted to take another blood pressure from Aparo again could not produce a blood pressure.**[8] Neither Choudhary nor Riley called an ambulance to transport Aparo to a hospital. Choudhary and Riley instructed Aparo to be sent back to his confinement cell.  The

---

[8] Choudhry and Riley apparently after failing to obtain a blood pressure at 13:15 and again at 13:25 simply returned to the infirmary.

Emergency Room Report is false to the extent that it indicates that Aparo walked to the infirmary. Lastly the Emergency Room Report indicates, that post use of force, Aparo was "wheezing" and that there was "motling [sp] noted upper right posterior back." This mottling may have been from post mortem lividity resulting from Aparo lying on a rubber shower mat for hours after his death. Upon information and belief, this lividity pattern is reflected in autopsy photos without explanation. Defendants Chouhary and Riley showed a deliberate indifference and reckless disregard towards the medical services provided to Aparo during this time period when, despite not being able to get his blood pressure on multiple occasions, and not calling an ambulance.

31. **September 18 and 19, 2010**. Certain inmate witnesses provided statements including sworn statements and interviews of events of September 18 and 19, 2010 (none of whom were interviewed by FDOC OIG Investigators until at least 2013, and some inmates were never interviewed at all). The summary of these statements were as follows:

    a. Aparo began to yell through his cell door in the lockdown unit of FCI that he was in pain and needed to go to the hospital. Aparo's yelling and desperate requests to go to the hospital started on September 18, 2010, and ended on September 19, 2010, when CNS gas was administered to him.

    b. Lieutenant Rollin Austin arrived at the cell of Aparo and advised Aparo, who was loudly requesting medical assistance, that "you're the son of a bitch I had a problem with in the chow hall, you got a slick-ass mouth and I got something for you." Upon information and belief, Lieutenant Austin had filed a disciplinary report naming Aparo and concerning an incident in the cafeteria several days prior to Austin's directing of Aparo's murder/manslaughter.

    c.      Sergeant James Hamm arrived at Aparo's cell with multiple canisters of CNS gas where Aparo was sprayed at least three separate times.  CNS gas was administered to Aparo in the presence of Lieutenant Austin, Patrick Burch, and others unknown to the Plaintiffs.

    d.      While CNS gas was being administered to Aparo, inmates could hear him screaming:

        "I can't take it."

        "I can't take the gas."

        "I need a nurse."

    e.      In response for Aparo's request for assistance, he was told by Lieutenant Austin and Sergeant Hamm to "F**k off."

    f.      After Aparo was gassed, he could not stand up; he was dragged to the shower with his toes scraping the floor[9] and laid on the shower floor complaining of chest pain and inability to breathe. While in the shower Aparo received injuries including skin abrasions and an injury to his chin.

32.    **September 19, 2010.**  Nurse Ola Melissa Riley began to make numerous false entries on the medical chart of Aparo which were inconsistent with Use of Force Reports. (**Ola Melissa Riley, Senior L.P.N.**)

33.    **September 19, 2010.  Time 13:15 – 17:30.** Aparo was not checked on by medical staff or institution staff every fifteen (15) minutes as required by FDOC policies and procedures.

34.    **September 19, 2010.   Time 17:30**. Correctional Officer George Foxworth (hereinafter "C.O. Foxworth") supposedly found Aparo lying on the floor of his cell face down at

---

[9] Aparo's autopsy indicates that there were abrasions on his toes.

17:30.  C.O. Foxworth supposedly stated that he advised Aparo to stand up but Aparo supposedly

advised C.O. Foxworth with a "thumbs up" that he was on the floor of his cell because it was

**"cooler down there."**

35.     **September 19, 2010.  Time 18:11**.  Aparo was found dead in his cell by C.O.

Foxworth during a routine 18:00 security check.  No resuscitation efforts were initiated.  C.O.

Foxworth supposedly stated that at 18:11 that Aparo was "blue" and that his arms were "up and

stiff" implying that rigor mortis had set in between 17:30 and 18:11, a period of 41 minutes.

Medical research indicates that rigor mortis normally sets in approximately three hours after the

death of an otherwise healthy person. If C.O. Foxworth in fact noted rigor mortis at 18:11 it was a

most likely a result of Aparo dying in the shower as indicated by rubber matt pattern of lividity

which upon information and belief was reflected in photos taken by investigators at approximately

23:00 the evening of September 19, 2010.  The FDOC Chronological Record of Health Care for

the dates in question indicated that Aparo made continual demands to be taken to a hospital because

of breathing problems in the days prior to his death.

36.     On the night of the death of Aparo, Warden Andrews, arrived at the prison and

instructed that no interviews be conducted of inmate witnesses including inmates James Hamrick,

Joseph Avram and Steven Whitsett.[10] Warden Andrews' statements were heard by various inmates

in the confinement unit where Aparo died. Warden Andrews' directive that no interviews of

inmates be conducted was contrary to FDOC policy. Not interviewing witnesses at the scene of a

---

[10] It's apparently the policy of FDOC that if an inmate is going to be administered CNS gas that the windows of
inmates be covered prior to the administration of CNS gas. On the day of Aparo's death, and prior to the administration
of the CNS gas, the windows of the inmates in the detention block were covered. However, there were not sufficient
window covers to fully block the view of inmates Avram, Whitsett and Hamrick.  Avram, Whitsett and Hamrick could
see Aparo both before and after the administration of CNS gas and could hear conversations between the corrections
officers and senior institution staff. Sworn statements were taken of inmates Whitsett (at Columbia Correctional
Institution on July 21, 2014); Avram (at Sumpter Correctional Institution on July 30, 2014), and Hamrick (at Sumpter
Correctional Institution on July 30, 2014) in connection with what they saw and heard on September 18th and 19th,
2010 at FCI concerning the death of Aparo.

death would obviously be in violation of FDLE policy, general orders and sound investigative techniques. Apparently FDOC, Office of Inspector General Investigators and FDLE agents at the scene meekly and oddly followed Warden Andrews's directives and conducted no interviews of inmates (ever).

