# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLASSEE DIVISION

**AMANDA CIMILLO, as Personal
Representative of the Estate of RANDALL
JORDAN-APARO, Deceased and MINOR
CHILD APARO, The Natural child of
Randall Jordan-Aparo By and Through her
Mother and Natural Guardian Amanda Cimillo,**

       Plaintiff,

v.                            **CASE NO.: 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN et al.,**

       Defendants.
_____/

## SECURITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, STATEMENT OF FACTS, AND MEMORANDUM OF LAW

       Defendants Austin, Brown, Burch, Gillikin, Hamm, Hampton, Martina, and

Spangler (the "Security Defendants"), through counsel, request this Court enter

judgment in their favor pursuant to Fed. R. Civ. P. 56(b), in that there are no

genuine issues of material fact and Defendants are entitled to judgment as a matter

of law as further set forth herein.  As grounds therefore, Defendants submit the

following:

## STATEMENT OF FACTS

Plaintiff asserts four claims against the Security Defendants in their individual capacities: (1) alleged violation of the Florida Wrongful Death Act; (2) common law civil conspiracy; (3) a 42 U.S.C. § 1983 claim alleging violation of the Eighth Amendment; and (4) a 42 U.S.C. § 1983 claim alleging conspiracy to deprive and interfere with Plaintiff's right to court access.  (*See*, Doc. 97, Counts I-IV).

Randall Jordan-Aparo ("Aparo") was remanded into the custody of the Florida Department of Corrections ("FDOC") on or about October 29, 2009.  (*Id.* at ¶ 9).  Aparo remained in the custody of FDOC until his death on September 19, 2010.  (*Id.*).  At the time of death, Aparo was housed at Franklin Correctional Institution ("FCI").  (*Id.*).  The Security Defendants all worked at FCI in September 2010.  (*See generally*, Ex. 3-10, the affidavits of the Security Defendants).

On September 17, 2010, Captain Brown was summoned to FCI's G Dorm, where Aparo was found lying on the floor in the bathroom making complaints.  (Ex. 4(A)).[1]  Medical staff was summoned and Aparo was brought to the infirmary

---

[1] Unless specifically stated otherwise, references to exhibits in this motion and memorandum refer to the exhibits the Security Defendants have filed in support of their summary judgment motion.  The "(A)" designation in this citation indicates the factual citation is located in the attachment to Exhibit 4 that is identified as exhibit A therein).

at 12:10 a.m. on September 18, 2010.  (*Id.*; Ex. 18).  Brown left Aparo with

medical staff in the infirmary.  (Ex. 4(A)).  Aparo remained in the infirmary for

approximately four hours.  (*Id.*; Ex. 18).  Aparo was advised by medical staff that

he would remain at FCI and not be transferred to an outside hospital.  (Ex. 18).

Aparo began cursing at staff in the infirmary.  (*Id.*).  Brown returned to the

infirmary, where Aparo began yelling and cursing at him.  (Ex. 4(A)).  Due to

Aparo's actions, he was placed in A Dorm, the confinement dormitory at FCI, at

4:37 a.m. on September 18, 2010.  (*Id.*; Ex. 14).  Aparo was given confinement

unit housing instructions and signed them, indicating he would comply with the

rules.  (Ex. 21).

On September 18, 2010, Aparo was counseled in A Dorm on several

occasions for his failure to comply with orders by FCI staff, including failure to

return his food tray, failure to make his bed, failure to comply with verbal orders,

and improperly yelling out of his cell.  (Ex. 14).

Aparo was counseled further on September 19, 2010.  (*Id.*).  FCI's second

shift for that day was from 8:00 a.m. to 4:00 p.m.  (Ex. 3, ¶ 3).  Sergeant Gillikin,

and Correctional Officers Martina and Spangler, were assigned to A dorm.  (Ex.

6(A), Ex. 9(A), Ex. 10(A)).  During this shift, Aparo refused to get dressed.  (Ex.

9(A)).  Another inmate was supposed to be assigned to Aparo's cell, but Aparo

refused wrist restraints and the cell door could not be opened to place the inmate.

(Ex. 10(A)).  Aparo also refused to make his bed, and his cell was messy, which was not compliant with the confinement rules.  (Ex. 6(A); Ex. 21).  Aparo refused to correct these issues and failed to comply with staff's orders.  (Ex. 6(A)).  Aparo was cursing at staff and being disorderly.  (*See, e.g.*, Ex. 9(A); Ex. 10(A); Ex. 14).

Lieutenant Austin, the designated Shift Supervisor on this date, was notified of Aparo's actions and refusal to cease his behavior.  (Ex. 3(A)).  Austin went to A Dorm, where he told Aparo chemical agents may be used if he did not cease his behavior and reviewed Aparo's records.  (*Id.*; Ex. 1, 10:56:52-11:00:55).  This included reviewing Aparo's DC4-650B form, signed by medical staff on September 18, 2010, which indicated Aparo had no known medical conditions that would be exacerbated by the use of chemical agents.  (Ex. 3(A); Ex. 19).  Austin also contacted medical staff to confirm chemical agents could be used on Aparo, which was confirmed.  (Ex. 3(A)).  Austin contacted the duty warden, who gave permission to use chemical agents.  (*Id.*).

Austin ordered Correctional Officer Burch to report to the A dorm for the purposes of operating a hand-held video camera.  (*Id.*; Ex. 5, ¶ 3; Ex. 1, 11:09:03).  Burch began taping and Austin gave a "lead-in" statement and final orders for Aparo to comply with orders, which he did.  (Ex. 3(A); Ex. 5, ¶ 4; Ex. 1, 11:15:39; Ex. 2).  Austin advised Aparo that if he became disorderly later, chemical agents

would be applied without another "lead-in" statement or final order.  (Ex. 7(A)).

Austin and Burch left the area.  (Ex. 3(A); Ex. 1, 11:17;08).

Austin was contacted a short time later due to Aparo's non-compliance with confinement rules.  (Ex. 3(A)).  Austin ordered Sergeant Hamm to A Dorm from his post in another dormitory to administer chemical agents to Aparo.  (Ex. 7, ¶ 3). Hamm reported to the A Dorm and administered OC spray in three one-second bursts and left the A Dorm.  (*Id.*; Ex. 1, 11:49:40).  Hamm was ordered to repeat the administration of OC spray a few minutes later, which he did and then promptly left the A Dorm again.  (Ex. 7, ¶ 3; Ex. 1, 11:56:28).  A few minutes later, Hamm was ordered to administer CS agent, which he did in three one-second bursts.  (Ex. 7, ¶ 3; Ex. 1, 12:02:31).  Hamm weighed the agent canisters after each application and prepared a use of force report.  (*Id.* at ¶ 3 and exhibit (A)).  During the use of force, Gillikin and Martina were ordered out of the confinement wing where Aparo was housed.  (Ex. 4, ¶ 4 and (A); Ex. 9, ¶ 5).  Spangler remained in the laundry room on the second floor of the wing.  (Ex. 5, ¶ 5).

Following the administration of chemical agents, Austin ordered Burch to report to A Dorm to operate the hand-held camera to record Aparo's removal from his cell and post use of force procedures.  (Ex. 3(A); Ex. 5, ¶ 4; Ex. 1, 12:08:04). Aparo was escorted to the shower by Martina and Spangler.  (Ex. 9, ¶ 5; Ex. 10, ¶ 6 and (A)).  He remained in the shower for approximately 11 minutes.  (Exhibit 2).

