UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**AMANDA CIMILLO,** et al.,

Plaintiffs,

vs.                                    **CASE NO.: 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN,** et al.,

Defendants.

_____/

## <u>DEFENDANT FLORIDA DEPARTMENT OF CORRECTIONS'</u><br><u>MOTION FOR SUMMARY JUDGMENT</u>

Defendant Florida Department of Corrections ("FDC"), through counsel and pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, moves for summary judgment on Count V of Plaintiff's Third Amended Complaint ("Complaint"), and states the following in support thereof:

## I. <u>INTRODUCTION</u>

Plaintiff's sole claim against FDC is brought under Title II of the ADA ("ADA"), and the Rehabilitation Act ("RA") (collectively "ADA/RA"). Plaintiff's claims arise out of the death of Randall Jordan-Aparo ("Aparo") on September 19, 2010 while incarcerated at Franklin Correctional Institution ("Franklin CI") in Carrabelle, Florida.

## A. STATEMENT OF UNDISPUTED FACTS

**INTRODUCTION AND MEDICAL HISTORY**

Aparo was incarcerated within FDC from November 2009 until his death on September 19, 2010. *See* Composite Exhibit 1, Aparo's FDC medical records (subset), at Bate Nos. 00009; 00003.[1] [2]Aparo had an inherited genetic disorder or syndrome known as Osler Weber Rendu ("OWR") (also known as Hereditary Hemorrhagic Telangiectasia or "HHT") which causes malformations in blood vessels, and manifests in telangiectasias (spots) on the skin primarily on the fingers, and in the nose and mouth area which are prone to bleed more if stuck or cut. The malformations in the blood vessels can also result in gastro-intestinal bleeding.[3]

Aparo's history of OWR was charted during his "Initial Physical Exam" on November 17, 2009 at FDC's Reception and Medical Center (RMC) in Lake

---

[1] The 2009-2010 medical records also included information from Aparo's incarceration in 2007.

[2] References to all exhibits except deposition transcripts are the Bate stamp numbers located at the lower right corner of the document.

[3] *See* https://medlineplus.gov/ency/article/000837.htmhttps://medlineplus.gov/ency/article/000837.htm.  "Hereditary hemorrhagic telangiectasia (HHT) is an inherited disorder of the blood vessels that can cause excessive bleeding."  Persons with OWR/HHT can also experience anemia caused by low iron. *Id.*

Butler, FL (as it had been during his 2007 incarceration). *Id*, 00027-30, 00016.

Aparo was transferred from RMC to Jefferson CI on or about December 1, 2009 where he was confined until May 21, 2010. *Id*, at 00123-24, 00106-08. During a medical appointment at Jefferson CI on February 17, 2010, Aparo told the nurse that he had a "rare bleeding disorder" and needed a "shaving pass" (i.e. to use clippers instead of a razor), and he was issued this pass. *Id*, at 00118. At Jefferson CI Aparo worked on the Public Work Squad which went outside the institution and performed various types of work in the City of Monticello. *See* Exhibit 2, Deposition of Correctional Officer Dennis Curry, at 20-21, 29, 63-64, 100-111; *see also* Exhibit 3, Deposition of Inmate William Aron, at 56-57. To be eligible for the Public Work Squad, inmates were evaluated based on "outside influences, time remaining to serve, health concerns, county of conviction and/or location of the victim." *See* Exhibit 4, Declaration of Rusty McLaughlin, FDC Chief of Classification Management.

On April 18, 2010 Aparo presented to medical at Jefferson CI with a one-half centimeter cut on his left thumb and told the nurse it happened while he was "playing ball during rec," and he also informed her of his OWR. *See* Composite Exhibit 1, at 00111-113. The nurse cleaned his thumb with an antibiotic cleanser and stopped the bleeding. *Id*, at 00112.

3

Aparo was transferred from Jefferson CI to Wakulla CI on May 21, 2010, and a "Pre-Special Housing Health Assessment" completed on that date states that he had a "blood disorder + Osler Webber [sic]-Rendu." *Id*, at 00103.  Aparo was next transferred to the Northwest Florida Reception Center for a brief stay, and then to the Bay City Work Camp (BCWC) in Apalachicola, Florida, which was the work camp for Franklin CI. *Id*, at 00102.  Aparo was seen by ARNP Patricia Lemon at BCWC on June 11, 2010 for a "Review and Clinic Appointment," and she noted his OWR and the presence of a "few telangiectasias" on his lips and tongue,[4] but added that he was having "no problems" with them, and "knows how to handle them." *Id*, at 00101.   The "A" note reflects that his OWR was "stable, [with] no active bleeding." *Id*.  ARNP Lemon told Aparo to report to sick call if he had any problems with bleeding, and that if he had any she would "pull [his] work camp status." *Id*.   She also completed a "Health Services Profile" on June 11, 2010 and assigned Aparo a medical grade "1", and wrote on the form, "Ok work camp/Ok work release." *Id*, 00024.

Aparo was next seen by Nurse Hardy on June 22, 2010 and reported that he had "stuck his finger when leaning on [a] fence" the day before, and she noted that he "has a bleeding disorder."  *Id*, at 00099 ("Abrasion/Laceration Assessment").

---

[4] A telangiectasia "is the dilation of small superficial vessels and capillaries that cause numerous flat red marks on the hands, face and tongue." *See* https://medlineplus.gov/ency/imagepages/19509.htm (January 16, 2016).

4

The cut was the size of a "pinhead" on Aparo's right middle fingertip. *Id*. Nurse
Hardy cleaned his finger with Betadine and water, gave him "band aids and
gauze", and referred him to the "clinician" for the following morning. *Id*.

ARNP Lemon saw him the next day on June 23, 2010 and noted that he had
telangiectasias "all over his fingers and mouth . . . [and was] prone to excessive
bleeding." *Id*, at 00098. ANRP Lemon concluded that the risk of bleeding was too
great to have him stay at the Work Camp and ordered him to be transferred to
Franklin CI), and also gave him a "pass" stating that he could not work with
"sharps" or machinery. *Id*. ARNP Lemon testified in deposition that she moved
him to the main camp at Franklin CI because of the distance (30 miles) between
the two facilities, and because there were no medical personnel at BCWC. *See*
Exhibit 5, Deposition of ARNP Lemon, at 53. In a Health Services Profile
completed on June 23, 2010, ARNP Lemon wrote, "No work – No sharps, no
machinery (Ok for him to work elsewhere – he <u>likes</u> to work!!"). [5] *See* Composite
Exhibit 1, at 00023 (emphasis original). ARNP Lemon also ordered labs for "iron
studies" and "serum ferritin levels" which she explained to Aparo, and blood was
drawn on June 29, 2010 for these labs. *Id*, at 00098; 00095.

---

[5] ARNP Lemon changed his medical grade back to "M:2" on June 29, 2010 based
on this bleeding event at the BCWC. *See* Composite Exhibit 1, at 00022.

On June 30, 2010 Aparo declared a medical emergency and presented to medical with bleeding from his left index finger which was wrapped in "paper towels", and his left hand was "covered in blood." *Id*, at 00094.  He was seen by Nurse Goodwin who applied pressure to the finger stopping the bleeding, and gave him a pass to come to medical as necessary for bleeding. *Id*.  The results of the blood labs ordered by ARNP Lemon were reported on June 30, 2010 showing that Aparo's iron was low, and when ARNP Lemon saw him on July 9, 2010 she noted his iron deficiency which she diagnosed as "secondary to Rendu-Osler-Webber [sic] syndrome", and prescribed iron ("FES04 325 MG 1 PO BID"). *Id*, at 00138, 00091; 00131 (Physician's Order Sheet).  In the "S" portion of the SOAPE note on July 9, 2010 ARNP Lemon wrote,

> Has Rendu-Webber-Osler [sic] – a malformation of the
> tiny blood vessels producing scattered angiomas [sic] on
> lips, fingertips and inside bowels.  This can lead to prolific
> bleeding when the lesions open. *He does not have a*
> *bleeding order per se.*

*Id*, 00091 (emphasis added).

