# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**AMANDA CIMILLO, as**
**Personal Representative of the**
**Estate of RANDALL JORDAN-APARO,**
**Deceased and MINOR CHILD APARO**
**The Natural Child of Randall Jordan-Aparo**
**By and Through Her Mother and Natural Guardian**
**Amanda Cimillo,**

      Plaintiffs,

**vs.**                      **CASE NO. 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN, et al.,**

      Defendants.

_____/

## PLAINTIFFS' RESPONSE TO DEFENDANT OLA MELISSA RILEY'S MOTION FOR SUMMARY JUDGMENT (DOC. 174)

      Plaintiff, Estate of Randall Jordan Aparo, and Cimillo, as Guardian of the Minor Natural Child, by and through its undersigned counsel, files this Response to Defendant Ola Melissa Riley's Motion for Summary Judgment (Doc. 174), and in support of its Response, states as follows:

## OVERVIEW

      Plaintiffs, the Estate of Randall Jordan-Aparo and Amanda Cimillo, as guardian of the Minor Natural Child, have sued Ola Melissa Riley ("Riley") for violations of  the Florida Wrongful Death Statute (FDA), Common Law Civil

1

Conspiracy, Violation of 42 U.S.C. § 1983 and Conspiracy to Violate 42 U.S.C. § 1983, alleging of violations of Common Law, Florida Statutory Law and Federal Statutes.

Randall Jordan-Aparo ("Aparo") was an inmate who was killed in the Department of Corrections ("DOC") at Franklin Correctional Institution ("FCI") on September 19, 2010. He had a rare and serious chronic disease, Osler-Weber-Rendu ("OWR") syndrome, and was also perceived to have a blood disorder, a bleeding disorder, hemophilia, and Von Willibrands disease, as was charted in his medical records and reviewed by DOC medical staff in 2007 and 2009-2010. Aparo was in DOC in 2007, and again from November 2009 to September 19, 2010, the day of his death.

On the day of his death, Aparo begged for medical assistance, and demanded accommodations. DOC violated policy by not calling a clinician, ignoring his requests for accommodations, and gassing him in response to his request for accommodations and medical intervention. Further, DOC employees Salman Choudhary, M.D., Nurse Riley, and ARNP Patricia Lemon-Watson ("Lemon") all believed that Aparo should not be gassed. These facts are not in dispute. On the day of his death, Aparo was alleged to have caused a disturbance in confinement, however, the only thing he did was request to be taken to a local hospital. In fact, he begged for medical treatment and for hospitalization. Numerous inmates within

the confinement wing heard Aparo crying for help and not being helped by the medical staff nor the correctional officers. Aparo continually screamed that he was dying and could not breathe. Aparo, while in the throes of death, was mocked, called a "snitch", and was told by Correctional Officers that nothing was wrong with him. At approximately 12:07 p.m. on the day he died, Aparo was administrated chemical restraints, and gassed for asking for accommodations and medical assistance.

Riley, beginning on the morning of September 19, 2010, acted with deliberate indifference, both objectively and subjectively, to the serious medical needs of Aparo. Riley was objectively aware that Aparo had complained about his inability to breathe and that on three times, she was unable to get a blood pressure reading on the afternoon of his death. Riley believed, and expressed the belief, that Aparo should not be gassed prior to him being gassed on September 19, 2010. Subjectively, the medical condition of Aparo on September 19, 2010, was one so obvious even a lay person would easily recognize the necessity for a doctor's attention based upon his medical condition that morning[1]. Riley was told by her superior that if she believed Aparo should not be gassed on September 19, 2010, she should put information in the medical record that would ensure that he would not be gassed. Riley did not chart any information on September 19, 2010, indicating that Aparo

---

[1] Riley knew that Aparo was going to be gassed based upon a request that she preform a Post-Use-of-Force Exam.

was subjectively at medical risk if subjected to gassing by the use of chemical restraint and especially OC gas which contains large amounts of citric acid. Persons allergic to citric acid can become anaphylactic and suffocate. Aparo's medical records are replete with charting that he was allergic to citric acid.

Immediately after Aparo had been gassed, Riley performed a Post-Use-of-Force Exam at approximately 1:15 p.m. in the confinement medical room which was captured on a handheld video. Riley took Aparo's vitals, but was unable to get a blood pressure reading twice, once using an electronic device and a second time using a manual cuff. The hand held video shows Aparo fully cooperative and still during the Post-Use-of-Force Exam.

At approximately 2:00 p.m., Riley attempted to take Aparo's blood pressure again. Riley believed that if she caused the Correctional Officers to open Aparo's cell to take his blood pressure, the Officers who had previously gassed him, would gas him again. Incredibly and inexplicably, despite Riley stating to her supervisors prior to Aparo getting gassed that he should not be gassed, **Riley believed that Aparo would be better off not being assessed by medical staff** during this critical time period when he had registered no blood pressure, **as opposed to Aparo being gassed again without legitimate reason.**

Additionally, Riley treated Aparo without having any knowledge of the symptoms (shortness of breath and predilection for anaerobic bacteria infections

such as septicemia) or treatment of OWR.  Riley altered and signed false medical records of Aparo on the date of his death in an effort to cover up hers and others direct and conspiratorial misconduct.

Lastly, it is Dr. Lisa Flannagan's ("Flannagan"), Medical Examiner, opinion that Aparo had actually died between 3:00 and 4:00 p.m. on September 19, 2010. Dr. Flannagan's opinion is bolstered by the amount of rigor mortis present at the time of the discovery of Aparo and the statement of Correctional Officer Kevin Hampton ("Hampton").[2]

## BACKGROUND AND STATEMENT OF MATERIAL FACTS, INCLUDING DISPUTED MATERIAL FACTS

Aparo was in inmate with DOC at two separate times, once in 2007 and from November 2009 through September 19, 2010.  Aparo lists his adopted Father as his contact for notification of an emergency.[3]  *See* **Exhibit 1**.  In 2007, Aparo was committed to DOC for a year and a day for retail grand theft shoplifting[4].  *See* **Exhibit 2**.

---

[2]  The OC spray administered to Aparo contained large amounts of capsicum.  Citric acid is contained in capsicum.  Aparo's medical records contained numerous indications that Aparo was allergic to citric acid. A citric acid allergy can cause anaphylaxis.  Anaphylaxis causes suffocation by closing the airway, which would cause petechiae to be present on an autopsy. Further, if Aparo died from allergy induced anaphylaxis, there would be no evidence of gassing in his lungs.  The autopsy of Dr. Flannagan found the presence of petechiae in Aparo's eyes that would suggest Aparo suffocated from an allergy induced anaphylaxis. *See* **Exhibit 20 pg. 2**. *See also,* https://allergy-symptoms.org/capsicum-allergy                                    and http://manoa.hawaii.edu/hpicesu/SAFETY/generic/05.pdf.  *See* **Composite Exhibit 57**.
[3] The Personal Representative of his Estate, Amanda Cimillo, was not listed as his next of kin and was not notified of his death at the time it occurred.
[4]  Theft of miscellaneous clothing having a value of $363.50.

In 2009, Aparo was committed to DOC for 19.8 months for car theft, possession of a controlled substance, fraudulent use of a credit card[5], fraudulent use of a credit card[6] (two counts), fraudulent use of a credit card[7], possession of oxycodone[8] and sell and delivery of oxycodone[9].  *See* **Composite Exhibit 3**.  Aparo was scheduled to be released after completion of his 2009 sentence on October 24, 2010.  This was one month and two days prior to his death.  *See* **Exhibit 4**.

### APARO'S TRANSFER FROM JEFFERSON CORRECTIONAL INSTITUTION ("JCI") TO FRANKLIN CORRECTIONAL INSTITUTION (FCI)

While confined at JCI, Aparo was approached by a white supremacy gang known as the Unforgiven.  The Unforgiven is known to operate in Florida prisons and are primarily involved in contraband smuggling. *See* **Exhibit 5**, pg. 7.  Additionally, it was well known throughout DOC that correctional officers conspired with white supremacy gangs to assist in the introduction of contraband, especially at FCI.  *See* **Exhibit 6**.  *See also* Aron Dep. 13:3-14:14.

