## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**AMANDA CIMILLO, as**
**Personal Representative of the**
**Estate of RANDALL JORDAN-APARO,**
**Deceased and MINOR CHILD APARO**
**The Natural Child of Randall Jordan-Aparo**
**By and Through Her Mother and Natural Guardian**
**Amanda Cimillo,**

      Plaintiffs,

**vs.**                          **CASE NO. 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN, et al.,**

      Defendants.

_____/

### PLAINTIFFS RESPONSE TO DEFENDANT MARTHA GREENE
### MOTION FOR SUMMARY JUDGMENT

      Plaintiffs, Estate of Randall Jordan Aparo and Amanda Cimillo as guardian

for the Minor Natural Child, by and through its undersigned counsel, files this

Response to Defendant Martha Greene's Motion for Summary Judgment (Doc. 176),

and in support of its Response, states as follows:

### OVERVIEW

      Plaintiffs, the Estate of Randall Jordan-Aparo and Cimillo as the Minor

Natural Child, have sued Martha Greene ("Greene") for violations of  the Florida

Wrongful Death Statute (FDA), Common Law Civil Conspiracy, Violation of 42

U.S.C. § 1983 and Conspiracy to Violate 42 U.S.C. § 1983, alleging of violations of Common Law, Florida Statutory Law and Federal Statutes.

Randall Jordan-Aparo ("Aparo") was an inmate who was killed in the Department of Corrections ("DOC") at Franklin Correctional Institution ("FCI") on September 19, 2010. He had a rare serious chronic disease, Osler-Weber-Rendu ("OWR") syndrome, and was also perceived to have a blood disorder, a bleeding disorder, hemophilia, and Von Willibrands disease, as was charted in his medical records and reviewed by DOC medical staff in 2007 and 2009-2010.  Aparo was in DOC in 2007, and again from November 2009 to September 19, 2010, the day of his death.  Greene was aware that Aparo suffered from his disease.

On September 17, 2010 at approximately 10:15 p.m., Aparo declared an inmate medical emergency.  Aparo arrived at the infirmary by wheelchair saying "I'm hurting too bad" and requested pain medication. Greene callously would not treat Aparo while he was on the floor. Aparo's vital signs were deteriorating.  His blood pressure had dropped to 98/54, pulse of 120 (tachycardia), and was warm to the touch.  Aparo did not routinely seek pain medication from the infirmary.  Greene ignored the need to perform a urinalysis and failed to admit Aparo to the infirmary. Also, Greene ignored the need to notify a doctor of Aparo's deteriorating condition. Instead, Greene sent Aparo back to his dormitory.

On September 18, 2010 at 12:10 a.m., Aparo was taken to the infirmary again by wheelchair after being found on the floor of the dorm bathroom incoherent with chest pains.  Aparo also said he could not breathe and could not sleep.  Greene took Aparo's blood pressure which had dropped to 80/50 (a marked deterioration from September 17, 2010) and his pulse was 110.  A pulse of 110 is abnormal.  Greene also noted signs of dehydration.  Greene was ordered to place Aparo in the infirmary and to administer one liter of lactated ringers.  Aparo, obviously dehydrated, did not receive the IV fluids because Greene could not place the IV.  After failing to place the IV, Greene was indifferent to Aparo's medical needs when she did not call the physician and notify him that she could not comply with his order.  Aparo continued to complain to Greene of shortness of breath throughout the early morning hours of September 18, 2010.

For her lack of care and treatment for Aparo, Greene was found in violation of and reprimanded by the Department of Management Services (DMS) Rules and DOC Rules including, Failure to Safeguard an Inmate, Negligence, and Substandard Quality of Work. She accepted a written reprimand in lieu of termination.

## BACKGROUND AND STATEMENT OF MATERIAL FACTS, INCLUDING DISPUTED MATERIAL FACTS

Aparo was an inmate with DOC at two separate times, once in 2007 and from November 2009 through September 19, 2010.  Aparo lists his adopted Father as his

contact for notification of an emergency.[1]  *See* **Exhibit 1**.  In 2007, Aparo was committed to DOC for a year and a day for retail grand theft shoplifting[2].  *See* **Exhibit 2**.

In 2009, Aparo was committed to DOC for 19.8 months for car theft, possession of a controlled substance, fraudulent use of a credit card[3], fraudulent use of a credit card[4] (two counts), fraudulent use of a credit card[5], possession of oxycodone[6] and sell and delivery of oxycodone[7].  *See* **Composite Exhibit 3**.  Aparo was scheduled to be released after completion of his 2009 sentence on October 24, 2010.  This was one month and two days prior to his death.  *See* **Exhibit 4**.

### APARO'S TRANSFER FROM JEFFERSON CORRECTIONAL INSTITUTION ("JCI") TO FRANKLIN CORRECTIONAL INSTITUTION ("FCI")

While confined at JCI, Aparo was approached by a white supremacy gang known as the Unforgiven. *See* Aron Dep. 13:3-14:14.   The Unforgiven is known to operate in Florida prisons and are primarily involved in contraband smuggling.  *See* **Exhibit 5**, pg. 7.  Additionally, it was well known throughout DOC that correctional

---

[1] The Personal Representative of his Estate, Amanda Cimillo, was not listed as his next of kin and was not notified of his death at the time it occurred.

[2] Theft of miscellaneous clothing having a value of $363.50.

[3] Plaintiff obtained goods and services in the amount of $394.96.

[4] Plaintiff obtained goods and services including food in the total amount of $266.65.

[5] Plaintiff obtained goods and services in the amount of $422.16.

[6] Plaintiff was in possession or constructive possession of three tablets of Roxicodone.

[7] Plaintiff sold one pill of oxycodone to a Pinellas Park Police Department uncover agent for $65.00.

officers conspired with white supremacy gangs to assist in the introduction of contraband, especially at FCI.  *See* **Exhibit 6**.  *See also* Aron Dep. 13:3-14:14.

Aparo was approached by the Unforgiven in the presence of Correctional Officer, Dennis Curry at JCI.  *See* Aron Dep. 10:19-11:12; 37:1-11.  Aparo was told that if he did not help the gang smuggle drugs into JCI, he and his roommate, William Aron ("Aron"), would be subject to beatings by the Unforgiven.  *See* Aron Dep. 16:6-14.

Approximately on May 14, 2010, Aparo and inmate Aron reported that Aparo had been recruited to engage in a drug transaction that would result in drugs being smuggled into the prison.  On or about May 14, 2010, Aparo and Aron gave a taped interviewed to a member of the DOC Inspector General's Office and a DOC Captain (since deceased). *See* Aron Dep. 21:13-20; 35:11-38:10. A record of this interview does not exist. DOC regulations require that a DOC Inspector maintain the tape and file a report concerning the cooperating inmates.  *See* **Exhibit 7**.  *See also* Aron Dep. 35:11-37:25.  At the time of the interview with the DOC Inspector General's office, both Aparo and Aron became subject to the protections afforded by Florida Statutes 914.28, otherwise known as Rachel's Law.  *See* **Exhibit 8**.  Neither Aparo nor Aron were provided these protections.

On May 21, 2010, Aparo approached JCI Warden, Christopher Landrum, advising him that he had been recruited to engage in two drops, one in front of the

prison and one at the City of Monticello garage.  *See* **Exhibit 9**.  The individual that was to drop the drugs at JCI and the Monticello garage was identified as Geremi B. Pierce.  *See* **Exhibit 10**.  Although Pierce was not arrested for drug related charges, it was clear that Pierce was the person that dropped drugs at JCI in the parking lot and was in the area of the Monticello garage when arrested.  *See* **Exhibit 10.** It is unknown whether the Monticello drop occurred.[8]  When the Monticello Police Department pulled over Pierce, drugs were not in the car[9].  *See* Norton Dep. 17:23-18:16.  The dog alerted to the presence of drugs in the car, but no drug charges were brought against Pierce.  *See* **Exhibit 10**, pg. 7.  *See also* Norton Dep. 5:7-9; 13:21-18:25.