37.    Inmate James Hamrick (hereinafter "Hamrick") testified under oath that he heard Sergeant Hamm go to Aparo's cell and told Aparo that he needed to "get his ass up and clean up his cell", "that there was nothing wrong with [Aparo] and if he did not comply they would "have to go another route." Hamrick testified that the first time any nurse came to Aparo's cell on September 19, 2010, it was to pronounce him dead. Hamrick testified that Lieutenant Austin came to Aparo's cell before CNS gas was administered to Aparo and said "if you don't get up and comply, I've got something for your ass." Hamrick testified that when Aparo was removed from his cell after being gassed at least three times, he could not walk to the shower and had to be dragged to the shower. Hamrick was transferred from FCI shortly after Aparo's death.

38.    Inmate Joseph Avram (hereinafter "Avram") testified under oath that he had heard Aparo ask for medical help numerous times on September 18, 2010. Avram testified that at one point, on September 18, 2010, after Aparo had repeatedly asked for medical assistance, a correctional officer had gone to Aparo's window and asked Aparo "…what's the matter? Did your boyfriend f**k you in the ass too hard?"[11] Avram testified that after the first administration of CNS gas to Aparo on September 19, 2010, Sergeant Joshua Martina told Aparo "to get off the f**king floor before he [Hamm] sticks his gas can down your throat." [12] Avram testified that after the third administration of CNS gas to Aparo, Avram heard Aparo say "I can't move. I can't get

---

[11] Aparo was a militant heterosexual.
[12] Upon information and belief the autopsy of the Office of the Medical Examiner noted "**acute** hemorrhage of posterior neck musculature." (emphasis added) Acute hemorrhages could be indicative of strangulation or a gas canister being rammed down the throat of Aparo.

up.  I need medical help".  Avram testified that either on September 18th or September 19th, 2010, Avram heard Lieutenant Austin say to Aparo, "You're the one with the slick-ass mouth.  I've got something for you."

39.     Avram, on the night of Aparo's death, phoned his sister Christina Bullins, a FDOC employee (hereinafter "Bullins"), on a recorded line and advised her that he had seen an inmate get killed.  Shortly after Avram spoke to her, Bullins began writing letters to several senior FDOC officials that her brother had witnessed a murder by guards and that he needed to be placed in protective custody.  Those letters were dated November 7, 2010, January 23, 2011, February 23, 2011, February 24, 2011 and March 2, 2011.   Additionally, Bullins called FDOC OIG inspectors on July 20, 2011 and September 26, 2011 concerning her fear that her brother would be retaliated against in connection with his status as a witness to the Aparo killing.  Bullins was ultimately disciplined by Warden Andrews for making these written inquiries.

40.     On October 4, 2010, Warden Andrews concludes "the application of force [against Aparo] appears to be in compliance with the rules governing the use of force." On October 7, 2010, the Office of Inspector General for FDOC approved Warden Andrews' report, exonerating all FDOC employees concerning the death of Aparo.  On May 3, 2011, the FDLE issued its report concluding that Aparo's death and his gassing were unrelated. On July 20, 2012, FDLE closed the Aparo investigation.

41.     In approximately February 2011, Warden Andrews caused an administrative complaint to be lodged internally at FDOC against Avram's sister (Christina Bullins) concerning her letters to FDOC senior officials and her brother's request for protective custody.  In retaliation for Avrams statements to his sister, Avram received multiple Disciplinary Reports filed at FCI in February of 2011.

42.     On March 4, 2011 Avrams sister (Bullins) filed with the Office of the Governor's Chief Inspector Melinda Miguel a whistle blower letter concerning the death of Aparo, and her brother, Joseph Avram's, fear of retaliation as a result of being a witness to Aparo's death. On June 7, 2011, Bullins' request for whistle blower status was denied.

43.     Inmate Steven Whitsett (hereinafter "Whitsett") testified under oath that he saw Aparo get gassed multiple times on September 19, 2010. Whitsett testified that he heard Aparo declare that he had a medical emergenc.y Whitsett testified that he heard Lieutenant Austin say to the correctional officers, who later administered CNS gas to Aparo, that "This is the son of a bitch I had problems with in the chow hall last week.  I got something for you, I got something for you." Whitsett testified that if a correctional officer indicates to an inmate that "I've got something for you", that you can expect that inmate to be administered CNS gas. Whitsett testified that Aparo was administered large canisters of CNS gas known within the institution as "red devils."  Whitsett testified that at least two full canisters of red devil were administered to Aparo.  Whitsett testified that shortly thereafter Aparo was dragged to the shower with the tips of his toes dragging on the concrete.  Whitsett testified that during the time after Aparo had been gassed that he saw no nurses or doctors go to Aparo's cell and assess him until a correctional officer delivering the evening meal discovered Aparo dead.

44.     Upon information and belief, the investigation concerning the death of Aparo was completed on or about October 7, 2010, and all FDOC employees were cleared of any wrong-doing.  No inmates were interviewed.[13]

---

[13] On November 20, 2012, a report was generated by the Bureau of State of Investigations under the letterhead of Florida Department of Corrections in connection with administrative investigations finding that:  Pamela Housholder, R.N. – failed to safeguard inmate Aparo; Amy Goodwin, L.P.N.- failed to safeguard inmate Aparo; Martha J. Green, L.P.N.- failed to safeguard inmate Aparo; Lucy Franklin, L.P.N. – failed to safeguard inmate Aparo; Ola Riley, L.P.N. – failed to safeguard inmate Aparo; Dr. Mohammad Choudhary, M.D. – failed to safeguard inmate Aparo; and Captain Mitchell Brown – failed to safeguard inmate Aparo.

45.     On September 13, 2013 the FBI and the FDLE apparently convened a federal grand jury to investigate the death of Aparo.  As of the date of the filing of this complaint, six years after Aparo's death, no criminal charges have ever been filed in connection with Aparo's death.

46.     On March 14, 2014, Aubrey Land, Investigator with the FDOC Office of the Inspector General, gave a 72-page statement to Melinda Miguel, the Chief Inspector General, concerning the death of Aparo and allegations of cover-up regarding prior investigations into Aparo's death. Four other inspectors with the FDOC Office of the Inspector General, John Ulm, James Padgett, Doug Glisson and David Clark, in the spring of 2014, gave statements to Miguel regarding the cover up of the prior investigations regarding the death of Aparo. Melinda Miguel denied Land, Ulm Padgett, Glisson, and Clark whistle blower protection.  Land, Ulm, Padgett, Glisson, and Clark have not been interviewed (as witnesses) by the FBI concerning the death of Aparo.