Martina and Spangler then escorted Aparo to the dormitory's examination room where a post use of force examination was performed by medical staff. (Exhibit 2, 12:30).[2]  During this time, orderlies decontaminated Aparo's cell. (Exhibit 1, 12:13:37-12:29:20).  Following the medical examination, Aparo was returned to his cell. (Ex. 9, ¶ 5).  The entire time in which Aparo is out of his cell is captured on the hand-held video recorded by Burch, which includes audio. (Exhibit 2).  At no time does Aparo declare a medical emergency on the hand-held video. (*Id.*).  Aparo voluntarily refused to provide a written statement regarding the use of force. (Ex. 17).

Security staff regularly checked on Aparo following the administration of chemical agents.  No abnormalities were noted with Aparo's breathing. (Ex. 9(A); Ex. 10(A)).  Medical staff returned to Aparo's cell to take his blood pressure. (Ex. 1, at 1:12:58-1:31:10 p.m.; Ex. 9(A)).  Aparo refused to be cuffed so that medical staff could enter the cell. (Ex. 9(A)).  Medical staff passed a self-administering cuff through the door flap, but Aparo returned it. (*Id.*).  Medical staff returned for a third time and interacted with Aparo. (Ex. 1, at 3:08:42-3:20:28 p.m.).  Aparo refused to sign a form that he was refusing health care services. (Ex. 9(A); Ex. 16).  Aparo also refused to cuff up so that Martina could provide a mattress for Aparo's cell. (Ex. 9(A)).

---

[2]  The time-stamps on the fixed-wing and hand-held cameras are not synchronized, so the time references in the citations are for the particular camera cited.

6

Sergeant Hampton reported to FCI to work the third shift, which covered

4:00 p.m. through 12:00 p.m.  (Ex. 8, ¶ 3).  Hampton tried to give Aparo a dinner

tray around 4:30 p.m., but Aparo refused it.  (Ex. 8(A)).  During this shift,

Correctional Officer George Foxworth (not a defendant in this case) had several

conversations with Aparo, the last being around 5:30 p.m.  (Ex. 13).  Later,

Hampton found Aparo non-responsive in his cell and contacted the captain on duty

and medical staff, who determined Aparo was dead.  (Ex. 8(A); Ex. 1, 6:11:01).

The Florida Department of Law Enforcement investigated Aparo's death.

FDLE took the statements of Brown and Hampton on September 20, and the

statements of Austin, Burch, Gillikin, Hamm, Martina, and Spangler on September

22, 2010.  (*See* Attachment A to Ex. 3-10).  Dr. Lisa Flannigan, the medical

examiner who conducted the autopsy on Aparo, concluded that Aparo died of

natural causes.  (Ex. 12, p. 7:11-17; p. 87:3-5).  Specifically, Flannigan found

Aparo's death was caused by bacterial abscesses in Aparo's heart and lungs.  (*Id.*

at p. 58:5-23).  The administration of chemical agents did not cause Aparo's death.

(*Id.* at p. 59:23-60:13).  The FDLE investigation was conducted by Special Agent

Michael DeVaney, who concluded that the Security Defendants did not cause

Aparo's death and otherwise did nothing wrong.  (Ex. 11, Vol. I, p. 51:17-22; p.

52:16-23; p. 85:14-16; Vol. II, p. 172:7-20; p. 216:15-217:9).

The administration of chemical agents on an inmate is governed by Rule 33-602.210, Florida Administrative Code. (Ex. 20). The use of force was reviewed by FCI's Warden, FCI's Institutional Inspector, and FDOC's Inspector General's Office. (Ex. 7(A)). The application of force was found to be in compliance with the rules governing use of force. (*Id.*).

At no point prior to Aparo's death did any of the Security Defendants have knowledge of the medical condition which caused his death. (*See generally*, Ex. 3-10). As security staff, these Defendants do not have access to inmates' medical records. (*See, e.g.*, Ex. 3, ¶ 6; Ex. 4, ¶ 7). The Security Defendants did have access to the medical form indicating chemical agents could be administered to Aparo on September 19, 2010. (Ex. 19). None of the Security Defendants were aware that Aparo had a diagnosis of Osler-Weber-Rendu. (*See generally*, Ex. 3-10).

None of the Security Defendants made an agreement, either with each other or any other individuals, to cause the death of Aparo or otherwise do anything unlawful in relation to Aparo or the ability to bring this claim. (*Id.*).

On September 2, 2014, Plaintiff's counsel sent correspondence to FDOC to place it on notice of this claim. (Ex. 22). Plaintiff's correspondence advised that suit would be filed on or before September, 2014. (*Id.* at p. 3). Plaintiff did not

file suit as noticed, rather, Plaintiff waited for six years after Aparo's death to file suit.  (Doc. 1).

<b><u>MEMORANDUM OF LAW</u></b>

The Security Defendants are entitled to summary judgment on Plaintiff's claims as follows:

<b><u>Federal Claims Against Security Defendants</u></b>

## I.   PLAINTIFF'S §1983 CLAIM ALLEGING EIGHTH AMENDMENT VIOLATION IS BARRED BY THE STATUTE OF LIMITATIONS

Summary judgment is warranted because Plaintiff failed to timely file this § 1983 claim within the applicable statute of limitations.  The acts on which Plaintiff bases the Eighth Amendment claim against the Security Defendants occurred on September 19, 2010, the same date on which inmate Aparo died.  Plaintiff filed the original complaint in this matter on September 19, 2016.  (Doc. 1).  This filing falls well outside the statutory period in which to bring this claim.

A four-year limitations period, imported from Florida law as the forum state, governs Plaintiff's Eighth Amendment claims under § 1983.  *Owens v. Okure*, 488 U.S. 235, 236 (1989); *Wallace v. Kato*, 549 U.S. 384, 387 (2007); *see, e.g.*, *Omar v. Lindsey*, 334 F.3d 1246, 1251 (11th Cir. 2003) (per curiam); *Walton v. Florida Department of Corrections*, 2018 WL 1393520 *3 (M.D. Fla. Mar. 20, 2018); *Bashimam v. City of Tallahassee*, 2011 WL 13232538 *2 (N.D. Fla. Mar. 11, 2011).  When the statute of limitations begins to run, however, is governed by

federal law.  *See, e.g.*, *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987); *McGinley v. Mauriello*, 682 Fed.Appx. 868, 871 (11th Cir. 2017).