On July 21, 2010 Aparo declared a medical emergency stating that he was "urinating blood" which was reported to ARNP Lemon who gave a telephone order for a "urine dip." *Id*, at 00085.  The urine sample was "very bloody… [and] when [Aparo] came in to [triage] he had alot of blood in his mouth and had to spit

it into a paper towel." *Id*.  Because of the blood in his mouth, ARNP Lemon

ordered an "observed urine specimen" to be "obtained by security."  *Id*.  The labs

for the urine showed "abnormal results with protein, nitrates and blood . . . urine

clear in appearance," and Aparo was "placed in observation status in [a] cell in

infirmary."  *Id*.  ARNP Lemon saw Aparo later on July 21, 2010 and noted his

history of

> hematuria that morning, and also the 'wad' of blood in
> his mouth . . . [and a] question as to whether or not he
> spit blood into the sample of urine, as the second sample
> approx. 40 min later was clear with microscopic blood...
> [and that he] is now being treated for a UTI.

*Id*, at 00082.  ARNP Lemon also noted Aparo's history of being transferred to

Franklin CI from the work camp, and that a

> review of the entire medical record shows the inmate
> did not have problems with bleeding until 6/22/10 and
> has been seen a total of 5 times for bleeding since . . .
> [and] on two occasions nurses have seen him 'picking'
> at the telangiectasias on his fingers which caused an
> increase in the bleeding.  Either the inmate is truely [sic]
> having increased bleeding problems or he is finding out
> he can manipulate staff with the bleeding.  In any event,
> I will continue to monitor this inmate and possibly send
> him to Butler [Reception and Medical Center] in the near
> future.

*Id.*[6] ARNP Lemon ordered Cipro for a possible UTI, and advised Aparo that "if there is a manipulation game occurring, and I can confirm it, I will write a [Disciplinary Report] if the behavior continues." *Id*, at 00082-83.

The next time Aparo presented to medical was on September 13, 2010 when he was seen ARNP Lemon for a "follow-up" appointment, and in the "S" note she wrote that Aparo has had

> no further events with bleeding problems... [that he] was previously warned to quite [sic] picking at his tangiomas/ angiomas [sic] to cause bleeding episodes and visits to medical. He hasn't had problems since 07/21/10. He feels good. No C/OS [complaints].

*Id*, at 00079. ARNP Lemon also charted that he had no "bleeding sites" but there were telangiectasias on his fingers and lips, and that his OWR was "stable". *Id*.

Two days later on September 15, 2010 Aparo declared a medical emergency and was seen in medical by Nurse Housholder complaining of back pain, and reported to her that he was "playing basketball and fell and my back has been hurting since." *Id*, 00078.

Aparo was next seen in medical on September 17, 2010 after declaring a medical emergency complaining of back pain, and told Nurse Goodwin that it happened when he "fell playing basketball," and that it "hurts down his left leg."

---

[6] Nurse Goodwin has testified that she saw Aparo on June 30, 2010 for bleeding on his left index finger, and observed him "chewing" on his finger causing it to bleed. *See* Exhibit 6, Deposition of Amy Goodwin, at 59-60.

*Id*, at 00074. Later on September 17, 2010 Defendant Nurse Greene saw Aparo and completed a "Back Pain Assessment" form writing that the "onset and duration [was] 2-3 days" when he was "playing basketball [and] fell last week." *Id*, at 00076. Nurse Greene charted that Aparo had pain from his "[left] flank to left leg, foot, [left] arm, [left] knee," and that his "head hurts". *Id*.

On September 18, 2010 at 12:10a (0010) Aparo declared a medical emergency and was brought to the infirmary by wheelchair, and told Nurse Greene that, "I can't breathe ... now I can't sleep." *Id*, at 00071. An EKG was done and Nurse Greene wrote, "poss[ible] dehydration", and called the 'on-call MD – hold in infirmary.'" *Id*. At 0020 Nurse Greene made a "call to Dr. Arunakul . . . and orders [were] given." *Id*. At 12:30a (0030) Nurse Greene wrote that she made two unsuccessful attempts to place an IV catheter and noted that Aparo was "not cooperative [and was] moving during attempts." *Id*., *see also* Doc. 176-8, at paragraph 11 (Affidavit by Defendant Greene filed with her Motion for Summary Judgment). At 4:00a Defendant Nurse Lucy Franklin made an incidental entry writing that, "inmate lying bed - profanity saying I am going to sue you're f**king assess. I need to go to the hospital and y'all won't send me." *Id*. In the "O" note Nurse Greene wrote that Aparo was "being very disrespectful to this nurse," and that an officer "was present when this happened – call to Captain." *Id*. Nurse

Greene wrote in the "E" note that she 'instructed [Aparo] that he will not be going to hospital / Dr. did not order this." *Id.*

A Pre-Special Housing Health Assessment was completed by Nurse Franklin on September 18, 2010 at 4:36a, and in a box on the form for noting any "threatening" behavior, wrote that Aparo said, "I am going to sue your f\*\*king asses.  I need to go to the hospital." *Id*, at 00069.  Nurse Franklin charted at 4:36a that Aparo was "released to security for confinement." *Id*, at 00068.

## THE USE OF CHEMICAL AGENTS ON SEPTEMBER 19, 2010

At approximately 10:49a on September 19, 2010 Aparo began engaging in disruptive behavior and Defendant Sergeant Chad Gillikin "attempted to counsel with [him] . . . due [sic] his disorderly actions," but Aparo "refused all counseling and orders." *See* Exhibit 7, Sgt. Gillikin's Incident Report, at 000664.  Sgt. Gillikin contacted Defendant Rollin Austin (a Lieutenant at the time and the Officer-in-Charge on the shift) who came to the confinement wing at approxi-mately 10:59a and counseled with Aparo to attempt to get him to cease his behavior, however he was unsuccessful.  *See* Exhibit 8, Defendant Sgt. Hamm's Incident Report, at 000660; *see also* Exhibit 9, Fixed-Wing video, at 11:08a. Austin initiated the chemical agent protocol which was recorded on the hand-held video camera (HH), and described Aparo's conduct, his attempts to get Aparo to

cease his behavior, that he had contacted medical to determine whether Aparo had any condition that would be exacerbated by the use of chemical agents and was told there none, and also contacted the Duty Warden and was given authorization to use chemical agents. *See* Exhibit 10, Hand-Held video, at 11:24a.

FDC security officers do not have knowledge of the medical condition or history of inmates, and the individual security Defendants in this action did not have knowledge of Aparo's medical condition or history , including his OWR, on September 18-19, 2010 (or at any other time during his incarceration). *See* Exhibit 11, FDC Rule 33.401.701; *see also* Exhibit 12, Deposition of Defendant James Hamm, at 70; and Exhibit 13, Deposition of Defendant Chad Gillikin, at 70, 159.

Defendant Austin went to Aparo's cell at approximately 11:24a accompanyied by Defendant Hamm (operating the HH video camera), and Austin ordered Aparo to cease his disruptive behavior or he would be sprayed with chemical agents, and Aparo complied with this order and he was not sprayed. *See* Exhibits 10 and 9 (HH, at 11:24a – 11:25a) (FW, at 11:15a – 11:16a). Austin then informed Aparo that if he continued or resumed his disorderly conduct after Austin and Hamm left the wing, Austin would return and chemical agents would be applied on him without further warning. *Id*; *see also* Exhibit 14, Rule 33.602.210 (8)(n)(2)(e, g).

11

At approximately 11:38a, Defendant Gillikin notified Austin that Aparo had resumed his disorderly conduct, and Austin returned to his cell with Defendant Hamm who sprayed three one-second bursts of OC through the food-flap of Aparo's cell door in accordance with FDC policy. *See* Exhibit 9, at 11:49, 11:56, and 1202.   After this first spraying, Aparo resumed his disorderly conduct two more times and was sprayed with OC on the second application and CS on the third. *Id*; *see also* Exhibit 14.

Aparo was handcuffed and removed from his cell at 12:17p, and escorted by Defendants COs Spangler and Martina to the shower walking under his own power. *See* Exhibit 10, at 12:17p -12:18p and Exhibit 9, at 12:08p - 12:09p. Aparo showered from approximately 12:18p to 12:25p, and remained standing the entire time except for brief periods when he can be seen leaning against the shower wall or holding onto the shower cell bars. *Id*, at 12:25p.   At approximately 12:25p, Aparo indicated to Austin that he was finished showering, and began to dry-off. *Id*, at 12:25.   After drying-off, Aparo was given clean boxer shorts and a T-shirt, was handcuffed and removed from his cell, and escorted by Defendants Spangler and Martina to the medical room. *Id*, at 12:29p.   The HH video shows Aparo initially struggling to walk from the shower area and leaned forward at which point

Defendants Spangler and Martina assisted him, and he then walked upright for the remainder of the walk to the medical room. *Id*, at 12:30p.