Aparo was approached by the Unforgiven in the presence of Correctional Officer, Dennis Curry at JCI.  *See* Aron Dep. 10:19-11:12; 37:1-11.  Aparo was told that if he did not help the gang smuggle drugs into JCI, he and his roommate,

---

[5]  Plaintiff obtained goods and services in the amount of $394.96.
[6]  Plaintiff obtained goods and services including food in the total amount of $266.65.
[7]  Plaintiff obtained goods and services in the amount of $422.16.
[8]  Plaintiff was in possession or constructive possession of three tablets of Roxicodone.
[9]  Plaintiff sold one pill of oxycodone to a Pinellas Park Police Department uncover agent for $65.00.

William Aron ("Aron"), would be subject to beatings by the Unforgiven. S*ee* Aron Dep. 16:6-14.

Approximately on May 14, 2010, Aparo and inmate Aron reported that Aparo had been recruited to engage in a drug transaction that would result in drugs being smuggled into the prison. On or about May 14, 2010, Aparo and Aron gave a taped interviewed to a member of the DOC Inspector General's Office and a DOC Captain (since deceased). DOC regulations require that a DOC Inspector maintain the tape and file a report concerning the cooperating inmates. *See* **Exhibit 7**. *See also* Aron Dep. 35:11-37:27. At the time of the interview with the DOC Inspector General's office, both Aparo and Aron became subject to the protections afforded by Florida Statutes 914.28, otherwise known as Rachel's Law. *See* **Exhibit 8**. Neither Aparo nor Aron were provided these protections.

On May 21, 2010, Aparo approached JCI Warden Christopher Landrum advising him that he had been recruited to engage in two drops, one in front of the prison and one at the City of Monticello garage when arrested. *See* **Exhibit 9**. The individual that was to drop the drugs at JCI and the Monticello garage was identified as Geremi B. Pierce. *See* **Exhibit 10**. Although Pierce was not arrested for drug related charges, it was clear that Pierce was the person that dropped drugs at JCI in the parking lot and was in the area of the Monticello garage. It is unknown whether

the Monticello drop occurred.[10]  When the Monticello Police Department pulled over Pierce, drugs were not in the car[11].  The dog alerted to the presence of drugs in the car, but no drug charges were brought against Pierce.  *See* **Exhibit 10**, pg. 7.  *See also* Norton Dep. 5:7-9; 13:21-18:25.

The drugs that were subject to the drug drop at JCI were found by a correctional officer at approximately 3:00 p.m.  *See* **Exhibit 11**.  These drugs were never turned into evidence by depositing them into the evidence drop box at JCI, never became part of a written chain of custody of evidence maintained by DOC, and never turned over to the DOC Inspector General[12] or the Jefferson County Sheriff's office.  *See* **Exhibit 10**.  *See* Norton Dep. 29:1-25 and Dep. Exh. 5.  Further, this contraband investigation never involved the DOC Inspector General's Office and the drugs were never placed in a contraband safe.  *See* Murphy Dep. 46:25-48:10.  *See also* D. Curry Dep. 1:1-4:25; 58:1-59:25.  The drugs found on May 21, 2010 simply disappeared.

The drugs seized at JCI on May 21, 2010 were contraband for purposes of the Contraband Statute 893.12 (*see* **Exhibit 13**), and must have either been retained by DOC, maintained on a seized contraband list turned over to the Monticello Police

---

[10] The Monticello drugs were to be placed in the ceiling of the Monticello garage.  It is unknown if the drugs were recovered from that location.
[11] Pierce had once been an inmate at JCI and resided in Madison Florida.  *See* **Exhibit 12**.
[12] S*ee* Kelley Martin-El-Urfali ("Martin") Dep. 35:5-40:25.

Department.   Alternatively, DOC must have petitioned the Court in Jefferson County, that the drugs found on May 21, 2010 were contraband and seek an Order that the drugs be forfeited and destroyed.  *See* 893.12, Fla. Stat.  DOC has not produced any chain of custody logs in connection with the drugs found on May 21, 2010 at JCI, nor has DOC filed a Petition with Jefferson Courts seeking a destruction Order in connection with the May 21, 2010 drugs last reported in the possession of a Correctional Officer.  In other words, the drugs recovered on May 21, 2010 simply disappeared.

On the night of May 21, 2010, Aparo and Aron were transferred out of JCI. Aparo ultimately ended up being permanently housed at FCI.  *See* **Exhibit 14**.  Aron ended up being housed at Washington Correctional Institute for a brief time where he was stabbed by members of the Unforgiven within several weeks of his transfer from JCI.  *See* Aron Dep. 39:1-42:9.

Lastly, Aparo had a reputation as a "snitch" among prison staff at both JCI and FCI.  Two to three days prior to his death, he was accused of being a snitch by Defendant Hampton.[13]  *See* Craig Middleton Dep. 56:19-57:4.  *See also* affidavit of Timothy Butler, **Exhibit 16**.  *See* **Exhibit 16A**, Whistle Blower statement of Aubrey Land provided to the Office of the Inspector General.

---

[13] Defendant Austin, as far back as 1993, had threatened a Department of Transportation ("DOT") employee who had filed a complaint against him at the Glades County work camp.  The DOT employee filed the complaint after Austin accused him of being a "snitch".  *See* **Exhibit 43**.

9

Also, all supervisory personal at FCI would have had access to the MINs acknowledging Aparo as a cooperating witness (*see* **Exhibit 9**, *supra*), including Defendants Captain Mitchell Brown ("Brown"), Lt. Rollin Austin ("Austin"), Sergeant C. Gillikin ("Gillikin"), Sergeant Hampton and Sergeant J. Hamm.[14]   *See* Rita Hall Dep., *supra*.

### APARO'S MEDICAL RECORDS FOR 2007 INCARCERATION

From Aparo's initial incarceration with DOC in 2007, *see* **Exhibit 17**[15]**,** and through his final incarceration beginning in 2009, *see* **Exhibit 18,** and ending with his death at FCI on September 19, 2010, Aparo disclosed to DOC that he suffered from and was perceived to have a blood disorder and a bleeding disorder, specifically disclosing hemophilia, Von Willibrands disease, and ultimately OWR.

The symptoms associated with these disorders and especially OWR include shortness of breath and a predilection for the onset of sepsis.  *See* affidavit of Dr.

---

[14] When Aparo was transferred to FCI, the following DOC employees would have had access to the May 21, 2010 MINs describing Aparo as a confidential informant. S*ee* **Exhibits 9 and 14** s*upra.*  These DOC employees include all Wardens, Assistant Wardens, Colonels, Captains, Lieutenants, Admin Lieutenants, Warden Secretaries, classification personnel, CO-INST-PopMgmtAdmin, and CO-INST-AdminMoveTransfers.  Specially, the following DOC employees received information that Aparo was a cooperating witness: Chester Green, Stuart Harrison, Kelley Martin, Vivian Stallworth, Leah Berg, Suzanne Powell, Patti Cleveland, Stephanie Neel, Teresa Williams-Harris, Wendel Whitehurst, Timothy Cannon, Christopher Landrum, Ed Watson, Stan Rutherford, Gene Hatcher, FCI Infirmary Sergeant Dave Wallace (present on the date of Aparo's death), and Pridgeon George would have had access to the May 21, 2010 MINs and Request for Administrative Move Transfer(s) indicating that Aparo was transferred out of JCI due to his status as a confidential informant.  *See* Rita Hall Dep. 1:1-6:25, taken in *Hickman v. DOC*, DOAH Case No. 17-4374, and *see* Middleton Dep., *supra*.  **See Exhibits 14** and **Exhibit 15**.

[15] Aparo's DOC Administrative files for this 2007 and 2009 incarceration indicates that he was never administered any chemical agents prior to September 19, 2010.

Donald Kern, **Exhibit 19**.  *See* Lemon Dep. 63:1-65:25, Dep. Exh. 8 (NIH Medline) and *see* **Exhibit 20**, Autopsy Report of Lisa Flannagan, M.D.  In fact, Aparo complained of shortness of breath multiple times in the days leading up to his death. *See* **Exhibit 21.**  *See also,*  E. Curry Dep. 13:19-25; 36:19-37:8, Martin Dep. 19:4-7; 62:3-7, Middleton Dep. 11:23-13:4; 17:6-25; 20:16-21; 111:1-2, Porter Dep. 21:12-22:25, Stripling Dep. 127:9-12; 136: 13-15, and Thomas Dep. 17:14-25; 22:8-11; 37:11-38:5.