The drugs that were subject to the drug drop at JCI were found by a correctional officer at approximately 3:00 p.m.  *See* **Exhibit 11**.  These drugs were never turned into evidence by depositing them into the evidence drop box at JCI, never became part of a written chain of custody of evidence maintained by DOC, and never turned over to the DOC Inspector General[10] or the Jefferson County Sheriff's office.  *See* **Exhibit 10**.  *See* Norton Dep. 29:1-25 and Dep. Exh 5.  Further, this contraband investigation never involved the DOC Inspector General's Office

---

[8] The Monticello drugs were to be placed in the ceiling of the Monticello garage.  It is unknown if the drugs were recovered from that location.
[9] Pierce had once been an inmate at JCI and resided in Madison Florida.  *See* **Exhibit 12**.
[10] *See* Kelley Martin-El-Urfali ("Martin") Dep. 35:5-40:25.

and the drugs where never placed in a contraband safe.  *See* Murphy Dep. 46:25-48:10.  *See also* D. Curry Dep. 1:1-4:25; 58:1-59:25.  The drugs found on May 21, 2010 simply disappeared. *See* K. Martin Dep. 28:3-34:3.

The drugs seized at JCI on May 21, 2010 were contraband for purposes of the Contraband Statute 893.12 (*see* **Exhibit 13)**, and must have either been retained by DOC, maintained on a seized contraband list turned over to the Monticello Police Department.   Alternatively, DOC must have petitioned the Court in Jefferson County, that the drugs found on May 21, 2010 were contraband and seek an Order that the drugs be forfeited and destroyed.  *See* Fla. Stat 893.12.  DOC has not produced any chain of custody logs in connection with the drugs found on May 21, 2010 at JCI, nor has DOC filed a Petition with Jefferson Courts seeking a destruction Order in connection with the May 21, 2010 drugs last to be reported in the possession of a Correctional Officer. *See* K. Martin Dep. 28:3-17.  In other words, the drugs recovered on May 21, 2010 simply disappeared. *See* K. Martin Dep. 28:3-34:3. *See also* D. Curry Dep. 58:1-59:25.

On the night of May 21, 2010, Aparo and Aron were transferred out of JCI. Aparo ultimately ended up being permanently housed at FCI.  *See* **Exhibit 14**.  Aron ended up being housed at Washington Correctional Institute for a brief time where he was stabbed by members of the Unforgiven within several weeks of his transfer from JCI.  *See* Aron Dep. 39:1-42:9.

Also, Aparo had a reputation as a "snitch" among prison staff at both JCI and FCI. *See* **Exhibit 16.** Two to three days prior to his death, he was accused of being a snitch by Correctional Officer Kevin Hampton ("Hampton").[11] *See* Craig Middleton ("Middleton") Dep. 56:19-57:4. *See also* Affidavit of Timothy Butler, **Exhibit 16**. *See* **Exhibit 16A**, Whistle Blower statement of Aubrey Land provided to the Office of the Inspector General.

Lastly, all supervisory personal at FCI and any other state prison would have had access to the MINs acknowledging Aparo as a cooperating witness (*see* **Exhibit 9**, *supra*), including Defendants Captain Brown ("Brown"), Lt. Rollin Austin ("Austin"), Sergeant C. Gillikin ("Gillikin"), Sergeant Hampton and Sergeant J. Hamm ("Hamm").[12] *See* Rita Hall Dep., *supra*.

---

[11] Austin, as far back as 1993, threaten a Department of Transportation ("DOT") employee who had filed a complaint against him at the Glades County work camp. The DOT employee filed the complaint after Austin accused him of being a "snitch". *See* **Exhibit 35**.

[12] When Aparo was transferred to FCI, the following DOC employees would have had access to the May 21, 2010 MINs describing Aparo as a confidential informant. *See* **Exhibits 9 and 14** s*upra*. These DOC employees include all Wardens, Assistant Wardens, Colonels, Captains, Lieutenants, Admin Lieutenants, Warden Secretaries, classification personal, CO-INST-PopMgmtAdmin, and CO-INST-AdminMoveTransfers. Specially, the following DOC employees received information Aparo was cooperating witness: Chester Green, Stuart Harrison, Kelley Martin, Vivian Stallworth, Leah Berg, Suzanne Powell, Patti Cleveland, Stephanie Neel, Teresa Williams-Harris, Wendel Whitehurst, Timothy Cannon, Christopher Landrum, Ed Watson, Stan Rutherford, Gene Hatcher, FCI Infirmary Sargent Dave Wallace (present on the date of Aparo's death), and Pridgeon George. All the above would have had access to the May 21, 2010 MINs and Request for Administrative Move Transfer(s) indicating that Aparo was transferred out of JCI due to his status as a confidential informant. *See* Rita Hall Dep. 1:1-6:25, taken in *Hickman v. DOC*, DOAH Case No. 17-4374, and *see* Middleton Dep., *supra*. *See* **Exhibits 14** and **Exhibit 15**.

## APARO'S MEDICAL RECORDS FOR 2009/2010 INCARCERATION RELATING TO NURSE GREENE

### June 24, 2010 Pre-Special Housing Assessment and Risk Assessment for the Use of Chemical Restraint Agents and Electronic Immobilization Devices ("Risk Assessment")

From Aparo's initial incarceration with DOC in 2007, *see* **Exhibit 17**[13]**,** and through his final incarceration beginning in 2009, *see* **Exhibit 18,** and ending with his death at FCI on September 19, 2010, Aparo disclosed to DOC that he suffered from and was perceived to have a blood disorder and a bleeding disorder, specifically disclosing hemophilia, Von Willibrands disease, and ultimately OWR. *See* **Exhibit 18,** Bates 074-076, 089-091, 093, 117, 130, 131, 132, 138, 140, 141, 144, 154, 157-160, 162, 166-170, 173-184, 188, 190, 192-197, 200-204 and 206.

Greene did not know what the symptoms of OWR were until after this case was filed. *See* **Exhibit 41**, Request No. 65. Further, Greene believes that an inmate who has exhibited symptoms of shortness of breath, tachycardia, and a blood pressure of 80/50 can still be gassed. *See* Greene Dep. 36:1-25, 37:1-25, and 38:1-2. Greene preformed an EKG for which she was not competent to read. Greene falsely testified in her interview with DOC Inspector Kelly Martin-El-Urfali ("Martin") that she had read Aparo's entire medical chart[14].

---

[13] Aparo's DOC Administrative files for this 2007 and 2009 incarceration indicates that he was never administered any chemical restraint agents prior to September 19, 2010.

[14] *See* **Exhibit 21**, transcript of Greene Interview with Inspector Martin.

The symptoms associated with these disorders and especially OWR include, shortness of breath and a predilection for the onset of sepsis. *See* Affidavit of Dr. Donald Kern, **Exhibit 19**. *See* ARNP Lemon Dep. Vol I 63:1-65:25 and Dep. Exh. 8 (NIH Medline). *See also* **Exhibit 20**, Autopsy Report of Lisa Flannagan, M.D ("Flannagan"). In fact, Aparo complained of shortness of breath multiple times in the days leading up to his death. *See* **Exhibit 21.** *See also,* E. Curry Dep. 13:19-25; 36:19-25; 37:1-3, 6-8, Martin Dep. 19:4-7; 62:3-7, Middleton Dep. 11:23-25; 12:1-3, 15-25; 13:1-4; 17:6-25; 20:16-21; 111:1-2, Porter Dep. 21:12-15, 17-25; 22:1-25, Stripling Dep. 127:9-12; 136: 13-15, and Thomas Dep. 17:14-25; 22:8-11; 37: 11-25; 38:1-5.