### MOTIVE FOR THE MURDER OF AND MOTIVE FOR THE FAILURE TO ACCOMMODATE APARO

47.     The Defendants had a motive for murder due to the known facts within FDOC, and specifically JCI and FCI, that Aparo was an informant against prison gangs and correctional officers at JCI. In other words, it was known at least at JCI and F CI that Aparo provided evidence of corrupt correctional officers at JCI, and was essentially a "snitch."

48.     On the night before his death, Aparo had been calling his co-informant's[14] mother on a monitored telephone line telling her that he kept trying to get put in lockdown because he was in fear for his life due to the guards at FCI knowing that he was an informant against correctional officers at JCI.

---

[14] The co-informant was sent to another prison.

## DEFENDANTS

49.     **Defendant Austin**, at all material times hereto, was a Lieutenant employed at FCI. Defendant Austin directly participated in the unlawful murder or manslaughter of Aparo by causing and directing the unauthorized and illegal use of CNS gas against Aparo on September 19, 2010, in violation of 42 U.S.C. § 1983. Further, Defendant Austin conspired with Defendant Brown, Defendant Burch, Defendant Choudhary, Defendant Franklin, Defendant Gillikin, Defendant Goodwin, Defendant Greene, Defendant Hamm, Defendant Hampton, Defendant Housholder, Defendant Martina, Defendant Riley, and Defendant Spangler to cause false Incident Reports, Use of Force Reports and provided false sworn statements concerning the death of Aparo. The purpose of the conspiracy, to which Defendant Austin was a party, was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo, in violation of the Eighth Amendment to the United States Constitution.

50.     **Defendant Burch**, at all material times hereto, was a Correctional Officer employed at FCI.  Defendant Burch directly participated in the unlawful murder or manslaughter of Aparo by causing and directing the unauthorized and illegal use of CNS gas against Aparo on September 19, 2010 in violation of 42 U.S.C. § 1983. Further, Defendant Burch conspired with Defendant Austin, Defendant Brown, Defendant Choudhary, Defendant Franklin, Defendant Gillikin, Defendant Goodwin, Defendant Greene, Defendant Hamm, Defendant Hampton, Defendant Housholder, Defendant Martina, Defendant Riley, and Defendant Spangler to cause false Incident Reports, Use of Force Reports and provided false sworn statements concerning the death of Aparo. The purpose of the conspiracy, to which Defendant Burch was a party, was to

formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo in violation of the Eighth Amendment to the United States Constitution.

51.     **Defendant Brown** at all material times hereto was a Captain employed at FCI. Defendant Brown set in motion the acts of murder and or manslaughter, which lead to the death of Aparo by causing Aparo to be placed in confinement directly from the infirmary without a medical directive or physicians order and with the knowledge that Aparo would be subject to an unwritten rule at FCI that an inmate who cursed at correctional staff would be subject to CNS gassing.   Further, Defendant Brown conspired with Defendant Austin, Defendant Burch, Defendant Choudhary, Defendant Franklin, Defendant Gillikin, Defendant Goodwin, Defendant Greene, Defendant Hamm, Defendant Hampton, Defendant Housholder, Defendant Martina, Defendant Riley, and Defendant Spangler to cause the preparation of false Incident Reports, Use of Force Reports and provided false sworn statements concerning the death of Aparo. The purpose of the conspiracy, to which Defendant Brown was a party, was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo in violation of the Eighth Amendment to the United States Constitution.

52.     **Defendant Choudhary** at all material times hereto was a Medical Doctor employed at FCI. Defendant Choudhary directly participated in the unlawful murder or manslaughter of Aparo by failing to provide medical care to Aparo after he had been gassed. Further, Defendant Choudhary failed to call an ambulance to the facility after he determined that

Aparo did not have a blood pressure, that medical staff could not place an IV and most likely that Aparo was dead at the time of his post use of force medical examination. Further, Defendant Choudhary caused the preparation of false medical records and directed the unauthorized and illegal use of CNS gas against Aparo on September 19, 2010, in violation of 42 U.S.C. § 1983, by failing to advise Defendant Austin that Aparo suffered from a physical condition causing shortness of breath and that Aparo had been noted to have been short of breath at least four times in the preceding 48 hours. Further, Defendant Choudhary conspired with Defendant Austin, Defendant Brown, Defendant Burch, Defendant Franklin, Defendant Gillikin, Defendant Goodwin, Defendant Greene, Defendant Hamm, Defendant Hampton, Defendant Housholder, Defendant Martina, Defendant Riley, and Defendant  Spangler to cause false Incident Reports, Use Of Force Reports and provided false sworn statements concerning the death of Aparo. The purpose of the conspiracy to which Defendant Choudhary was a party was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo in violation of the Eighth Amendment to the United States Constitution.

53.     **Defendant Franklin** at all material times hereto was a Nurse employed at FCI. Defendant Franklin directly participated in the unlawful murder or manslaughter of Aparo by causing and directing the unauthorized and illegal use of CNS gas against Aparo on September 19, 2010, in violation of 42 U.S.C. § 1983.  Defendant Franklin knew that Aparo was not in any physical condition on September 19, 2010, but falsely charted that Aparo could be subject to CNS gas after inquiry.  Defendant Franklin was aware of the unwritten rule that any inmate who cursed staff would be subject to being gassed.  Further, Defendant Franklin conspired with Defendant

Austin, Defendant Brown, Defendant Burch, Defendant Choudhary, Defendant Gillikin, Defendant Goodwin, Defendant Greene, Defendant Hamm, Defendant Hampton, Defendant Housholder, Defendant Martina, Defendant Riley, and Defendant Spangler to cause false Incident Reports, Use of Force Reports, provided false sworn statements and prepared false medical records concerning the death of Aparo. The purpose of the conspiracy to which Defendant Franklin was a party was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo in violation of the Eighth Amendment to the United States Constitution.

54.    **Defendant Gillikin** at all material times hereto was a Sergeant employed at FCI. Defendant Gillikin directly participated in the unlawful murder or manslaughter of Aparo by causing and directing the unauthorized and illegal use of CNS gas against Aparo on September 19, 2010 in violation of 42 U.S.C. 1983.  Defendant Gillikin was aware of the unwritten rule that any inmate who cursed staff would be subject to being gassed.  Further, Defendant Gillikin conspired with Defendant Austin, Defendant Brown, Defendant Burch, Defendant Choudhary, Defendant Franklin, Defendant Goodwin, Defendant Greene, Defendant Hamm, Defendant Hampton, Defendant Housholder, Defendant Martina, Defendant Riley, and Defendant Spangler to cause false Incident Reports, Use of Force Reports and provided false sworn statements concerning the death of Aparo. The purpose of the conspiracy, to which Defendant Gillikin was a party, was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo, in violation of the Eighth Amendment to the United States Constitution.