In this case, Plaintiff's § 1983 claim, asserting a violation of inmate Aparo's Eighth Amendment rights, accrued on September 19, 2010.  *See*, *Baker v. City of Hollywood*, 391 Fed.Appx. 819, 821 (11th Cir. 2010) (dismissing claim as untimely where claim filed more than four years after use of force); *Ross v. Mickle*, 194 Fed.Appx. 742, 744 (11th Cir. 2006) (holding excessive force claim untimely and finding claim accrued on date force used, even though the plaintiff alleged the defendants' conspiracy prevented him from learning identity of officer that used force); *Walton v. Florida Department of Corrections*, 2018 WL 1393520 at *5 (finding complaint untimely where it was filed more than four years after use of force).  Here, the applicable four-year statute of limitations began to accrue on the date the force was used, September 19, 2010, and the accrual date is not affected by the fact that a personal representative has stepped into the shoes of the decedent; the accrual date remains as if inmate Aparo himself filed the action. *Walton v. Florida Department of Corrections*, 2018 WL 1393520 at *5-6.[3] Finally, there are no tolling provisions that would apply to the four-year statute of limitations for Plaintiff's excessive force/deliberate indifference claims.  *Walton v.*

---

[3]  This is analysis is the same whether the Eighth Amendment claim is for excessive force or deliberate indifference.  *See*, *Walton v. Florida Department of Corrections*, 2018 WL 1393520 at *5 (citing *Lawson v. Okmulgee Cty. Crim. Justice Auth.*, 2018 WL 1104553 *4-5 (10th Cir. Feb. 28, 2018)).

*Florida Department of Corrections*, 2018 WL 1393520 at *7-8 (citing *Davis v. Monahan*, 832 So. 2d 708, 710-11 (Fla. 2002) (holding Florida's delayed discovery rule is narrowly interpreted and only as to claims enumerated by the legislature)).

In this case, Plaintiff's claims accrued on September 19, 2010, and the applicable statute of limitations dictated this claim be filed no later than September 19, 2014. Plaintiff filed this claim two years after the expiration of the limitations period. The Security Defendants are entitled to summary judgment.[4]

## II.   SECURITY DEFENDANTS' ENTITLMENT TO QUALIFIED IMMUNITY ON PLAINTIFF'S EIGHTH AMENDMENT CLAIMS

"Qualified immunity" requires courts enter judgment in favor of government employees sued in their individual capacities unless the employees' conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986) *see also*, *Holt v. U.S. Atty. Gen.*, 486 Fed.Appx. 97, 99 (11th Cir 2012) (noting qualified immunity offers complete protection). "Qualified immunity is meant to ensure that government officials are not afraid to fulfill their job-related responsibilities." *Williams v.*

---

[4] Plaintiff's Third Amended Complaint seems to suggest there exists a § 1983 civil conspiracy claim personal to inmate Aparo. (Doc. 97, ¶ 87). If this is the case, the same statute of limitations defense and analysis in this section holds true for such claim. Any § 1983 conspiracy claim brought on Aparo's own behalf had to be brought by September 19, 2014, and is therefore, untimely.

*Consol. City of Jacksonville*, 381 F.3d 1298, 1307 (11th Cir. 2004) (citation omitted).

"In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). Government employees act within their discretionary authority where objective circumstances show the challenged actions occurred in the performance of the employees' duties "and within the scope of this authority." *Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007) (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1185 n. 17 (11th Cir. 1994)).

The Security Defendants are all governmental officials, and the actions of these individuals, as established in the record, clearly fall within the scope of discretionary authority given correctional officers employed by FDC. *See, e.g.*, *McNeeley v. Wilson*, 649 Fed.Appx. 717, 721 (11th Cir. 2016) (finding a primary job responsibility for prison officials is inmate discipline and control and such actions are "well within the scope of their discretionary authority"); *Howard v. Gee*, 538 Fed.Appx. 884, 887 (11th Cir. 2013) (finding supervising inmates, maintaining jail security, and filling out incident reports were within the discretionary authority of a government official working in a jail). There is no

dispute in this case that the Security Defendants were acting within their discretionary authority or within the scope of their office on the date in question.

Establishing that the alleged constitutional violation occurred while the public official was acting within the scope of discretionary authority, the burden shifts to the plaintiff to overcome the defense of qualified immunity. *Moran v. Cameron*, 362 Fed. Appx. 88, 92 (11th Cir. 2010) (citing *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)). "The applicability of qualified immunity is subject to a two-part test, which asks whether the officer's conduct amounted to a constitutional violation, and whether the right violated was clearly established at the time of the violation." *Blickley v. Ford*, 390 Fed. Appx. 890, 892 (11th Cir. 2010). If the plaintiff cannot prove a constitutional infringement, further inquiry concerning qualified immunity is not necessary by the court. *See*, *e.g.*, *Federov v. Board of Regents*, 194 F. Supp. 2d 1378, 1390 (S.D. Ga. 2002). If a reasonable jury could find a constitutional violation, the plaintiff must show the right was clearly established, at the time of violation, in light of preexisting law. *Id.*; *Blickley v. Ford*, 390 Fed. Appx. 890, 892 (11th Cir. 2010).[5] This burden is not satisfied by referencing abstract constitutional guarantees. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Where precedent makes the unlawfulness of

---

[5] The order of the inquiry is fluid, providing the reviewing court the flexibility to address the two issues in either order. *Blickley v. Ford*, 390 Fed. Appx. at 892*, Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 242 (2009)).

the officer's actions apparent, then the law is clearly established.  *McMillian v. Johnson*, 88 F.3d 877,881 n.6 (11th Cir. 1995).

Plaintiff's Third Amended Complaint alleges the Security Defendants violated Plaintiff's Eighth Amendment rights by using excessive force and by being deliberately indifferent to Plaintiff's medical needs.  (Plaintiff's Third Amended Complaint, ¶¶ 78-82).  Summary judgment, on the basis of qualified immunity, is warranted on Plaintiff's Eighth Amendment claim as follows:

### A.    Excessive Force Claim

The Eighth Amendment prohibits the use of cruel and unusual punishment against inmates and governs the use of force by prison officials.  *Campbell v. Sikes*, 169 F.3d 1353, 1362 (11th Cir. 1999) (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).  Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline. . . ."  *Skritch v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting *Whitley*, 475 U.S. at 320-21).  To establish an excessive force claim, an inmate must prove the force in question was applied "maliciously and sadistically for the very purpose of causing harm."  *Whitley*, 475 U.S. at 320-21.  The courts afford "a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a

disturbance." *Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam).

### 1. Defendants Brown, Burch, and Hampton were not involved in the use of force and are entitled to qualified immunity.

Defendants Brown, Burch, and Hampton are entitled to summary judgment on Plaintiff's excess use of force claim because these individuals were not involved in the use of force at issue, and the record shows their actions on the date in question simply did not amount to a constitutional violation of Plaintiff's rights.

Regarding Brown, he last observed Aparo on September 19, 2010, at approximately 9:00 a.m. (Ex. 4(A)). At the time, Aparo was lying on his mattress and looked at Brown through the cell door. No words were exchanged between them. (*Id.*). Brown was not involved in the use of force on Aparo later that day. He did not order the use of force, participate in it, nor was he present when force was used. (Ex. 4, ¶ 4).

Regarding Burch, on September 19, 2010, Burch was stationed in another separate dormitory from where Aparo was housed. Burch was asked by the officer-in-charge to report to A-dormitory for the purpose of operating a hand-held video recorder in relation to the potential use of force regarding Aparo. Burch initiated camera operation and recorded Lt. Austin's lead-in statement to the use of force on Aparo. (Ex. 2). Lt. Austin gave a final order to cease and desist Aparo's disorderly actions or chemical agents would be applied to gain compliance with the

order.  Aparo complied with the order.  Lt. Austin further advised Aparo that if he resumed his disorderly actions after Burch stopped videotaping and exited the dormitory, that the video-taping and lead-in order would not be repeated prior to the application of chemical agents.  Aparo complied and Burch ceased videotaping. Burch then left the dormitory.  After a period of time, Burch was recalled to A-dormitory to operate the video recorder *after* use of force was applied to Aparo. Burch recorded Aparo post use of force, which included Aparo's removal from his cell, escort to the shower, receipt of new clothing, escort to an examination room where Aparo received a post use of force physical, and escort back to the cell which was decontaminated by orderlies.  (Ex. 2).  Burch then ceased recording and Lt. Austin took possession of the video camera.