Aparo was seen by Defendant Nurse Riley in the medical room arriving at 12:31p for a post-use of force evaluation, and she charted that Aparo complained of "back pain from previous injury," but was "unable to get a blood pressure reading with either the manual or automatic cuffs." *See* Composite Exhibit 1 at 0001; *see also* Exhibit 10, at 12:31-12:40.  Nurse Riley also noted that Aparo had "right lower lobe wheezing...bruising," and a history of OWR. *Id*, at 0001.  On the "Diagram of Injury" accompanying the ER Record, Nurse Riley noted "mottling . . . on upper posterior back" [which is depicted by hand-drawn dots on the far right body outline]. *Id*, at 0002.  Nurse Riley also wrote "skin intack [sic]," and then "Breaths even" (the word "even" has a line striking though it). *Id*.

At approximately 1:13p, Riley went to Aparo's cell accompanied by Nurse Franklin to attempt again to take Aparo's blood pressure by passing a part of the blood pressure device through the food-flap, however he handed it back through the food-flap. *See* Exhibit 15, Deposition of Ola Melissa Riley, at 22, 70-71. Riley then asked the security officers to bring him out of the cell to take him to the medical room where she could try again to take his blood pressure, but Aparo refused to be handcuffed and he could not be removed from his cell, and he also

refused to sign a "Refusal" form. *Id*, at 20-25; *see also* Composite Exhibit 1, at 00068; and Exhibit 9, 1:13-1:31p.  Nurse Riley returned to Aparo's cell at approximately 3:25p to attempt to take his blood pressure, but he again refused. *See* Exhibit 16, FDLE Report TL-37-0003 at 002111-12; 002124-25.  Nurse Riley also recalls talking to Aparo when she went to his cell at 3:25p. *Id*, at 002125.

After Aparo was returned to his cell at 12:33p, he was not taken out of his cell again, and no one entered his cell until he was found unresponsive by CO Foxworth at approximately 6:14p, after which medical was contacted and Nurses Riley and Greene went to his cell. *See* Exhibit 9.  Approximately 40 minutes earlier at 5:30p, Officer Foxworth had stopped at Aparo's cell and found him lying on the floor of his cell, and told him "to get off the floor, at which time inmate [Aparo] responded by advising that it was 'cool down there…' [and] Foxworth advised he then asked the inmate if he was 'ok,' at which time [Aparo] responded with a 'thumbs up' from his left hand." *See* Exhibit 16, at 002117-18.

**APARO'S ALLEGED DISABILITY**

Plaintiff claims that Aparo was disabled because of his OWR. *See* Plaintiff's Third Amended Complaint, at ¶12.  Plaintiff alleges that OWR is a "blood disorder", and it is described as such in his FDC medical records. Medically, however, OWR is an "inherited disorder of the blood vessels that can

cause excessive bleeding."[7]  OWR is often incorrectly compared to hemophilia

which is a "blood disorder that affects the ability of the blood to clot properly."[8]

Aparo's medical records show that all of the bleeding episodes he

experienced during his FDC incarceration in 2010 (there were none in 2009) were

promptly and successfully treated, and he was never denied treatment for any of

these bleeding episodes.  The only other OWR related symptom Aparo

experienced during his FDC was anemia resulting in low iron for which he was

given iron pills.

The FDC policy and procedure for an inmate to request an accommodation

in 2009-2010 was set forth in Rule 33-210.201 ("ADA Provisions for Inmates"),

which stated in pertinent part that, "Inmates shall be provided the opportunity to

identify the nature of any disability and to request an accommodation or auxiliary

aids."  *See* Exhibit 17, Rule 33-210.201(1).  In subsection (3)(a) it states that the

"determination of whether an inmate is disabled shall be made by department

medical staff, either at reception or at the institution where the inmate is assigned,

---

[7] *See* Medlin Plus article on HHH at https://medlineplus.gov/ency/article/
000837.htm.

[8] *See* https://www.mayoclinic.org/diseases-conditions/hemophilia/diagnosis-
treatment/drc-20373333 (hemophilia is defined as "a rare disorder in which the
*blood does not clot normally*.  It is usually inherited. Hemophilia usually occurs in
males." (Emphasis added).

based upon the inmate's record of impairment or some other qualified evaluation of the inmate's impairment." *Id.*   The rule further provided that, "All department and privately operated facilities shall furnish to any inmate, upon request, a Reasonable Modification or Accommodation Request, Form DC2-530." *Id*, subsection (3)(b).

There are no entries in Aparo's medical or classification records showing that he ever told anyone that he had a disability, or that he ever requested an accommodation for his OWR (or for any other reason).  The ADA Coordinator at FDC's Central Office, Evelynn Garst, has searched the records maintained in her office, and attests that no requests for accommodation were ever submitted by Aparo.  *See* Exhibit 18, Affidavit of Lynn Garst.  There is also nothing in Aparo's medical or classification records which show or suggest that any FDC employees ever perceived Aparo as being "disabled", or as having a "disability" because of his OWR (or for other reason).  *Id.*

Aparo worked on a Public Work Squad at Jefferson CI from December 2009 to May 21, 2010, and was ultimately transferred in June 2010 to the BCWC, the work camp for Franklin CI.  *See* Exhibit 19, Aparo's Administrative File, at 001849.  Aparo was transferred from BCWC to Franklin CI by ARNP Lemon on June 23, 2010 after he stuck his finger causing bleeding, however the decision to

transfer Aparo was based on ARNP Lemon's concern with the distance between

BCWC and Franklin CI, and the fact that there were no medical personnel at

BCWC—not because of his OWR or any perceived disability based on his OWR.

*See* Exhibit 5, at 53-54.  ARNP Lemon emphasized in her note that Aparo "liked"

to work—and noted only that he should not work with sharp tools or machinery.

*Id*, at 55.

Aparo's medical records show that his OWR and each bleeding episode, and

other symptoms (e.g., anemia), were treated by medical personnel, and he was

never denied access to medical because of his OWR.

In addition to working on a Public Work Squad and a Work Camp during his

incarceration, Aparo's records show that he played basketball regularly (including

on September 15, 2010—four days before his death).  *See* Composite Exhibit 1, at

00074, 00076, and 00078; *see also* Exhibit 16, at 002201-03.

There are no records which show or suggest that Aparo was limited

physically in any way, and or that he was unable to perform any of the essential

activities of daily living.

## WHEN PLAINTIFF LEARNED OF APARO'S DEATH

Plaintiff attests in her answers to FDC's interrogatories that she does not

"recall the specific date" she learned of Aparo's death, but does

remember searching the Internet to confirm that he was to

17

> be released because I remember seeing that his anticipa-
> ted release date was on September 21, 2010, or somewhere
> around that time...When I searched the internet to confirm
> his release date, I discovered he was dead. I searched prob-
> ably within a few days after his death, but I don't recall the
> specific day.

*See* Exhibit 20, Plaintiff's Answer to Interrogatory 15 of FDC's First

Interrogatories at 027541.

After learning of Aparo's death, Plaintiff "called the Department of

Corrections in Tallahassee multiple times," and "was told that he died of natural

causes which [she] now believe[s] to be false." *Id.* Plaintiff also received a copy

of Aparo's death certificate from Aparo's father, Tom Aparo, and "saw what was

listed on the death certificate for his cause of death, but [she] didn't really know

what the multiple causes of death meant." *Id.,* at 027541-42.[9] Plaintiff further

attests that she "retained attorneys" after reading a Miami Herald article but does

not give a date. *Id.,* at 027542. Plaintiff also does not describe or explain in her

sworn interrogatory answers what steps or actions she took to obtain more

information about Aparo's death after speaking with someone at FDC, or after

---

[9] District Two Associate Medical Examiner Dr. Lisa Flannagan concluded that the
cause of Aparo's death was from, "Complications of multiple cardiac and
pulmonary bacterial abscesses." *See* Exhibit 24, Autopsy Report of Dr. Flannagan
dated November 16, 2010, at 001124.

receiving a copy of the Death Certificate from Tom Aparo, before she read the

Miami Herald article.