Contained within the medical records for 2007, were numerous records that discussed Aparo's bleeding issues during his confinement with DOC. S*ee* **Exhibit 17**, *supra*.  In particular, *see* Bates 004, 006, 008, 010, 013, 027, 037, 048, 055, 058, 061, 063-064 and 066.

DOC's charting in the above medical records for the 2007 incarceration clearly indicate that Aparo was diagnosed with hemophilia, Von Willibrands disease and ultimately OWR. Aparo regularly suffered from multiple bleeding incidents during 2007.[16]

---

[16] To the extent ARNP Lemon testified that Aparo had only started in June 2010 reporting to the clinic for bleeds was FALSE.  Lemon testified that she had recalled Aparo from 2007 and monitored his active bleeding is false.  S*ee* Lemon Dep. 58:1-62:25; 124:1-125:25. *See* Dep. Exh. 18.

## APARO'S MEDICAL RECORDS FOR NOVEMBER 2009 THROUGH SEPTEMBER 19, 2010 INCARCERATION

The medical records for Aparo while confined at DOC from November 2009 through September 19, 2010 indicate that Aparo routinely suffered bleeding from hemophilia, Von Willibrands disease and OWR during his 2009 incarceration.  *See* **Exhibit 18,** Bates 074-075, 076, 089, 090, 091, 093, 117, 130, 131-132, 138, 140, 141, 144, 154, 157, 158, 159, 160, 162, 166, 167, 168, 169-170, 173, 180, 174-175, 178, 176-184, 188, 190, 182, 193, 192, 194, 195, 196, 197, 200, 201, 202, 203, 204 and 206.

## MYSTERY DISCIPLINARY REPORTS OF JULY 16, 2010 AND JULY 21, 2010 AND RILEY'S EXECUTION OF THE JULY 21, 2010 RISK ASSESSMENT FOR THE USE OF CHEMICAL RESTRAINT AGENTS

On **July 16, 2010** at 10:00 a.m., Aparo received a Disciplinary Report ("DR") for not making his bed.  A DR of this type is highly unusual and normally issued for retaliatory reasons.  In connection with this DR, Aparo lost fifteen days of gain time as a result of the "failure to make his bed" DR.  *See* **Exhibits 22 & 23**.  This DR is clearly retaliatory.

On **July 21, 2010**, Aparo declared an inmate emergency regarding bleeding from his penis and his mouth.  S*ee* **Exhibit 18,** Bates 174.  Aparo was seen by Nurse Amy Goodwin, LPN at 10:30 a.m. on **July 21, 2010**.  He was given two urine dip stick tests, both of which were abnormal.  *See* **Exhibit 24**.

The record also shows, for that same date and time Aparo was seen in the Infirmary, Aparo also allegedly received a DR at **10:30 a.m.** signed by a Captain Paynter transferring him from general population to an administrative confinement cell pending disciplinary action for "disrespecting" unnamed officials. The disrespected officials are not named within the DR.  This DR was retaliatory and cost Aparo forty-three days of gain time. A DR provided to an inmate without naming the officials that were supposedly disrespected, is improper and cannot be defended by the inmate.  *See* **Exhibits 25 and 26.**  In two weeks' time, Aparo lost **58 days of gain time because of two insignificant DRs**.

Again on **July 21, 2010**, Aparo was seen by Nurse Adair, SRN ("Adair"), supposedly at **10:30 a.m.** for an inmate declared emergency.  At that time, Aparo was given two urine dip stick tests, both of which produced abnormal results. *See* **Exhibit 24**, *supra.*  Aparo was diagnosed and **treated for a urinary tract infection** with Cipro[17].  *See* Bates 174.   This Cipro was not prescribed for OWR.  Then, at 4:00 p.m., Aparo was seen by Lemon who also diagnosed him with a urinary tract infection and a bleeding disorder.  *See* **Exhibit 18**, Bates 176-177.  *See also* Lemon Dep. 122:1-126:25.

---

[17] Cipro was not administered to Aparo as treatment for his OWR syndrome. *See* Lemon Dep. 45:19-25; 49:14-50:10.

Despite what was an emergent medical condition on **July 21, 2010**, Riley signed, that very day, a Risk Assessment for the Use of Chemical Restraint Agents and Electronic Immobilization Devices ("Risk Assessment"). In signing the Risk Assessment, Riley averred that she had reviewed Aparo's medical records including him bleeding from his mouth (lungs?) and penis on **July 21, 2010** when Riley was present in the infirmary. Prior to signing the Risk Assessment, Riley should have reviewed his medical records back to 2007 which indicated that Aparo had multiple bleeds including coughing up blood. *See supra*. *See* Edward Watson Dep. 4:22-5:24. *See* **Exhibit 17***, supra.[18]*  Bates 004, 006, 008, 010, 013, 027, 037, 048, 055, 058, 061, 063-064 and 066.  *See* **Exhibit 18,** 074-075 (Intake Screening disclosing OWR), 076 (Health Problem List), 089-091 (Initial Physical Exam), 093 (DOC Health Appraisal: coughing up blood (lungs), blood clotting problem, blood excessively after injury), 117, 130 (coughing up bright red blood), 131-132, 138, 140-141 ("blood disorder", "Osler-Weber-Rendu"), 144, 154 (SOAP Assessment OWR), 157, 158, 159, 160, 162, 166 (bleeding that won't stop), 167, 168, 169-170 (diagnosed with OWR), 173-184.

Despite signing the Risk Assessment on **July 21, 2010**, **Riley testified that in-fact she knew nothing about OWR** including its symptoms. Further, in Riley's Responses to Plaintiff's Request for Admissions dated August 23, 2017, she

admitted in request #3 that she lacked knowledge of the symptoms of OWR until after she was sued. Furthermore, Riley signed the July 21, 2010 Risk Assessment knowing Aparo had abnormal urine results and a UTI. *See* Riley Dep. 14:2-9. *See also* Def. Riley's Response to Plaintiff's Request for Admissions dated August 23, 2017 and Def. Riley's Response to Plaintiff's Request for Admissions dated April 4, 2018, No. 65-66, **Exhibit 27**.

On or before **July 21, 2010**, Riley committed culpable negligence by undertaking the following acts or omissions:

a.     by rendering in essence a medical opinion, when she consciously signed the Risk Assessment for the Use of Force of Chemical Agents on July 21, 2010 (*see* **Exhibit 28**) that Aparo was free to be gassed by Correctional Officers **despite having no knowledge of the symptoms of OWR**; *supra*, and

b.     by consciously executing the Risk Assessment for the Use of Force of Chemical Agents on July 21, 2010 having no knowledge of OWR or its symptoms, is conduct that a reasonable person, and especially a nurse, would know that if Aparo was gassed on **July 21, 2010,** *see supra* **Exhibit 28**, it was **likely** to result in death or great bodily harm. *See J.C. v. State*, 233 So. 3d 519; 2018 Fla. App. LEXIS 174**; 43 Fla. L. Weekly D 108*; State v.*

*Greene,* 348 So. 2d 3, 4(Fla. 1977)*; Tsavaris v. State*, 414 So. 2d 1087, 1088 (Fla. 2d DCA 1982).

      c.    by consciously executing the Risk Assessment for the Use of Force of Chemical Agents on July 21, 2010, knowing that his symptoms had changed in derogation of the form. *See supra*, **Exhibit 28**.

Nurse Riley committed culpable negligence on a disabled person in the event that as a result of signing the July 21, 2010 Risk Assessment, Aparo would have been gassed.

## RILEY TESTIFIED THAT SHE KNEW PRIOR TO THE GASSING, APARO SHOULD NOT HAVE BEEN GASSED ON SEPTEMBER 19, 2010

### Summary of Aparo's Medical Treatment on September 17th to September 18th

On September 17, 2010 at 10:15 p.m., Aparo declared an inmate emergency. At this visit, Aparo advised Nurse Martha Greene ("Greene") that his back pain increases with urination.  Greene charts that he may have blood in his urine, but Aparo was unable to give a urine sample due to the pain associated with urination. Greene charts this as a refusal of treatment.  His blood pressure was charted as 98/54 and pulse is 120 bpm.  *See* **Exhibit 18,** Bates 194 *supra.*

During the early morning hours of September 18, 2010 beginning at 12:10 a.m., Aparo was ordered to receive 1000 ml of lactated ringers for dehydration to be administered by Nurse Greene.  Greene was unable after several attempts, in placing

the IV in Aparo.  Thus, Aparo does not receive IV fluids as ordered. Riley was aware of this omission when she arrived at 6:00 a.m.  *See* Riley Dep. 66:16-67:6, *see also* Sworn Statement of Riley, Bates 716. *See* **Exhibit 18**, Bates 197 *supra*.  Of the five timed entries made on the morning of September 18, 2010, four are identified as late entries in violation of the DOC Nursing Manual. *See* **Exhibit 18A**.