Contained within the medical records for 2007, were numerous records which discuss Aparo's bleeding issues during his confinement with DOC. *See* **Exhibit 17**, *supra*. In particular, *see* Bates 004, 006, 008, 010, 013, 027, 037, 048, 055, 058, 061, 063-064 and 066.

DOC's charting in the above medical records for the 2007 and 2009-2010 incarceration, clearly indicate that Aparo was diagnosed with hemophilia, Von Willibrands disease and ultimately OWR. *See* **Exhibit 18,** Bates 074-076, 089-091, 093, 117, 130, 131, 132, 138, 140, 141, 144, 154, 157-160, 162, 166-170, 173-184, 188, 190, 192-197, 200-204 and 206. Aparo regularly suffered from multiple

bleeding incidents during 2007 and 2009/2010.[15] Based on the above, Greene as well as any other nurse who signed a Risk Assessment approving Aparo for gassing, would be guilty of deliberate indifference.

## THE CITRIC ACID ALLERGY AND THE ADMINISTRATION OF BENADRYL

On June 24, 2010, Greene preformed the first Pre-Special Housing Health Assessment and Risk Assessment for Aparo upon his arrival at FCI. *See* **Exhibit 22.** Greene would have reviewed the 2009/2010 medical records up to June 23, 2010, to effectively sign off on that form. *See* Patricia Lemon-Watson ("Lemon") Dep. 59:8-25. Thus, when Greene reviewed the June 23, 2010 records, she saw that Aparo was granted a Medical Transfer from the Work Camp back to the prison, pending a classification review for medical reasons. *See* **Exhibit 18**, Bates 159. Thus, Greene was aware that Aparo had a serious blood disorder on June 24, 2010, complained of shortness of breath and most importantly had an allergy to **citric acid** when she signed the June 24, 2010 Risk Assessment. *See* **Exhibit 53**.

The Risk Assessment dated June 24, 2010 and signed by Greene, indicates that conditions such as asthma, chronic COPD, and emphysema, should alert the medical provider that conditions involving the shortness of breath may be

---

[15] To the extent ARNP Lemon testified that Aparo had only started in June 2010 reporting to the clinic for bleeds, was FALSE. Lemon testified that she had recalled Aparo from 2007 and monitored his active bleeding is false. *See* Lemon Dep. Vol I 58:1-62:25; 124:1-125:25 and Dep Exh. 18.

exacerbated by the use of chemical restraint agents. *See* **Exhibit 53.** Aparo's medical history prior to June 24, 2010 is replete with complaints of shortness of breath. Based on these conditions, Greene nor any other nurse should have signed a Risk Assessment approving Aparo for gassing separate and apart from his citric acid allergy[16].

**Prior to September 19, 2010, Aparo had never been sprayed with chemical restraint agents while incarcerated in 2007 and 2009-2010 up to the date of his death**. *See* **Exhibits 17 and 18**.

Further, Aparo's medical records up to June 24, 2010, repeatedly state that Aparo was allergic to citric acid. *See* **Exhibit 18,** Bates 91.

Citric acid is a major component of capsicum. Capsicum is the major component of pepper spray and OC gas. *See* **Exhibit 24,** pg. 2 and **Exhibit 25** http://manoa.hawaii.edu/hpicesu/SAFETY/generic/05.pdf and https://allergy-symptoms.org/capsicum-allergy. Aparo, for the first time, was sprayed with OC gas containing capsicum on September 19, 2010, the date of his death. Aparo's medical records prior to June 24, 2010 contained numerous indications that Aparo was allergic to citric acid. *See supra* and generally **Exhibit 18.**

---

[16] The Defendants have in fact adopted this argument in their Motions for Summary Judgment stating that Greene could have relied upon the Risk Assessments signed by a Wakulla CI nurse. This argument nonsensical because each nurse who signs a Risk Assessment would be required to do their own independent review prior to signing a Risk Assessment, because the Risk Assessment form specifically addresses whether or not any new symptoms may had been identified between a prior Risk Assessment and the new Risk Assessment.

A citric acid allergy can cause anaphylaxis. *See* **Exhibits 34 and 25**. Anaphylaxis causes suffocation by closing the airway, which would cause petechiae to be present in an autopsy. *See* Flannagan Dep. 24:3-25:13.   Further, if Aparo died from an allergy induced anaphylaxis, there would be no evidence of gassing in his lungs.  *See* Flannagan Dep. 59:25-60:7.  The autopsy of Dr. Flannagan found the presence of petechiae in Aparo's eyes that would suggest Aparo suffocated from an allergy induced anaphylaxis shortly after his gassing with pepper spray and OC gas. *See* Flannagan Dep. 23:21-25:13.

The record is void as to whether Greene discussed with Aparo his citric acid allergy, however, it is clear she reviewed records when she signed the risk assessment that he had such an allergy. *See* **Exhibit 53.**  Thus, if Greene had done the bare minimum to even gain a rudimentary knowledge of OWR prior to the filing of this lawsuit or had researched the effects of a citric acid allergy prior to signing Aparo's Risk Assessment, the chart would have been properly noted that he was allergic to pepper spray and OC gas. *See* **Exhibit 41** Request No.: 65**.**   Further, Greene would not have been deliberately indifferent and later nurses who approved the use of chemical restraints on Aparo would have been forewarned.  *See* Greene Dep. 35:12-17.

A dose of OTC Benadryl (Diphenhydramine) was administered to Aparo by Greene on September 18th, 2010. *See* **Exhibit 20.**   The administration of Benadryl

is not noted anywhere in the chart of Aparo. *See* **Exhibit 18 generally**.  Benadryl is detectable in young adults for up to 2.11 days from a urine sample.  The Benadryl was most likely issued in a pill form, based upon the fact that it was over the counter.  It is unknown as to whether Aparo was given multiple doses of Benadryl.   Benadryl is kept in the dorm dispensary as well as the infirmary.  There is nothing in the medical records which would suggest that on September 18, 2010 Aparo had a condition that Benadryl would be effacious for except for an allergy.  *See* **Exhibit 18**.  It is more likely that the Benadryl would have been administered by Nurse Franklin or Riley after Aparo had been gassed on September 19, 2010 to treat an allergy induced anaphylaxis.  *See* **Exhibits 24 and 25.**  Thus, the absence of any medical record referring to the Benadryl may be considered evidence of a conspiracy.  *See* **Exhibit 37,** Interrogatory No. 11.  Inmate Harold Baker ("Baker") in his interview with SA DeVaney on September 27, 2010, indicated Aparo told Baker that he had been given bad medicine and if Aparo died, Baker should write his "girl" and tell her that he was given bad medicine, *see supra* **Exhibit 27.**  The presence of Benadryl (Diphenhydramine) was not found until the autopsy was released in 2017 along with the toxicology report. *See* **Exhibit 20.**   The only allergies reported by Aparo were citric acid and bee bites. *See* **Exhibit 18.**

The only plausible explanation for the presence of Benadryl in Aparo's lab report would be that Benadryl was administered after Aparo's gassing as he

continued to suggest he could not breathe and to reverse the anaphylaxis while he suffocated from anaphylaxis causing the petechiae detected in the autopsy.  *See* **Exhibit 23.**  *See also* Flannagan Dep. 24:1-25:19.