55.     **Defendant Goodwin** at all material times hereto was a Nurse employed at FCI. Defendant Goodwin directly participated in the unlawful murder or manslaughter of Aparo by causing and directing the unauthorized and illegal use of CNS gas against Aparo on September 19, 2010, in violation of 42 U.S.C. § 1983. Defendant Goodwin was aware of the unwritten rule that any inmate who cursed staff would be subject to being gassed. Further, Defendant Goodwin conspired with Defendant Austin, Defendant Brown, Defendant Burch, Defendant Choudhary, Defendant Franklin, Defendant Gillikin, Defendant Greene, Defendant Hamm, Defendant Hampton, Defendant Housholder, Defendant Martina, Defendant Riley, and Defendant Spangler to cause false Incident Reports, Use of Force Reports and provided false sworn statements concerning the death of Aparo. The purpose of the conspiracy, to which Defendant Goodwin was a party, was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo in violation of the Eighth Amendment to the United States Constitution.

56.     **Defendant Greene** at all material times hereto was a Nurse employed at FCI. Defendant Greene directly participated in the unlawful murder or manslaughter of Aparo by causing and directing the unauthorized and illegal use of CNS gas against Aparo on September 19, 2010, in violation of 42 U.S.C. § 1983. Defendant Greene was aware of the unwritten rule that any inmate who cursed staff would be subject to being gassed. Further, Defendant Greene conspired with Defendant Austin, Defendant Brown, Defendant Burch, Defendant Choudhary, Defendant Franklin, Defendant Gillikin, Defendant Goodwin, Defendant Hamm, Defendant Hampton, Defendant Housholder, Defendant Martina, Defendant Riley, and Defendant Spangler to cause false medical records, Incident Reports, Use of Force Reports and provided false sworn statements

concerning the death of Aparo. The purpose of the conspiracy, to which Defendant Greene was a party, was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo in violation of the Eighth Amendment to the United States Constitution.

57.     **Defendant Hamm** at all material times hereto was a Sergeant employed at FCI. Defendant Hamm directly participated in the unlawful murder or manslaughter of Aparo by causing and directing the unauthorized and illegal use of CNS gas against Aparo on September 19, 2010, in violation of 42 U.S.C. § 1983.  Defendant Hamm was aware of the unwritten rule that any inmate who cursed staff would be subject to being gassed. Further, Defendant Hamm conspired with Defendant Austin, Defendant Brown, Defendant Burch, Defendant Choudhary, Defendant Franklin, Defendant Gillikin, Defendant Greene, Defendant Goodwin, Defendant Hampton, Defendant Housholder, Defendant Martina, Defendant Riley, and Defendant Spangler to cause false Incident Reports, Use of Force Reports and provided false sworn statements concerning the death of Aparo. The purpose of the conspiracy, to which Defendant Hamm was a party, was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo in violation of the Eighth Amendment to the United States Constitution.

58.     **Defendant Hampton** at all material times hereto was a Correctional Officer employed at FCI.  Defendant Hampton was aware of the unwritten rule that any inmate who cursed staff would be subject to being gassed. Further, Defendant Hampton conspired with Defendant Austin, Defendant Brown, Defendant Burch, Defendant Choudhary, Defendant Franklin,

Defendant Gillikin, Defendant Goodwin, Defendant Greene, Defendant Hamm, Defendant Housholder, Defendant Martina, Defendant Riley, and Defendant Spangler to cause false Incident Reports, Use of Force Reports and provided false sworn statements concerning the death of Aparo. The purpose of the conspiracy, to which Defendant Hampton was a party, was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo in violation of the Eighth Amendment to the United States Constitution.

59.    **Defendant Housholder** at all material times hereto was a Nurse employed at FCI. Defendant Housholder was aware of the unwritten rule that any inmate who cursed staff would be subject to being gassed. Defendant Housholder was aware that Aparo was suffering from shortness of breath as early as September 15, 2010. Further, Defendant Housholder conspired with Defendant Austin, Defendant Brown, Defendant Burch, Defendant Choudhary, Defendant Franklin, Defendant Gillikin, Defendant Goodwin, Defendant Greene, Defendant Hamm, Defendant Hampton, Defendant Martina, Defendant Riley, and Defendant Spangler to cause false Incident Reports, Use of Force Reports and provided false sworn statements concerning the death of Aparo. The purpose of the conspiracy, to which Defendant Martina was a party, was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo in violation of the Eighth Amendment to the United States Constitution.

60.    **Defendant Martina** at all material times hereto was a Sergeant employed at FCI. Defendant Martina directly participated in the unlawful murder or manslaughter of Aparo by

25

causing and directing the unauthorized and illegal use of CNS gas against Aparo on September 19, 2010, in violation of 42 U.S.C. § 1983.  Further Defendant Martina conspired with Defendant Austin, Defendant Brown, Defendant Burch, Defendant Choudhary, Defendant Gillikin, Defendant Goodwin, Defendant Greene, Defendant Hamm, Defendant Hampton, Defendant Housholder, Defendant Martina, Defendant Riley, and Defendant Spangler to cause false Incident Reports, Use of Force Reports and provided false sworn statements concerning the death of Aparo. The purpose of the conspiracy, to which Defendant Martina was a party, was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo in violation of the Eighth Amendment to the United States Constitution.

61.     **Defendant Riley** at all material times hereto was a Nurse employed at FCI. Defendant Riley directly participated in the unlawful murder or manslaughter of Aparo by causing and directing the unauthorized and illegal use of CNS gas against Aparo on September 19, 2010, in violation of 42 U.S.C. § 1983.  Defendant Riley caused the preparation of false medical records and directed the unauthorized and illegal use of CNS gas against Aparo on September 19, 2010, in violation of 42 U.S.C. § 1983, by failing to advise Defendant Austin that Aparo suffered from a physical condition causing shortness of breath and that Aparo had been noted to have been short of breath at least four times in the preceding 48 hours.  Defendant Riley was aware of the unwritten rule that any inmate who cursed staff would be subject to being gassed.  Further, Defendant Riley conspired with Defendant Austin, Defendant Brown, Defendant Burch, Defendant Choudhary, Defendant Franklin, Defendant Gillikin, Defendant Goodwin, Defendant Greene, Defendant Hamm, Defendant Hampton, Defendant Housholder, Defendant Martina, and Defendant  Spangler

26

to cause false medical records, Incident Reports, Use of Force Reports to be prepared and provided false sworn statements concerning the death of Aparo. The purpose of the conspiracy, to which Defendant Riley was a party, was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo in violation of the Eighth Amendment to the United States Constitution.