Regarding Hampton, on September 19, 2010, Hampton worked the 4:00 p.m. to midnight shift.  Hampton was not involved in the use of force incident, as he did not start his shift until approximately four hours after the use of force. Hampton obviously was not present for the use of force.  (Ex. 8, ¶¶ 4-5).

The following is undisputed: neither Brown, Burch, or Hampton ordered a use of force on Plaintiff, nor did they participate in the use of force.  None of these individuals were present in the confinement dormitory where Plaintiff was housed when the use of force was applied.  The fixed-wing video of the confinement

dormitory shows Brown's, Burch's, and Hampton's lack of participation, and in fact shows their absence when the use of force was applied to Plaintiff.

No reasonable jury could find Brown, Burch, or Hampton violated any constitutional rights of Plaintiff regarding use of force. *See, e.g.*, *Souter v. Edelen*, 2011 WL 7162886 *10 (N.D. Fla. Nov. 7, 2011) (finding qualified immunity warranted for prison official whose only role was operating video camera, and finding qualified immunity warranted for other prison officials who did not participate in use of force, witness it, or were in a position to intervene); *Askew v. Crosby*, 2017 WL 4391717 (N.D. Fla. Aug. 31, 2017) (granting summary judgment to prison official who was not present when use of force applied). This Court should find Brown, Burch, and Hampton are entitled to qualified immunity on the excessive force claim.

## 2. Hamm is entitled to qualified immunity.

Hamm was summoned to the A-dormitory, Wing 1 (where Aparo was housed), by the officer in charge, on three occasions on September 19, 2010, to administer chemical agents. Review of the fixed-wing video shows Hamm was in the A-dormitory/Wing 1 for approximately 53 seconds total and was at Plaintiff's cell door approximately 12 seconds of that time. Hamm observed Plaintiff sitting on his bunk. Hamm was aware that medical authorization was given to administer chemical agents to Plaintiff. Hamm had no other knowledge concerning Plaintiff's

medical condition.  Hamm had no personal knowledge, one way or the other, regarding Plaintiff's actions that led to the use of chemical agents.  Rather, Hamm was simply following the orders of the officer in charge to come to the A-dorm and administer chemical agents.  (Ex. 7, ¶ 3).  Hamm's application of the agents themselves, for example, the amount to be used on an inmate, were within FDOC policy.  Hamm applied the agents and then immediately left the dorm.  He was summoned back to A-dorm, on two more occasions, and ordered to repeat the application of chemical agents by a superior officer.  Again, Hamm simply entered the dormitory, applied the agents, and immediately left.

Hamm is entitled to qualified immunity on Plaintiff's excessive force claim because no reasonable jury could find, on the undisputed facts, that Hamm violated Plaintiff's constitutional rights when following the directive of the officer in charge, and not having knowledge, because he was not physically present, to suggest that the use of force ordered was anything other than constitutionally permitted.

**B.     Deliberate Indifference to an Inmate's Medical Needs Claim**

The Eighth Amendment can be violated if prison officials act with deliberate indifference to an inmate's serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A plaintiff must establish three elements to show a deliberate-indifference claim: (1) that the plaintiff had an objectively serious medical need;

(2) that the defendant acted with deliberate indifference to that need; and (3) that the deliberate indifference caused the plaintiff's injury.  *See, e.g.*, *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010).

To satisfy the first objective element, the medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007) (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (per curiam)).

To satisfy the second subjective element, the plaintiff is required to prove: (1) the defendant's subjective knowledge of a risk of serious harm; (2) the defendant's disregard of that risk; and (3) disregard by conduct that is more than gross negligence.  *Id.* at 1326-27.

To satisfy the third element, the plaintiff must prove the defendant had a causal connection to the harm alleged.  *Id.* at 1327.

> ### 1. All Security Defendants are entitled to summary judgment because Plaintiff cannot show deliberate indifference on the Defendants' part.

The Eleventh Circuit identified the applicable duty of care prison officials owe incarcerated individuals in *Nobles v. Corrections Corp. of America*, 327 Fed.Appx. 838, 840 (11th Cir. 2009).  Where a prisoner is sick or injured, officers "will seldom be required to do more than give such first aid as [they] reasonably

can, and take reasonable steps to turn the sick [person] over to a physician, or to those who will look after [the person] and see that medical assistance is obtained." *Id.* (quoting *Ferguson v. Perry*, 593 So. 2d 273, 277 n. 5 (Fla. 5th DCA 1992)).

In *Santana v. City of Hialeah*, 2009 WL 6635306 (S.D. Fla. Nov. 30 2009), the court utilized this duty of care in granting summary judgment to officers who were alleged to have failed to provide the decedent with necessary and prompt medical attention.  In *Santana*, officers had to use force when apprehending a suspect.  The officers thereafter turned the suspect over to medical providers for attention.  The suspect later died from acute toxicity unrelated to the use of force. *Id.* at *2-3.  The court granted summary judgment, holding no reasonable jury could find the officers failed to provide access to appropriate medical treatment. *Id.* at *5.  The court held:

> The record is clear and it is undisputed that the officer at the scene promptly turned Santana over to paramedics who examined him and did not indicate any need for urgent medical treatment.  While it may be true that the paramedics-like the medical staff in *Nobles*-failed to recognize Santana's life-threatening condition, this failure in no way implicates the reasonableness of the officers' actions, for they did exactly what was required of them; that is, they took reasonable steps to promptly turn Santana over to medical professionals and followed the medical professionals' recommendation. . . .  The law does not require otherwise, nor does it require officers to second-guess the judgment of medical professionals.  *See Sullivan v. Bornemann*, 384 So. 2d 372, 377 (7th Cir. 2004) (noting that law enforcement officers should not be placed in the difficult position of having to second-guess decisions made by medical professionals).

*Id.*

While the *Santana* case dealt with a claim under Florida's Wrongful Death Act, the analysis is instructive here, and compels a similar result. The facts in *Santana* and in this case are very similar: the officers used force and then turned the plaintiffs over to medical professionals for assessment. In *Santana*, the court granted summary judgment, concluding the plaintiff could not even establish negligence on the officer's part, when comparing the officer's acts with the duty required of them. In this case, Plaintiff has to show far more than negligence; Plaintiff must show the Security Defendants' conduct amounted to more than gross negligence, which Plaintiff cannot show. Prior to use of force, Austin contacted medical to make sure chemical agents could be applied to Aparo. After the use of force, Aparo was promptly turned over to medical for a post use of force physical. Medical staff came back to treat Aparo two more times on the day in question.[6] Similar to *Santana*, the Security Defendants in this case did exactly what was required of them. Not only does the record show the Security Defendants acted reasonably, the record also shows that no reasonable jury could find these defendants acted with more than gross negligence related to Aparo's medical needs.