The facts show that Tom Aparo called FDLE Special Agent Michael

DeVaney at least two times during the first phase of FDLE's investigation

(September 19, 2010 to July 12, 2012), however SA DeVaney could not disclose

information to him because it was still an active investigation.  *See* Exhibit 21,

Deposition of SA DeVaney, at 231-33,[10]  The evidence also shows that Mr. Aparo

called and spoke with Dr. Flannagan on January 21, 2011, and she told him what

caused his son's death.  *See* Exhibit 22, Telephone message from Tom Aparo; *see*

*also* Exhibit 23, Deposition of Dr. Flannagan, at 63-65.  There are no records

showing that Plaintiff ever contacted FDLE or the Medical Examiner's Office at

any time after learning of Aparo's death, or that she took any additional steps to

obtain information or records from FDC after her initial call.  It is unknown when

Plaintiff first contacted an attorney, but it is known that her attorney in this case,

Steven Andrews, sent a notice of claim letter to FDC and the Department of

Financial Services dated September 2, 2014 in which he identified FDC and forty-

seven current and former individual FDC employees against whom claims would

be filed.  *See* Exhibit 25.  This letter also states that Plaintiff would be filing a

---

[10] FDLE began its investigation of Aparo's death on September 19, 2010 (the date he died) and closed it on July 6, 2012, and then reopened it on September 20, 2013 based on purportedly new information. *See* Exhibit 16, at 002171-73; 002179.

complaint on or before September 18, 2014 however her complaint was not filed until September 19, 2016.

## FDLE INVESTIGATION

FDLE commenced its criminal investigation within hours of Aparo's death on September 19, 2010 pursuant to a Memorandum of Understanding ("MOU") between FDC and FDLE, and SA DeVaney was the lead FDLE agent on the investigation. *See* Exhibit 26, MOU; *see also* Exhibit 21, at 17-19.  SA DeVaney explained that it was a criminal investigation, and that FDLE took control over "all aspects" of the investigation. *Id*, at 24-25.

After FDLE Crime Scene analysts completed their inspection of Aparo's body and the cell, the body was transported by funeral home employees to the Medical Examiner's Office in Tallahassee for an autopsy to be done the next by Associate Medical Examiner Dr. Lisa Flannagan. *See* Exhibit 16, at 002120-23; *see also* Exhibit 24, Autopsy Report.

At the conclusion of the first phase of the investigation, SA DeVaney found no violations of policy or procedure by FDC security officers on the administration of chemical agents on Aparo on September 19, 2010. *See* Exhibit 21, at 24.  SA DeVaney also testified that he relied on the autopsy findings by Dr. Flannagan's as to the cause of death (i.e., complications from bacterial abscesses in his heart and

lungs), and the fact that there was no evidence of any trauma to Aparo's body. *See* Exhibit 16, at 002153-54. Although the formal FDLE Investigative Report was not issued until July 12, 2012, SA DeVaney explained that he considered his investigation complete on April 28, 2011, based on the decision by the State Attorney's Office not to pursue any criminal charges. *See* Exhibit 21, at 13-16; *see also* Exhibit 16, at 002169.

When the investigation was initially closed on July 12, 2012, the Report and the records collected during the investigation would have become public records, and would have remained public records until the investigation was reopened on September 20, 2013. *See* Exhibit 21, at 16, 105-06, and 112-113; *see also* Exhibit 16, at 002179.

FDLE's investigation was reopened on September 20, 2013 based on information provided to SA DeVaney by an inspector with FDC's Office of Inspector General, obtained during interviews with inmates in an unrelated investigation who were housed in the confinement wing at Franklin CI on September 19, 2010, and had information about Aparo's death. *See* Exhibit 21, at 82-83. SA DeVaney was joined by FDC Inspectors and the FBI during this second phase of the investigation. *Id*, at 28. After approximately three more years investigating Aparo's death, SA DeVaney concluded that this additional "investigative

activity did not result in any significant information different than what was revealed during the initial investigation during 2010-2012." *See* Exhibit 16, at 002245-47.  By letter dated November 1, 2016, the United States Attorney's Office declined prosecution, stating, "There is insufficient evidence to prove a violation of federal statutes beyond a reasonable doubt." *See* Exhibit 27.

## THE FINDINGS AND CONCLUSIONS OF DR. FLANNAGAN

Based on the physical autopsy and findings from the microscopic examination of tissues, Dr. Flannagan concluded that Aparo died from, "complications of multiple cardiac and pulmonary bacterial abscesses." *See* Exhibit 24, Autopsy Report, at 002256; *see also* Exhibit 23, at 59.  Dr. Flannagan testified that Aparo's death was not caused (or contributed to) by his OWR, or by physical trauma to his body, or from exposure to chemical agents based on the absence of any chemical agents on his lips or tongue, in his throat, larynx, esophagus, or trachea) *Id*, at 59-60.

In her internal examination of the body, Dr. Flannagan noted that the "posterior neck show[ed] a mild to moderate amount of hemorrhage in the musculature over the occipital region." *See* Exhibit 24, at 002259.  However, on microscopic examination of this area Dr. Flannagan wrote that, "Posterior Neck (L) Skeletal muscle with intramuscular, perineural and intraneural acute

hemorrhage. No associated inflammatory cell infiltrate is noted." *Id*, at 002261.

Dr. Flannagan concluded that these findings in Aparo's posterior neck were not

caused by any trauma to his neck, and specifically no external trauma, and

concluded that Aparo did not suffer any physical trauma to his body prior to his

death which caused or contributed to his death. *See* Exhibit 23, at 52.

## II. MEMORANDUM OF LAW AND ARGUMENT

## A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted only when the "movant

shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." *See* Rule 56(a), Federal Rules of Civil

Procedure.  In order to determine whether the moving party is entitled to summary

judgment, the court reviews the record in the light most favorable to the non-

moving party and draws all justifiable inferences against the movant. *See Stephens

v. DeGiovanni*, 852 F.3d 1298, 1313 (11th Cir. 2017); *see also Fils v. City of

Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011).  Yet, "[T]aking the facts in the

light most favorable to Plaintiff does not, however require that [the court] presume

the existence of a genuine dispute of fact that must go to trial; 'the issue of fact

must be genuine,' which means that '[w]hen the moving party has carried its

burden under Rule 56(c), its opponent must do more than simply show that there is

some metaphysical doubt as to the material facts.'" *Thomas v. City of Jacksonville*, 2018 WL 1907146 *2 (11th Cir., April 23, 2018) (quoting *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The well-established law also requires the non-moving party to submit more than a "mere scintilla of evidence ... to defeat a motion for summary judgment." *See Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004). Further, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial," and show that there is sufficient evidence such that a jury could reasonably find for that party. *Walker v. Darby*, 911 F.2d, 1573, 1576-77 (11th Cir. 1990) (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). Nor is this Court is required to accept any facts "blatantly contradicted by the record, so that no reasonable jury could believe [them]." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B. STANDARD FOR STATING AND PROVING A CLAIM UNDER TITLE II OF THE ADA AND UNDER THE RA

"To state a claim under Title II of the ADA, a plaintiff must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's

disability." *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir.2007).

The standard for claims under § 504 of the RA is the same as those brought under

the ADA. *See Silva v. Baptist Health South Florida, Inc.*, 856 F.3d 824, 830 (11th

Cir. 2017) ("ADA and RA claims are governed by the same substantive standard

of liability") (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)). Title II

of the ADA applies to state prisoners. *See Pennsylvania Dep't of Corr. v. Yeskey*,

524 U.S. 206, 212 (1998).

> Under the ADA, a "qualified individual with a disability" is an

>> individual with a disability who, with or without reasonable
>> modifications to rules, policies, or practices, the removal of
>> architectural, communication, or transportation barriers, or the
>> provision of auxiliary aids and services, meets the essential
>> eligibility requirements for the receipt of services or the
>> participation in programs or activities provided by a public
>> entity.

42 U.S.C. § 12131(2). The ADA defines a disability as: "(A) a physical or mental

impairment that substantially limits one or more of the major life activities of [an]

individual; (B) a record of such an impairment; or (C) being regarded as having

such an impairment . . ." 42 U.S.C. § 12102(1). "Major life activities include, but

are not limited to, caring for oneself, performing manual tasks, seeing, hearing,

eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning,

reading, concentrating, thinking, communicating, and working." *Id.* However, a

"physical impairment, standing alone . . . is not necessarily a disability as contemplated by the ADA." *Gordon v. E.L. Hamm & Assoc., Inc.*, 100 F.3d 907, 911 (11th Cir.1996).