The Chronological Record of Health Care, **Exhibit 18**, Bates 197, supra, charted by Greene and Franklin on September 18, 2010 states as follows:

a.  "9/18/10 0010
Inmate EMID Inmate to Infirmary by w/c
"I can't breathe. Now I can't sleep."
VS BP 80/50, P 110, T 98.7, lips-dry, heart rhythm-reg
Lungs sounds clear x4 – still claiming no ua - EKG done[19]
Poss Dehydration
Call to on call MD – Hold in infirmary"

b.  Late entry "9/18/10 0220 (via late entry) SPO2 98%, P 98 bpm, sips of H2O taken.
Still c/o breathing problems, leg pain."

FDLE interviews of Captain Brown, Correctional Officer Patricia Cicirello ("Cicirello"), Harold Baker ("Baker") and Greene all testified to SA DeVaney that

---

[19] The EKG done by Greene was not normal and in fact, abnormal.  It showed that Aparo was suffering from tachycardia on 9/18/2010.  See Lemon Dep. 109:25-110:-9.  See also FDLE Serial 34, pg. 2:

*"When SA DeVaney advised Dr. Arunakul that this investigation revealed that inmate Jordan-Aparo had continual complaints regarding chest pains over at least a three (3) day time period, he (Dr. Arunakul) stated that any time an inmate complained of chest pains, an inmate would immediately be examined by a physician. Dr. Arunakul added that a DOC nurse had no option but to contact a DOC physician with an inmate's complaints of chest."*

Aparo had complained of chest pains, specifically that "his heart was hurting." *See* *Composite* **Exhibit 29** (FDLE Serials). DOC Office of Health Services requires that a Chest Pain Assessment be done each time an inmate complains of chest pains. *See* **Exhibit 30**. No Chest Pain Assessment forms (2001) are included in Aparo's 2010 medical records. Additionally, no Respiratory Assessment forms (2000) are included in Aparo's 2010 medical records despite his numerous complaints of shortness of breath. *See* **Exhibit 31**. Further, the medical records indicate that Aparo had mottling on his back which would have required that a Skin Protocol be instituted. *See* **Exhibit 31A**. The numerous DOC nurses that failed to fill out the mandatory Chest Pain Assessment and Respiratory Assessment forms assessing Aparo's chest pains, shortness of breath, and skin abnormalities are evidence of concerted action to engage in a cover up or are evidence of deliberate indifference.[20]

Suddenly on September 18, 2010, Riley was advised that Aparo was removed from the infirmary contrary to both the doctor's orders and DOC policy. DOC policy requires that if a doctor orders an inmate to the infirmary for 23 hour observation, that inmate cannot be released without a doctor's order.[21] Riley testified that she notified the doctor about the release of Aparo from the infirmary to "cover us." *See*

---

[20] Riley noted skin mottling twice on duplicate forged medical records, and twice failed to do a skin protocol. *See* **Exhibit 31B and 31C**.
[21] *See* Lemon Dep. 112:10-113:12; *see also* Sworn Interview of Capt. Brown, DOC Bates 000689, lines 4-16.

Riley Sworn Statement, Bates 741.  However, nowhere in the medical records for September 18, 2010, does this note appear nor was any physician notified.

This "cover up" which was ongoing, at least from September 18, 2010 concerning the improper release of Aparo from the infirmary, contributed to his death by delaying treatment to Aparo.  Dr. Flannagan found that the infectious process in Aparo's lungs had been ongoing since at least September 15th, and had he received antibiotics or other care including care from Riley, he would have had a better chance of survival.  *See* Flannagan Dep. 36:11-37:10.  *See also,* Affidavit of Flannagan, **Exhibit 32**.  Further, Dr. Hantz Hercule ("Hercule"), the Regional Medical Executive Director for Region One, categorized the treatment of Aparo, including the treatment by Riley, as being a "gross delay" and "gross negligence." *See* **Exhibit 33**, DOC Bates 000533, 000589, 000590, 00594, 00595 and 00604.

### NURSE RILEY'S ACTIVITIES ON SEPTEMBER 19, 2010

### Riley's Objection to the Gassing of Aparo and Taking no Action

Prior to the commencement of the gassing of Aparo at 11:54 a.m., Riley and Nurse Lucy Franklin-Jones ("Franklin") received a call from security asking them to be available to do a Post-Use-of-Force Exam.  Riley was informed that Aparo was to be gassed and knew that Aparo had been removed from the infirmary contrary to DOC rules.  Riley also knew that Aparo did not receive the 1000 ml of lactated ringers that was ordered to be given on September 18, 2010. *See* Riley sworn

statement, *see Bates 726, lines 5-9,* **Exhibit 18**, Bates 182.  Riley, prior to the gassing on September 19, 2010, spoke to Nurse Supervisor Lynda Adair, RN ("Adair") and advised her:

> *"I don't think he should be gassed because he supposed to have gotten IV fluids. She (Adair) said if there is nothing documented on the chart that prevents him from being gassed, he could get gas.[22]*

Riley obviously believed Aparo was dehydrated and did not receive his IV fluids previously ordered.  **Adair told Riley if there is nothing documented in the chart that prevented him from being gassed, he could be gassed.**  Despite Adair's admonition that Riley chart her concerns in the record to avoid Aparo being gassed, Riley put nothing in the medical record about her concerns and belief there should be a documented intervention. Riley was grossly negligent by not intervening and executing a new Risk Assessment on the morning of September 19, 2010, prior to Aparo's death.  *See* **Exhibit 34**, Bates 003400 and 003403 interventions.  *See also,* the sworn statement of Riley, Bates 000726, lines 5-9 *supra*.  Adair's testimony to SA DeVaney confirmed that Riley had called Adair prior to the gassing.  *See also* **Exhibit 36**, FDLE Serial #21.  Riley had an independent duty to report events that were dangerous to her patient prisoners. Riley failed to act in any manner about her

---

[22] The only thing in the chart that could have prevented Aparo from being gassed would have been a new Risk Assessment dated September 19, 2010, which would have superseded the Risk Assessment executed on September 18, 2010.  *See* **Exhibit 35**.  Riley also could have called Defendant Austin and advised him that Aparo should not be gassed.

concerns, thus violating her independent duty to protect Aparo. This failure to act was subjectively and objectively unreasonable and as a matter of law, would have violated the 8th Amendment. *See* Riley Dep. 6:16-7:1.

Further, Riley failed to contact Dr. Salman Choudhary, MD, the on call physician before the gassing of Aparo to express her concerns about Aparo being gassed. Had Riley called Dr. Choudhary prior to the gassing of Aparo to express her concerns and advised Dr. Choudhary that Aparo suffered from OWR, Dr. Choudhary would have "never" approved the gassing of Aparo. *See* Choudhary Dep. 25:8-19. *See* Riley Dep. 15:2-23.

## Riley's Post-Use-of-Force Exam

Riley's Post-Use-of-Force Exam on Aparo was filmed on a handheld video on September 19, 2010 at approximately 1:15 p.m. *See* ECF Doc. 180-10. The handheld video of Riley's examination indicates that at all times Aparo was compliant, not moving his arms or interfering with having his blood pressure being taken. Aparo was constantly complaining that he could not breathe. The only charting concerning the 1:15 p.m. Post-Use-of-Force examination in the Chronological Record of Health Care is a late entry by Riley simply acknowledging that a post use of force exam was done. *See* **Exhibit 18**, Bates 201.

Riley did not attempt to retake the blood pressure of Aparo until approximately 2:00 p.m. At this time, Riley attempted to pass a wrist blood pressure

cuff through the cell door opening.  Riley could not obtain a blood pressure from Aparo because Aparo "stood up and fell to the floor".  Aparo was lying on the floor and could not get up.  Riley could have but did not request Aparo be removed from his cell by correctional officers and be taken to the infirmary.  **Riley did not request that Aparo be taken to the infirmary** *because she was afraid that the guards would gas him again*.  *See* Riley Dep. 24:18-25:16.[23]

Riley notified Dr. Choudhary at 2:00 p.m. that she could not obtain a blood pressure from Aparo because Aparo "stood up and fell to the floor" and Choudhary advised her to retake the blood pressure. Dr. Choudhary does not recall this conversation. *See* Choudhary Dep. 35:25, 36:1-3. Riley never notified Dr. Choudhary after the third failed attempt to obtain a blood pressure.