Thus, if on June 24, 2010, Greene had research the symptoms or side effects of a citric acid allergy prior to signing the Risk Assessment, she would have noted that Aparo should not be sprayed with pepper spray or OC gas based solely on his citric acid allergy irrespective of his other medical conditions.  *See supra* **Exhibit 23.**  If the first Risk Assessment done by Greene on June 24, 2010 noted that Aparo could not be gassed, then the following Risk Assessments done by other nurses prior to Aparo's death, would have also noted that Aparo should not be gassed solely based on the citric acid/capsicum allergy. *See* **Exhibits 24 and 25.**   The failure of Greene, as well as all the other nurses that approved Aparo for gassing without researching the side effects of the citric acid/capsicum allergy, would be guilty of deliberate indifference[17].

## APARO'S MEDICAL RECORDS FOR
## 2009-SEPTEMBER 19, 2010 INCARCERATION

The medical records for Aparo while confined at DOC from November 2009 through September 19, 2010, indicate that Aparo routinely suffered bleeding from

---

[17] The citric acid/capsicum contained in the chemical restraint agents used on Aparo can be absorbed through the skin.  Further, the Use of Force Reports indicate that Aparo used his personal property to cover his face while he was gassed.  *See* **Exhibit 26.**  Lastly, the handheld video indicated Aparo did not have his shirt on at the time he was sprayed.  *See* ECF Doc. 180-10.

hemophilia, Von Willibrands disease and OWR during his 2009 incarceration.  *See*
**Exhibit 18,** Bates 074-076, 089-091, 093, 117, 130, 131, 132, 138, 140, 141, 144,
154, 157-160, 162, 166-170, 173-184, 188, 190, 192-197, 200-204 and 206.

### SUMMARY OF GREENE MEDICAL TREATMENT OF APARO FROM SEPTEMBER 17, 2010-SEPTEMBER 19, 2010

### September 15, 16, and 17, 2010

Aparo was seen on September 15, 2010 at 9:35 a.m. for an inmate declared
medical emergency.   His temperature was 102.4. *See* **Exhibit 18,** Bates 189-191.
At that time, Aparo was given bed rest for one day and was instructed **not** to take
Ibuprofen or Aspirin due to his bleeding disorder (OWR). *See* **Exhibit 18,** Bates
189-191.

Inmate Baker testified to FDLE that beginning on September 15th, Aparo had
skipped breakfast and stayed in his bunk all day complaining of back and chest pains,
and went through the "same routine" on the 16th.  *See* **Exhibit 27**.

On September 17, 2010 at 1:30 p.m., Baker told SA DeVaney that Aparo "fell
out" sitting in the courtyard in the afternoon.   A group of inmates "ran" with Aparo
to the infirmary to be seen by medical.  *See* **Exhibit 27,** *supra*.   Aparo was seen for
an inmate declared medical emergency at 2:15 p.m. on September 17, 2010.

Aparo was told **to take Ibuprofen** from the dorm dispensary and to drink
more water.  *See* **Exhibit 18**, Bates 193.  The directive to take Ibuprofen on the 17th

16

was absolutely contrary to the nurses' orders on September 15, 2010. *See* **Exhibit 18,** Bates 189-191.

Then, on September 17, 2010 at 10:15 p.m., Greene saw Aparo for his third inmate declared medical emergency over the preceding three days for the same complaints.   *See* Hercule Statement, Bates 000006.   At that time, Greene was required to immediately refer Aparo to a doctor, but never did, ignoring that DOC rule, policy, and procedure. *See* **Exhibit 21**, Bates 787-788.   Due to his deteriorating conditions, Aparo was required to be taken by wheelchair from his dorm to the infirmary per Greene's statement to SA DeVaney.  *See* **Exhibit 28.** Greene was so deliberately indifferent to Aparo's condition that she wouldn't even treat him on the floor, conduct that is shocking for a nurse treating a patient in distress. *See* **Exhibit 27.**   At this visit, Aparo advised Greene that his back pain increased with urination. *See* **Exhibit 18**, Bates 194. This was a new condition present and was not addressed in any subsequent Risk Assessments as required. *See* **Exhibits 54 and 55.** Aparo was cooperative and did not refuse to give a urine sample. *See* **Exhibit 18**, Bates 194.   Greene failed to call the doctor to prescribe pain medication despite his complaints of pain for the previous three days.   Greene claimed Aparo was "hot to the touch" and may have blood in his urine. *See* **Exhibit 18**, Bates 194.  Aparo was unable to give a urine sample due to the pain associated with urination, most likely due to his extreme dehydration. Greene wrongly charts this as a refusal of treatment,

and incorrectly noted he had no allergies. *See* **Exhibit 18**, Bates 194.  Aparo indicated that he was having these symptoms for two to three days. *See* **Exhibit 18**, Bates 194.  The only treatment provided to Aparo was to provide him with an analgesic balm and send him back to his dorm. *See* **Exhibit 18**, Bates 194.  Aparo's blood pressure was charted as 98/54 and pulse at 120 bpm, a market increase. *See* **Exhibit 18**, Bates 192. Greene did not call the doctor or perform any interventions. *See* **Exhibit 18,** Bates 196 *supra.*

At her deposition, Greene testified that at the 10:15 p.m. exam, Aparo did not refuse to give a urine sample.  Greene said Aparo indicated "his back is hurting too bad for him to stand up and urinate in a cup...... He told me he couldn't."  *See* Greene Dep. 76:23-77:6.  Hence, Greene's medical record for 10:15 p.m. is grossly incorrect to the extent that Greene charted Aparo refused to give a urine sample.  *See* Greene Dep. 74:24-77:12.

## SEPTEMBER 18, 2010

The Chronological Record of Health Care prepared by Greene on September 18, 2010 contains late medical record entries signed by Greene using only her stamp. *See* **Exhibit 18,** Bates 197.  Greene violated the DOC Nursing Manual in connection with the charting of these late entries.  *See* **Exhibit 29** (Bates 3407, Section 17).  The DOC Nursing Manual requires that late entries be documented in the following manner:

18

a. Current date and time
b. Late entry for_____ (date of incident)
c. Documentation information (presumably as to why it is a late entry)
d. Signature

None of Greene's late entries comply with the DOC Nursing Manual rules suggesting that the charting on September 18, 2010 was false and back dated. *See* **Exhibit 18**, Bates 197. *See also* **Exhibit 29,** *supra***.**

On September 17, 2010 just before midnight, Correctional Officer Patricia Cicirello ("Cicirello") found Aparo lying on the floor of the dorm bathroom incoherent and mumbling "Sergeant, I'm hurting bad, I'm hurting bad." *See* **Exhibit 31**. Cicirello requested medical assistance. At that time, Aparo was holding his chest and seemed very "in and out." *See* **Exhibit 31.** Greene arrived and inexplicitly twice refused to treat Aparo in the dorm bathroom despite his apparent emergent condition. Cicirello then requested assistance from two inmates in placing Aparo in a wheelchair. *See* **Exhibit 31**. Screaming and crying from pain, Aparo was then taken to the infirmary. *See* **Exhibit 31**.

During the early morning hours of September 18, 2010 beginning at 12:10 a.m., Aparo was ordered by Dr. Nikon Arunakul ("Arunakul") to receive 1000 ml of lactated ringers for Aparo's dehydration to be administered by Greene. *See* **Exhibit 18**, Bates 197, 200. Greene was unable, after several attempts, in placing the IV in Aparo. *See* **Exhibit 18**, Bates 197. *See* Hercule Interview, Bates 496-498. Thus,

Aparo, despite his dehydrated condition, did not receive IV fluids as ordered[18].  The Chronological Record of Health Care, **Exhibit 18**, Bates 197, *supra*, charted by Greene and Franklin on September 18, 2010 states as follows:

a.     "9/18/10 0010
          Inmate EMID Inmate to Infirmary by w/c
       "I can't breathe. Now I can't sleep."
        VS BP 80/50, P 110, T 98.7, lips-dry, heart rhythm-reg
        Lungs sounds clear x4 – still claiming no ua - EKG done[19]
        Poss Dehydration
        Call to on call MD – Hold in infirmary[20]"

b.     Late entry "9/18/10 0020 call to Dr. Aranakal, on call MD orders given"

c.     Late entry "9/18/10 0220 (via late entry) SPO2 98%, P 98 bpm, sips of H2O taken.
       Still c/o breathing problems[21], leg pain."