62.     **Defendant Spangler** at all material times hereto was a Correctional Officer employed at FCI. Defendant Spangler directly participated in the unlawful murder or manslaughter of Aparo by causing and directing the unauthorized and illegal use of CNS gas against Aparo on September 19, 2010, in violation of 42 U.S.C. § 1983. Defendant Spangler was aware of the unwritten rule that any inmate who cursed staff would be subject to being gassed. Further, Defendant Spangler conspired with Defendant Austin, Defendant Brown, Defendant Burch, Defendant Choudhary, Defendant Franklin, Defendant Gillikin, Defendant Goodwin, Defendant Greene, Defendant Hamm, Defendant Hampton, Defendant Housholder, Defendant Martina, and Defendant Riley to cause false Incident Reports, Use of Force Reports and provided false sworn statements concerning the death of Aparo. The purpose of the conspiracy, to which Defendant Spangler was a party, was to formulate and execute a plot, plan or agreement to conceal the murder and or manslaughter of Aparo from FDLE investigators and investigators from the FDOC Office of Inspector General and to conceal that the conspirators acted in a manner which failed to safeguard the safety of Aparo in violation of the Eighth Amendment to the United States Constitution.

63.     **Defendant Florida Department of Corrections (FDOC)**. FDOC is an agency of the State of Florida whose headquarters is in Tallahassee, Florida. At all material times hereto, the individual Defendants described above were employees of FDOC and at the relevant times described in this complaint, were not acting within the scope and course of their employment, but were acting under color of state law. FDOC has approximately 20,000 employees and is an agency under the purview of the Executive Office of the Governor. As co-conspirators, FDOC and the individual Defendants, enjoyed peculiar power of coercion prior to and after the death of Aparo because of the force of numbers and other exceptional circumstances,[15] and such power of coercion caused constitutional deprivations, cause and cover up Aparo's death, and delay justice for the Plaintiff. All conditions precedent have been met as to Defendant FDOC in the filing of this action.

64.     Defendant FDOC administers and operates the Florida Prison System, including FCI. Defendant FDOC receives federal financial assistance and is covered by the Rehabilitation Act. Defendant FDOC is a public entity within the meaning of Title II of the ADA.

## COUNT I
## WRONGFUL DEATH
### (Section 768.16 et al., Florida Statutes)

65.     The Plaintiff, The Estate of Randall Jordan-Aparo realleges paragraphs 1 through 64 herein.

66.     This action is brought pursuant to section 768.16 et al., Florida Statutes, by Plaintiff Estate of Aparo, in and on behalf of Minor Child Aparo, the statutory survivor of Decedent Aparo.

---

[15] The unusual circumstances include ability to delay, deter, undermine, and falsify the records, testimony, and investigation into the death of Aparo. In fact, these conspirators caused the investigation of an obvious murder to last for over 6 years in an effort, at least in part, to deprive the Plaintiff of access to the courts.

67.     Defendants Austin, Brown, Burch, Choudhary, Franklin, Gillikin, Goodwin, Greene, Hamm, Hampton, Housholder, Martina, Riley and Spangler caused the intentional death of the Decedent Aparo in violation of sections 768.16 et al.; 782.04, or 782.07, Florida Statutes.

68.     The acts of Defendants Austin, Brown, Burch, Choudhary, Franklin, Gillikin, Goodwin, Greene, Hamm, Hampton, Housholder, Martina, Riley, and Spangler were the proximate cause and direct cause of the death of Aparo.

69.     Plaintiff Estate of Aparo seeks all wrongful death damages allowable under section 768.21, Florida Statutes for itself and for the statutory survivor, Minor Child Aparo.

WHEREFORE, the Plaintiff, the Estate of Randall Jordan-Aparo, demands judgment against the Defendants listed herein this Count jointly and severally for compensatory damages, punitive damages, pain and suffering of Minor Child Aparo, lost wages, costs and such other relief as this court deems appropriate.

## COUNT II
### Common Law Civil Conspiracy pursuant to *Margolin v. Morton F. Plant Hosp. Ass'n, Inc.*, 342 So. 2d 1090 (Fla. 2d DCA 1977) see also *Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1542 (11th Cir. 1990).

70.     The Plaintiff, The Estate of Randall Jordan Aparo, realleges paragraphs 1 through 64 herein.

71.     Defendants Austin, Brown, Burch, Choudhary, Franklin, Gillikin, Goodwin, Greene, Hamm, Hampton, Housholder, Martina, Riley, and Spangler, each acting outside the scope of their employment, acted as conspirators to cause and then conceal the death of Aparo. Thus the underlying tort, which formed the purpose of a conspiracy, is murder or manslaughter.

72.     Alternatively, the Defendants are liable for the tort of civil conspiracy, standing alone, based upon *Margolin v. Morton F. Plant Hosp. Ass'n, Inc.*, 342 So. 2d 1090 (Fla. 2d DCA

1977) and *Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1542 (11th Cir. 1990)[16] based upon the reason of the coercive force of numbers and the exceptional circumstances surrounding the facts of this case which have led to the instant cause of action.

73.     The term of the conspiracy commenced immediately prior to the death of Aparo and ended at such time as there was a determination in 2016 that there would be no criminal charges filed over his death.

74.     The conspiracy between the Defendants was a conspiracy to do an unlawful act by unlawful means.

75.     Each Defendant engaged in overt acts in furtherance of the conspiracy as described herein above.

76.     The damage to the Plaintiff is a violation of her constitutional protections under the First Amendment, the Article IV Privileges and Immunities Clause, the Fifth Amendment, the Fourteenth Amendment under the U.S. Constitution, and Article I, Section 21, of the Florida Constitution.

77.     The damage to Aparo, as a result of the conspiracy, was his death or murder.

WHEREFORE, the Plaintiff, the Estate of Randall Jordan Aparo, demands judgment against the Defendants listed herein this Count for compensatory damages, punitive damages, pre-death pain and suffering of Aparo, attorneys' fees, costs and such other relief as this court deems appropriate.