---

[6] Of interest, medical staff visited A Dorm several times before use of force was administered. (Ex. 15). Medical staff came to A Dorm around 7:00 a.m. on both September 18 and 19, 2010. (*Id.*). Aparo never declared any medical emergencies when medical staff were present.

### 2.     Burch is entitled to qualified immunity.

Applying qualified immunity law to the facts of this case, Burch is entitled to summary judgment because a reasonable jury could not conclude that Burch violated Plaintiff's constitutional rights or otherwise acted deliberately indifferent.

First, there is an absence of evidence in the record that, prior to his death, Aparo was diagnosed by a physician as having a medical need that *mandated* treatment.  Aparo likewise did not have a medical need that was so obvious that a lay person like Burch would recognize the *necessity* for a doctor's attention.  The video evidence in this case, especially the hand-held video, objectively shows what Burch could observe.  (Ex. 2).  Reviewing the hand-held video, it cannot be said that it was "so obvious" that Aparo needed a doctor's attention.  This is especially true because the hand-held video shows Aparo being attended to by a nurse immediately following Aparo's post use of force shower, and the nurse did not find it a necessity that Aparo see a doctor.

Second, Plaintiff cannot show Burch was deliberately indifferent to Aparo's medical needs.  Burch entered the A-dormitory on September 19, 2010, for a very limited period of time.  Burch's actions/observations are all documented not only on the fixed-wing video in the dormitory, but also on the hand-held video (which contains audio).  Burch was unaware that Aparo had any serious medical needs.  In

fact, correctional officers are prohibited from access to inmates' medical records.[7] Reviewing the hand-held video, no reasonable jury could conclude that Burch acted with more than gross negligence as related to Aparo's medical needs, much less serious medical needs. Again, Burch is filming the medical attention given to Aparo immediately after the use of force at issue. At no point on the hand-held video does Aparo declare a medical emergency.

Third, even though the record shows no deliberate indifference on Burch's part, Plaintiff cannot show Burch's actions caused Aparo's injury. Aparo was receiving medical attention when Burch was observing him. No reasonable jury could conclude that Burch's actions caused the injury for which Plaintiff complains.

Further, Burch is entitled to qualified immunity because Plaintiff cannot meet the burden of showing a constitutional right was clearly established at the time of the challenged conduct. Under this burden, "preexisting law must make it obvious that the defendant's acts violated the plaintiff's rights in the specific set of

---

[7] Crucially, Exhibit 19 is a medical form advising the Security Defendants that Plaintiff had no known medical conditions that would be exacerbated by the use of chemical restraint agents. This undisputed fact clearly shows a lack of subjective knowledge of a risk of serious harm as related to all Security Defendants. This fact further shows all Security Defendants did not disregard any alleged risk with more than gross conduct. All Security Defendants adopt this argument, regarding the lack of knowledge to Plaintiff's medical condition, other than the fact that Plaintiff was medically cleared to receive chemical agents, in their respective sections of this memorandum.

circumstances at issue." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010). There simply is no decision that makes it obvious that Burch's acts on September 19, 2010 violated Plaintiff's rights. Qualified immunity is warranted because it was not clearly established, at the time of Burch's actions, that his actions violated Aparo's constitutional rights.

### 3. Hamm is entitled to qualified immunity.

Again, on September 19, 2010, there was no evidence that Aparo was diagnosed by a physician as having a medical need that *mandated* treatment. Aparo did not have a medical need that was so obvious that a lay person like Hamm would recognize the *necessity* for a doctor's attention.

As set forth in section II(A)(2) *supra*, Hamm was in the confinement wing for approximately 53 seconds total and was at Aparo's cell door approximately 12 seconds of that time. Hamm was aware that medical authorization was given to administer chemical agents to Aparo and was not subjectively aware of any risk of serious harm. Nor does the record show Hamm disregarded any risk by conduct more than grossly negligent. Rather, the approximate 53 seconds of time Hamm was in the confinement dormitory shows his actions did not amount to a constitutional violation of Aparo's rights, and qualified immunity is warranted.

Further, Plaintiff cannot meet the burden of showing that preexisting law makes it obvious that Hamm's acts violated Aparo's rights in the specific set of

24

circumstances at issue.   There is no decision that makes it obvious that Hamm's acts violated Aparo's rights.  Qualified immunity is warranted.

### 4.    Hampton is entitled to qualified immunity.

On the date in question, Aparo did not have a physician diagnosed medical need, and there is no record evidence that it was obvious to Hampton that Aparo necessitated a doctor's attention.  By the time Hampton started his shift at 4:00 p.m., Aparo had already been seen by medical staff three times earlier that day, and at no point was it determined by medical staff that Aparo required a doctor's attention or more urgent care.

Subjectively, Hampton was not aware of a risk of serious harm to Aparo. At the start of his shift, Hampton was away from A-dormitory attending a meeting. Aparo refused a dinner tray offered by Hampton around 4:30 p.m.  This was the last contact Hampton had with Aparo, prior to another officer noticing Aparo was unresponsive and requested that Hampton check on him around 6:12 p.m.[8]  When Hampton checked on Aparo, he could not get a response, and immediately contacted the duty captain, medical, and the control room.  This certainly does not evince deliberate indifference.

---

[8]  Importantly, between 4:30 p.m. and 6:12 p.m., another correctional officer, George Foxworth, had a conversation with Plaintiff, who indicated to Foxworth, around 5:30 p.m., that he was okay.  Plaintiff did nothing in his interaction with Foxworth to suggest any serious medical need.

Hampton's actions on September 19, 2010, did not amount to a violation of Aparo's constitutional rights; deliberate indifference has not been established. Further, Plaintiff cannot meet the burden of showing that preexisting law makes it obvious that Hampton's acts violated Aparo's rights in the specific set of circumstances at issue.   There is no decision that makes it obvious that Hampton's acts violated Aparo's rights.

### 5.   Spangler and Martina are entitled to qualified immunity.

On September 19, 2010, Spangler and Martina were assigned to the A-dormitory for the 8:00 a.m. to 4:00 p.m. shift.  At the beginning of the shift, both Spangler and Martina were on transport duty and not in the A-dormitory.  They both returned to the A-dormitory somewhere around 10:00-10:30 a.m.  (Ex. 9(A); Ex. 10(A)).  The fixed-wing video shows both Spangler and Martina going about the everyday duties of the prison.  Of importance, A-dormitory has four wings; Aparo was housed in Wing 1.  Spangler and Martina are observed on the fixed-wing video often leaving Wing 1 to attend to their duties in other parts of the dormitory.  Neither Spangler nor Martina heard Aparo declare a medical emergency on the day in question or heard him request medical attention.  (Ex. 9, ¶ 5; Ex. 10, ¶ 6).

Both Spangler and Martina escorted Aparo to the shower following use of force, and then escorted Aparo to the medical room for examination by medical

staff.  (Ex. 1, 12:20:51).  Moreover, this is all documented on the hand-held video taken by Burch, which includes audio.  Aparo is not declaring any medical emergencies on the audio.  Medical clears Aparo to return to his cell after the post use of force examination.  While Spangler and Martina work their shift, medical staff return to Aparo's cell two more times.  Medical staff do not order Aparo to the infirmary or order he be seen by a doctor at that time.  Both Spangler and Martina observed Aparo in his cell.  Aparo was seen on his bed or on the floor (which was not unusual for confinement inmates).  Both observed Aparo appeared to be breathing normally during their shift.