## 1.  APARO DID NOT HAVE A DISABILTIY BECAUSE OF HIS OWR

The undisputed facts and evidence in this case establish that Aparo was not disabled and did not have a disability because of his OWR, nor was he regarded as has having a disability because of his OWR by employees of FDC.  The undisputed facts also show that Aparo was not substantially limited from engaging in any major life activity.  To the contrary, the medical records are replete with evidence showing that Aparo was very active throughout his 2009-2010 incarceration, i.e., his work on the Public Work Squad at Jefferson CI for months, his work at the BCWC (albeit brief), and the fact that he played basketball regularly—up to and including just days before he died.  There is also no evidence that Aparo ever requested to be taken-off the Public Work Squad at Jefferson CI, or asked not to be assigned to the BCWC in June 2010.

The only time a decision was made related to his OWR was on June 23, 2010 when ARNP Lemon had Aparo transferred from the BCWC to Franklin CI after he stuck his finger which caused profuse bleeding; however her decision to transfer him was based on the distance between the two facilities (30 miles), and

the fact that there were no medical personnel at BCWC--not because of his OWR. *See* Exhibit 5, at 147-148.  Also noteworthy is the fact that on the Health Services Profile ARNP Lemon completed on June 23, 2010 for the transfer, she wrote that it was, "Ok for him to work elsewhere – he <u>likes</u> to work!!").   *Id*, at 00023 (emphasis original).

Aparo's medical records show that he had a Medical Grade of "M:1" (the best or highest level) throughout his 2009-2010 FDC incarceration (except for an initial grade of "M:2" assigned at RMC which was then changed to "M:1" on December 9, 2009 shortly after arriving at Jefferson CI).  *See* Composite Exhibit 1, at 00030; 00025.  Aparo's work grade during his 2009-2010 incarceration was "W-2" which was based on the issuance passes during intake (i.e., "shaving pass").  *Id*, at 00010, 00029; *see e.g.*, Exhibit 5, at 149-150, 158-159.

These undisputed facts and evidence show that Aparo did not have a disability and was not disabled because of his OWR, and FDC is entitled to summary judgment on Plaintiff's Title II ADA/RA claim on this ground alone.

## 2. APARO NEVER REQUESTED AN ACCOMMODATION FOR HIS OWR

The undisputed evidence establishes that Aparo never submitted a request for an accommodation during his 2009-2010 FDC incarceration based on his OWR (or for any other medical or physical condition).

In *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361 (11th Cir.1999), the Court held that a "plaintiff cannot establish a claim under the [Rehab Act] alleging that the defendant discriminated against him by failing to provide a reasonable accommodation *unless he demanded such an accommodation.*" *Id*, at 1363 (emphasis added) (citing *Wood v. President and Trustees of Spring Hill College in the City of Mobile*, 978 F.2d 12 14, 1222 (11th Cir.1992); *see U.S. v. Hialeah Hous. Auth.*, 418 Fed.Appx. 872, 876 (11th Cir.2011) (stating that "[t]his Court has held that under the [RA] and the ADA, 'the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made' and that [d]efendants must have...the ability to conduct a meaningful review of the requested accommodation"); *see also Holly v. Clairson Industries*, 492 F.3d 1247 n. 14 (11th Cir.2007); *Schwarz v. The Villages Charter School*, 165 F.Supp.3d 1153, 1213 (M.D. Fla. 2016); *Musgrove v. Tom Vilsack*, 173 F.Supp.3d 1337, 1346-47 (M.D. Ga.2016) (and cases cited therein).

Therefore, FDC is entitled to summary judgment on Plaintiff's Title II ADA/RA claim based on Plaintiff's failure to request an accommodation during his 2009-2010 FDC incarceration.

### 3. PLAINTIFF WAS NEVER DENIED MEDICAL CARE OR ACCESS TO MEDICAL CARE DURING HIS 2009-2010 FDC INCARCERATION

The undisputed facts and evidence outlined above demonstrate that Plaintiff was never denied medical care, or access to medical care by FDC employees, including the individual Defendants in this case, *because* of his OWR.

"To prevail on a claim for compensatory damages under either the RA or the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent." *McCullum v. Orlando Regional Healthcare System, Inc.*, 768 F.3d 1135, 1146-47 (11th Cir.2014); *see Greenberg v. BellSouth Telecomms.*, 498 F.3d 1258, 1263 (11th Cir. 2007). Discriminatory intent must be proved by the plaintiff "showing that a defendant was deliberately indifferent to his statutory rights." *Id*, at 1147 (citing *Liese v. Indian River Cnty Hosp. Dist.*, 701 F.3d 334, 342 (11th Cir.2012). The Court in *McCullum* emphasized that showing discriminatory intent is an "exacting standard," *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1259 (11th Cir.2010), which requires showing more than gross negligence, *Liese*, 701 F.3d at 344." *Id*; *see Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

A showing of deliberate indifference for purposes of Plaintiff's Title II ADA/RA claim requires that Plaintiff prove that FDC, through its employees, had:

"(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir.2005) (per curiam) (abrogated on other grounds, *Kingsley v Hendrickson*, 576 U.S. ___, 135 S.Ct. 2466, 2473 (2015)). A Title II ADA/RA claim has to do with access to services--here medical services--not the quality of care provided. *See Ganstine v. Buss*, 2011 WL 6780956, *4 (N.D. Fla.2011), affirmed on appeal, *Ganstine v. Sec'y, Florida Department of Corrections*, 502 F.3d 905 (11th Cir. 2012) ("A denial of medical treatment, without more, is not an ADA violation."); *see also Owens* 602 Fed.Appx., at 479 (inmate-plaintiff's motion to file proposed amended complaint denied on the grounds that it showed he "had access to medical services and used those services . . ."). Moreover, "[T]o establish deliberate indifference, a plaintiff must show that the defendant 'knew that harm to a federally protected right was substantially likely' and 'failed to act on that likelihood.'" *McCullum*, 768 F.3d at 1147; *see Boynton v. City of Tallahassee*, 650 Fed.Appx. 654, 658 (11th Cir.2016) (citing *McCullum*, *supra*).

In the instant action, the evidence is undisputed that FDC security employees, including the security Defendants in this case, had no knowledge of Aparo's OWR, and no knowledge of his past or recent medical history when he was placed in confinement on September 18, 2010 at Franklin CI. Therefore, any

actions taken or not taken by them with respect to Aparo, including the use of chemical agents on September 19, 2010 could not have been taken *because of* his OWR of which they had no knowledge.  Further, while the security Defendants deny that Aparo ever declared a medical emergency on September 19, 2010, even assuming that he had, any failure or refusal by the security Defendants to contact medical personnel, that failure or refusal was not *because* of his OWR.

The undisputed facts and evidence also establish that the individual medical Defendants were not deliberately indifferent to Aparo's medical needs *because* of his OWR.  The medical records show that Aparo had access to medical at all times during his incarceration in 2009-2010 for the bleeding incidents caused by cuts or pricks to his fingers associated with the telangiectasias, and the anemia for which he was given iron.  In *Owens v. Florida Dept. of Corrections*, 602 Fed.Appx. 475 (11th Cir. 2015), a case involving an inmate's claim under Title II of the ADA, the Court found that the claim was "not plausible" because his complaint "did not demonstrate that [he] was excluded from or denied the benefits of FDC services *because of* his disability."  *Id*, at 478-79 (citing *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir.2007) (emphasis added)).[11]

---

[11] Even assuming that not sending Aparo to the hospital on September 18, 2010 is deemed to be a denial of medical care or access to medical care, that decision was not made *because* of his OWR.

Therefore, FDC is entitled to summary judgment on Plaintiff's Title II

ADA/RA claim on the grounds that the undisputed facts and evidence show that

the alleged actions or omissions of the individual Defendants, attributable to FDC

for purposes of her Title II ADA/RA claim, were not *because of* Aparo's OWR.

## 4. APARO WAS NOT SUBSTANTIALLY LIMITED IN ANY MAJOR LIFE ACTIVITIES

There is no evidence that Aparo was unable to engage in a major life activity

because of his OWR, and no evidence that he had a medical or physical condition

that was so apparent or obvious (i.e., a *per se* disability) that FDC knew or should

have known that he was disabled and should have been given an accommodation.