Two hours after her 1:15 p.m. Post-Use-of-Force Exam where she twice could not obtain a blood pressure and after a period of an hour and a half after Dr. Choudhary told her to retake the third attempted blood pressure at 2:00 p.m., Riley finally then returns to Aparo's cell to retake the blood pressure at 3:25 p.m.

---

[23] "So, your fear was that -- that, if you continued to ask the COs to unlock the door, he continued to refuse – your fear was they would gas him again?...  A: Correct."

### RILEY ALLOWED THE PLAINTIFF TO BE PUT BACK INTO A CONTAMINATED CELL AFTER HER INITIAL POST-USE-OF-FORCE ASSESSMENT

Nurse Riley was aware that the pepper spray and OC gas was detrimental to the health of Aparo as indicated in the hand-held video where she advised the guards that he needed to be cleaned up again. *See* ECF Doc. 180-10.

After the gassing and after the Post-Use-of-Force Exam, Aparo's cell was half heartily cleaned by orderlies for approximately 20 minutes. *See* ECF Doc. 180-9 at 12:12 p.m. to 12:33 p.m.  Aparo's cell was obviously still contaminated at 9:00 p.m. when FDLE came and took crime scene photos.  See **Exhibit 52 and 53**.  Aparo's time of death was approximately 3:15 p.m. to 3:30 p.m. per Dr. Flannagan's deposition testimony, or at 6:30 p.m. based upon DOC charting.  Aparo was subject to continued contamination exposure from chemical agents sprayed in his for at least three hours and possibly six hours on the day of his death. Aparo's exposure in his tiny confinement cell was no different than being placed in a 4 point restraint chair while being gassed.

### APARO'S TIME OF DEATH

It was very likely that Aparo was already deceased at 3:15/3:25 p.m. based upon his severe rigor mortis at the time he was discovered at approximately 6:20

p.m.  *See* Flannagan Dep. 41:8-42:2. *See also* Stripling Dep. 16:17-20:16.[24]  *See* **Exhibit 36** *supra*.  Thus, any medical records that purport to chart the condition of Aparo after 3:15 p.m. are arguably false based on the testimony of Dr. Flannagan (*supra)* and an examination of the fixed wing video. *See* ECF Doc.180-9.  *See also* **Exhibit 37**. *See also,* **Exhibit 18**, Bates 201, 202, 203, 204 and 206.  The majority of these records were prepared and signed by Riley.  Lastly, *see* ECF Doc. 144.  The fixed wing video makes clear that the last time Riley or any other nurse checked on Aparo, was at approximately 3:17 p.m.

Between 1:15 p.m. and 3:25 p.m., various correctional officers and inmate orderlies approached Aparo's cell and looked inside.  *See* ECF Doc. 180-9, fixed wing video.  Plaintiff is unable to identify all of the correctional officers and orderlies that went to Aparo's cell and peered into the flap.  However, of the correctional officers that could be identified from the fixed wing video, Defendant Austin, Defendant Gillikin, Defendant Martina, Officer McClain and Defendant Christopher Spangler ("Spangler") looked into Aparo's cell a total of 89 times between 12:30 p.m. and 3:45 p.m. *See* attached composite summary **Exhibit 38**.  At 3:45 p.m., the show was over.  This is consistent with the testimony of inmate witness Angelo Stripling who quoted a correctional officer saying "this shit is

---

[24] Riley described Aparo's rigor mortis as being so severe that they used his stiff arms to roll him over. See Riley Dep. 40:17-42:11.

fucked-up, let's leave it for the next shift".  *See* Stripling Dep. 16:23-18:4.   It's clear that Riley's charting at 4:00 p.m. is most likely false.

After 4:00 p.m., the start of the next shift[25], one correctional officer looked in on Aparo for a brief moment at 5:28 p.m. Then at 6:11 p.m. Aparo was discovered deceased.

## EVIDENCE OF A CONSPIRACY

There is clear evidence of a conspiracy involving Riley, Nurse Franklin, Nurse Greene and as well as the Defendant Correctional Officers.  Between the gassing and 3:15 p.m., correctional officers looked into Aparo's cell approximately 89 times. After 3:15 p.m., one correctional officer looked into Aparo's cell at 5:28 p.m. and then Aparo was found deceased at 6:11 p.m.   At approximately 4:24 p.m., the meal cart carrying Aparo's dinner and pushed by a correctional officer passed Aparo's cell briefly stopping.

Riley and the others were acting outside of the course and scope of their employment, their actions were not for the benefit of their employer and they had a particular power of coercion and force based on their numbers and supervisor status.

Additionally DOC, in DOC case #13-7092, found strong evidence of creditable allegations that there was a conspiracy involving, among others, Defendants Hampton and Austin.  DOC determined that there were allegations of

---

[25] *See* **Exhibit 39** FDLE Predicate to Investigative Report 13-9886 pg. 4.

misconduct including "hits" being placed on inmates by staff and falsification and fabrication of reports and documents. *See* **Exhibit 40**, FDOC case briefing 13-7092. This investigation included allegations involving the death of Randall Jordon-Aparo. *See* **Exhibit 40**.

In SA Devaney's interview with Austin (FDLE Serial 13, *see* **Exhibit 61**), Austin instructed Spangler to conduct checks every 15 minutes on inmate Aparo due to his reported respiratory distress, **which was reported by the nurses**[26]. The fixed wing video makes clear that either Austin did not tell Spangler to check on Aparo's respiratory distress or Spangler chose not to do so. *See* ECF Doc. 180-9. Lastly, the special housing record makes no mention of Spangler checking on Aparo. *See* **Exhibit 42**, DOC Inspection of Special Housing Record.

## MEMORANDUM OF LAW

### I.   THE SUMMARY JUDGEMENT STANDARD

A court should not grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is genuine issue as to any material fact and that the moving party precluded from summary judgement. *See* Fed. R. Civ. P. 56.

---

[26] No place in the medical records after the gassing of Aparo is there any mention of a nurse concerned with Aparo's shortness of breath. *See* **Exhibit 41**, DOC Chronological Record of Healthcare. This medical record contains mostly late entries by Riley.

## II.    NURSE RILEY IS NOT ENTITLED TO THE DEFENSE OF QUALIFIED IMMUNITY

Nurse Riley is not entitled to the defense of qualified immunity because her actions on September 19, 2010, violated preexisting law as a result of her falsification of medical records contrary to Florida law.   Florida law provides that any person who fraudulently alters, defaces, or falsifies any medical record, or causes or procures any of these offenses to be committed, commits a misdemeanor of the second degree.  *See,* 395.302, F.S. (2018).  Riley also violated 18 U.S.C. section 1519, as evidence exists that could permit a jury to find that she altered or destroyed medical records to impede the administration of justice. *See United States v. Gray* 642 F3d 371. (2nd Cir 2011)

Riley could not have been acting in the scope of her duties as a nurse when she engaged in the falsification of Aparo's medical records.   Thus, Riley is not entitled to, as a matter of law, a defense of qualified immunity.  Riley cannot claim that she was acting within the scope of her duties as a state employee or engaging in discretionary functions when she falsified Aparo's medical records in contravention of a Federal Statute and a Florida Statute.  *See*, *Lumley v. City of Dade City*, 327 F.3d 1186, 1194 (11th Cir. 2003), *see also*, *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  The burden of proof in regards to whether or not a defendant is entitled to assert qualified immunity rests with the defendant and is the threshold issue.  In order to assert qualified immunity, Riley must show that when she was engaged in

the falsification of medical records, she was performing a legitimate job related function. She cannot assert that she was acting within the scope of her authority because Dr. Flannagan testified that Aparo died as early as 3:30 p.m., with an inmate testifying it could have been as early as 2:00 p.m. *See* Porter Dep. 13:7-14:22. Flannagan's testimony concerning time of death based on Aparo's rigor mortis is bolstered by the fixed wing video showing no activity in front of Aparo's cell after 3:00/3:30 p.m. Every nurse would be placed on notice that the falsification of a medical record is clearly unlawful given these circumstances from the first day of nursing school. A conviction for altering or defacing medical records would prohibit a person from engaging in the practice of nursing. It cannot be objectively reasonable. *See* ECF Doc. 145 and ECF Doc. 156.