---

[18] The Doctor's order for the lactated ringers also violated the Nursing Manual.  *See* **Exhibit 29.** The order does not confirm that it is a telephone order, the name of the ordering physician and the nurses' name and designation.  The order is also not signed or stamped by the nurse that took the order.  *See* **Exhibit 18** Bates 182.

[19] The EKG done by Greene was not normal and in fact, abnormal. **Greene admitted to FDLE that she was not competent to read an EKG.**  *See supra* **Exhibit 28. (SA DeVaney interview of Greene serial 20).**  The EKG showed that Aparo was suffering from tachycardia on 9/18/2010. *See* ARNP Lemon Dep. Vol, I 109:23-110:-9.  *See also* **Exhibit 28,** FDLE Serial 34, Bates 2167**.**
   *"When SA DeVaney advised Dr. Arunakul that this investigation revealed that inmate Jordan-Aparo had continual complaints regarding chest pains over at least a three (3) day time period, he (Dr. Arunakul) stated that any time an inmate complained of chest pains, an inmate would immediately be examined by a physician. Dr. Arunakul added that a DOC nurse had no option but to contact a DOC physician with an inmate's complaints of chest."*

[20] Dr. Arunakul advised SA DeVaney that Arunakul presumed that the lactated ringer IV he ordered for Aparo had been successfully placed since he did not receive a call back.  Greene never advised Arunakul that she could not place the IV because Aparo was moving. Also, to the extent and if Greene advised Dr. Arunakul that Aparo was suffering from chest pain, a physician must immediately see the inmate.  Greene never called Dr. Arunakul or any other physician to see Aparo concerning his chest pains.  *See* **Exhibit 28A.**

[21] No Respiratory Assessment was done by Greene despite Aparo's second complaint of shortness of breath on 9/18/2010.

> d.   Late entry "9/18/10 0030 unsuccessful in placement of IV cath.
>      2 attempts-inmate not cooperative moving during attempts".

*See* FDLE interviewed Captain Mitchell Brown ("Brown") (**Exhibit 30**),
Correctional Officer Patricia Cicirello ("Cicirello") (**Exhibit 31**), Inmate Baker
(**Exhibit 27**) and Greene (**Exhibit 28**), who all testified to SA DeVaney that Aparo
had complained of chest pains and shortness of breath, specifically that "his heart
was hurting." *See* **Exhibit 27**, Bates 2144.  DOC Office of Health Services requires
that a Chest Pain Assessment be done each time an inmate complains of chest pains.
*See* **Exhibit 32**.  No Chest Pain Assessment forms (2001) are included in Aparo's
2010 medical records. *See* **Exhibit 18.**  Greene did not assess Aparo for chest pains
other than taking and reading an EKG, for which Greene was not competent to read.
*See* Greene Dep. 21:3-9.  Furthermore, Greene never emailed the EKG to Dr.
Arunakul. Also, no Respiratory Assessment forms (2000) are included in Aparo's
2010 medical records despite Aparo's numerous complaints of shortness of breath.
*See* **Exhibit 33**.  The numerous DOC nurses, including Greene, Riley and Lucy
Franklin-Jones ("Franklin"), failed to assess Aparo using the mandatory Chest Pain
Assessment and Respiratory Assessment forms for Aparo's chest pains and
shortness of breath. *See* **Exhibit 18**.  *See also* **Exhibits 27, 28 and 28A**. This could

be evidence of concerted action to engage in a cover up or are evidence of deliberate indifference.[22]   *See infra.*

While in the infirmary at 2:20 a.m. on September 18, 2010, Greene did an incomplete assessment of Aparo's vital signs, only checking his pulse ox and pulse. *See* **Exhibit 18**, Bates 197.  Greene further noted Aparo was continuing to be in respiratory distress.  Greene failed to complete a Respiratory Assessment at that time. *See* **Exhibit 18,** Bates 197.

Captain Brown came to the infirmary when Aparo was being treated by Greene after midnight on September 18, 2010. *See* **Exhibit 30**.  As reported by Brown, Aparo was compliant and cooperative until 4:36 a.m.   Brown never mentioned in his statement to SA DeVaney that Aparo was uncooperative when Greene attempted to place the IV at 12:20 a.m. *See* **Exhibit 30**.  Then, at 4:36 a.m., Aparo cursed demanding to go to the hospital. *See* **Exhibit 18**, Bates 195-197. Brown removed Aparo from the infirmary placing him in a solitary confinement cell contrary to doctors' orders and DOC rules.  *See* **Exhibit 30**.  *See also* Brown's statement to Martin, Bates 000688-000689.  Lastly, DOC determined that Greene committed gross negligence[23], failed to safeguard Aparo and performed a

---

[23] It was Dr. Hercule's opinion that Greene committed gross negligence in connection with her delay in treatment and delivery of care regarding Aparo and by failing to send Aparo to an outside hospital in the early morning of September 18, 2010.  *See* **Exhibit 36,** Bates 533, 589, 590, 595, and 604**.**

substandard quality of work concerning the care and treatment of Aparo.  *See* Hercule Interview, Bates 496-499.

This was Greene's last encounter with Aparo.  On September 19, 2010, Aparo was gassed with chemical restraint agents containing capsicum and died.  His time of death is in dispute.  *See* **Exhibit 18**, Bates 206.  *See also*  Martin Dep. 22:6-17; Middleton Dep. 45:24-47:11;  Porter Dep. 13:7-14:22; Stripling Dep. 16:23-20:16; and Thomas Dep. 30:12-31:15; 130:6-18

## EVIDENCE OF A CONSPIRACY

There is clear evidence of a conspiracy involving Nurses Greene, Riley and Franklin.  As a result of their late entries in the medical records of Aparo on September 18th and 19th, their joint failure to perform Chest Pain & Respiratory Assessments in the days before Aparo's death, Riley's suggestion of a cover up[24] to conceal the unauthorized release of Aparo from the infirmary at 4:36 a.m. contrary to explicit doctor's orders in violation of DOC policy, should be considered evidence of a conspiracy.  *See* **Exhibit 18**, Bates 197.

---

[24]i.e. to cover the nursing staff present on the 18th and 19th in the infirmary from releasing Aparo contrary to Dr. Arunakul.  *See* Riley Sworn Statement, Bates 741.

<u>MEMORANDUM OF LAW</u>

## I.    THE SUMMARY JUDGEMENT STANDARD

A court should not grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is genuine issue as to any material fact and that the moving party precluded from summary judgement. *See* Fed. R. Civ. P. 56.