**COUNT III**
**VIOLATION OF 42 U.S.C. § 1983**
**(Eighth Amendment Claim)**

---

[16] These cases are essentially anti-trust cases, but also can be applied to other factual situations where coercive conduct and exceptional circumstances involving numerous actors and the largest state agency in Florida.

78.     The Estate of Randall Jordan-Aparo and his daughter, Minor Child Aparo bring this claim for the violation of 42 U.S.C. § 1983. The Plaintiffs, The Estate of Randall Jordan-Aparo and Minor Child Aparo, reallege paragraphs 1 through 64 herein.

79.     Defendants Austin, Brown, Burch, Choudhary, Franklin, Gillikin, Goodwin, Greene, Franklin, Hamm, Hampton, Martina, Mitchel, Riley, and Spangler are sued for violation of 42 USC § 1983 (Eighth Amendment Claim) in their individual capacities.

80.     At all material times hereto the Defendants named in paragraph 79 above acted under color of state law and intentionally deprived Aparo of his rights under the United States Constitution.

81.     Specifically, the Plaintiffs allege that the Defendants named in paragraph 78 above, while working in a correctional facility owned and operated by the State of Florida, intentionally violated Aparo's right as a prisoner to be free from cruel and unusual punishment and to be free from the use of excessive force and to receive appropriate medical care while being detained as a prisoner.

82.     The force used by the Defendants or caused to be used by the Defendants named in Paragraph 79 above was excessive.  The Defendants acted under the color of state law in the acts committed or caused to be committed by said Defendants caused the Plaintiff injuries.

WHEREFORE, the Plaintiff, the Estate of Randall Jordan-Aparo, demands judgment against the Defendants listed herein this Count for compensatory damages, punitive damages, pre and post death pain and suffering of Aparo, the post death pain and suffering of Minor Child Aparo, attorney's fees, costs and such other relief as this court deems appropriate.

## COUNT IV
## CONSPIRACY TO VIOLATE 42 U.S.C. § 1983

83.     The Plaintiff, The Estate of Randall Jordan Aparo, realleges paragraphs 1 through 64 herein.

84.     Defendants Austin, Brown, Burch, Choudhary, Franklin, Gillikin, Goodwin, Greene, Hamm, Hampton, Household, Martina, Riley, and Spangler, are sued in their individual capacities.

85.     The Defendants listed in paragraph 84 above engaged in a conspiracy involving state action.

86.     The conspiracy involved a deprivation of civil rights and the acts of the Defendants alleged above were done in furtherance of such conspiracy. The conspiracy involved the deprivation and interference with the Plaintiff's right of court access by state agents who intentionally concealed the true facts about the crime committed against Aparo to deny the Plaintiff her right access to the courts, in violation of the First Amendment, the Article IV Privileges and Immunities Clause, the Fifth Amendment, the Fourteenth Amendment, and Article I, Section 21, of the Florida Constitution.

87.     Aparo in fact and in law was a subject of an actual violation of his rights protected by 42 U.S.C. § 1983 to the extent such that the actions of the conspirators were undertaken to conceal violations of the Eighth Amendment to the United States Constitution.

88.     The Defendants listed in paragraph 84 above acted in combination to do a criminal act.  The agreement among the Defendant conspirators was in furtherance of the conspiracy. These acts by the Defendant conspirators was in furtherance of the conspiracy.

89.     The time period of the conspiracy alleged herein runs from at least June 1, 2010,[17] to 2016 when it was determined that no criminal charges would be brought. The object of the

---

[17] At or about the time that Randall Jordan-Aparo was known to have been an informant against correctional officers at Jefferson CI.

conspiracy was to conceal the means and methods of the death of Aparo and the constitutional violations alleged above.

WHEREFORE, the Plaintiff, the Estate of Randall Jordan Aparo, demands judgment against the Defendants listed above in paragraph 84 for compensatory damages, punitive damages, pre and post death pain and suffering of Randall Jordan Aparo, attorney's fees, costs and such other relief as this court deems appropriate.

### COUNT V
### Violations of Title II of the Americans with Disabilities Act and the Rehabilitation Act by Defendant FDOC
**(*Pled in the Alternative*)**

90. The Plaintiff, The Estate of Randall Jordan Aparo, realleges paragraphs 1 through 64 above, except to the extent that, for the purposes of this Count, the Plaintiff Estate pleads in the alternative and alleges that at all material times hereto, Defendant FDOC's agents and employees were operating within the scope of their employment.

91. Count Five is a claim for disability discrimination against Defendant FDOC and, pursuant to 42 U.S.C. § 1983, for violating Title II of the Americans with Disabilities Act (ADA) (public entities). Title II of the ADA prohibits disability-based discrimination by any public entity. *See* 42 U.S.C. §§ 12131-12132; 28 C.F.R. § 39.130; and 28 C.F.R. §35.130.

92. Section 504 of the Rehabilitation Act prohibits discrimination against an individual based on disability by any program or entity receiving federal funds. *See* 29 U.S.C. §§ 794(a), (b)(1)(A), (b)(1)(B), and (b)(2)(B).

93. These disability anti-discrimination laws impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability.

94.    Aparo was disabled as defined in 42 U.S.C. § 12102 and 42 U.S.C. §§ 12131, 28 C.F.R. §§ 35.108, as he suffered a physical impairment that substantially limited one or more of his major life activities.

95.    Defendant FDOC is a program or entity that receives federal financial assistance.

96.    Defendant FDOC is a public entity as defined by Title II of the ADA.

97.    Defendant FDOC's prison, Franklin Correctional Institution, is a facility and its operation comprises a program of service for purposes of Title II of the ADA.

98.    Aparo was an individual qualified to participate in or receive the benefit of FDOC's services, programs, or activities.

99.    Aparo was abused because of his disabilities by FDOC's agents and employees at FCI. Aparo was abused when he was gassed and then denied medical treatment for injuries he suffered due to his disability, which was known to Defendant FDOC and its agents and employees, and the abuse and gassing of Defendant FDOC and its agents and employees. Such abuse and denial of medical treatment by Defendant FDOC and its agents and employees was in spite of Aparo's disability. Such abuse constitutes discrimination against individuals based on their disability in violation of the Rehabilitation Act and Title II of the ADA.