Qualified immunity is warranted because Spangler's and Martina's actions do not amount to a violation of Aparo's constitutional rights.  Aparo was seen by medical three times on these Defendants' shift.  If medical staff did not indicate the necessity for a doctor's attention, then lay-persons such as Spangler and Martina should not be held to a higher standard.  Spangler and Martina had no subjective knowledge of a risk of serious harm, and no reasonable jury could conclude that their actions on the record show a disregard of any risk by conduct that is more than gross negligence.

Further, similar to the other Security Defendants, Plaintiff cannot meet the burden of showing that preexisting law makes it obvious that Spangler's and Martina's acts violated Aparo's rights in the specific set of circumstances at issue.

### 6.   Brown is entitled to qualified immunity.

Brown last observed Aparo on September 19, 2010, "around" 9:00 a.m.  (Ex. 4(A)).  The Inspection of Special Housing Record for that date shows Brown entered the confinement dormitory at 8:40 a.m. and exited five minutes later.  (Ex. 15).  Brown observed Aparo lying on his mattress and looking at Brown through the cell door.  No words were exchanged between Aparo and Brown.  Aparo did not declare a medical emergency to Brown nor suggest he needed medical attention.  The record simply lacks any facts to show Brown acted with deliberate indifference to Aparo on September 19, 2010.

Plaintiff may suggest Brown acted with deliberate indifference towards Aparo on September 18, 2010, but the record shows that argument fails as well. On September 17, 2010, around 11:30 p.m., Brown was summoned to G-dormitory because a sergeant found Aparo lying on the ground.  This was the first contact Brown had with Aparo.  Brown immediately called medical staff to come to the dormitory.  On September 18, 2010, at approximately 12:10 a.m., Brown escorted Aparo to the infirmary.  Brown assisted Aparo in obtaining medical attention. Brown left the infirmary.

Aparo remained in the infirmary for approximately four and one-half hours. During this time, Aparo was non-cooperative, and later became belligerent, yelling and cursing at the medical staff.  Brown was summoned back to the infirmary,

where he counseled Aparo and warned him that Aparo would go to confinement if he did not cease his disruptive behavior.  Aparo became belligerent to Brown as well, and he was escorted to confinement at 4:37 a.m.  Of note, Aparo's medical records show medical staff advised Aparo, at 4:00 a.m., that he was not going to a hospital as the doctor did not order it.  (Ex. 18).

No reasonable jury could find Brown acted with deliberate indifference to Aparo.  Brown did not deny Aparo medical treatment, rather, Brown immediately summoned medical staff and escorted Aparo to the infirmary.  Brown did not delay treatment; Aparo was in the infirmary for over four hours when, as the record undisputedly shows, Aparo began yelling and cursing.  At this point, Aparo was being monitored, with no plans to send him outside the prison.  Brown did not conduct himself in a manner that could be characterized as more than grossly negligent.  Further, taking Aparo to confinement for his improper actions did not preclude medical staff from further seeing Aparo if necessary, showing Brown did not cause the harm alleged in this case.

Qualified immunity is applicable to Brown because Brown's conduct did not amount to a constitutional violation, and further, Plaintiff cannot meet the burden of showing that preexisting law makes it obvious that Brown's acts violated Aparo's rights in the specific set of circumstances at issue.

**7.    Austin and Gillikin are entitled to Qualified Immunity.**

Similar to the argument set forth above, there is no record evidence to show that it was so obvious to either of these defendants that Aparo necessitated medical treatment.  Moreover, there is no record evidence showing these Defendants had a subjective knowledge of a risk of serious harm.  To the contrary, the Security Defendants, including Austin and Gillikin, were not privy to Aparo's medical history, with the exception of the record in his dormitory file indicating medical authorized the use of chemical agents on Aparo.  Medical staff saw Aparo three times on September 19, 2010.  It cannot be said that these Defendants disregarded Aparo's medical needs when he was seen multiple times by medical on the date in question; the record shows Austin and Gillikin did not act with more than gross negligence in this regard.

Finally, qualified immunity is applicable to Austin and Gillikin because their conduct did not amount to a constitutional violation, and further, Plaintiff cannot meet the burden of showing that preexisting law makes it obvious that Austin's and Gillikin's acts violated Aparo's rights in the specific set of circumstances at issue.

**III.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY, AND MORE BROADLY, SUMMARY JUDGMENT ON PLAINTIFF'S § 1983 CLAIM ALLEGING CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS**

Count IV of Plaintiff's Third Amended Complaint alleges, pursuant to § 1983, that the Security Defendants engaged in a conspiracy to deprive and interfere

with Plaintiff's right of court access.  (Doc. 97, ¶¶ 83-89).  Summary judgment is

warranted on Plaintiff's conspiracy claim.  To maintain a claim for conspiracy

under § 1983, a plaintiff must show: (1) the defendants reached an understanding

or agreement that they would deny Plaintiff one of his constitutional rights; and (2)

the conspiracy resulted in an actual denial of one of his constitutional rights.  *See*,

*Hadley v. Guiterrez*, 526 F.3d 1324, 1332 (11th Cir. 2008).

First, Plaintiff cannot meet the burden of showing the Security Defendants'

conduct amounted to a constitutional violation, as the Security Defendants'

conduct cannot be considered a conspiracy as a matter of law.  The intracorporate

conspiracy doctrine is applicable under the facts of this case and prohibits a § 1983

conspiracy claim against these Defendants.  *See, e.g.*, *Detris v. Coats*, 523

Fed.Appx. 612, 615 (11th Cir. 2013).  The doctrine provides that "a corporation's

employees cannot conspire among themselves when acting in the scope of their

employment, as their actions are attributed to the corporation itself, 'thereby

negating the multiplicity of actors necessary for the formation of a conspiracy.'"

*Id.* (quoting *Grider v. City of Auburn*, 618 F.3d 1240, 1261 (11th Cir. 2010)); *see*

*also*, *Tillman v. Orange County, Florida*, 519 Fed.Appx. 632, (11th Cir. 2013)

(noting the intracorporate conspiracy doctrine applies to public entities and § 1983

conspiracy claims). In *Detris*, the plaintiff alleged that several employees of the

Pinellas County Sheriff conspired to deprive the plaintiff of his constitutional

rights, specifically alleging that one of the defendants instructed the others to use excessive force on him, and that the other deputies agreed to do so. *Detris v. Coats*, 523 Fed.Appx. at 615. The Eleventh Circuit upheld the dismissal of the § 1983 conspiracy count, under the intracorporate conspiracy doctrine, as all the defendants worked for the same employer. *Id.* Similarly, this Court should dismiss the § 1983 conspiracy count because all of the alleged conspirators work for the same employer, FDOC. This Court reached a similar conclusion in *Ferris v. Jones*, 2015 WL 4668297 *11 (N.D. Fla. Jun. 11, 2015), a § 1983 case brought by an inmate against FDOC employees.