*See Downing v. Osceola County Board of County Commissioners*, 2017 WL

5495138 *3 (M.D. Fla. 2017) (citing *Shotz v. Cate*, 256 F.3d 1077, 1079 (11th

Cir.2001) (other citation omitted).  The fact that a person has a particular physical

or medical condition is not, by itself, the same as having a disability.  *See Gordon

v. E.L. Hamm & Assoc., Inc.*, *supra*, 100 F.3d 907 at 911 (a "physical impairment,

standing alone . . . is not necessarily a disability as contemplated by the ADA.");

*see also Hilburn v. Murata*, 181 F.3d 1220, 1227 (11th Cir.1999) ("the existence of

a physical ailment, such as heart disease, without more does not constitute a

disability . . . [and] plaintiff had not demonstrated that her heart disease had

substantially limited any major life activities.").

There is no factual basis to support a claim that FDC perceived him as having a disability or as being disabled, and no evidence to support a finding or conclusion that Aparo was "substantially limited" in any life activity ("major" or otherwise) during his 2009-2010 FDC incarceration.  To the contrary, the overwhelming and undisputed evidence shows that Aparo led a physically active life during his incarceration which included working on a Public Work Squad and at a work camp (i.e., BCWC), and playing basketball regularly.  *See Holton v. First Coast Service Options, Inc.*, 2017 WL 3446880 **2-3 (11th Cir.2017).  ARNP Lemon saw Aparo and provided care to him on multiple occasions and has testified that he was not substantially limited in any major life activities.  *See* Exhibit 5, at 100, 103; Vol. 2, 150, 156-57.

Therefore, FDC is entitled to summary judgment on Plaintiff's ADA/RA claim based on the undisputed facts showing that Aparo was not substantially limited in any major life activity.

Wherefore, FDC is entitled to summary judgment on Plaintiff's Title II ADA/Rehab claim on the grounds set forth above which establish that Aparo was not disabled or have a disability because of his OWR.

## C. PLAINTIFF'S TITLE II ADA/RA CLAIM AGAINST FDC IS BARRED AS UNTIMELY UNDER THE APPLICABLE STATUTE OF LIMITATIONS

### 1. SECTION 95.11(10), FLORIDA STATUTES DOES NOT APPLY TO PLAINTIFF'S TITLLE II ADA/RA CLAIM AGAINST FDC

Plaintiff relies on section § 95.11(10), Florida Statutes, as the statute of limitations applicable to her ADA/Rehab Act claim against FDC.  This statute states in pertinent part that

> an action for wrongful death seeking damages authorized under section 768.21 brought against a natural person for an intentional tort resulting in death from acts described in section 782.04 or section 782.07 may be commenced at any time. This subsection shall not be construed to require an arrest, the filing of formal criminal charges, or a conviction for a violation of section 782.04 or section 782.07 as a condition for filing a civil action.

*See also* Complaint, ¶¶ 1, 4 and 11.  Plaintiff's reliance on § 95.11(10), Florida Statutes is misplaced for several reasons.

### (1) PLAINTIFF'S CLAIM AGAINST FDC IS NOT ONE FOR "WRONGFUL DEATH"

The plain and unambiguous language of § 95.11(10) states that it applies to an action for "wrongful death" brought pursuant to section 768.21, Florida Statutes.  Plaintiff's claim against FDC is not one for "wrongful death" but for violations of Title II of the ADA and the Rehab Act.

Plaintiff's Complaint was filed on September 19, 2016, or six years after

Aparo's death, and the applicable statute of limitations for claims brought under

Title II of the ADA and Rehab Act is four years based on Florida's four-year

personal injury statute of limitations.  *See Silva v. Baptist Heath So. Fla., Inc.*, 856

F.3d 824, 841 (11th Cir. 2017).

Thus, because Plaintiff's claim against FDC is brought pursuant to the

ADA/RA, and is not a "wrongful death" claim, her claim against FDC is barred as

untimely under the applicable four-year statute of limitation.

Therefore, FDC is entitled to summary judgment on Plaintiff's Title II

ADA/RA claim on this ground alone.

## (2) FDC IS NOT A "NATURAL PERSON"

The statute expressly applies to actions brought against a "natural person,"

and as FDFC is a Florida state agency, this statute does not apply.  The term

"natural person" in § 95.11(10) is not defined however the term is generally

understood to mean a "human being." *See Black's Law Dictionary* (6th Ed. 1996).

In Florida jurisprudence, the term "natural person" is construed as distinguishable

from non-persons such as corporations or other business entities.  In *Corporate*

*Express Office Products v. Phillips*, 847 So.2d 406 (Fla.2003), the Court held that,

"The corporate owner/employee, a natural person, is distinct from the corporation

itself, a legally different entity with different rights and responsibilities due to its different legal status." *Id*, at 411 (citing *Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, 163 (2001) (also citing *Am. States Ins. Co. v. Kelley*, 446 So.2d 1085, 1086 (Fla. 4th DCA 1984) ("The general rule is that corporations are legal entities separate and distinct from the persons comprising them."); *see Florida Carry, Inc. v. University of Florida*, 180 So.3d 137, 151 (Fla. 1st DCA 2015) (citing section 20.055 (1)(b), Fla. Stat., which defines "'Entities contracting with the state to mean 'for-profit and not-for-profit organizations or businesses that have a legal existence, such as corporations or partnership, *as opposed to natural persons*...'") (emphasis added).

Florida courts apply the "ordinary meaning" test and analysis when a term is not defined in the statute. *See Searcy, Denney, Scarola, Barnhart & Shipley v. State of Florida*, 209 So.3d 1181, 1189 (Fla.2017) ("The statute's plain and ordinary meaning must control, unless this leads to an unreasonable result or a result clearly contrary to legislative intent."); *see also National Council on Compensation Insurance v. Fee*, 219 So.3d 172, 178 (Fla. 1st DCA 2017).

There is nothing in section 95.11(10) which indicates or suggests that the term "natural person" is intended to mean anything other than an "individual" or a "human being"—particularly when the offending acts at issue in section 95.11(10)

are the criminal acts of murder and manslaughter referenced in the statute (i.e.,

sections 782.04 and 782.07), which acts can only be committed by individuals or

"natural persons," and not by corporate entities or state agencies.  In *Black v. State

of Florida*, 2009 WL 1605410 (N.D. Fla.2009), the court rejected petitioner's

attempt to change his identity or status from "a human, natural person to a legal

entity" citing Black's Law Dictionary (8th Ed.2004) which defines a "person" as a

"'human being, also known as a 'natural person.'".  *Id*, at *3.  The Court in *Black*

also cited § 1.01(3), Florida Statutes which defines a "'person…as '[a] human

being,' also known as a 'natural person.'"  *Id*, n. 6.

Thus, FDC is not a "natural person" for purposes of section 95.11(10) and

this statute has no application to FDC in this case, and Plaintiff's Title II FDA/RA

claim against FDC is time-barred under the applicable four-year statute of

limitations.[12]

Therefore, FDC is entitled to summary judgment on Plaintiff's Title II

ADA/RA claim on this ground alone.

### (3) APARO WAS NOT A "DISABLED ADULT"

As above, section 95.11(10) cites to sections 782.04 and 782.07 which

identify the "acts" causing death for which actions may be "commenced at any

---

[12] There are no reported Florida state cases or federal cases citing or construing the current and applicable version of section 95.11(10), Florida Statutes.

time."  Section 782.04(3) states that, "When a human being is killed during the

perpetration of, or during the attempt to perpetrate, any . . . (i) Aggravated abuse of

an elderly person or *disabled adult* ..." *Id*, subsection 4(i) (emphasis added).

Similarly, section 782.07(2) states in pertinent part that, "A person who causes the

death of any elderly person or *disabled adult* by culpable negligence under

s. 825. 102(3) commits aggravated manslaughter of an elderly person or disabled

adult, a felony of the first degree, punishable as provided in s. 775.082, s.

775.083."  (Emphasis added).