If the Court finds that Riley was performing a discretionary function and thus entitled to assert qualified immunity, the Court should look as to whether or not (1) Riley had fair warning that her conduct would violate a constitutional right that is obvious to all reasonable government actors, (2) Riley violated broader clearly established principle which should control the novel facts of this case, (3) Riley violated a clearly established right that lies so obviously at the very core of what the Eighth Amendment prohibits that her unlawfulness would be readily apparent to any official, and (4) Riley's acts were so obviously clear and her conduct was so bad that

case law is not needed to establish and put her on notice that the complained of conduct cannot be lawful. *See Jones v. Fransen*, 857 F.3d 843. (11th Cir. 2017).

DOC has determined that Riley failed to provide timely medical care to Aparo and acted with "gross negligence" with the performance of her duties. *See* **Exhibit 60**, Bates 589.

First, Riley allowed Aparo to be placed back into a barely cleaned and clearly contaminated cell which continued his exposure to chemical agents for many hours up to the time of his death. This would violate clearly established law in the Eleventh Circuit, *see Danley v. Allen*, 540 F.3d 1298 (11th Cir. 2008).

The fixed wing video shows that after approximately 3:15 p.m., Nurse Riley never went back to check on Aparo despite her knowledge that he suffered from OWR, had complained of shortness of breath numerous times in the proceeding days and failed to cause him to be admitted to the hospital. It's clear from the handheld video which depicted Riley's Post-Use-of-Force examination of Aparo and her attempts to obtain a blood pressure twice and then a third time at 3:15 p.m. were futile. Riley violated Aparo's minimal rights to medical care. *See Harris v. Coweta Cty.*, 21 F.3d 388, 393-94 (11th Cir. 1994) and *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999) (delaying medical care). Further, Riley cannot show that her conduct lies so obviously at the core of what the Eighth Amendment prohibits that her unlawful conduct would have been readily apparent to any official

notwithstanding the lack of controlling authority.  A cop maybe entitled to shoot his gun as part of his discretionary duties, but he is not entitled to lie about it.

Lastly, Riley should not be entitled to qualified immunity because she failed to protect Aparo from the use of excessive force.  Riley stated that she knew if she asked Defendant Austin to pull Aparo out of his cell, Riley was afraid that he would be punitively gassed again.  Punitive gassing is a violation of the Eighth Amendment and was clearly established law in 2010.  *See Cabaniss v. City of Riverside*, 231 Fed. Appx. 407, 413 (6th Cir. 2007); *Grawey v. Drury*, 567 F.3d 302, 310-12 (6th Cir. 2009); *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008); *Danley v. Allen*, 540  F.3d 1298, 1308-10 )(11th Cir. 2008); *United States v. Gonzales*, 436 f.3d 560, 571-72 (5th Cir. 2006); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902-03 (6th Cir. 2004); *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002). Moreover, Riley's conduct was so bad, and she knew it, such that she should not be entitled to qualified immunity.

Further, Riley should not be entitled to qualified immunity because she disregarded a serious risk to Aparo when she knew that Aparo was in serious need of medical care both before and after his gassing by failing to obtain medical treatment for Aparo, including pain medication for his complaints of pain from September 17th through his death. *See Lancaster v. Monroe Cty.*, Ala., 116 F.3d 1419, 1425 (11th Cir. 1197), <u>overruled on other grounds</u> by *LeFrere v. Quezada*, 588

30

F.3d 1317, 1318 (11th Cir. 2009), *see also*, *McElligott v. Foley,* 182 F.3 1248, 1255 (11th Cir. 1999).

Lastly, *see infra* at IV. "Deliberate Indifference." The law was well settled that a delay in treatment, or no treatment, violated the Eighth Amendment.

## III.   RILEY COULD BE FOUND GUILTY OF MANSLAUGHTER PURSUANT TO 782.07, FLA. STAT.

There is evidence that Riley engaged in acts that would be considered manslaughter of Aparo as a result of culpable negligence.  After three attempts to take Aparo's blood pressure, each attempt showing that he had no blood pressure, the Jury could certainly find that Riley was guilty of manslaughter by (1) failing to notify Dr. Choudhary of Riley's third failed attempt at obtaining a blood pressure contrary to his orders; (2) by failing to demand that the correctional officer remove Aparo from his cell so she could assess him; (3) failing to call 911 so that Aparo could be taken to a hospital, which Riley admitted that she had the right to do; and (4) by failing to call 911 when Aparo fell to the floor of his cell after being gassed.

These facts, as they relate to Riley, are similar to *Ramos v. State*, 162 So. 3d 992, (Fla. 1st DCA 2015).  In <u>*Ramos,*</u> a mother's manslaughter conviction of the death of her child was upheld.  The appellate court found that defendant Ramos was culpably negligent by allowing her 19 month old son to wander, unsupervised, fall from the second floor of an apartment building, requiring neighbors to attempt to rescue him from drowning in a pond and a spa, and ultimately drowning in a

31

retention pond.  *See* Jury Instructions for Manslaughter attached hereto as **Exhibit 55**. Thus, a jury could conclude that Riley committed manslaughter of a disabled adult, meaning that the statute of limitations would never run as to Riley.

## IV.   DELIBERATE INDIFFERENCE

To prove deliberate indifference, a Plaintiff must show three things: (1) that the inmate had an objectively serious medical need; (2) that the defendant acted with deliberate indifference; and (3) that the defendant's wrongful conduct caused the detainee's injury.  *See*, *Goeber v. Lee County*, 510 F.3d 1312, (11th Cir. 2007).

### Riley's Conduct Does Constitute Deliberate Indifference

Dr. Flannagan testified that the administration of chemical agents was a contributing factor to the death of Aparo and listed on her autopsy report as a pathologic diagnoses that Aparo had been pepper sprayed.   *See* Flannagan Dep. 46:1-17.  *See also* Expert Report of William R. Anderson, M.D., **Exhibit 56**.  There is also evidence that Aparo's citric acid allergy may have caused anaphylaxis. *See* **Composite Exhibit 57**.

Riley engaged in deliberate indifference by failing to notify either an ARNP or physician at 1:15 p.m. that Aparo did not return a blood pressure after two attempts in the treatment room.  No blood pressure after gassing, would subjectively and objectively indicate that Aparo was suffering from a serious medical condition warranting immediate treatment.  Further, Riley engaged in deliberate indifference

objectively and subjectively by not calling a physician contrary to his expressed order that he be notified in the event that Riley could not obtain a blood pressure after the second and third attempt.  Riley engaged in deliberate indifference both objectively and subjectively by failing to conduct a Respiratory Assessment, Chest Pain Assessment and conduct a Skin Protocol. Riley engaged in deliberate indifference by failing to call 911 after the second/third attempt at taking Aparo's blood pressure had failed.  Riley also engaged in deliberate indifference both subjectively and objectively by waiting almost two hours to retake Aparo's blood pressure for the third time.  Riley engaged in deliberate indifference both objectively and subjectively by not notifying a physician that Riley had determined Aparo was wheezing from his right lower lobe at the Post-Use-of-Force Exam. *See* **Exhibit 58**. Riley engaged in deliberate indifference by attempting to treat Aparo for OWR when she admitted that she know nothing about the disease.  Riley engaged in deliberate indifference by not monitoring Aparo for any signs of respiratory distress or shortness of breath, not getting immediate medical treatment and allowing Aparo to lay on the floor of his cell.  *See* **Exhibit 59**, 33-602.210, F.A.C. (0 medical requirements).

The controlling case law regarding deliberate indifference requires that a Plaintiff must show that the defendant acted with a culpable state of mind and must show that the medical provider knows of and disregards an excessive risk of an

inmate's health or safety.  The health care provider must be aware of facts where an inference could be drawn that a substantial risk of harm exists and he must also draw the inference from the facts from which the provider is aware.  In Riley's case, she was aware of facts that a substantial risk of harm existed and she was aware from the facts that she knew that a substantial risk of harm to Aparo existed and she did nothing.  In other words, Riley was aware of facts from which an inference could be drawn that Aparo was at a substantial risk of harm.  Riley acted with deliberate indifference when she intentionally delayed taking his blood pressure a third time. Riley knew that Aparo's lack of a blood pressure for approximately two hours would exacerbate his condition and further failed to call the doctor to advise the doctor of Aparo's condition.  *See*, *Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176 (11th Cir. 1994), overruled in part on other grounds by *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) and *also see*, *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988).  Delay in medical treatment must be interrupted in the context of the prisoner's need and condition.  Where delay results in an inmate's death, a medical need is considered serious.