## II.    NURSE GREENE IS NOT ENTITLED TO THE DEFENSE OF QUALIFIED IMMUNITY

Nurse Greene is not entitled to the defense of qualified immunity because her actions on September 18, 2010, violated long standing preexisting law as a result of her falsification of medical records contrary to Florida law.   Florida law provides that any person who fraudulently alters, defaces, or falsifies any medical record, or causes or procures any of these acts to be committed, commits a misdemeanor of the second degree. *See,* 395.302, F.S. (2018).  Greene also violated 18 U.S.C. section 1519, as evidence exists that could permit a jury to find that she altered or destroyed medical records to impede the administration of justice. *See United States v. Gray 642 F3d 371. (2nd Cir 2011).*

Greene could not have been acting in the scope of her duties as a nurse when she engaged in the falsification/backdating of Aparo's medical records for September 17th and 18th.  Thus, Greene is not entitled as a matter of law to the defense of qualified immunity.  Greene cannot claim that she was acting within the scope of

24

her duties as a state employee or engaging in discretionary functions when she falsified/backdated Aparo's medical records on September 18, 2010 in contravention of a Federal Statute and a Florida Statute. *See*, *Lumley v. City of Dade City*, 327 F.3d 1186, 1194 (11th Cir. 2003), *see also*, *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). The burden of proof in regards to whether or not a defendant is entitled to assert qualified immunity rests with the defendant and is the threshold issue. In order to assert qualified immunity, Greene must show that when she was engaged in the falsification/backdating of Aparo's medical records for September 18, 2010, she was performing a legitimate job related function. Every nurse would be placed on notice that the falsification/backdating of a medical record is clearly unlawful given these circumstances from the first day of nursing school. A conviction for altering or defacing medical records would prohibit a person from engaging in the practice of nursing. Thus, it cannot be objectively reasonable. *See* ECF 145 and ECF 156. In other words, Greene and the other nurses cannot meet their burden by merely stating that they were acting within the course and scope of their duties to have the defense of qualified immunity available to them.

If the Court finds that Greene was performing a discretionary function and thus entitled to assert qualified immunity, the Court should look as to whether or not:

1.      Greene had fair warning that her conduct would violate a constitutional right that is obvious to all reasonable government actors; or

2.      Greene violated broader clearly established principles which should control the novel facts of this case;

3.      Greene violated a clearly established rights that lie so obviously at the very core of what the Eighth Amendment prohibits:

      a.      by delaying necessary care for Aparo;

      b.      by not calling the on call physician the night of September 18, 2010 and advising him that she was unable to place the IV in a patient with obvious dehydration

      c.      by failing to address to Aparo's dropping blood pressure despite knowing it had dropped;

      d.      by failing to react to Aparo's tachycardia despite being aware of it; and

      e.      failing to cause Aparo to be admitted to the hospital when his condition was emergent and on the cusp of death as they were wrongful acts that would be readily apparent to any official as they were to Dr. Hercule.

4.      Greene's acts were so obviously clear and her conduct was so bad that case law is not needed to establish and put her on notice that the complained conduct cannot be lawful.  *See Jones v. Fransen*, 857 F.3d 843 (11th Cir. 2017).

26

DOC itself has determined that Greene failed to safeguard her patient, engaged in substandard quality medical treatment, as well as a gross delay in delivery of medical care to Aparo, and acted with "gross negligence" with the performance of her duties. *See supra* **Exhibit 36,** Bates 533, 589, 590, 595, and 604.

Lastly, Greene performed and EKG on Aparo, which she was incompetent to interpret, and failed to email the EKG to the on call physician, Dr. Arunakul. Instead, Greene just placed the EKG in Aparo's medical record never sending it to a qualified physician to review before Aparo was gassed to death.

Greene violated Aparo's minimal rights to medical care. *See Harris v. Coweta Cty.*, 21 F.3d 388, 393-94 (11th Cir. 1994) and *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999) (delaying medical care). Further, Greene cannot show that her gross delay in care, and gross negligence conduct lies so obviously at the core of what the Eighth Amendment protects that her unlawful conduct, would have been readily apparent to any official notwithstanding the lack of precise controlling authority. A cop maybe entitled to shoot his gun as part of his discretionary duties, but he is not entitled to lie about it.

Lastly, Greene should not be entitled to qualified immunity because she engaged in gross negligence and gross delay in the delivery of medical care to Aparo on September 17th and 18th. On September 17, 2010 when Aparo's vital signs were deteriorating, Aparo was unable to urinate. Greene failed to monitor Aparo and

address his decreasing blood pressure.  Lastly, on September 17th and 18th, Greene failed to address Aparo's obvious pain which had been ongoing for three days by requesting pain medication.  It is a gross violation of the Eighth Amendment to allow an inmate to be in unremitting pain over a period of days and ignore it.

Lastly, Greene should not be entitled to qualified immunity because she failed to call the physician that ordered the lactated ringers, based upon the very medical condition that Greene had relayed to him.  Had Greene bother to call Dr. Arunakul and advise him of her failure to re-hydrate Aparo, Dr. Arunakul would have immediately ordered Aparo to be taken to the hospital.  In essence, Greene had one thing to do.  Follow the doctor's orders by placing the IV and call him back if she failed to do so.  Greene did neither.

## III.  GREENE COULD BE FOUND GUILTY OF MANSLAUGHTER PURSUANT TO 782.07, F.S.

There is evidence that Greene engaged in acts that would be considered the manslaughter of Aparo, a disabled person, as a result of culpable negligence.  Greene failed in her duty to provide Aparo with the care, supervision and services that a prudent person would consider essential for the well-being for a disabled adult.  *See Peterson v. State 765 So. 2d 861 (Florida Fifth DCA, 2000)*.  Greene had the clear duty to provide Aparo with timely medical care and to follow doctors' orders in connection with Aparo's care.  Greene had the authority as a nurse to call 911 if a

doctor refused to admit Aparo.  Greene was grossly negligent by failing to call the doctor when she could not place an IV.

These facts as they relate to Greene are similar to *Ramos v. State*, 162 So. 3d 992, (Fla. 1st DCA 2015).  In *Ramos,* a mother's manslaughter conviction of the death of her child was upheld.  The appellate court found that defendant Ramos was culpably negligent by allowing her 19 month old son to wander, unsupervised, fall from the second floor of an apartment building, requiring neighbors to attempt to rescue him from drowning in a pond and a spa, and ultimately drowning in a retention pond.

## IV.  DELIBERATE INDIFFERENCE

To prove deliberate indifference, a Plaintiff must show three things: (1) that the inmate had an objectively serious medical need; (2) that the defendant acted with deliberate indifference; and (3) that the defendant's wrongful conduct caused the detainee's injury.  *See*, *Goeber v. Lee County*, 510 F.3d 1312, (11th Cir. 2007).  Grossly inadequate measures to treat an inmate's serious medical need will not eliminate a jailer's liability for deliberate indifference. *See McElligott,* 182 F.3d at 1256 ("[P]rison officials with knowledge of [a serious] need for care may not . . . provid[e] grossly inadequate care, caus[ing] a prisoner to needlessly suffer the pain resulting from his or her illness."); *Ancata v. Prison Health Servs., Inc.,* 769 F.2d

700, 704 (11th Cir. 1985) (stating that a jailer may be deliberately indifferent if the treatment provided is "so cursory as to amount to no treatment at all").

### Greene's Conduct Does Constitute Deliberate Indifference

Greene's conduct, by callously not calling back the ordering physician who ordered that Aparo receive an IV for rehydration to advise him of her inability to place the IV, constitutes deliberate indifference.  *See* **Exhibit 44,** Expert Report of William R. Anderson, M.D.

It also shows deliberate indifference to fail to chart that Greene had given Aparo Benadryl at 10:00 p.m. on September 18, 2010.  Aparo had no symptoms of any condition or illness that Benadryl would have addressed.  If Greene believed that Aparo was suffering from an allergy necessitating the administration of Benadryl, it would have been simple to research the side effects of  Aparo's listed allergies, citric acid and bee stings, and to determine if citric acid was a component of OC gas or pepper spray, or if Aparo had been recently stung by a bee.  One side effect of a citric acid allergy is anaphylaxis, *see supra*.  It makes no medical sense to have administered Benadryl at 10:00 p.m. on September 18, 2010 and then not chart it as given, except to engage in a cover up.

No one knew that Benadryl had been administered to Aparo until the autopsy had been released containing Dr. Bruce Goldberger's toxicology report.  Plaintiff's counsel did not receive the autopsy and the toxicology report until April 21, 2017.