100.    Defendant FDOC failed to provide any medical services to Aparo specifically for the care and treatment of his Osler-Weber-Rendu disease. Additionally, the extent any cursory treatment of Aparo occurred, for example, giving him Tylenol in the time leading up to his death, was so grossly incompetent and inadequate that it shocks the conscience and showed a deliberate indifference and reckless disregard for Aparo's disability.

101.    Defendant FDOC showed a deliberate indifference towards Aparo and his medical needs when:

a.      FDOC failed to order or request *any* of Aparo's prior medical records, including his genetic testing, which would have provided the basic and minimum insight into his disease and treatment of the disease.

b.       FDOC medical staff failed to provide any management and treatment specific to this disease, despite obvious presentations of the illness.

c.      FDOC medical staff made no attempt to stop Aparo from being gassed on September 19, 2010, and made no attempt to advise security of the risks of gassing Aparo.

d.      FDOC failed to provide any specialized testing for Osler-Weber-Rendu disease, including to Aparo, despite knowing of his condition, and despite knowing of his symptoms.

e.      FDOC showed a bias towards treating his Osler-Weber-Rendu disease when they threatened him with disciplinary reports (and also took away his gain time) in response to his declaration of a medical emergency.

f.      FDOC failed to take Aparo to the medical unit after he declared an inmate medical emergency and instead subsequently gassed him to death for requesting medical services, despite being required to take him to the medical unit after declaring the inmate medical emergency.

g.      Despite Aparo's repeated bleeding episodes due to Osler-Weber-Rendu disease, he was never offered or given specific treatments or medication which would have alleviated such bleeding episodes.

h.      FDOC refused to refer Aparo for specialize when he was bleeding profusely from his fingers, a classic symptom if Osler-Weber-Rendu disease.

i.      His medical records show that instead of treating Aparo's serious medical condition, FDOC employees showed a bias against by suggesting that he was using his Osler-Weber-Rendu disease to manipulate the system.

j.      Although FDOC received Aparo's urinalysis on July 21, 2010, indicating, consistent with his complaints, that he was bleeding through his penis, his tests were abnormal due to positive microscopic blood and elevated nitrates, he was given a diagnosis of (1) Rule out UTI, (2) Bleeding disorder, and (3) manipulation of staff/medical for secondary gain. This is prima facie evidence of a bias and a deliberate indifference to the care and treatment of Aparo. Such a diagnosis demonstrates that Aparo was receiving no care and treatment specific to his Osler-Weber-Rendu disease.

k.      On September 15, 2010, despite declaring a medical emergency stating that he fell, he presented with a temperature of 102.4 degrees, and was only given Tylenol, a medication which would only mask the fever. Falling does not cause 102.4 degree fevers.

l.      On September 17, 2010, despite Aparo's blood pressure falling below his baseline and, his pulse being elevated to the level of tachycardia, he was not seen by a doctor, did not receive an x-ray, and no labs were taken. Had FDOC provided any care and treatment for Osler-Weber-Rendu disease, these symptoms on an index of suspension would have suggested that sepsis should have been ruled out by appropriate testing, which did not occur.

m.      The deliberate indifference FDOC employees showed towards Aparo and the for the treatment of his disease was especially apparent when FDOC medical staff permitted him to be gassed by the security staff when it was and should have been

objectively obvious and apparent that he needed emergency medical attention, including treatment specifically for his Osler-Weber-Rendu disease.

102.    Prior to his incarceration, Aparo had been routinely seen by a hematologist. However, while at FCI, Aparo was never referred to a hematologist, nor was it ever considered that he may need to be referred to a specialist who knew how or could treat his Osler-Weber-Rendu disease.

103.    Had Defendant FDOC and its employees not shown a deliberate indifference towards treating Aparo's Osler-Weber-Rendu disease, and provided him the care and treatment he needed, he would not have had an infection in his heart, which is attributed to Osler-Weber-Rendu disease.

104.    Aparo asked for a shot which is more likely than not what his former hematologist would most likely give him to treat his symptoms of Osler-Weber-Rendu disease. Despite this reasonable request to treat his Osler-Weber-Rendu disease on September 17, 2010, FDOC employees denied this treatment.

105.    On September 18, 2010, Aparo complained of shortness of breath and trouble breathing, symptoms directly associated with complications of Osler-Weber-Rendu disease, yet he was provided with no treatment of the disease or those symptoms.

106.    While the medical records indicate that Aparo received an IV of fluid on September 18, 2010, the autopsy of Aparo does not indicate any wounds consistent with an IV being placed, suggesting that the medical record is inaccurate, and that Aparo never received the fluid he was ordered to receive. In other words, Aparo failed to receive even the care and treatment he was ordered to receive which was not specific to treating his Osler-Weber-Rendu disease.

107.    The FDOC medical records of Aparo are completely devoid of any information concerning the care and treatment of his Osler-Weber-Rendu disease.

108.    Osler-Weber-Rendu disease is an uncommon condition that no primary care physician, LPN, or ARNP would be familiar with the care and treatment of Osler-Weber-Rendu and should have consulted and relied upon more expert opinions. This is especially true in the absence of any medical journals contained within his FDOC file which would have provided guidance to his care and treatment.

109.    FDOC's agents and employees discriminated and retaliated against Aparo by abusing him specifically because of his disease and excluding him from treatment programs by subjecting him to discrimination. FDOC's agents and employees discriminated and retaliated against Aparo by abusing him specifically when they denied him medical treatment when it was obvious and apparent that he was suffering from his disability and FDOC's agents and employees continued to gas Aparo and deny him the medical treatment it was obvious he needed at the time. It was objectively apparent that Aparo was in desperate need of emergency medical care, including care and treatment specific to Osler-Weber-Rendu disease. It was objectively apparent that gassing Aparo would not help the medical illnesses he was suffering from. Every FDOC agent and employee involved with the approval of the gassing and the gassing of Aparo acted with reckless disregard and deliberate indifference when they permitted Aparo to be gassed, failed to stop Aparo from being gassed, or in fact participated in the gassing. Further, FDOC's employees retaliated against Aparo for requesting medical care for his Osler-Weber-Rendu disease by gassing him to death. Aparo was discriminated and retaliated against when he declared an inmate medical emergency on September 19, 2010, due to the illnesses he was suffering from which were

associated with his disability, shortly before he was gassed, and in response, FDOC agents and employees gassed Aparo to death.