Second, the record is undisputed that the Security Defendants, individually, did not reach any understanding or agreement, with each other or anyone else, to conceal anything that transpired on September 19, 2010. There is no competent evidence in the record by which a jury could conclude otherwise. The Security Defendants are entitled to qualified immunity because Plaintiff cannot show that any of the defendant's actions amount to a constitutional violation of Plaintiff's rights asserted in Count IV. *See, Ferris v. Jones*, 2015 WL 4668297 *11 (N.D. Fla. Jun. 11, 2015) (noting a plaintiff must show more than subjective suspicions and unsupported speculation to establish a conspiracy claim).

Third, Plaintiff Cimillo's claim is barred by the applicable statute of limitations. In furtherance of brevity, the Security Defendants adopt by reference

the argument raised by FDOC concerning when Cimillo knew or should have

known when this claim accrued.  The undisputed facts of record show the claim

should have been filed far earlier than six years from the date of Aparo's death.

*See*, *United States v. Kubrick*, 444 U.S. 111 (1979); (Ex. 22).

## State Claims Against Security Defendants

## IV.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT II, ALLEGING COMMON LAW CIVIL CONSPIRACY

Under Florida law, a civil conspiracy claim requires: (1) an agreement

between two or more parties; (2) to do an unlawful act or to do a lawful act by

unlawful means; (3) the doing of some overt act in pursuit of the conspiracy; and

(4) damage to the plaintiff as a result of the acts done under the conspiracy.  *Philip*

*Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n. 9 (Fla. 2015).  There are several

reasons Defendants are entitled to summary judgment on this claim.

First, similar to the § 1983 conspiracy claim addressed in Section III above,

Plaintiff's claim alleging common law conspiracy is barred by the intracorporate

conspiracy doctrine; Defendants adopt the argument, regarding the doctrine in

Section III, here as well.  *See also*, *Kornagay v. Burt*, 2011 WL 839496 *19 (N.D.

Fla. Feb 8, 2011), *report and recommendation adopted in* 2011 WL 855619 (N.D.

Fla. Mar 9, 2011) (applying intracorporate conspiracy doctrine in granting

summary judgment to FDOC officers who allegedly conspired to retaliate against

inmate by, amongst other acts, using force against the inmate).

Second, there is no record evidence from which a reasonable jury could conclude a conspiracy existed in this matter.  The Security Defendants deny having reached any agreement with anyone else to perform an unlawful act or lawful act by unlawful means.  There is no evidence of agreement, and Plaintiff's claim cannot avoid summary judgment where it is based on nothing other than sheer speculation.  *See, e.g.*, *Moody v. City of Albany, Georgia*, 228 Fed.Appx. 859, 861 (11th Cir. 2007) (affirming summary judgment on conspiracy claim where the plaintiff simply offered speculation as to what the defendant officers said to each other during the incident at issue).  A conspiracy claim requires "that Plaintiff provide more than a label or a conclusion," and "Plaintiff cannot rely on subjective suspicions and unsupported speculation but must provide sufficient *facts* to show that an agreement was made."  *Claudio v. Barfield*, 2014 WL 4079925 *4 (N.D. Fla. Aug. 19, 2014) (emphasis added).  Plaintiff has not offered facts to show an agreement in this case.

Third, the conspiracy claim in Count II is barred by the statute of limitations. For state tort claims, Florida law governs the accrual of the claim.  *Bloom v. Alvereze*, 498 Fed.Appx. 867, 876 (11th Cir. 2012).  "A cause of action accrues when the last element constituting the cause of action occurs."  § 95.031(1), Fla. Stat.; *Davis v. Monahan*, 832 So. 2d 708, 709 (Fla. 2002).  A conspiracy claim under Florida law "accrues when the plaintiff suffers damages performed pursuant

to the conspiracy." *Bloom v. Alvereze*, 498 Fed.Appx. at 876 (quoting *Olson v. Johnson*, 961 So. 2d 356, 360 (Fla. 2d DCA 2007)). The doctrine of delayed discovery does not apply to civil conspiracy claims. *Davis v. Monahan*, 832 So. 2d at 710.

Any conspiracy action that could be alleged by Aparo accrued September 19, 2010. Plaintiff filed this action six years after this date; the conspiracy claim is barred by the statute of limitations in § 95.11, Florida Statutes. *See*, *Laterza v. JP Morgan Chase Bank, N.A.*, 221 F. Supp. 3d 1347, 1351 (S.D. Fla. 2016) (noting four-year statute of limitations for civil conspiracy claims under Florida law). Moreover, Plaintiff's allegation that the conspiracy continued into 2016 has no merit. "Florida courts have recognized continuing torts, but focus on continual acts by the defendants, not continual effects of a completed act." *Bloom v. Alvereze*, 498 Fed.Appx. at 876 (citing *Suarez v. City of Tampa*, 987 So. 2d 681, 686 (Fla. 2d DCA 2008)). In this case, the completed act would have occurred September 19, 2010. At best, looking at the facts in a light most favorable to Plaintiff, the Security Defendants did provide statements to FDLE, but these statements were made within days of Aparo's death. The Security Defendants have not engaged in any further acts, or continual acts in this matter. The complaint was simply filed too late, and summary judgment should be entered on this claim.

35

Finally, to the extent Plaintiff suggests an actionable civil conspiracy claim pursuant to *Margolin v. Morton F. Plant Hosp. Ass'n, Inc.*, 342 So. 2d 1090 (Fla. 2d DCA 1977) and *Kee v. Nat'l Reserve Life Insurance Co.*, 918 F.2d 1538, 1542 (11th Cir. 1990), the Security Defendants adopt the argument, raised in FDOC's motion to dismiss Plaintiff's second amended complaint, that the "coercive force of numbers" theory raised by Plaintiff is inapplicable to this case. (*See*, Doc. 79, II(C)(2), pp. 7-11).

## V.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S WRONGFUL DEATH CLAIM

Plaintiff failed to file a timely claim under Florida's Wrongful Death Act (§§ 768.16-768.21, Fla. Stat.), pursuant to section 95.11(4)(d), Florida Statutes, which would have required Plaintiff file the claim by September 19, 2012. *See*, *Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1280-81 (11th Cir. 2003). Filing the claim six years after the death of inmate Aparo, Plaintiff relies upon section 95.11(10), which provides, in pertinent part:

> Notwithstanding paragraph (4)(d), an action for wrongful death seeking damages authorized under s. 768.21 brought against a natural person for an intentional tort resulting in death from acts described in s. 782.04 or s. 782.07 may be commenced at any time.

To utilize the limitations period in § 95.11(10), Plaintiff has to show that the Security Defendants committed murder or manslaughter as to inmate Aparo.

Summary judgment is warranted because Plaintiff has not, and cannot, show Aparo was the victim of murder or manslaughter.

On September 19, 2010, application of force was used on inmate Aparo pursuant to Chapter 33-602.210(1)(e) and (f), and 602.003(6), F.A.C. Prior to the use of force, Austin counseled inmate Aparo regarding his conduct. Inmate Aparo's DC4-650B form was reviewed, which showed Aparo had no known medical condition that would be exacerbated by chemical agents. Austin contacted Nurse Franklin in medical to verify this information. Austin contacted the duty warden to obtain authorization to use chemical agents. Austin gave Aparo a final warning to cease his conduct before chemical agents were applied, and Aparo complied. A short time later, however, Aparo resumed his conduct. Austin summoned Hamm from another dormitory to apply chemical agents to Aparo.