Plaintiff attempts to appropriate and apply section 95.11(10) here based on

an inference or presumption that the term "disabled adult" is synonymous with a

disabled person under the ADA/RA.  The term "disabled adult" is not defined in

either sections 782.04 or 782.07, however section 782.07 references section

825.102(3), Florida Statutes, and in section 825.101(3) of the same chapter (under

"Definitions") it defines a "disabled adult" as a

> a person 18 years of age or older who suffers from a
> condition of physical or mental incapacitation due to
> a developmental disability, organic brain damage, or
> mental illness, or who has one or more physical or
> mental limitations that restrict the person's ability to
> perform the normal activities of daily living.

The undersigned could find no reported cases in Florida, or Florida federal

cases including any opinions from the 11th Circuit, where the term "disabled adult"

is found in conjunction with the terms "Americans with Disabilities Act" or the "Rehabilitation Act". Nor do the Florida Statutes contain any references to the term "disabled adult" in the context of claims brought under the ADA or Rehab Act. From this absence of legal support or authority, there are no grounds warranting a conclusion that the Florida Legislature intended the term "disabled adult" in sections 782.04 and 782.07 to be construed in light of, or to borrow from, the ADA or the Rehab Act. Rather, the term "disabled adult" is a singular Florida statutory creation with no relationship to the ADA or the Rehab Act, and therefore has no application to the instant action.

Therefore, section 95.11(10) does not apply to the instant action, and Plaintiff's Title II ADA/Rehab claim against FDC is barred as untimely under the applicable four-year statute of limitations.

### D. PLAINTIFF'S ADA/RA CLAIM AGAINST FDC IS BARRED AS UNTIMELY UNDER THE APPLICABLE FOUR-YEAR STATUTE OF LIMITATIONS

The applicable statute of limitations for an ADA/RA claim is governed by Florida law as set forth in § 95.11(3)(p) (four years), Florida Statutes, *City of Hialeah v. Rojas*, 311 F.3d 1096, 1103 n.2 (11th Cir. 2002), however, the date an action accrues is a question of federal law. *See Mullinax v. McElhenney*, 817 F.2d. 711, 716 (11th Cir.1987).

There is no dispute that the date of "injury" in this case is September 19,

2010, the date Aparo died, and Plaintiff acknowledges that she learned of his death

several days later while searching the FDC website for his release date which she

believed was September 23, 2010.  Plaintiff also admits that she called FDC and

was told by someone that he died of "natural causes".  In her answers to

interrogatories, Plaintiff acknowledges receiving a copy of the Death Certificate

from Tom Aparo, but does not explain or describe what additional actions or steps

she took thereafter, if any, to obtain information or records regarding the

circumstances of Aparo's death.[13]

As above, FDLE's records could have been obtained through a Public

Records request from July 12, 2012 (when the investigation was initially closed)

through September 20, 2013 (when it was reopened), however there is no evidence

that she or her attorney submitted such requests.

Plaintiff attests that she retained "attorneys" after reading an article in the

Miami Herald but gives no date as to when this happened.  It is known that her

current attorney sent a notice of claim letter to FDC and the Department of

Financial Services dated September 2, 2014 in which FDC and forty-seven

---

[13] By comparison, Tom Aparo contacted SA DeVaney at FDLE, and Dr. Flannagan
at the Medical Examiners' Office, seeking information about his son's death;
however there is no evidence that Plaintiff contacted either FDLE or the Medical
Examiner's Office.

individual FDC current and former employees were identified as potential

defendants.  *See* Exhibit 25.  In this same notice letter, Plaintiff's counsel stated

that his intent to bring a section 1983 claims, and Florida medical malpractice

claims against individuals, and a negligence claim against FDC.  *Id*.  This notice of

claim letter also informed FDC and DFS that a complaint would be filed on or

before September 18, 2014, however Plaintiff did not file her original complaint

until September 19, 2016.  Had Plaintiff's complaint been filed on September 18,

2014, all of her claims would have been timely except for the medical malpractice

claim which has a two-year limitations' period.  *See* section 95.11(4), Florida

Statutes.

      In *United States v. Kubrick*, 444 U.S. 111 (1979), the Supreme Court

explained that

> Statutes of limitations which 'are found and approved in all
> systems of enlightened jurisprudence.' *Wood v. Carpenter*,
> 101 U.S. 135, 139 (1879), represent a pervasive legislative
> judgment that it is unjust to fail to put the adversary on notice
> to defend with a specified period of time and that 'the right to
> be free from stale claims in time comes to prevail over the
> right to prosecute them.' *Railroad Telegraphers v. Railway
> Express Agency*, 321 U.S. 342, 359 (1944).  These enactments
> are statutes of repose; and although affording plaintiffs what
> the legislature deems a reasonable time to present their claims,
> they protect defendants and the courts from having to deal with
> cases in which the search for truth may be seriously impaired by
> the loss of evidence, whether by death or disappearance of wit-
> nesses, fading memories, disappearance of documents, or other-
> wise. *United States v. Marion*, 404 U.S 307, 322 n. 14 (1971).

41

*Kubrick*, 444 U.S., at 117. *Kubrick* involved a claim brought under the Federal

Tort Claims Act (FTCA) which requires that claims against the United States be

"presented in writing to the appropriate federal agency 'within two years after such

claim accrues.'" *Id*, at 113 (citing 28 U.S.C. § 2401(b)). The issue before the

Court was "whether the claim 'accrues' within the meaning of the Act when the

plaintiff knows both the existence and the cause of his injury or at a later time

when he also knows that the acts inflicting the injury may constitute medical

malpractice." *Id*. The Court rejected the Court of Appeals' reasoning that

plaintiff's claim, arising from the improper use of an antibiotic in April 1969, did

not accrue until his doctor informed him of it in June 1971. *Id*, at 121-22. The

Court acknowledged that the accrual date can come after the date of injury, but

held that when a plaintiff is "in possession of the critical facts that he has been hurt

and who has inflicted the injury...[h]e is no longer at the mercy of the latter . . .

[and] there are others who can tell him if he has been wronged, and he need only

ask." *Id.*, at 122; *see Mullinax*, 817 F.2d at 716 (the statute of limitations in section

1983 cases "does not begin to run until facts which would support a cause of action

are apparent or should be apparent to a person with a reasonably prudent regard for

his rights."); *see also Branch v. Atwater*, 2014 WL 11412879 *2 (N.D.Fla.2014).

Here, Plaintiff admits that she knew that the date Aparo had died, and while she may not have known the cause of his death or who may have been involved, she had sufficient information to prompt her to make further inquiry, or retain an attorney to act on her behalf.  The Court in *Kubrick* held that a plaintiff with knowledge of an injury, even if he or she does not know the *why* of that injury— "need only have made inquiry among doctors with average training and experience in such matters to have discovered that [plaintiff] probably had a good cause of action." *Kubrick*, 444 U.S. at 123.  It was not "apparent" that the plaintiff in *Kubrick* "ever made an inquiry," and there is no evidence in the instant case that Plaintiff made further inquiry after she learned of Aparo's death.  Plaintiff also acknowledges that Tom Aparo provided her with a copy of the Death Certificate, however unlike Mr. Aparo, there is no evidence that she ever attempted to contact FDLE or the Medical Examiner's Office to obtain additional information.  Had Plaintiff taken these steps she would have learned at a minimum that FDLE was conducting a criminal investigation, which by itself was sufficient to question whether Aparo had died of "natural causes" (especially given that he was 27-years old at the time of his death).  This information was also sufficient to put her on notice of a potential claim against either FDC or individual FDC employees.  And

even if she did not know what to do, she had a duty to ask someone who would know, including an attorney. *Id*, at 122.

It is clear from her attorney's notice of claim letter that he knew the complaint had to be filed on or before September 19, 2014 for the section 1983, medical malpractice and negligence claims to be timely (and the future Title ADA/RA claim first asserted in Plaintiff's Third Amended Complaint). Plaintiff also could have obtained information and records from FDC through a Public Records Request asking for: medical records, roster sheets (showing the employees on-duty for the days leading up to and including September 19, 2010), and other administrative records. Clearly, Plaintiff's attorney was able to obtain these types of records before his letter of September 2, 2014 in order to identify forty-seven individuals, and inform FDC and DFS as to the types of claims to be brought. And as above, Plaintiff or her attorneys also could also have obtained FDLE records after its investigation was initially closed on or about July 12, 2012 and until it was reopened on September 20, 2013 (a period of approximately fourteen months).