"Grossly incompetent or inadequate care can constitute deliberate indifference ...as can a doctor's decision to take an easier and less efficacious course of treatment." *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989), citing Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986*); McElligott v. Foley*, 182 F.3d 1248, 1255

(11th Cir. 1999). *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016) (noting that "[a] defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference.").

An "official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *McElligott*, 182 F.3d at 1255 (*citing Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997)); *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989).

*Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994). The Eleventh Circuit has found cognizable deliberate indifference claims when prison officials delayed treatment for life-threatening emergencies and in "situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Hill* at 1187. "A delay in providing medical treatment can constitute deliberate indifference in violation of an inmate's constitutional rights." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

An inmate who complains of a delay in medical treatment must be able to prove the detrimental effect of the delay. *Townsend v. Jefferson Cnty.*, 582 F.3d 1252, 1259 (11th Cir. 2009). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to

35

a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." *See Youmans v. Gagnon*, 626 F.3d 557, 561 (11th Cir. 2010); *see also Farmer v. Brenna*n, 511 U.S. 825, 834 (1994) (serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm."). In delay of treatment cases, relevant factors include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007). *See generally*, **Exhibit 60**.

## STATUTE OF LIMITATIONS

The Supreme Court and the Eleventh Circuit have both stated that "[I]n *Section 1983* actions '[o]nly the length of the limitations period, **and the closely related questions of tolling and application, are to be governed by state law.**'" *Wilson v. Garcia*, 471 U.S. 261, 269 (1985); *McGinley v. Mauriello*, 682 F. App'x 868, 871 (11th Cir. 2017). As noted in *Jones v. Childers*, 18 F.3d 899, 906 (11th Cir. 1994), Florida courts have relied on the reasoning in *Urie v. Thompson, 337 U.S. 163(1949), holding in a variety of legal contexts that "the* statute of limitations begins to run when a person has been put on notice of his right to a cause of action" and "under Florida law, a party is held to have been put on notice when he discovers, or reasonably should have discovered, facts alerting him of the existence of his cause of action." 18 F.3d at 906.  Applying Florida law to the tolling period is controlled

by *Tanner v. Hartog*, 618 So. 2d 177, Fla. 1993. *Tanner* states that mere knowledge of an injury which could have occurred from natural causes, without more, holds that in determining the point at which a statute of limitations starts to run when the plaintiff has engaged in additional fact finding that would indicate the injury occurred in a tortious manner and the persons who are responsible for such tortious injury. When a Plaintiff should have discovered the cause of action is a question of fact for a jury. *See Jones*, 18 F.3d at 907 (11th Cir. 1994) ("Whether the plaintiff discovered, or by due diligence should have discovered the existence of the cause of action . . . was a question of fact . . . and it has been held that genuine issues relating to such question of fact are to be determined by the trier of fact"). *See* **Exhibit 44**. Dr. Flannagan received a phone call from Aparo's step father concerning his death. Dr. Flannagan advised the adopted father that Aparo's death occurred from an infection. However, *see* Flannagan Dep. 46:14-17.

Further, the Death Certificate of Aparo, gives no indication that the gassing of Aparo was a contributing factor to his death. S*ee* **Exhibit 45.** Thus, the Personal Representative of the Estate, Amanda Cimillo, was not put on notice that Aparo's gassing was a contributing factor even when the death certificate was issued, nor did she even know that he had been gassed, only that he died of an infection, which was not uncommon. *See* **Exhibit 62.**

The Autopsy Report of Dr. Flannagan lists a pathologic diagnoses of the administration of pepper spray. However, the Medical Examiner's office could not release the autopsy until the criminal investigation of death of Aparo was completed. *See* **Exhibit 46**, **Exhibit 47**, **Exhibit 48**, **Exhibit 49** and **Exhibit 50**[27]. Despite Ms. Rhew-Miller's phone call and letter advising that the criminal investigation was in the process of closing, Counsel did not receive the Autopsy Report containing 205 pages until May 21, 2017.

In connection with DOC's concealment and interference with Aparo's investigation, counsel for Aparo sent counsel for DOC a letter indicating that DOC had not sent a Certificate of Completeness, indicating that the Plaintiff had not received all of the medical records from DOC. *See* **Exhibit 51**. In-fact, Plaintiff was correct regarding the falsification and incompleteness of the medical records. *See* ECF Doc. 144.

## PLAINTIFF'S CONSPIRACY CLAIMS

The intra corporate conspiracy doctrine does not apply when employees of the same company are acting outside the scope of their authority. *Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000). Thus, Riley was acting outside of her authority when she falsified medical records and failed to accurately chart Aparo's

---

[27] Counsel's phone message from Ms. Rhew-Miller was received on November 1, 2016. *See* **Exhibit 50**.

death as occurring at approximately 3:30 p.m.  After 3:30 p.m., no nurses and only one correctional officer looked into Aparo's cell.  Between 1:30 p.m. and 3:30 p.m., correctional officers looked into Aparo's cell 89 times.  It is also evidence of a conspiracy when Riley failed to remove Aparo from his cell at 2:00 p.m., because she believed (apparently without any verbal communication)[28] that Aparo would be gassed again by the correctional officers who had previously gassed him.

The goals of the conspiracy were to cover up the injuries to Aparo from what was a retaliatory gassing by the correctional officers and to cover up the time of his death.  Only a conspiracy between the nurses and the correctional officers could accomplish the goals of a conspiracy.  The Court must look at the fixed wing video, as evidence of the conspiracy.  The fixed wing video between 1:30 p.m. & 3:15 p.m. will clearly show evidence of a conspiracy between the nurses and the correctional officers.  *See* ECF Doc. 180-9.  The handheld and fixed wing videos provide evidence that the gassings were retaliatory because at no time on the videos was Aparo seen or heard acting in a disruptive manner.  *See* ECF Doc. 180-10.

Finally, as to evidence of conspiracy among the guards, inmate Middleton heard Defendant Hampton call Aparo a snitch.  The only place Hampton could have learned that information would have been from Aparo's cooperation to expose a drug deal at JCI.  *See* Middleton Dep. 52:1-25.

---

[28] This is akin to Butch and Sundance looking at each other and jumping into the river.

For these reasons, the Defendant's Motion for Summary Judgment should be denied as to Defendant Riley.

## CERTIFICATE OF COMPLIANCE

This response and memorandum complies with Loc. R. 7.1(F), Loc. R. 56(E), and this Court's rulings at the Case Management Conference held May 29, 2018, in that the number of words in the response and memorandum is 9,588, as counted by Microsoft Word, excluding the items that may be excluded under Rule 7 .1 (F), the font used in this motion is Times New Roman 14-point font.

Respectfully Submitted,

The Law Offices of
STEVEN R. ANDREWS, P.A.
822 Monroe Street
Tallahassee, Florida 32303
Tel:  (850) 681-6416 / Fax: (850) 681-6984

*/s/ Steven R. Andrews*
STEVEN R. ANDREWS (FBN 0263680)
BRIAN O. FINNERTY (FBN 0094647)
RYAN J. ANDREWS (FBN 104703)
SERVICE: service@andrewslawoffice.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

served by electronic transmission this 20th day of July, 2018, to:

W. Peter Martin, Esq.
Dennis, Jackson, Martin & Fontela, P.A.
1591 Summit Lake Drive, Suite 200
Tallahassee, Florida  32317
peter@djmf-law.com
jmauer@djmf-law.com
jennifer@djmf-law.com
*Attorney for FDOC*

Jeffrey S. Howell, Esq.
Phipps & Howell
201 South Monroe Street, 4th Floor (32301)
Post Office Box 1351
Tallahassee, Florida  32302
jeff@phipps-howell.com
Margaret@phipps-howell.com
*Attorney for Jones a/k/a Franklin, Riley & Greene*

Brian C. Keri, Esq.
The Law Offices of Brian C. Keri, PA
3375-H Capital Circle NW, Suite 4
Tallahassee FL 32308
brianckeri@earthlink.net
michellemsmith@earthlink.net
*Attorney for Austin, Brown, Burch, Gillikin, Hamm, Hampton, Martina & Spangler*

/s/  ***Steven R. Andrews***
STEVEN R. ANDREWS

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**AMANDA CIMILLO, as**
**Personal Representative of the**
**Estate of RANDALL JORDAN-APARO,**
**Deceased and MINOR CHILD APARO**
**The Natural Child of Randall Jordan-Aparo**
**By and Through Her Mother and Natural Guardian**
**Amanda Cimillo,**

      Plaintiffs,

**vs.**               **CASE NO. 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN, et al.,**

      Defendants.