No one knew that Greene had administered the Benadryl until she admitted to administering it in her response to Interrogatories dated April 26, 2018, *see supra* **Exhibit 38.**

Greene engaged in additional acts of deliberate indifference when Aparo showed such a rapid decline in his vital signs, complaints of chest pains and shortness of breath on September 18, 2010. Greene's conduct when she refused to treat Aparo on the floor was deliberately indifferent and conduct unbecoming of someone in the medical field. Further, there was nothing that the FCI infirmary could have done to treat such a rapid decline and those conditions. Greene was deliberately indifferent and culpably negligent when Greene failed to even attempt to send Aparo to the hospital herself or to recommend to the on call physician the evening of September 17, 2010 and request an order for Aparo be sent to the hospital for at least an evaluation. Greene never called the on call physician.

Finally, Greene engaged in additional acts of deliberate indifference when her inactions of September 17th and 18th resulted in a gross delay of Aparo receiving medical care.

The controlling case law regarding deliberate indifference requires that a Plaintiff must show that the defendant acted with a culpable state of mind and must show that the medical provider knows of and disregards an excessive risk of an inmate's health or safety. The health care provider must be aware of facts where an

inference could be drawn that a substantial risk of harm exists and he must also draw the inference from the facts from which the provider is aware.  In Greene's case, she was aware of facts that a substantial risk of harm existed on September 17th and 18th and she was aware from the facts that she knew that a substantial risk of harm to Aparo existed if he was not taken to the hospital.  Yet, she did nothing except take an EKG that she was unable to read.  In other words, Greene was aware of facts from which an inference could be drawn that Aparo was at a substantial risk of harm. Greene acted with deliberate indifference when she intentionally failed to call the on call physician or engage in any other medical interventions.  *See*, *Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176 (11th Cir. 1994), overruled in part on other grounds by *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) and *also see*, *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988).  Delay in medical treatment must be interrupted in the context of the prisoner's need and condition.  Aparo's need on September 17th and 18th could not have been greater and his condition could not have been worse.

"Grossly incompetent or inadequate care can constitute deliberate indifference ...as can a doctor's decision to take an easier and less efficacious course of treatment." *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989), citing Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986*); McElligott v. Foley*, 182 F.3d 1248, 1255 (11 th Cir. 1999). *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016) (noting that

"[a] defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference.").

An "official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *McElligott*, 182 F.3d at 1255 (*citing Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997)); *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989).

*Hill v.Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994). The Eleventh Circuit has found cognizable deliberate indifference claims when prison officials delayed treatment for life-threatening emergencies and in "situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Hill* at 1187. "A delay in providing medical treatment can constitute deliberate indifference in violation of an inmate's constitutional rights. *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). An inmate who complains of a delay in medical treatment must be able to prove the detrimental effect of the delay. *Townsend v. Jefferson Cnty.*, 582 F.3d 1252, 1259 (11th Cir. 2009). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would

detrimentally exacerbate the medical problem." *See Youmans v. Gagnon*, 626 F.3d 557, 561 (11th Cir. 2010); *see also Farmer v. Brenna*n, 511 U.S. 825, 834 (1994) (serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm."). In delay of treatment cases, relevant factors include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007).

## <u>STATUTE OF LIMITATIONS</u>

The Supreme Court and the Eleventh Circuit have both stated that "[I]n *Section 1983* actions '*[o]nly* the length of the limitations period, **and the closely related questions of tolling and application, are to be governed by state law.**'" *Wilson v. Garcia*, 471 U.S. 261, 269 (1985); *see also McGinley v. Mauriello*, 682 F. App'x 868 871 (11th Cir. 2017). As noted in *Jones v. Childers*, 18 F.3d 899, 906 (11th Cir. 1994), Florida courts have relied on the reasoning in *Urie v. Thompson, 337 U.S. 163, 69S.Ct. 1018 (1949), holding in a variety of legal contexts that "the* statute of limitations begins to run when a person has been put on notice of his right to a cause of action" and "under Florida law, a party is held to have been put on notice when he discovers, or reasonably should have discovered, facts alerting him of the existence of his cause of action." 18 F.3d at 906. Appling Florida law to the tolling period is controlled by *Tanner v. Hartog*, 618 So. 2d 177, Fla. 1993. *Tanner*

34

states that mere knowledge of an injury which could have occurred from natural causes, without more, holds that in determining the point at which a statute of limitations starts to run when the plaintiff has engaged in additional fact finding that would indicate the injury occurred in a tortious manner and the persons who are responsible for such tortious injury.  When a Plaintiff should have discovered the cause of action is a question of fact for a jury.  *Jones*, 18 F.3d at 907 (11th Cir. 1994) ("Whether the plaintiff discovered, or by due diligence should have discovered the existence of the cause of action . . . was a question of fact . . . and it has been held that genuine issues relating to such question of fact are to be determined by the trier of fact").  *See* **Exhibit 45**.  Dr. Flannagan received a phone call from Aparo's step father concerning his death.  Dr. Flannagan advised the step father that Aparo's death occurred from an infection.  However, *see* Flannagan Dep. 46:14-17.

Further, the Death Certificate of Aparo, gives no indication that the gassing of Aparo was a contributing factor to his death.  S*ee* **Exhibit 46.**  Thus, the Personal Representative of the Estate, Amanda Cimillo, and Cimillo's counsel was not put on notice that Aparo's gassing was a contributing factor even when the death certificate was issued.

The Autopsy Report of Dr. Flannagan lists a pathologic diagnoses of the administration of pepper spray.  However, the Medical Examiner's office could not release the autopsy until the criminal investigation of death of Aparo was completed.

*See* **Exhibit 47**, **Exhibit 48**, **Exhibit 49**, **Exhibit 50** and **Exhibit 51**[25]. Despite Ms. Rhew-Miller's phone call and letter advising that the criminal investigation was in the process of closing, Counsel did not receive the Autopsy Report containing 205 pages until May 21, 2017.

In connection with DOC's concealment and interference with Aparo's investigation, counsel for Aparo sent counsel for DOC a letter stating that DOC had not sent a Certificate of Completeness, indicating that Plaintiff had not received all of the medical records from DOC. *See* **Exhibit 52**. In fact, Plaintiff was correct regarding the falsification and incompleteness of the medical records. *See* ECF Doc. 144.

## PLAINTIFF'S CONSPIRACY CLAIMS

The intra corporate conspiracy doctrine does not apply when employees of the same company are acting outside the scope of their authority. *Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) Thus, Greene was acting outside of her authority when she falsified medical records and failed to accurately chart Aparo's condition on September 17th and 18th.

The goals of the conspiracy were to cover up the injuries to Aparo beginning at least on September 17, 2010 and continuing to the time of his death.

---

[25] Counsel's phone message from Ms. Rhew-Miller was received on November 1, 2016. *See* **Exhibit 51**.

For these reasons, the Defendant's Motion for Summary Judgment should be denied as to Defendant Greene.

## <u>CERTIFICATE OF COMPLIANCE</u>

This response and memorandum complies with Loc. R. 7.1(F), Loc. R. 56(E), and this Court's rulings at the Case Management Conference held May 29, 2018, in that the number of words in the response and memorandum is 8,967, as counted by Microsoft Word, excluding the items that may be excluded under Rule 7 .1 (F), the font used in this motion is Times New Roman 14-point font.