110.    The abuse of Aparo at FCI was carried out by Defendant FDOC's agents and employees at FCI while acting within the course and scope of their employment with FDOC. Defendant FDOC is liable for the action of its agents and employees when they committed the violations of the Rehabilitation Act and Title II of the ADA alleged herein.

111.    FDOC discriminated against Aparo by failing to provide a non-abusive, safe treatment environment at FCI generally, and within the inpatient unit, and, as a result, Aparo died.

112.    As a result of Defendant FDOC's deliberate indifference to ongoing discrimination against Aparo as a result of his disability, Aparo suffered a horrific and tragic death that could have and should have been avoided had Defendant FDOC complied with the Rehabilitation Act and Title II of the ADA.

WHEREFORE, on this Count V, as a result of the tragic and untimely death of Randall Jordan-Aparo, in violation of Title II of the ADA and the Rehabilitation Act., Plaintiff, the Estate of Randall Jordan-Aparo, has sustained the following damages, and therefore seeks the same from Defendant FDOC:

A.    The Estate of Randall Jordan-Aparo seeks the following damages:

a.    Loss of prospective net Estate accumulations

b.    Loss of earnings of Aparo from the date of his death, less lost support of his Survivors excluding contributions in-kind with interest; and

c.    Aparo's pain, suffering, emotion distress, and loss of enjoyment of life.

Plaintiff respectfully requests that this Court award Plaintiff Estate of Aparo the aforementioned damages, any and all other compensatory damages suffered by the Plaintiffs,

attorneys' fees, all prejudgment interest allowable under law, and such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all counts alleged above.

DATED this 5th day of October, 2017.

Respectfully submitted,

The Law Offices of
STEVEN R. ANDREWS, P.A.
822 North Monroe Street
Tallahassee, Florida 32303
T: (850) 681-6416 / F: 681-6984

*/s/ Ryan J. Andrews*
RYAN J. ANDREWS (FBN 0104703)
STEVEN R. ANDREWS (FBN 0263680)
BRIAN O. FINNERTY (FBN 0094647)
Service:  service@andrewslawoffice.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served by electronic transmission this 5th day of October, 2017, to:

W. Peter Martin, Esq.
Dennis, Jackson, Martin & Fontela, P.A.
1591 Summit Lake Drive, Suite 200
Tallahassee, Florida 32317
peter@djmf-law.com
jmauer@djmf-law.com
jennifer@djmf-law.com
*Atty for FDOC & Andrews*

Jeffrey S. Howell, Esq.
Phipps & Howell
201 South Monroe Street, 4th Floor (32301)
Post Office Box 1351
Tallahassee, Florida 32302
jeff@phipps-howell.com
Margaret@phipps-howell.com
*Atty for Goodwin, Housholder, Jones a/k/a Franklin, Riley & Greene*

Brian C. Keri, Esq.
The Law Offices of Brian C. Keri, PA
3375-H Capital Circle NW, Suite 4
Tallahassee FL 32308
brianckeri@earthlink.net
michellemsmith@earthlink.net
*Atty for Austin, Brown, Burch, Gillikin, Hamm, Hampton, Martina & Spangler*

Thomas Thompson, Esq.
Mallory R. Bennett, Esq.
Thompson, Crawford & Smiley
1300 Thomasville Road
Tallahassee, FL 32303
tom@tcslawfirm.net
mallory@tcslawfirm.net
tcslaw@aol.com
lauren@tcslawfirm.net
*Atty for Choudhary*

/s/ **_Ryan J. Andrews_**
RYAN J. ANDREWS

41

**Kelly, Dana**

| | |
|---|---|
| **From:** | Gustafson, Teresa S. <Teresa.Gustafson@ic.fbi.gov> |
| **Sent:** | Tuesday, June 24, 2014 1:35 PM |
| **To:** | Rhew-Miller, Karen (USAFLN); Devaney, Michael |
| **Cc:** | Canova, Chris (USAFLN) |
| **Subject:** | Re: Public Disclosure |

Hi karen,

I'll need to defer to Mike Devaney. He's the subject matter expert on this case.

Teresa

---

**From:** Rhew-Miller, Karen (USAFLN) <Karen.Rhew-Miller@usdoj.gov>
**To:** Mike Devaney (michaeldevaney@fdle.state.fl.us) (michaeldevaney@fdle.state.fl.us) <michaeldevaney@fdle.state.fl.us>; Gustafson, Teresa S.
**Cc:** Canova, Chris (USAFLN)
**Sent:** Tue Jun 24 13:26:31 2014
**Subject:** Public Disclosure

Mike and Teresa - I sent an email to DOC saying we didn't object to release of the case opening predicate, or the September 2010 reports of the use of force and discovery of Aparo's body. However, I had missed the last report on the attachment, which refers to Aparo's providing information leading to a drug arrest at Jefferson CI. See the excerpt below. DOC says the incident is "unrelated" and is already in the public, but this is information that would have been available in the DOC computer system for anyone to read and could have led to Aparo's being labeled as an informant. There are two aspects to this. First, it's information that four months before his death, Aparo provided information on a prison related drug case. And second, that this information was entered in a "Mins" report in the DOC system and was available to anyone looking up info on Aparo. Do we have any reason to believe that 1) Aparo's provision of information below could have provided a motive for any mistreatment or 2) that this information definitely DID NOT figure into any officials' treatment of Aparo?

DESCRIPTION OF INCIDENT:

ON 5-21-2010 AT APPROXIMATELY 9:00 A.M. WHILE SUPERVISING
SQUAD #15, INMATE JORDAN APARO, RANDALL DC#737895 HAD
INFORMEME THAT TWO DRUG DROPS WERE TO BE MADE TODAY. ONE WAS
TO BE MADE HERE AT THE INSTITUTION BY BIG JOE ROAD UNDER THE
THIRD TREE AT 9:00 A.M. THE SECOND DROP POINT WAS TO BE MADE
AT THE CITY DEPARTMENT YARD AT 12:00 P.M. THE MONTICELLO
POLICE DEPARTMENT WAS NOTIFIED AND SET UP SURVEILLANCE ON
THE DROP POINT AND AN ARREST WAS MADE.

*Karen Rhew-Miller*

Senior Litigation Counsel
Northern District of Florida
111 N. Adams St., 4th Floor
Tallahassee, Florida 32301
ph.  (850) 942-8430
fax  (850) 942-8424