The record shows Hamm applied chemical agents to Aparo in compliance with the rules governing use of force. Hamm used OC agent at two different times, using the agent in three one-second bursts. The dispensers were weighed after each application. After these two events, Austin contacted the duty warden, who authorized the use of CS agent. Hamm used CS agent on one occasion, again using three one-second bursts and weighing the dispenser after use.

Following the use of force, Martina and Spangler escorted inmate Aparo to the shower where Aparo received cold water decontamination and clean clothes.

Martina and Spangler escorted Aparo to the examination room in A-dormitory,

where Aparo received a post use of force examination from medical staff.  During

this time, the fixed-wing footage shows orderlies decontaminating Aparo's cell.

Following the medical examination, Aparo was returned to his cell.  Inmate Aparo

was observed after the use of force per policy, with no respiratory distress noted.

Medical staff attended to Aparo two more times after the post use of force

examination.

Simply stated, based upon the record, which includes video on the date in

question, no reasonable jury could conclude that any of the Security Defendants

murdered Aparo or otherwise committed manslaughter.

Moreover, for Plaintiff to avail herself to the open-ended statute of

limitations in § 95.11(10), she has to show that each individual Security Defendant

committed an intentional tort that resulted in Aparo's death.[9]  Breaking this

analysis down, per individual defendant, more clearly shows their entitlement to

summary judgment.

---

[9]  As set forth in Sections III and IV above, the intracorporate conspiracy doctrine
provides, as a matter of law, that conspiracy is not an actionable issue in this
matter, and thus, Plaintiff cannot rely upon the intentional tort of conspiracy as a
means to satisfy § 95.11(10)'s requirements as to the individual Security
Defendants' alleged liability.

For example, Burch operated a camera on the date in question, and was not present, nor involved in the use of force at all.  Burch's acts do not amount to an intentional tort that resulted in Aparo's death.

Brown's only interaction with Aparo on the date in question was to observe him in his cell hours before any force was used.  Brown had nothing to do with the application of force.  The record is devoid of any acts by Brown which could be characterized as an intentional tort that resulted in Aparo's death.

Hampton worked the evening shift, starting his job duties hours after the use of force was applied to Aparo.  By this time, Aparo had been seen by medical staff three times.  Hampton interacted with Aparo when trying to give him a dinner tray, and then later found him unresponsive in his cell, whereupon Hampton summoned medical staff.  No reasonable jury could conclude Hampton's acts constituted an intentional tort that resulted in Aparo's death.

Hamm applied the chemical agents to Aparo, but his actions do not amount to an intentional tort that resulted in Aparo's death.  The undisputed record shows Hamm was ordered to report to the confinement dormitory to apply chemical agents.  Hamm was in Aparo's wing for an approximate total of 53 seconds for this use of force.  Hamm was following the directions of Austin and did not observe anything to suggest that Austin's orders should not be followed.  Hamm's use of force was in compliance with the rules governing application of force.  No

reasonable jury could conclude Hamm's actions amounted to murder or manslaughter.

Martina and Spangler were correctional officers working in A-dormitory on the date in question. These defendants did not order or apply any force to Aparo. These officers escorted Aparo for a medical examination right after the use of force and decontamination shower provided Aparo. No reasonable jury could conclude that Martina's or Spangler's acts amounted to an intentional tort that resulted in Aparo's death.

Gillikin was the A-dormitory housing supervisor on the date at issue. Gillikin did not order the use of force and did not apply the use of force. Plaintiff cannot show that any acts undertaken by Gillikin amounted to an intentional tort that resulted in Aparo's death.

Austin was the FDOC official that ordered the use of force on Aparo. Austin attempted to gain compliance by Aparo, and actually called off the use of force on one occasion when Aparo did comply. Austin obtained the necessary authorization to use force and confirmed with medical that use of chemical agents would not exacerbate any known medical conditions of Aparo. Austin followed policy, which was confirmed by the institutional warden, institutional inspector, and FDOC's inspector general's office. Plaintiff cannot show that Austin

committed murder or manslaughter, or otherwise an intentional tort that resulted in Aparo's death.

The record further shows that none of the Security Defendants' acts resulted in Aparo's death. Dr. Lisa Flannigan conducted an autopsy on Aparo. Dr. Flannigan concluded that Aparo died from natural causes, specifically from complications of multiple cardiac and pulmonary bacterial abscesses, found in extensive necrotic heart and lung tissue that existed before September 19, 2010. Dr. Flannigan did not rule Aparo's death a homicide, nor did she find the use of chemical agents caused or contributed to Aparo's death. It is important to note here the Security Defendants did not have access to Aparo's medical records and were not aware of his medical history, and importantly, had no knowledge that Aparo was suffering from bacterial infections in his heart and lungs which eventually killed him.

Further, the incident at issue was investigated by FDLE Special Agent Michael DeVaney. The investigation's conclusion was that Aparo died of a medical condition and was not killed by any corrections staff. DeVaney testified that there was no evidence in his investigation that the Security Defendants committed murder or manslaughter. The investigation did not reveal evidence that the Security Defendants did anything to intentionally cause the death of Aparo.

Summary judgment as to the wrongful death claim is warranted because Plaintiff cannot show the acts of the Security Defendants caused or resulted in Aparo's death.

Finally, as an alternate basis for granting summary judgment on the wrongful death claim, this Court should consider § 768.28(9), Florida Statutes, which provides, in pertinent part:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property . . . . The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Plaintiff cannot show that any of the Security Defendants' actions were committed with bad faith, maliciously, or wanton and willfully.  Without such showing, Florida's sovereign immunity statute precludes Plaintiff from individually naming and pursuing the Security Defendants in the claims based upon state law.

## VI.   SUMMARY JUDGMENT AS TO CERTAIN DAMAGES

To the extent it may be necessary to reach the discussion of damages, the

Security Defendants seek summary judgment on damage claims inconsistent with

*Sharbaugh v. Beaudry*, 267 F. Supp. 3d 1326 (N.D. Fla. Jul 14, 2017).  For

example, the *Sharbaugh* case prohibits Plaintiff from seeking a pain and suffering

claim for Aparo.  *Id.* at 1333.

## CONCLUSION

Based upon the foregoing grounds and authorities, this Court should enter

judgment in the Security Defendant's favor as to all claims in this action.


<u>Brian C. Keri</u>
BRIAN C. KERI (FBN 0087874)
P.O. Box 13599
Tallahassee, Florida 32317-3599
Telephone: (850) 297-2222
brianckeri@earthlink.net
Attorney for Security Defendants


## CERTIFICATE OF COMPLIANCE WITH LOC. R. 7.1(F) AND 56(E)

This motion and memorandum complies with Loc. R. 7.1(F), Loc. R. 56(E),

and this Court's rulings at the Case Management Conference held May 29, 2018,

in that the number of words in the motion and memorandum is 9,819.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by CM/ECF service to

Steven R. Andrews, Esquire
822 North Monroe Street
Tallahassee, FL 32303

W. Peter Martin, Esquire
1591 Summit Lake Drive, Suite 200
Tallahassee, FL 32317

Jeffrey S. Howell, Esquire
201 S Monroe Street, 4th Floor
Tallahassee, FL 32301

on July 3, 2018.

*s/Brian C. Keri*
Brian C. Keri