Plaintiff claims that FDC, by and through its employees, failed to accommodate Aparo, and under the four-year statute of limitations for claims brought pursuant to Title II of ADA/RA, her accrual date was September 19, 2010 (the date of his death). *See Horsely v. Univ. of Ala.*, 564 Fed.Appx. 1006, 1008

(11th Cir.2014) (accrual date commenced when plaintiff knew the injury was

caused by a failure to accommodate) (citing *Chappell v. Rich*, 340 F.3d 1279, 1283

(11th Cir.2003)).  Based on this accrual date, Plaintiff's Complaint had to be filed

on or before September 19, 2014 however it was not filed until September 19,

2016 well outside the four-year statute of limitations.

In *Diaz v. United States*, 165 F.3d 1337 (11th Cir.1999), an FTCA claim

involving the suicide of a prisoner, the Court citing *Kubrick*, noted that a claim

may accrue at a date after the injury "to protect plaintiffs who are blamelessly

unaware of their claim because the injury has not yet manifested itself or because

the facts establishing a causal link between the injury and the medical malpractice

are in the control of the tortfeasor or are otherwise not evident" *Id*, at 1339 (citing

*Kubrick*, at 122).  The Court in *Diaz* continued holding that

> Under this rule, the plaintiff need not know that she has a
> legally cognizable claim for the action to accrue, and may
> not bury her head in the sand once she is put on notice that
> the government may have caused an injury.  She will not
> automatically lose her claim, however, merely because the
> circumstances surrounding the injury make its existence of
> government cause not reasonably knowable.

*Id*.  The Court in *Diaz* concluded holding that a "wrongful death case accrues when

the plaintiff knows, *or exercising reasonable diligence* should know, both of the

decedent's death and its causal connection with the government." *Id*, at 1340

(emphasis supplied); *see also Gabelli v. S.E.C.*, ___ U.S. ___, 133 S.Ct. 1216,

1220 (2013) (a cause of action accrues "when with reasonable diligence, the

plaintiff has or should have discovered the critical facts of both [the] injury and its

cause.").[14]

Here, even if Plaintiff could not have known all the persons or circumstances

involved in Aparo's death, she knew that he died on September 19, 2010, that he

was an inmate at the time, knew that he was 27 years old, and through the exercise

of reasonable diligence, including retention of attorney, could have learned that

FDLE was conducting a criminal investigation into Aparo's death, obtained FDC

---

[14] An argument can be made that the accrual date in this case precedes Aparo's death on September 19, 2010. Plaintiff's ADA/RA claim against FDC is based on the failure or refusal to accommodate Aparo because of his OWR by denying him medical care, or access thereto during his 2009-2010 FDC incarceration. If so, then the acts constituting a failure to accommodate, and therefore the accrual date, began in November, 2009, and on each date thereafter up to and including September 19, 2010. In *Walton v. Florida Department of Corrections*, 2018 WL 19393520 (M.D. Fla. 2018 March 20, 2018), a case involving injuries to an inmate on one date followed by his death from those injuries on a later date, and the Court ruled that the accrual date was the date the decedent inmate suffered the injury, and not the date on which he later died. *Id*, at *5. The Court found that because the inmate was aware of the injury, and the personal representative who was suing in a "purely representative capacity... stepped into his shoes for all purposes." *Id*, at *5 (quoting *Lawson v. Okmulgee Cty. Crim. Justice Auth.*, 2018 WL 1104533 *4 (10th Cir., Feb. 28, 2018)). Thus, the accrual date or range for Plaintiff's ADA/RA claim would begin to run in November 2009 making her complaint due to have been filed in November 2013 under the four-year statute of limitations. As a practical matter, it is immaterial whether the accrual date is sometime in November 2009 or any date until September 19, 2010 given Plaintiff's claim against FDC would be barred by the four-year statute of limitations on any date during this time-frame.

records, all of which would have been sufficient to put her on notice of a potential

claim, and the date by which a complaint had to be filed.

**DELAYED DISCOVERY**

Plaintiff has not expressly alleged or asserted that actions by FDC delayed

her ability to learn of the facts and circumstances of Aparo's death, but she has

alleged generally the commission of "acts causing or concealing the intentional

death of [Aparo]." *See* Complaint, paragraph 2.  FDC will address this issue out of

an abundance of caution and note that: (1) there is no evidence that FDC withheld

or refused to disclose information or records to her or her attorney; (2) there is no

evidence that FDC or its employees ever gave false information to Plaintiff

regarding the circumstances of Aparo's death; and (3) it was FDLE, and not FDC,

who conducted the criminal investigation of Aparo's death during two separate

phases.  Additionally, under Florida law "only specific enumerated causes of

action are subject to a discovery accrual date, as opposed to a strict time period

beginning on the date of an identified act or omission." *Walton*, *supra*, at*7 (citing

section § 95.11(4, 7), Florida Statutes); (also citing *Davis v. Monahan*, 832 So.2d

708, 710-11 (Fla. 2002).[15]  Plaintiff's ADA/RA claim is not one of the enumerated

actions.

---

[15] Equitable tolling is an "extraordinary remedy available only when unavoidable
circumstances beyond plaintiff['s] control delay filing." *McGinley v. Mauriello*,

Therefore, Plaintiff's Title II ADA/RA claim against FDC is barred under the applicable four-year statute of limitations entitling FDC to summary judgment.

### III.   CONCLUSION

FDC is entitled to summary judgment on Plaintiff's ADA/RA claim on the grounds that Plaintiff did not have a disability, he never claimed to have a disability, he was not substantially limited in any major life activities, he never requested an accommodation, that section 95.11(10), Florida Statutes does not apply to Plaintiff's ADA/RA claim against FDC, and therefore, her claim is barred under the applicable four-year statute of limitations.

WHEREFORE, FDC's motion for summary judgment should be granted for all the foregoing reasons.

---

682 Fed.Appx. 868 n. 5 (11th Cir.2017) (citing *Downs v. McNeil*, 520 F.3d 1311, 1318-19 (11th Cir.2008).  In *Rowland v. Conyers*, 2013 WL 794860 *3 (N.D.Fla. 2013), this Court observed that the Florida Supreme Court in *Maschules v. Department of Administration*, 523 So.2d 1132 (1988) cited a ground for equitable tolling not listed in § 95.051, Florida Statutes, but also noted that the plaintiff in "had ample time to file [his] lawsuit" within the applicable statute of limitations. As in *Rowland*, Plaintiff had sufficient time to file her Complaint within the applicable four-year statute of limitations.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(F) of the N.D. Fla. Loc. R., I certify that this memorandum complies with the length limitation set forth in Rule 7.1(F) because it contains 11,362 words, as counted by Microsoft Word, excluding the items that may be excluded under Rule 7.1(F), the font used in this motion is Times New Roman 14-point font.

**DENNIS, JACKSON, MARTIN &
FONTELA, P.A.**

By*: William Peter Martin*
Peter@djmf-law.com
FL Bar ID No. 0843024
1591 Summit Lake Drive, Suite 200
Tallahassee, FL 32317
(850) 422-3345
(850) 422-1325 (Fax)
Attorney for Defendant FDC

49

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the above and foregoing has been furnished via electronic mail on this 3rd day of July, 2018, to:

Steven R. Andrews, Esquire
The Law Offices of Steven R. Andrews
822 North Monroe Street
Tallahassee, Florida 32303
steve@andrewslaw.com
ryan@andrewslaw.com
natalie@andrewslaw.com
lisa@andrewslaw.com
Attorney for Plaintiff

Brian C. Keri, Esquire
3375-H Capital Circle NE, Suite 4
Tallahassee, Florida 32308
brianckeri@earthlink.net
Attorney for Defendants Austin, Burch, Brown, Gillikin, Hamm, Hampton, Martina and Spangler

Jeff Howell, Esquire
Phipps & Howell
P.O. Box 1351
Tallahassee, Florida 32302
jeff@phipps-howell.com
margaret@phipps-howell.com
Attorney for Defendants Franklin, Goodwin, Greene, Housholder and Riley

**DENNIS, JACKSON, MARTIN & FONTELA, P.A.**

By*: **William Peter Martin***
Peter@djmf-law.com
FL Bar ID No. 0843024
1591 Summit Lake Drive, Suite 200
Tallahassee, FL 32317
(850) 422-3345
(850) 422-1325 (Fax)
Attorney for Defendant FDC

50