_____/

**EXHIBITS TO PLAINTIFFS' RESPONSE TO DEFENDANT OLA MELISSA RILEY**
**MOTION FOR SUMMARY JUDGMENT**

| No. | Document |
|---|---|
| 1. | DOC Photo Identification Card (DOC Bates 1479, 1478, 1476 and 1477) |
| 2. | Partial Judgment and Arrest Affidavit for Grand Theft which lead to 2007 Incarceration with DOC (DOC Bates 1485, 1492, 1500) |
| 3. | Partial Judgments and Arrest Affidavits which lead to 2009 Incarceration with DOC (DOC Bates 1606, 1613, 1594, 1600, 1566, 1568, 1572, 1580, 1587, 1538, 1545, 1525, 1531, 1620, 1630) |
| 4. | DOC Internal Movement (DOC Bates 3869-3874) |
| 5. | White Supremacist Prison Gangs in the United States (A Preliminary Inventory) Published by Anti-Defamation League. See page 7 |
| 6. | FDOC Case Briefing – Case #13-7092 Dated 09/05/13 |
| 7. | 33-601.3055, F.A.C. – Inmate Discipline – Use of Confidential Informants During Investigation |
| 8. | 914.28, F.S. (2011) Confidential Informants |
| 9. | MINS Incident Report dated 05/25/10 – 0000336880 (DOC Bates 2443) |
| 10. | Monticello Police Department 2010 Case Report 10-01-0835 |
| 11. | MINS Incident Report dated 05/25/10 – 0000336861 (DOC Bates 27504) |
| 12. | FDOC Offender Network Inmate Information Detail – Geremi B. Pierce |
| 13. | 893.12, F.S. (2004) Contraband; Seizure, forfeiture, sale. |
| 14. | Request for Administrative Move Transfer(s) dated 05/21/10 (Aparo and Aron) (DOC Bates 3794-3797) |
| 15. | 05/21/10 Emails Regarding Informed drug drops (DOC Bates 004692) |

| | |
|---|---|
| 16. | Affidavit of Timothy Butler – Dated 09/22/17 |
| 16A. | Whistle Blower Statement of A.P. Land, taken on 03/04/14 |
| 17. | 2007 Medical Records from DOC – Randall Jordan-Aparo (Bates: Aparo.doc.medical records.001-066 |
| 18. | 2009 Medical Records from DOC – Randall Jordan-Aparo (Bates: Aparo.doc.medical records.067-206) |
| 18A. | DOC Nursing Manual dated 08/13/08 (DOC Bates 3400-3409) |
| 19. | Plaintiffs' Amended Rule 26(a)(2) Report of Donald C. Kern, MD dated 05/31/18 |
| 20. | Medical Examiner's Report |
| 21. | DOC Chronological Record of Health dated 09/18/10 (Bates: Aparo.doc.medical records.197. |
| 22. | Disciplinary Report dated 07/16/10 re Failing to make his bunk (DOC Bates 001417-1419) |
| 23. | Disciplinary Report dated 07/21/10 (DOC Bates 1429-1440) |
| 24. | Chronological Record of Health Care dated 07/21/10 (Bates: Aparo.doc.medical records.178-179) |
| 25. | HS49 SOAPE Comments dated 07/21/10 (Bates: Aparo.doc.medical records.174) |
| 26. | Disciplinary Report dated 08/18/10 re Chow Incident (DOC Bates 1441-1452) |
| 27. | Defendant DOC Response to Plaintiffs' Requests for Admissions dated April 4, 2018 |
| 28. | Risk Assessment for the Use of Chemical Restraints Agents and Electronic Immobilization Device dated 07/21/10 (DOC Bates 001938) & DOC Daily Record of Special Housing (DOC Bates 1942) |
| 29. | **COMPOSITE EXHIBIT**<br>FDLE Investigative Report Serial 20 (DOC Bates 2139-2140) (Martha Greene)<br>FDLE Investigative Report Serial 22 (DOC Bates 2143-2145) (Harold Baker)<br>FDLE Investigative Report Serial 17 (DOC Bates2133-2134) (Mitchell Brown)<br>FDLE Investigative Report Serial 19 (DOC Bates2133-2134) (Patricia Cicirello) |
| 30. | DOC Chest Pain Assessment (DOC Bates 3696-3697) |
| 31. | DOC Respiratory Assessment (DOC Bates 3694-3695) |
| 31A. | DOC Skin Protocol Form (DOC Bates 3724) |
| 31B | DOC Diagram of Injury (Aparo.doc.medical records.203) |
| 31C | DOC Diagram of Injury – dated 09-19-10 (DOC Bates 566) |
| 32. | Affidavit of Lisa Flannagan, M.D. dated 08/02/12 (DOC Bates 582) |
| 33. | OIG Case No. 10-1-8057 – Timeline of Kelly Martin with emails (DOC Bates 533, 584-599 and 604) |
| 34. | DOC Nursing Manual (DOC Bates 3400 and 3403) |
| 35. | Risk Assessment for the Use of Chemical Restraint Agents and Electronic Immobilization Devices dated 09/18/10 (DOC Bates 564) |
| 36. | FDLE Investigative Report Serial 21 (DOC Bates 2141-2142) (Lynda Adair) |
| 37. | FDLE Investigative Report Serial 15 (DOC Bates 2130) |
| 38. | Timeline of Fix Wing Video |
| 39. | OIG Investigative Report Case No. 13-9886 Use of Force (DOC Bates 146-151) |
| 40. | DOC Case Briefing Report Case No. 13-7092 (Bates FDLE REP to SUBP DATED MARCH 15, 2017 – 02314) |
| 41. | Chronological Record of Health Care dated 09/19/10 (DOC Bates 68) |

| 42. | DOC Inspection of Special Housing Record dated 09/19/10 |
|---|---|
| 43. | FDOT Ltr. Regarding Request for Rollin Austin's Dismissal – dated 10/08/93 |
| 44. | Email from Cimillo to Attorney Andrews regarding her Daughter and Randall Jordan-Aparo |
| 45. | Death Certification of Randall Jordan-Aparo dated September 2, 2014 |
| 46. | Email from ME District II to Steven R. Andrews regarding release of Autopsy Report dated 01/26/15. |
| 47. | Email from ME District II to Steven R. Andrews regarding response to request for release of Autopsy Report for Randall Jordan-Aparo dated 02/02/15 |
| 48. | Email from Steven R. Andrews to ME District II regarding the autopsy report of Randall Jordan-Aparo |
| 49. | Karen Rhew Miller Letter to Steven Andrews dated November 1, 2016 |
| 50. | Phone message from Karen Rhew Miller to Steven Andrews Re: Closing the Aparo Case. |
| 51. | Letter from Steven Andrew to Peter Martin, counsel for DOC regarding Pre-Suit Investigation dated 01/25/15 |
| 52. | Crime Scene Photo of Aparo Cell taken by FDLE on 09/10/10 |
| 53. | Crime Scene Photo of Aparo Cell taken by FDLE on 09/10/10 |
| 54. | Hand Held Video – Omitted – Use copy provided to the court from opposing counsel. |
| 55. | Jury Instructions – 7.7 Manslaughter |
| 56. | Plaintiffs' Rule 26(a)(2) Report of William Anderson, MD dated 10/03/17 |
| 57. | Standard Operating Procedures – Pepper Spray http://manoa.hawaii.edu/hpicesu/SAFETY/generic/05.pdf Capsicum Allergy – https://allergy-symptoms.org/capsicum-allergy |
| 58. | Emergency Room Record – dated 09/19/10 (Bates Aparo.doc.medical records.202) |
| 59. | 33-602.210 FAC (2010) |
| 60. | DOC Investigation Case Summary – Case No.: 10-1-8057 (Bates DOC 525-539) |
| 61. | FDLE Investigative Report Serial # 13-Rollin Austin |
| 62. | Affidavit of Amanda Cimillo |