Respectfully Submitted,

The Law Offices of
STEVEN R. ANDREWS, P.A.
822 Monroe Street
Tallahassee, Florida 32303
Tel:  (850) 681-6416 / Fax: (850) 681-6984

*/s/ Steven R. Andrews*
STEVEN R. ANDREWS (FBN 0263680)
BRIAN O. FINNERTY (FBN 0094647)
RYAN J. ANDREWS (FBN 104703)
SERVICE: service@andrewslawoffice.com
*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

served by electronic transmission this 20th day of July, 2018, to:

W. Peter Martin, Esq.
Dennis, Jackson, Martin & Fontela, P.A.
1591 Summit Lake Drive, Suite 200
Tallahassee, Florida  32317
peter@djmf-law.com
jmauer@djmf-law.com
jennifer@djmf-law.com
*Attorney for FDOC*

Jeffrey S. Howell, Esq.
Phipps & Howell
201 South Monroe Street, 4th Floor (32301)
Post Office Box 1351
Tallahassee, Florida  32302
jeff@phipps-howell.com
Margaret@phipps-howell.com
*Attorney for Jones a/k/a Franklin, Riley & Greene*

Brian C. Keri, Esq.
The Law Offices of Brian C. Keri, PA
3375-H Capital Circle NW, Suite 4
Tallahassee FL 32308
brianckeri@earthlink.net
michellemsmith@earthlink.net
*Attorney for Austin, Brown, Burch, Gillikin, Hamm, Hampton, Martina & Spangler*

/s/  ***Steven R. Andrews***
STEVEN R. ANDREWS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AMANDA CIMILLO, as
Personal Representative of the
Estate of RANDALL JORDAN-APARO,
Deceased and MINOR CHILD APARO
The Natural Child of Randall Jordan-Aparo
By and Through Her Mother and Natural Guardian
Amanda Cimillo,

      Plaintiffs,

vs.                            CASE NO. 4:16-cv-00584-RH-CAS

ROLLIN AUSTIN, et al.,

      Defendants.

_____/

**EXHIBITS TO PLAINTIFFS' RESPONSE TO DEFENDANT MARTHA GREENE'S
MOTION FOR SUMMARY JUDGMENT**

| No. | Document |
|---|---|
| 1. | DOC Photo Identification Card (DOC Bates 1479, 1478, 1476 and 1477) |
| 2. | Partial Judgment and Arrest Affidavit for Grand Theft which lead to 2007 Incarceration with DOC (DOC Bates 1485, 1492, 1500) |
| 3. | Partial Judgments and Arrest Affidavits which lead to 2009 Incarceration with DOC (DOC Bates 1606, 1613, 1594, 1600, 1566, 1568, 1572, 1580, 1587, 1538, 1545, 1525, 1531, 1620, 1630) |
| 4. | DOC Internal Movement (DOC Bates 3869-3874) |
| 5. | White Supremacist Prison Gangs in the United States (A Preliminary Inventory) Published by Anti-Defamation League (see pg. 7) |
| 6. | FDOC Case Briefing – Case #13-7092 dated September 5, 2013 |
| 7. | 33-601.3055, F.A.C. – Inmate Discipline – Use of Confidential Informants During Investigation |
| 8. | 914.28, F.S. (2011) - Confidential Informants |
| 9. | MINS Incident Report dated May 25, 2010 – 0000336880 (DOC Bates 2443) |
| 10. | Monticello Police Department 2010 Case Report 10-01-0835 |
| 11. | MINS Incident Report dated May 25, 2010– 0000336861 (DOC Bates 27504) |
| 12. | FDOC Offender Network Inmate Information Detail – Geremi B. Pierce |
| 13. | 893.12, F.S. (2004) - Contraband; Seizure, Forfeiture, Sale |
| 14. | Request for Administrative Move Transfer(s) dated May 21, 2010 (Aparo and Aron) (DOC Bates 3794-3797) |
| 15. | 05/21/10 Emails Regarding Informed drug drops (DOC Bates 004692) |

| 16. | Affidavit of Timothy Butler dated September 22, 2017 |
|---|---|
| 16A. | Whistle Blower Statement of A.P. Land, taken on March 4, 2014 |
| 17. | 2007 Medical Records from DOC– Randall Jordan-Aparo (Bates Aparo.doc.medical records.001-066) |
| 18. | 2009 Medical Records from DOC–Randall Jordan-Aparo (Bates Aparo.doc.medical records.067-206) |
| 18A. | DOC Nursing Manual dated August 13, 2008 (DOC Bates 3400-3409) |
| 19. | Plaintiffs' Amended Rule 26(a)(2) Report of Donald C. Kern, MD dated May 31, 2018 |
| 20. | Medical Examiner's Report |
| 21. | FDLE Interview of Martha Greene (DOC Bates 00769-00789) |
| 22. | Chronological Record of Health Care dated September 18, 2010 (Bates Aparo.doc medical records 197) |
| 23. | DOC Pre-Special Housing Assessment dated June 24, 2010 (Bates Aparo.doc.medical records 161, 177, 178) |
| 24. | Standard Operating Procedures - Pepper Spray |
| 25. | Capsicum Allergy |
| 26. | DOC Incident Report dated September 19, 2010 (DOC Bates 01377-001378) |
| 27. | FDLE Investigative Report Serial #22 Harold Baker (DOC Bates 002143-002145) |
| 28. | FDLE Investigative Report Serial #20 Martha Greene (DOC Bates 002139-002140) |
| 28A | FDLE Investigative Report Serial #34 Nikoron Arunakul, M.D. (DOC Bates 002166-002167) |
| 29. | DOC Nursing Manual dated July 18, 2008 (DOC Bates 003400-003409) |
| 30. | FDLE Investigative Report Serial #17 Mitchell Brown (DOC Bates 002133-002134) |
| 31. | FDLE Investigative Report Serial #19 Cicirello (DOC Bates 002137-002138) |
| 32. | DOC Blank Chest Pain Assessment (DOC Bates 003696, 003697) |
| 33. | DOC Blank Respiratory Assessment (DOC Bates 003694, 003695) |
| 34. | Affidavit of Flannagan (DOC Bates 000582) |
| 35. | Florida Department of Transportation Letter dated October 8, 1993 Regarding R. Austin |
| 36. | DOC Investigative Report 10-1-8057 (Bates 000525-00068, in particular 00533, 00589, 00590, 595, 604) |
| 37. | Defendant Martha Greene Answers to First Interrogatories to Plaintiff dated August 25, 2017 |
| 38. | Defendant Martha Greene's Response to Plaintiff Interrogatories dated April 26, 2018 |
| 39. | Defendant Martha Greene Responses to Plaintiffs First Request for Admissions |
| 40. | Defendant Martha Greene Response to Plaintiffs Request for Admissions dated August 23, 2017 |
| 41. | Defendant Martha Greene Response to Plaintiffs Request for Admissions dated April 4, 2018 |
| 42. | Defendant Martha Greene Response to Plaintiffs Second Request for Admissions dated April 4, 2018 |
| 43. | Defendant Martha Greene Response to Plaintiffs Third Request for Admissions dated April 4, 2018 |

| 44. | Expert Report of William R. Anderson, M.D. dated October 3, 2017 |
|-----|------------------------------------------------------------------|
| 45. | Cimillo Email to Attorney Andrews regarding her Daughter and Randall Jordan-Aparo |
| 46. | Death Certification of Randall Jordan-Aparo dated September 2, 2014 |
| 47. | ME District II Emails and Letter regarding release of Autopsy Report |
| 48. | Email from ME District II to Steven R. Andrews regarding response to request for release of Autopsy Report for Randall Jordan-Aparo dated February 2, 2015 |
| 49. | Email from Steven R. Andrews to ME District II regarding the Autopsy Report of Randall Jordan-Aparo |
| 50. | Karen Rhew Miller Letter to Steven Andrews dated November 1, 2016 |
| 51. | Phone message from Karen Rhew Miller to Steven Andrews Re: Closing the Aparo Case |
| 52. | Steven Andrews Letter to Peter Martin, counsel for DOC, regarding Pre-Suit Investigation dated January 25, 2015 |
| 53. | Risk Assessment dated June 24, 2010 |
| 54. | Risk Assessment dated Sept. 18, 2010 |
| 55. | Risk Assessment dated July 21 2010 |