**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**AMANDA CIMILLO, as**
**Personal Representative of the**
**Estate of RANDALL JORDAN-APARO,**
**Deceased and MINOR CHILD APARO**
**The Natural Child of Randall Jordan-Aparo**
**By and Through Her Mother and Natural Guardian**
**Amanda Cimillo,**

      Plaintiffs,

**vs.**                **CASE NO. 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN, et al.,**

      Defendants.
_____/

**PLAINTIFF ESTATE OF RANDALL JORDAN APARO'S RESPONSE TO**
**DEFENDANT LUCY FRANKLIN-JONES MOTION FOR SUMMARY**
**JUDGMENT**

      Plaintiff, Estate of Randall Jordan-Aparo, by and through its undersigned

counsel, files this Response to Defendant Lucy Franklin-Jones's ("Franklin")

Motion for Summary Judgment (Doc. 175), and in support of its Response, states as

follows:

**OVERVIEW**

      Plaintiff, the Estate of Randall Jordan-Aparo, has sued Franklin for violations

of  the Florida Wrongful Death Statute (FDA), Common Law Civil Conspiracy,

Violation of 42 U.S.C. § 1983 and Conspiracy to Violate 42 U.S.C. § 1983, alleging of violations of Common Law, Florida Statutory Law and Federal Statutes.

Randall Jordan-Aparo was an inmate who was killed in the Department of Corrections ("DOC") at Franklin Correctional Institution ("FCI") on September 19, 2010. He had a rare serious chronic disease, Osler-Weber-Rendu ("OWR") syndrome, and was also perceived to have a blood disorder, a bleeding disorder, hemophilia, and Von Willibrands disease, as was charted in his medical records and reviewed by DOC medical staff in 2007 and 2009-2010. Aparo was in DOC in 2007, and again from November 2009 to September 19, 2010, the day of his death. Franklin was aware that Aparo suffered from his disease. Franklin had been a licensed practical nurse for approximately 30 years.

On September 17, 2010 at approximately 10:15 p.m., Aparo declared an inmate medical emergency to Nurse Martha Greene ("Greene").[1]  Aparo arrived at the infirmary by wheelchair saying "I'm hurting too bad" and requested pain medication. Aparo's vital signs were deteriorating. His blood pressure had dropped to 98/54, pulse of 120 (tachycardia), and was warm to the touch. Aparo did not routinely seek pain medication from the infirmary. Nurse Greene sent Aparo back to his dormitory.

---

[1] Greene's actions set the predicate for the misconduct of Franklin beginning at 4:00 a.m. on September 18, 2010 including Franklin's Pre-Special Housing Health Assessment and Risk Assessment performed at 4:36 a.m.

Later, on September 18, 2010 at 12:10 a.m., Aparo was taken to the infirmary again by wheelchair after being found on the floor of the dorm bathroom incoherent with chest pains and was seen a second time by Nurse Greene.  Aparo also said he could not breathe and could not sleep.  Greene took Aparo's blood pressure which had dropped to 80/50 (a marked deterioration from September 17, 2010) and his pulse was 110.  A pulse of 110 is abnormal.  Greene noted signs of dehydration. Greene received doctor's orders to place Aparo in the infirmary and to administer one liter of lactated ringers.  Aparo, obviously dehydrated, did not receive the IV fluids because Greene could not place the IV.  After failing to place the IV multiple times, Greene failed to call the physician and notify him that she could not comply with his order.  Aparo continued to complain to Greene of shortness of breath throughout the early morning hours of September 18, 2010.  The symptoms that Aparo complained of on September 17th and 18th to Greene were new symptoms and these new symptoms should have been considered, at a minimum, in the Pre-Special Housing Health Assessment and Risk Assessment for the Use of Chemical Restraint Agents and Electronic Immobilization Devices ("Risk Assessment") done by Franklin at 4:36 a.m.

At 4:00 a.m. on September 18, 2010, Franklin saw Aparo for the first time in the infirmary.  Franklin failed to note the deteriorating condition of Aparo and failed to do any intervention or assessment on Aparo, including obtaining Aparo's vitals.

3

Then, at 4:36 a.m. on September 18, 2010, Franklin purported to perform a Pre-Special Housing Health Assessment on Aparo which was at best inaccurate and worst false.   For example, Franklin charted in this assessment vital signs she admitted making Aparo's vitals up and indicated she used from prior Aparo medical records for the vitals she recorded at 4:36 a.m. on September 18, 2010.   Further, Franklin charted at 4:36 a.m. that Aparo had "no current medical complaints" despite Aparo's previous medical complaints to Greene and others during September 17th and 18th.[2]   Further, Franklin attested in this assessment that Aparo had no acute medical health reasons that would preclude special housing and suffered from no infirmities or impairments.

The Risk Assessment signed by Franklin on September 18, 2010 at 4:36 a.m. was the last Risk Assessment done on Aparo prior to his gassing and subsequent death.   The Risk Assessment form requires that any new medical conditions or diagnoses that would affect the use of chemical restraint agents must be considered and a new Risk Assessment must be completed and provided to security staff.   Since Franklin falsified Aparo's vitals on the Pre-Special Housing Health Assessment, Franklin could not determine if Aparo's blood pressure would be considered stable for purposes of the use of chemical restraint agents as required in the Risk Assessment.   Franklin failed to consider the new medical conditions charted by

---

[2] Chest pains, shortness of breath, unable to urinate, tremendous pain and tachycardia.

Nurse Greene and her inability to rehydrate Aparo with IV fluids.  Lastly, Franklin never checked the prior medical history of Aparo when treating him in the infirmary and when signing the Risk Assessment and later advising Lt. Rollin Austin before the gassing on September 19, 2010, that Aparo had no medical conditions that would interfere with his gassing. Franklin later testified that "if someone is short of breath, you shouldn't gas them…. No."

Franklin allowed her patient, Aparo, to be removed from the infirmary at some unknown time by Captain Mitchell Brown ("Brown") contrary to the written telephone order of Dr. Arunakul at 12:30 a.m. on September 18, 2010 which would have required Aparo to remain in the infirmary until 11:30 p.m. on that day.  Franklin never notified any doctor or ARNP that Aparo had been removed from the infirmary by security in violation of DOC policy and the doctor's written telephone order. Franklin's charting for that event is recorded as a late entry and indicates that Aparo was removed by Brown at 4:36 a.m.

At 11:05 a.m. on September 19, 2010, the day Aparo was gassed and died, Franklin received a phone call from Defendant Rollin Austin ("Austin") asking whether or not if Aparo had any medical history that would be exacerbated by the use of chemical agents.  Franklin indicated "no" despite her knowledge that Aparo had not been rehydrated the previous evening and Franklin falsified Aparo's vitals for his Pre-Special Housing Health Assessment exam where she in fact never took

Aparo's vitals at that time, and despite numerous medical records which suggested Aparo should not be gassed because of his disability and OWR.

Later, at 3:25 p.m. on September 19, 2010, Franklin falsified that she witnessed Aparo's Refusal of Health Care Services. Defendant Martina gave Franklin the Refusal to sign as a witness even though Martina and Franklin both knew Franklin was not there for a purported refusal by Aparo to take his blood pressure. The evidence suggests that Aparo was dead at this time or on the cusp of death.

For her lack of care and treatment for Aparo, Franklin was found in violation of and reprimanded by the Department of Management Services (DMS) Rules and DOC Rules including, Failure to Safeguard an Inmate, Negligence, and Substandard Quality of Work.

<u>**BACKGROUND AND STATEMENT OF MATERIAL FACTS, INCLUDING DISPUTED MATERIAL FACTS**</u>

Aparo was in inmate with DOC at two separate times, once in 2007 and from November 2009 through September 19, 2010. Aparo lists his adopted Father as his contact for notification of an emergency.[3] *See* **Exhibit 1**. In 2007, Aparo was

---

[3] The Personal Representative of his Estate, Amanda Cimillo, was not listed as his next of kin and was not notified of his death at the time it occurred.

committed to DOC for a year and a day for retail grand theft shoplifting[4].  *See* **Exhibit 2**.

In 2009, Aparo was committed to DOC for 19.8 months for car theft, possession of a controlled substance, fraudulent use of a credit card[5], fraudulent use of a credit card[6] (two counts), fraudulent use of a credit card[7], possession of oxycodone[8] and sale and delivery of oxycodone[9].  *See* **Composite Exhibit 3**.  Aparo was scheduled to be released after completion of his 2009 sentence on October 24, 2010.  This was one month and two days prior to his death.  *See* **Exhibit 4**.

## APARO'S MEDICAL RECORDS FOR 2009-SEPTEMBER 19, 2010 INCARCERATION

The medical records for Aparo while confined at DOC from November 2009 through September 19, 2010, indicate that Aparo routinely suffered bleeding from hemophilia, Von Willibrands disease and OWR during his 2009 incarceration.  *See* **Exhibit 18,** Bates 074-076, 089-091, 093, 117, 130, 131, 132, 138, 140, 141, 144, 154, 157-160, 162, 166-170, 173-184, 188, 190, 192-197, 200-204 and 206.

## APARO'S TRANSFER FROM JEFFERSON CORRECTIONAL INSTITUTION ("JCI") TO FRANKLIN CORRECTIONAL INSTITUTION (FCI)

---

[4]  Theft of miscellaneous clothing having a value of $363.50.
[5]  Plaintiff obtained goods and services in the amount of $394.96.
[6]  Plaintiff obtained goods and services including food in the total amount of $266.65.
[7]  Plaintiff obtained goods and services in the amount of $422.16.
[8]  Plaintiff was in possession or constructive possession of three tablets of Roxicodone.
[9]  Plaintiff sold one pill of oxycodone to a Pinellas Park Police Department uncover agent for $65.00.

While confined at JCI, Aparo was approached by a white supremacy gang known as the Unforgiven. The Unforgiven is known to operate in Florida prisons and are primarily involved in contraband smuggling. *See* **Exhibit 5**, pg. 7. Additionally, it was well known throughout DOC that correctional officers conspired with white supremacy gangs to assist in the introduction of contraband, especially at FCI. *See* **Exhibit 6**. *See also* Aron Dep. 13:3-14:14.

Aparo was approached by the Unforgiven in the presence of Correctional Officer, Dennis Curry at JCI. *See* Aron Dep. 10:19-11:12; 37:1-11. Aparo was told that if he did not help the gang smuggle drugs into JCI, he and his roommate, William Aron ("Aron"), would be subject to beatings by the Unforgiven. *See* Aron Dep. 16:6-14.

Approximately on May 14, 2010, Aparo and inmate Aron reported that Aparo had been recruited to engage in a drug transaction that would result in drugs being smuggled into the prison. On or about May 14, 2010, Aparo and Aron gave a taped interviewed to a member of the DOC Inspector General's Office and a DOC Captain (since deceased). A record of this interview does not exist. DOC regulations require that a DOC Inspector maintain the tape and file a report concerning the cooperating inmates. *See* **Exhibit 7**. *See also* Aron Dep. 35:11-37:25. At the time of the interview with the DOC Inspector General's office, both Aparo and Aron became subject to the protections afforded by Florida Statutes 914.28, otherwise known as

Rachel's Law.   *See* **Exhibit 8**.   Neither Aparo nor Aron were provided these protections.

On May 21, 2010, Aparo approached JCI Warden, Christopher Landrum, advising him that he had been recruited to engage in two drops, one in front of the prison and one at the City of Monticello garage.   *See* **Exhibit 9**.  The individual that was to drop the drugs at JCI and the Monticello garage was identified as Geremi B. Pierce.   *See* **Exhibit 10**.  Although Pierce was not arrested for drug related charges, it was clear that Pierce was the person that dropped drugs at JCI in the parking lot and was in the area of the Monticello garage when arrested.  It is unknown whether the Monticello drop occurred.[10]  When the Monticello Police Department pulled over Pierce, drugs were not in the car[11].  The dog alerted to the presence of drugs in the car, but no drug charges were brought against Pierce.  *See* **Exhibit 10**, pg. 7.  *See also* Norton Dep. 5:7-9; 13:21-18:25.

The drugs that were subject to the drug drop at JCI were found by a correctional officer at approximately 3:00 p.m.  *See* **Exhibit 11**.  These drugs were never turned into evidence by depositing them into the evidence dropbox at JCI, never became part of a written chain of custody of evidence maintained by DOC,

---

[10] The Monticello drugs were to be placed in the ceiling of the Monticello garage.  It is unknown if the drugs were recovered from that location.
[11] Pierce had once been an inmate at JCI and resided in Madison Florida.  *See* **Exhibit 12**.

and never turned over to the DOC Inspector General[12] or the Jefferson County Sheriff's office. *See* **Exhibit 10**. *See* Norton Dep. 29:1-25 and Dep. Exh 5. Further, this contraband investigation never involved the DOC Inspector General's Office and the drugs where never placed in a contraband safe. *See* Murphy Dep. 46:25-48:10. *See also* D. Curry Dep. 1:1-4:25; 58:1-59:25. The drugs found on May 21, 2010 simply disappeared. *See* K. Martin Dep. 28:3-34:3.

The drugs seized at JCI on May 21, 2010 were contraband for purposes of the Contraband Statute 893.12 (*see* **Exhibit 13)**, and must have either been retained by DOC, maintained on a seized contraband list turned over to the Monticello Police Department. *See* K. Martin Dep. 28:3-34:3. Alternatively, DOC must have petitioned the Court in Jefferson County, that the drugs found on May 21, 2010 were contraband and seek an Order that the drugs be forfeited and destroyed. *See* Fla. Stat 893.12. DOC has not produced any chain of custody logs in connection with the drugs found on May 21, 2010 at JCI, nor has DOC filed a Petition with Jefferson Courts seeking a destruction Order in connection with the May 21, 2010 drugs last to be reported in the possession of a Correctional Officer. *See* K. Martin Dep. 28:3-17. In other words, the drugs recovered on May 21, 2010 simply disappeared. *See* K. Martin Dep. 28:3-34:3. *See also* D. Curry Dep. 58:1-59:25.

---

[12] *See* Kelley Martin-El-Urfali ("Martin") Dep. 35:5-40:25.

On the night of May 21, 2010, Aparo and Aron were transferred out of JCI. Aparo ultimately ended up being permanently housed at FCI.  *See* **Exhibit 14**.  Aron ended up being housed at Washington Correctional Institute for a brief time where he was stabbed by members of the Unforgiven within several weeks of his transfer from JCI.  *See* Aron Dep. 39:1-42:9.

Also, Aparo had a reputation as a "snitch" among prison staff at both JCI and FCI.  *See* **Exhibit 16.**  Approximately one or two days prior to his death, Aparo was accused of being a snitch by Correctional Officer Kevin Hampton ("Hampton").[13] *See* Craig Middleton ("Middleton") Dep. 56:19-57:4.  *See also* Affidavit of Timothy Butler, **Exhibit 16**.  *See* **Exhibit 16A**, Whistle Blower statement of Aubrey Land provided to the Office of the Inspector General.

Lastly, all supervisory personal at FCI and any other state prison would have had access to the MINs acknowledging Aparo as a cooperating witness (*see* **Exhibit 9**, *supra*), including Defendants Captain Brown ("Brown"), Lt. Rollin Austin ("Austin"), Sergeant C. Gillikin ("Gillikin"), Sergeant Hampton and Sergeant J. Hamm ("Hamm").[14]  *See* Rita Hall Dep., *supra*.

---

[13] Austin, as far back as 1993, threaten a Department of Transportation ("DOT") employee who had filed a complaint against him at the Glades County work camp.  The DOT employee filed the complaint after Austin accused him of being a "snitch".  *See* **Exhibit 47**.

[14] When Aparo was transferred to FCI, the following DOC employees would have had access to the May 21, 2010 MINs describing Aparo as a confidential informant. *See* **Exhibits 9 and 14** s*upra.*  These DOC employees include all Wardens, Assistant Wardens, Colonels, Captains, Lieutenants, Admin Lieutenants, Warden Secretaries, classification personal, CO-INST-PopMgmtAdmin, and CO-INST-AdminMoveTransfers.  Specially, the following DOC employees

## APARO'S MEDICAL RECORDS FOR 2009/2010 INCARCERATION RELATING TO NURSE FRANKLIN

**September 18, 2010 Pre-Special Housing Assessment and Risk Assessment for the Use of Chemical Restraint Agents and Electronic Immobilization Devices ("Risk Assessment")**

From Aparo's initial incarceration with DOC in 2007, *see* **Exhibit 17**[15], and through his final incarceration beginning in 2009, *see* **Exhibit 18,** and ending with his death at FCI on September 19, 2010, Aparo disclosed to DOC that he suffered from and was perceived to have a blood disorder and a bleeding disorder, specifically disclosing hemophilia, Von Willibrands disease, and ultimately OWR.  *See* **Exhibit 18,** Bates 074-076, 089-091, 093, 117, 130, 131, 132, 138, 140, 141, 144, 154, 157-160, 162, 166-170, 173-184, 188, 190, 192-197, 200-204 and 206.

Franklin did not know what the symptoms of OWR were until shortly after Aparo's death.  *See* **Exhibit 19,** Interrogatory 65.  *See also* Franklin Sworn Statement Bates 000763, lines 17-21.

---

received information Aparo was cooperating witness: Chester Green, Stuart Harrison, Kelley Martin, Vivian Stallworth, Leah Berg, Suzanne Powell, Patti Cleveland, Stephanie Neel, Teresa Williams-Harris, Wendel Whitehurst, Timothy Cannon, Christopher Landrum, Ed Watson, Stan Rutherford, Gene Hatcher, FCI Infirmary Sargent Dave Wallace (present on the date of Aparo's death), and Pridgeon George.  All the above would have had access to the May 21, 2010 MINs and Request for Administrative Move Transfer(s) indicating that Aparo was transferred out of JCI due to his status as a confidential informant.  *See* Rita Hall Dep. 1:1-6:25, taken in *Hickman v. DOC*, DOAH Case No. 17-4374, and *see* Middleton Dep., *supra*.  *See* **Exhibits 14** and **Exhibit 15**.

[15] Aparo's DOC Administrative files for this 2007 and 2009 incarceration indicates that he was never administered any chemical restraint agents prior to September 19, 2010.

The symptoms associated with these disorders and especially OWR include, shortness of breath and a predilection for the onset of sepsis.  *See* affidavit of Dr. Donald Kern, **Exhibit 20**.  *See* ARNP Lemon Dep. Vol I 63:1-65:25 and Dep. Exh. 8 (NIH Medline).  *See also* **Exhibit 21**, Autopsy Report of Lisa Flannagan, M.D ("Flannagan").  In fact, Aparo complained of shortness of breath multiple times in the days leading up to his death including the dates that Franklin assessed Aparo. *See* **Exhibit 18,** Bates 197, 202.  *See* Franklin Dep. pg. 190:2-8.  *See also,*  E. Curry Dep. 13:19-25; 36:19-25; 37:1-3, 6-8, Martin Dep. 19:4-7; 62:3-7, Middleton Dep. 11:23-25; 12:1-3, 15-25; 13:1-4; 17:6-25; 20:16-21; 111:1-2, Porter Dep. 21:12-15, 17-25; 22:1-25, Stripling Dep. 127:9-12; 136: 13-15, and Thomas Dep. 17:14-25; 22:8-11; 37: 11-25; 38:1-5.

Contained within the medical records for 2007, were numerous records which discuss Aparo's bleeding issues during his confinement with DOC.  *See* **Exhibit 17**, *supra*.  In particular, *see* Bates 004, 006, 008, 010, 013, 027, 037, 048, 055, 058, 061, 063-064 and 066. However, Franklin never bothered to read these medical records prior to signing the Risk Assessment on September 18th and giving approval to Austin on September 19th approving Aparo for gassing.[16]  *See* Franklin Dep. pg. 190:2-8, *supra* where Franklin testified:

---

[16] *See also* Franklin Sworn Statement Bates 000763:17-21 where Franklin stated she never looked at Aparo's medical records prior to his death.

> "Q:  Okay.  Well, I think you testified that it's – it
> would have been – if someone is short of breath, you
> shouldn't gas them.  Do you – do you remember that
> testimony?"
> "A:  I remember that."
> "Q:  Okay.  And you don't disagree with that?"
> "A:  No."

Obviously, when Franklin signed the Risk Assessment on September 18, 2010 approving Aparo for gassing and when advising security that Aparo had no medical conditions that would exacerbate any existing medical conditions, she was culpably negligent and grossly indifferent to Aparo's Eighth Amendment rights. *See* **Exhibit 25.**

DOC's charting in the above medical records for the 2007 and 2009/2010 incarceration, clearly indicate that Aparo was diagnosed with hemophilia, Von Willibrands disease and ultimately OWR. *See* **Exhibit 18,** Bates 074-076, 089-091, 093, 117, 130, 131, 132, 138, 140, 141, 144, 154, 157-160, 162, 166-170, 173-184, 188, 190, 192-197, 200-204 and 206.  Aparo regularly suffered from multiple bleeding incidents during 2007 and 2009/2010.[17]  Based on the above, Franklin as well as any other nurse who signed a Risk Assessment approving Aparo for gassing,

---

[17] To the extent ARNP Lemon testified that Aparo had only started in June 2010 reporting to the clinic for bleeds, was FALSE.  Lemon testified that she had recalled Aparo from 2007 and monitored his active bleeding is false.  S*ee* Lemon Dep. Vol I 58:1-62:25; 124:1-125:25 and Dep Exh. 18.

would be guilty of deliberate indifference. *See* **Exhibit 25.** Of course, Franklin never read Aparo's medical records.  *See* Franklin Sworn Statement Bates 000763:17-21.

### Franklin's Examination of Aparo at 4:00 a.m. on September 18, 2010

On September 18, 2010 at 4:00 a.m., Aparo was be observed in the infirmary pursuant to Dr. Arunakul's 23 hours hold. CITE While Aparo continued to deteriorate and request to be sent to the hospital, Franklin refused to call Dr. Arunakul or re-attempt to place an IV in Aparo that had been previously ordered but which could not be placed by Greene.  *See* **Exhibit 18** Bates 195.

In Franklin' SOAPE Note at 4:00 a.m. indicates that Franklin would not send Aparo to the hospital out of spite because Franklin claimed Aparo was using profanity.  *See* Franklin's Sworn Statement where Franklin stated "I didn't do his vitals and everything and he just got real belligerent….. He wouldn't let me touch him."  *See* Franklin's Sworn Statement, Bates 000752:18-21.  However, Franklin's SOAPE note for the 4:00 a.m. encounter showed Franklin recording Aparo's complete vital signs at that time.[18]  *See* **Exhibit 18,** Bates 195.

Whether Aparo was allegedly cursing or not on September 18, 2010, is irrelevant. *See* Hercule Interview, Bates 503-505. Defendant Franklin should have done a full assessment, which she failed to do, because she just referred him to

---

[18] It is nonsensical for Franklin to claim that Aparo did not want to be touched.  Aparo repeated asked to be taken to the hospital for help.  It is clear that Franklin's SOAPE note at 4:00 a.m. which contains Aparo's complete vitals was falsified.  *See* **Exhibit 18,** Bates 195.

confinement. *See* Hercule Interview, Bates 503-505. Further, Aparo wasn't refusing treatment, he was begging for treatment. *See* Hercule Interview, Bates 503-505. As demonstrated herein, Franklin stated in her note that she would not send a cursing inmate to the hospital because she would not be talked to that way. *See* **Exhibit 18**, Bates 195. In other words, even though he was dying and presenting with classic symptoms of sepsis and OWR, there was no way she was going to refer him to hospital because he was cursing in pain while he begged for medical help. *See* Hercule Interview, Bates 503-506. *See also* **Exhibit 18**, Bates 195. "Something is not right, in anybody's judgement." *See* Hercule Interview, Bates 506. Moreover, after he had made at the least his 3rd-6th about the same medical problems, he should have been referred **automatically** to the clinician. *See* Hercule Interview, Bates 6

### Aparo's Release from the Infirmary at 4:36 a.m. on September 18, 2018 and Sent to Confinement

Aparo was removed from the infirmary and taken to confinement arriving at 4:37 a.m. by Captain Brown. *See* **Exhibit 22.** Aparo was allegedly removed from the infirmary for disrespecting a nurse. However, no Disciplinary Report was made by Franklin or Brown regarding Aparo's actions concerning Franklin. Further, Franklin did not call or otherwise inform Dr. Arunakul that his orders had not been complied with. *See* **Exhibit 23**, DOC's Written Reprimand of Franklin.

16

In connection with Aparo's release from the infirmary and assignment to confinement, Franklin prepared a Pre-Special Housing Health Assessment and Risk Assessment. *See* **Exhibit 18,** Bates 196. *See also* **Exhibit 25**.[19]

The Pre-Special Housing Health Assessment was signed by Franklin at 4:36 a.m. on September 18, 2010. *See* **Exhibit 18**, Bates 196. The vital signs on this assessment are false and were not taken at 4:36 a.m. *See* Franklin's Sworn Statement, Bates 000752:18-21. *See* **Exhibit 18,** Bates 196, *supra.* This assessment is also false as it indicates Aparo has no current medical complaint. Additionally, this assessment is false because it indicated that Aparo was not suffering from any apparent acute medical conditions that would preclude his placement in special housing. *See* **Exhibit 18**, Bates 196. At this time, Aparo should not have been sent to special housing, but should have been sent to the hospital. *See* Hercule Sworn Statement (2nd) Bates 000515:14-18 and Bates 000516:1-13. Lastly, this assessment is false because it indicates Franklin had reviewed Aparo's medical records when she had not. *See* Franklin Sworn Statement Bates 000763:17-21.

At that same time around 4:36 a.m. on September 18, 2010, Franklin prepared and signed a Risk Assessment for Aparo. *See* **Exhibit 25**[20], *supra.* In connection

---

[19] The Risk Assessment signed by Franklin was not provided in the medical records originally provided to the Plaintiff and is not Bates stamped.

[20] The Risk Assessment is a three part form with a copy being provided to Security. **Exhibit 25** is the copy given to Security at the time of confinement. This Risk Assessment was not included in the medical records of Aparo initially produced by DOC as required by the form designation at the bottom right of the page.

with the preparation of the Risk Assessment, Franklin was required to review Aparo's medical records and to determine if Aparo had any medical conditions that would be exacerbated by the use of chemical agents. *See* **Exhibit 25.** Franklin failed to take Aparo's vital signs to determine if his blood pressure was stable as the Risk Assessment form requires. *See* **Exhibit 25.** Prior to signing this Risk Assessment, Franklin knew Aparo had complained of chest pains, shortness of breath, unstable hypertension and asthma-like conditions. *See* **Exhibit 18**, Bates 194. Aparo had complained of all of these conditions and Franklin knew it and was culpably negligent in signing it. In fact, inmate Samuel Wooden testified in a sworn statement that Aparo told the correctional officers prior to be gassed:

> "don't spray me, I have asthma, I have a medical condition, I can't breathe." *See* **Exhibit 26**.

### Franklin's Failure to Send Aparo to the Hospital on September 18, 2010

Franklin failed to assess Aparo while he was in her care on September 18, 2010 and while his medical condition was declining. *See* **Exhibit 37**. Franklin failed to realize that there was nothing that could been done at the infirmary to help Aparo. If a nurse sees a patient in danger, the nurse can refer a patient to an outside hospital. *See* **Exhibit 23**, *supra.* *See* Hercule Sworn Statement (2nd) Bates 000515:14-18 and Bates 000516:1-13. *See* Amended Expert Report of Dr. Donald Kern, **Exhibit 24**. *See* affidavit of Dr. Donald Kern, **Exhibit 20**, *supra.*

### Franklin's Conversation with Defendant Austin on September 19, 2010

Prior to the gassing of Aparo, Franklin was contacted by Defendant Austin at 11:05 a.m. on September 19, 2010 regarding Aparo's medical history and whether or not Aparo could be exposed to chemical agents. *See* **Exhibit 48.** Despite Franklin's knowing the medical history of Aparo, and his recent medical history, Franklin knew Aparo suffered from the following conditions:

1.    OWR;

2.    severe dehydration;

3.    recent chest pains (angina);

4.    recent shortness of breath;

5.    unstable hypertension (blood pressure fluctuation);

6.    an allergy to citric acid (a main ingredient in capsicum which is contained in pepper spray and OC gas); and

7.    pain from an unspecified source.

*See* **Exhibit 27**, Franklin Incident Report dated September 19, 2019.

### The Record Suggests that Franklin and Riley Never Attempted to Take Aparo's Blood Pressure at 3:25 p.m.

Nurse Franklin signed as a witness to Aparo's refusal to have his blood pressure taken at 3:25 p.m. on September 19, 2010.  *See* **Exhibit 28.**  However, Franklin testified that she was not present at the cell at 3:25 p.m., and that her signature on the refusal form was only intended to "verify" that Riley and two

correctional officer Defendants witnessed the alleged refusal. *See* **Exhibit 18**, Bates 204.

Franklin in fact testified that she did not see anything in connection with Aparo refusing a blood pressure check at 3:25 p.m. Franklin also testified that she did not see Riley go up and try and take Aparo's blood pressure at 3:25 p.m. *See* Franklin Dep. Vol I 110:12-113:2.

> Page 112:25      "Q:  Any you didn't see Riley go up and try to get a BP, did  you ?"

> Page 113:2      "A:  Not on that – not on that, I didn't."

The fact that Franklin claimed to have witnessed Aparo's refusal when she later testified that Riley did not try to take Aparo's blood pressure at 3:25 p.m., is fraudulent charting of a medical record. *See* **Exhibit 18**, Bates 201**.** This also suggests that Riley perjured herself when she testified that she (Riley) had slipped through Aparo's meal slot a blood pressure cuff. *See* Riley Dep. 19:20-21:15.

Franklin testified that when Riley went back to Aparo's cell, Franklin does not remember if Aparo's blood pressure was even attempted to be taken and if Riley even brought a blood pressure cuff with her. *See* Franklin Dep. Vol. II 191:15-19.

According to Dr. Flannagan, Aparo was most likely dead between 3:00 and 4:00 p.m. based on his rigor mortis.  *See* Flannagan Dep. 41:8-42:2.  The fact that the falsified 3:25 p.m. refusal was signed by Defendant Martina, Defendant Gillikin,

Defendant Riley and Franklin, shows an act in furtherance of a conspiracy to conceal the time of Aparo's death.

**Franklin Failed to Protect Aparo When He Was
Placed in a Contaminated Cell**

The evidence is clear that Aparo was sent back to a contaminated cell after Aparo's Post-Use-of-Force Exam done by Riley. *See* **Exhibits 29-31.** Franklin was also aware that Riley was observed the presence of chemical agents still on Aparo after his shower. *See* **Exhibits 29, 30 and 31.** *See also* handheld video, ECF Doc. 180-10.

**THE CITRIC ACID ALLERGY AND THE ADMINISTRATION OF
BENADRYL**

On September 18, 2010, Franklin preformed the Pre-Special Housing Health Assessment and Risk Assessment for Aparo. *See* **Exhibit 18** Bates 196, *supra. See also* **Exhibit 25**, *supra.* Franklin should have reviewed at least the preceding three days of Aparo's medical records. *See* Patricia Lemon-Watson ("Lemon") Dep. 59:8-25. If Franklin had reviewed the prior three days of Aparo's medical records, Aparo would be alive today. Franklin was well aware that Aparo had a serious blood disorder on September 18, 2010, complained of chest pains, shortness of breath and most importantly had an allergy to **citric acid** when she signed the September 18, 2010 Risk Assessment. *See* **Exhibit 25.**

The Risk Assessment dated September 18, 2010 and signed by Franklin, indicates that conditions such as asthma, chronic COPD, and emphysema, should alert the medical provider that conditions involving the shortness of breath may be exacerbated by the use of chemical restraint agents. *See* **Exhibit 25.** Aparo's medical history prior to September 18, 2010 is replete with complaints of shortness of breath. Based on these conditions, Franklin nor any other nurse should have signed a Risk Assessment approving Aparo for gassing separate and apart from his citric acid allergy[21].

**Prior to September 19, 2010, Aparo had never been sprayed with chemical restraint agents while incarcerated in 2007 and 2009/2010 up to the date of his death**. *See* **Exhibit 17 and 18**.

Further, Aparo's medical records up to September 18, 2010, repeatedly state that Aparo was allergic to citric acid. *See* **Exhibit 18** Bates 91.

Citric acid is a major component of capsicum. Capsicum is the major component of pepper spray and OC gas. *See* **Exhibit 32 pg. 2 and Exhibit 33.** http://manoa.hawaii.edu/hpicesu/SAFETY/generic/05.pdf and https://allergy-symptoms.org/capsicum-allergy. Aparo, for the first time, was sprayed with OC gas

---

[21] The Defendants have in fact adopted this argument in their Motions for Summary Judgment stating that Franklin could have relied upon prior Risk Assessments signed by other nurses. This argument is nonsensical because each nurse who signed a prior Risk Assessment would be required to do their own independent medical record review and perform a Pre-Special Housing Health Assessment prior to signing a Risk Assessment. The Risk Assessment form specifically addresses whether or not any new symptoms may had been identified between a prior Risk Assessment and the new Risk Assessment.

containing capsicum on September 19, 2010, the date of his death. *See* **Exhibit 32.** Aparo's medical records prior to September 18, 2010 contained numerous indications that Aparo was allergic to citric acid. *See supra* and generally **Exhibit 18.**

A citric acid allergy can cause anaphylaxis. *See* **Exhibit 33.** Anaphylaxis causes suffocation by closing the airway, which would cause petechiae to be present in an autopsy. Further, if Aparo died from an allergy induced anaphylaxis, there would be no evidence of gassing in his lungs. *See* Flannagan Dep. 59:25 60:1-7. The autopsy of Dr. Flannagan found the presence of petechiae in Aparo's eyes that would suggest Aparo suffocated from an allergy induced anaphylaxis shortly after his gassing with pepper spray and OC gas. *See* Flannagan Dep. 23:21-25 24:1-25 25:1-13.

The record is void as to whether Franklin discussed with Aparo his citric acid allergy. Thus, if Franklin had any knowledge of OWR prior to the death of Aparo or had researched the effects of a citric acid allergy prior to signing Aparo's Risk Assessment on September 18th, the chart would have been properly noted that he was allergic to pepper spray and OC gas. *See* **Exhibit 18.**

A dose of OTC Benadryl (Diphenhydramine) was administered to Aparo by Nurse Greene on September 18th, 2010. *See* **Exhibit 21.** The administration of Benadryl is not noted anywhere in the chart of Aparo. *See* **Exhibit 18 generally**

Benadryl is detectable in young adults for up to 2.11 days from a urine sample. The Benadryl was most likely issued in a pill form, based upon the fact that it was over the counter. It is unknown as to whether Aparo was given multiple doses of Benadryl.  Benadryl is kept in the dorm dispensary as well as the infirmary. There is nothing in the medical records which would suggest that on September 18, 2010 Aparo had a condition that Benadryl would be effacious for except for an allergy. *See* **Exhibit 18**.  It is more likely that the Benadryl would have been administered by Franklin or Riley after Aparo had been gassed on September 19, 2010 to treat what they may have suspected to be an allergy induced anaphylaxis.  Thus, the absence of any medical record referring to the Benadryl may be considered evidence of a conspiracy. Inmate Harold Baker ("Baker") in his interview with SA DeVaney on September 27, 2010, indicated Aparo told Baker that he had been given bad medicine and if Aparo died, Baker should write his "girl" and tell her that he was given bad medicine.  *See* **Exhibit 34**.  The presence of Benadryl (Diphenhydramine) was not found until the autopsy was released in 2017 along with the toxicology report. *See* **Exhibit 21.** The only allergies reported by Aparo were citric acid and bee bites. *See* **Exhibit 18.**

The only plausible explanation for the presence of Benadryl in Aparo's lab report would be that Benadryl was administered after Aparo's gassing as he continued to suggest he could not breathe and to reverse the anaphylaxis while he

suffocated from anaphylaxis causing the petechiae detected in the autopsy.  *See* **Exhibit 21.**  *See* Flannagan Dep. 24:1-25:19.

Thus, if on September 18, 2010, Franklin had research the symptoms or side effects of a citric acid allergy prior to signing the Risk Assessment, she would have noted that Aparo should not be sprayed with pepper spray or OC gas based solely on his citric acid allergy irrespective of his other medical conditions.  *See supra* **Exhibit 21.**  The failure of Franklin, as well as all the other nurses that approved Aparo for gassing without researching the side effects of the citric acid/capsicum allergy, would be guilty of deliberate indifference[22].

## FRANKLIN'S LATE ENTRIES IN APARO'S MEDICAL RECORDS

The Chronological Record of Health Care prepared by Franklin on September 18, 2010 contains late medical record entries signed by Franklin.  *See* **Exhibit 18** bates 197.  Franklin violated the DOC Nursing Manual in connection with the charting of these late entries.  *See* **Exhibit 35** (section 17).  The DOC Nursing Manual requires that late entries be documented in the following manner:

    a. Current date and time
    b. Late entry for_____ (date of incident)
    c. Documentation information (presumably as to why it is a late entry)
    d. Signature

---

[22] The citric acid/capsicum contained in the chemical restraint agents used on Aparo can be absorbed through the skin.  Further, the Use of Force Reports indicate that Aparo used his personal property to cover his face while he was gassed.  *See* **Exhibit 36**.  Lastly, the handheld video indicated Aparo did not have his shirt on at the time he was sprayed.  *See* ECF Doc.180-10.

None of Franklin's late entries comply with the DOC Nursing Manual rules suggesting that the charting on September 18, 2010 was false and back dated. *See* **Exhibit 35.**

The Chronological Record of Health Care medical records for Aparo charted by Franklin were inexplicably charted as late entries.  *See* **Exhibit 18**, Bates 197, 201, *supra*.  Those late entries were not properly charted by Franklin in accordance with the DOC Nursing Manual.  *See* **Exhibit 35 (**section 17), *supra.*

In Summary, DOC determined that Franklin committed gross negligence[23], failed to safeguard Aparo and performed a substandard quality of work concerning the care and treatment of Aparo.  *See* **Exhibit 23.**

<u>**EVIDENCE OF A CONSPIRACY**</u>

There is clear evidence of a conspiracy involving Nurses Franklin, Riley, Defendant Gillikin and Defendant Martina based upon their joint involvement in the concealment of the facts that Aparo never refused to have his blood pressure taken at 3:25 p.m.  *See* **Exhibit 18,** Bates 201.

Also, as a result of their late entries in the medical records of Aparo on September 18th and 19th, Franklin, Riley and Greene were to conceal their failure to

---

[23] It was Dr. Hercule's opinion that Franklin committed gross negligence in connection with her delay in treatment and delivery of care regarding Aparo and by failing to send Aparo to an outside hospital in the early morning of September 18, 2010.  *See* **Exhibit 37.**

protect Aparo and their unlawful acts and policy violations.  *See* **Exhibit 18,** Bates

197, 201

## MEMORANDUM OF LAW

### I.     THE SUMMARY JUDGEMENT STANDARD

A court should not grant summary judgment if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is genuine issue as to any material fact and that the moving

party precluded from summary judgement.  *See* Fed. R. Civ. P. 56.

### II.     NURSE FRANKLIN IS NOT ENTITLED TO THE
### DEFENSE OF QUALIFIED IMMUNITY

Nurse Franklin is not entitled to the defense of qualified immunity because

her actions on September 18th and 19th, violated long standing preexisting law as a

result of her falsification of medical records contrary to Florida law.   Florida law

provides that any person who fraudulently alters, defaces, or falsifies any medical

record, or causes or procures any of these acts to be committed, commits a

misdemeanor of the second degree.   *See,* 395.302, F.S. (2018).   Franklin also

violated 18 U.S.C. section 1519, as evidence exists that could permit a jury to find

that she altered or destroyed medical records to impede the administration of justice.

*See United States v. Gray 642 F3d 371. (2nd Cir 2011).*

Franklin could not have been acting in the scope of her duties as a nurse when

she engaged in the falsification/backdating of Aparo's medical records for

September 18th and 19th.  Thus, Franklin is not entitled as a matter of law to the defense of qualified immunity.  Franklin cannot claim that she was acting within the scope of her duties as a state employee or engaging in discretionary functions when she falsified/backdated Aparo's medical records on September 18th and 19th in contravention of a Federal Statute and a Florida Statute.  *See*, *Lumley v. City of Dade City*, 327 F.3d 1186, 1194 (11th Cir. 2003), *see also*, *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  The burden of proof in regards to whether or not a defendant is entitled to assert qualified immunity rests with the defendant and is the threshold issue.  In order to assert qualified immunity, Franklin must show that when she was engaged in the falsification/backdating of Aparo's medical records for September 18th and 19th, she was performing a legitimate job related function.  Every nurse would be placed on notice that the falsification/backdating of a medical record is clearly unlawful given these circumstances from the first day of nursing school.  A conviction for altering or defacing medical records would prohibit a person from engaging in the practice of nursing.  Thus, it cannot be objectively reasonable. *See* ECF 145 and ECF 156.  In other words, Franklin and the other nurses cannot meet their burden by merely stating that they were acting within the course and scope of their duties to have the defense of qualified immunity available to them.

If the Court finds that Franklin was performing a discretionary function and thus entitled to assert qualified immunity, the Court should look as to whether or not:

(1) Franklin had fair warning that her conduct would violate a constitutional right that is obvious to all reasonable government actors; or

(2) Franklin violated broader clearly established principles which should control the novel facts of this case;

(3) Franklin violated a clearly established rights that lie so obviously at the very core of what the Eighth Amendment prohibits:

  a.    by delaying necessary care for Aparo;

  b.    by not calling the on call physician on September 18, 2010 and advising him that Aparo was taken from the infirmary by security contrary to the doctor's orders;

  c.    by failing to assess Aparo while he was in the infirmary;

  d.    by failing to react to Aparo's dropping blood pressure;

  e.    by failing to react to Aparo's tachycardia;

  f.    failing to cause Aparo to be admitted to the hospital when his condition was emergent and on the cusp of death as they were wrongful acts that would be readily apparent to any official as they were to Dr. Hercule; and

  g.    failing to assess Aparo at all on September 18th and 19th.

(4) Franklin's acts were so obviously clear and her conduct was so bad that case law is not needed to establish and put her on notice that the complained conduct cannot be lawful.  *See Jones v. Fransen*, 857 F.3d 843. (11th Cir. 2017).

DOC has determined that Franklin failed to safeguard her patient, engaged in substandard quality medical treatment, as well as a gross delay in delivery of medical care to Aparo, and acted with "gross negligence" with the performance of her duties. *See supra* **Exhibit 37,** bates 00533, 00589, 00590, 595, and 604.

Franklin violated Aparo's minimal rights to medical care.  *See Harris v. Coweta Cty.*, 21 F.3d 388, 393-94 (11th Cir. 1994) and *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999) (delaying medical care).  Further, Franklin cannot show that her gross delay in care, and gross negligence conduct lies so obviously at the core of what the Eighth Amendment protects that her unlawful conduct, would have been readily apparent to any official notwithstanding the lack of precise controlling authority.  A cop maybe entitled to shoot his gun as part of his discretionary duties, but he is not entitled to lie about it.

Franklin should not be entitled to qualified immunity because she engaged in gross negligence and gross delay in the delivery of medical care to Aparo on September 18th and 19th.  An "official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." McElligott, 182 F.3d at 1255 (citing

30

Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997)); Mandel v. Doe, 888 F.2d 783, 788 (11th Cir. 1989). "When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005).

"An official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997); accord Hill v. Dekalb Regional [*1274] Youth Detention Center, 40 F.3d 1176, 1187 (11th Cir. 1994); Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990); Thomas v. Town of Davie, 847 F.2d 771, 772 (11th Cir. 1988); Aldridge v. Montgomery, 753 F.2d 970, 972-73 (11th Cir. 1985).

Also, Franklin should not be entitled to qualified immunity because she failed at 4:00 a.m. on September 18, 2010 to assess Aparo and attempt to place the IV that Greene had previously be unable to place at 12:30 a.m. Had Franklin bothered to call Dr. Arunakul and advise him of Greene's failure to re-hydrate Aparo, Dr. Arunakul would have immediately ordered Aparo to be taken to the hospital.

Lastly, Franklin should not be entitled to qualified immunity because she failed to notify the doctor when Aparo was removed from the infirmary under her care and contrary to doctor's orders.

### III.   FRANKLIN COULD BE FOUND GUILTY OF MANSLAUGHTER PURSUANT TO 782.07, F.S.

There is evidence that Franklin engaged in acts that would be considered the manslaughter of Aparo, a disabled person, as a result of culpable negligence. Franklin failed in her duty to provide Aparo with the care, supervision and services that a prudent person would consider essential for the well-being for a disabled adult. *See Peterson v. State 765 So. 2d 861 (Florida Fifth DCA, 2000).* Franklin had the clear duty to provide Aparo with timely medical care and to follow doctors' orders in connection with Aparo's care. Franklin had the authority as a nurse to call 911 if a doctor refused to admit Aparo.

These facts as they relate to Franklin are similar to *Ramos v. State*, 162 So. 3d 992, (Fla. 1st DCA 2015). In *Ramos,* a mother's manslaughter conviction of the death of her child was upheld. The appellate court found that defendant Ramos was culpably negligent by allowing her 19 month old son to wander, unsupervised, fall from the second floor of an apartment building, requiring neighbors to attempt to rescue him from drowning in a pond and a spa, and ultimately drowning in a retention pond.

## IV. DELIBERATE INDIFFERENCE

To prove deliberate indifference, a Plaintiff must show three things: (1) that the inmate had an objectively serious medical need; (2) that the defendant acted with deliberate indifference; and (3) that the defendant's wrongful conduct caused the detainee's injury.  *See*, *Goeber v. Lee County*, 510 F.3d 1312, (11th Cir. 2007). Grossly inadequate measures to treat an inmate's serious medical need will not eliminate a jailer's liability for deliberate indifference. *See McElligott,* 182 F.3d at 1256 ("[P]rison officials with knowledge of [a serious] need for care may not . . . provid[e] grossly inadequate care, caus[ing] a prisoner to needlessly suffer the pain resulting from his or her illness."); *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 704 (11th Cir. 1985) (stating that a jailer may be deliberately indifferent if the treatment provided is "so cursory as to amount to no treatment at all").

### Franklin's Conduct Does Constitute Deliberate Indifference

Franklin's conduct by not calling back the ordering physician who ordered that Aparo receive an IV for rehydration to advise him of her inability to place the IV, constitutes deliberate indifference.  *See* Expert Report of William R. Anderson, M.D., **Exhibit 38**.

Franklin engaged in additional acts of deliberate indifference when Aparo showed such a rapid decline in his vital signs, complaints of chest pains and shortness of breath on September 18, 2010.  There was nothing that the FCI

infirmary could have done to treat such a rapid decline and those conditions. Franklin was deliberately indifferent and culpably negligent when Franklin failed to even attempt to send Aparo to the hospital herself or to recommend to the on call physician on September 18th and 19th and request an order for Aparo be sent to the hospital for at least an evaluation.  Franklin never called the on call physician.

Finally, Franklin engaged in additional acts of deliberate indifference when her inactions of September 18th and 19th resulted in a gross delay of Aparo receiving medical care.  This includes Aparo to be placed in a contaminated cell.  *See Danley v. Allen, 540 F.3d 1298 (11th Cir. 2008).*

The controlling case law regarding deliberate indifference requires that a Plaintiff must show that the defendant acted with a culpable state of mind and must show that the medical provider knows of and disregards an excessive risk of an inmate's health or safety.  The health care provider must be aware of facts where an inference could be drawn that a substantial risk of harm exists and he must also draw the inference from the facts from which the provider is aware.  In Franklin's case, she was aware of facts that a substantial risk of harm existed on September 18th and 19th and she was aware from the facts that she knew that a substantial risk of harm to Aparo existed if he was not taken to the hospital.  Franklin was aware of facts from which an inference could be drawn that Aparo was at a substantial risk of harm. Franklin acted with deliberate indifference when she intentionally failed to call the

34

on call physician or engage in any other medical interventions.  *See*, *Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176 (11th Cir. 1994), overruled in part on other grounds by *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) and *also see*, *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988).  Delay in medical treatment must be interrupted in the context of the prisoner's need and condition.  Aparo's need on September 18th and 19th could not have been greater and his condition could not have been worse.

"Grossly incompetent or inadequate care can constitute deliberate indifference ...as can a doctor's decision to take an easier and less efficacious course of treatment." *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989), citing Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986*); McElligott v. Foley*, 182 F.3d 1248, 1255 (11 th Cir. 1999). *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016) (noting that "[a] defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference.").

An "official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *McElligott*, 182 F.3d at 1255 (*citing Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997)); *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989).

A jury could conclude that Franklin was mad that Aparo wanted to go to the hospital and cursed when asking, and retributively stopped her assessment and treatment of him, instead referring him to confinement and simultaneously sanctioning the use of chemical agents on him and that such conduct was deliberant indifference.  A jury should not be prevented from determining if Franklin, a nurse who is supposed to take care of her patient and treat his illnesses, was deliberately indifferent to Aparo when, instead of referring him to the hospital to save his life, she signed his death warrant on September 18, 2010.

*Hill v.Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994).  The Eleventh Circuit has found cognizable deliberate indifference claims when prison officials delayed treatment for life-threatening emergencies and in "situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Hill* at 1187. "A delay in providing medical treatment can constitute deliberate indifference in violation of an inmate's constitutional rights. *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  An inmate who complains of a delay in medical treatment must be able to prove the detrimental effect of the delay. *Townsend v. Jefferson Cnty.*, 582 F.3d 1252, 1259 (11th Cir. 2009). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would

detrimentally exacerbate the medical problem." *See Youmans v. Gagnon*, 626 F.3d 557, 561 (11th Cir. 2010); *see also Farmer v. Brenna*n, 511 U.S. 825, 834 (1994) (serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm."). In delay of treatment cases, relevant factors include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007).

## STATUTE OF LIMITATIONS

The Supreme Court and the Eleventh Circuit have both stated that "[I]n *Section 1983* actions '*[o]nly* the length of the limitations period, **and the closely related questions of tolling and application, are to be governed by state law.**'" *Wilson v. Garcia*, 471 U.S. 261, 269 (1985); *see also McGinley v. Mauriello*, 682 F. App'x 868 871 (11th Cir. 2017). As noted in *Jones v. Childers*, 18 F.3d 899, 906 (11th Cir. 1994), Florida courts have relied on the reasoning in *Urie v. Thompson, 337 U.S. 163, 69S.Ct. 1018 (1949), holding in a variety of legal contexts that "the* statute of limitations begins to run when a person has been put on notice of his right to a cause of action" and "under Florida law, a party is held to have been put on notice when he discovers, or reasonably should have discovered, facts alerting him of the existence of his cause of action." 18 F.3d at 906. Appling Florida law to the tolling period is controlled by *Tanner v. Hartog*, 618 So. 2d 177, Fla. 1993. *Tanner*

states that mere knowledge of an injury which could have occurred from natural causes, without more, holds that in determining the point at which a statute of limitations starts to run when the plaintiff has engaged in additional fact finding that would indicate the injury occurred in a tortious manner and the persons who are responsible for such tortious injury.  When a Plaintiff should have discovered the cause of action is a question of fact for a jury.  *Jones*, 18 F.3d at 907 (11th Cir. 1994) ("Whether the plaintiff discovered, or by due diligence should have discovered the existence of the cause of action . . . was a question of fact . . . and it has been held that genuine issues relating to such question of fact are to be determined by the trier of fact").  *See* **Exhibit 39**.  Dr. Flannagan received a phone call from Aparo's step father concerning his death.  Dr. Flannagan advised the step father that Aparo's death occurred from an infection.  However, *see* Flannagan Dep. pg. 46, lines 14-17.

Further, the Death Certificate of Aparo, gives no indication that the gassing of Aparo was a contributing factor to his death.  S*ee* **Exhibit 40.**   Thus, the Personal Representative of the Estate, Amanda Cimillo, and Cimillo's counsel was not put on notice that Aparo's gassing was a contributing factor even when the death certificate was issued.   *See* **Exhibit 49.**

The Autopsy Report of Dr. Flannagan lists a pathologic diagnoses of the administration of pepper spray.  However, the Medical Examiner's office could not release the autopsy until the criminal investigation of death of Aparo was completed.

*See* **Exhibit 41**, **Exhibit 42**, **Exhibit 43**, **Exhibit 44** and **Exhibit 45**[24].  Despite Ms. Rhew-Miller's phone call and letter advising that the criminal investigation was in the process of closing, Counsel did not receive the Autopsy Report containing 205 pages until May 21, 2017.

    In connection with DOC's concealment and interference with Aparo's investigation, counsel for Aparo sent counsel for DOC a letter stating that DOC had not sent a Certificate of Completeness, indicating that Plaintiff had not received all of the medical records from DOC.  *See* **Exhibit 46**.  In-fact, Plaintiff was correct regarding the falsification and incompleteness of the medical records.  *See* DOC. 144.

## **PLAINTIFF'S CONSPIRACY CLAIMS**

    The intra corporate conspiracy doctrine does not apply when employees of the same company are acting outside the scope of their authority.  *Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000)  Thus, Franklin was acting outside of her authority when she falsified medical records and failed to accurately chart Aparo's condition on September 18th and 19th.

    The goals of the conspiracy were to cover up the injuries to Aparo beginning at least on September 17, 2010 and continuing to the time of his death.

---

[24] Counsel's phone message from Ms. Rhew-Miller was received on November 1, 2016. *See* **Exhibit 45**.

For these reasons, the Defendant's Motion for Summary Judgment should be denied as to Defendant Franklin.

## <u>CERTIFICATE OF COMPLIANCE</u>

This response and memorandum complies with Loc. R. 7.1(F), Loc. R. 56(E), and this Court's rulings at the Case Management Conference held May 29, 2018, in that the number of words in the response and memorandum is 9,421, as counted by Microsoft Word, excluding the items that may be excluded under Rule 7 .1 (F), the font used in this motion is Times New Roman 14-point font.

Respectfully Submitted,

The Law Offices of
STEVEN R. ANDREWS, P.A.
822 Monroe Street
Tallahassee, Florida 32303
Tel:  (850) 681-6416 / Fax: (850) 681-6984

*/s/ Steven R. Andrews*
STEVEN R. ANDREWS (FBN 0263680)
BRIAN O. FINNERTY (FBN 0094647)
RYAN J. ANDREWS (FBN 104703)
SERVICE: service@andrewslawoffice.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

served by electronic transmission this 20th day of July, 2018, to:

W. Peter Martin, Esq.
Dennis, Jackson, Martin & Fontela, P.A.
1591 Summit Lake Drive, Suite 200
Tallahassee, Florida  32317
peter@djmf-law.com
jmauer@djmf-law.com
jennifer@djmf-law.com
*Attorney for FDOC*

Jeffrey S. Howell, Esq.
Phipps & Howell
201 South Monroe Street, 4th Floor (32301)
Post Office Box 1351
Tallahassee, Florida  32302
jeff@phipps-howell.com
Margaret@phipps-howell.com
*Attorney for Jones a/k/a Franklin, Riley & Greene*

Brian C. Keri, Esq.
The Law Offices of Brian C. Keri, PA
3375-H Capital Circle NW, Suite 4
Tallahassee FL 32308
brianckeri@earthlink.net
michellemsmith@earthlink.net
*Attorney for Austin, Brown, Burch, Gillikin, Hamm, Hampton, Martina & Spangler*

/s/  ***Steven R. Andrews***
STEVEN R. ANDREWS

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**AMANDA CIMILLO, as**
**Personal Representative of the**
**Estate of RANDALL JORDAN-APARO,**
**Deceased and MINOR CHILD APARO**
**The Natural Child of Randall Jordan-Aparo**
**By and Through Her Mother and Natural Guardian**
**Amanda Cimillo,**

      Plaintiffs,

**vs.**                            **CASE NO. 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN, et al.,**

      Defendants.

_____/

**EXHIBITS TO PLAINTIFFS' RESPONSE TO DEFENDANT LUCY FRANKLIN'S**
**MOTION FOR SUMMARY JUDGMENT**

| No. | Document |
|---|---|
| 1. | DOC Photo Identification Card (DOC Bates 1479, 1478, 1476 and 1477) |
| 2. | Partial Judgment and Arrest Affidavit for Grand Theft which lead to 2007 Incarceration with DOC (DOC Bates 1485, 1492, 1500) |
| 3. | Partial Judgments and Arrest Affidavits which lead to 2009 Incarceration with DOC (DOC Bates 1606, 1613, 1594, 1600, 1566, 1568, 1572, 1580, 1587, 1538, 1545, 1525, 1531, 1620, 1630) |
| 4. | DOC Internal Movement (DOC Bates 3869-3874) |
| 5. | White Supremacist Prison Gangs in the United States (A Preliminary Inventory) Published by Anti-Defamation League (see pg. 7) |
| 6. | FDOC Case Briefing – Case #13-7092 dated September 5, 2013 |
| 7. | 33-601.3055, F.A.C. – Inmate Discipline – Use of Confidential Informants During Investigation |
| 8. | 914.28, F.S. (2011) - Confidential Informants |
| 9. | MINS Incident Report dated May 25, 2010 – 0000336880 (DOC Bates 2443) |
| 10. | Monticello Police Department 2010 Case Report 10-01-0835 |
| 11. | MINS Incident Report dated May 25, 2010– 0000336861 (DOC Bates 27504) |
| 12. | FDOC Offender Network Inmate Information Detail – Geremi B. Pierce |
| 13. | 893.12, F.S. (2004) - Contraband; Seizure, Forfeiture, Sale |
| 14. | Request for Administrative Move Transfer(s) dated May 21, 2010 (Aparo and Aron) (DOC Bates 3794-3797) |
| 15. | 05/21/10 Emails Regarding Informed drug drops (DOC Bates 004692) |

| 16. | Affidavit of Timothy Butler dated September 22, 2017 |
|---|---|
| 16A. | Whistle Blower Statement of A.P. Land, taken on March 4, 2014 |
| 17. | 2007 Medical Records from DOC– Randall Jordan-Aparo (Bates Aparo.doc.medical records.001-066) |
| 18. | 2009 Medical Records from DOC–Randall Jordan-Aparo (Bates Aparo.doc.medical records.067-206) |
| 19. | Franklin Response to Plaintiffs First Request for Admissions |
| 20. | Affidavit of Donald Kern, M.D. |
| 21. | Autopsy Report |
| 22. | DOC Daily  Record of Special Housing dated September 18, 2010 |
| 23. | Lucy Franklin Reprimand (DOC Bates 0019601-002022) |
| 24. | Donald C. Kern, M.D. Rule 26(a)(2) Amended Report |
| 25. | Risk Assessment for the Use of Chemical Restraint Agents Dated September 19, 2010 |
| 26. | Sworn Statement of Samuel Wooden |
| 27. | DOC Incident Report dated September 19, 2010 |
| 28. | Refusal of Health Care Services dated September 19, 2010 (Bates Aparo.doc.medical records. 204) |
| 29. | Death Cell Photo |
| 30. | Death Cell Photo |
| 31. | Death Cell Photo |
| 32. | Standard Operating Procedures - Pepper Spray |
| 33. | Capsicum Allergy |
| 34. | FDLE Investigative Report Serial 22 Harold Baker |
| 35. | DOC Nursing Manual dated July 18, 2008 (DOC Bates 003400-003409) |
| 36. | DOC Incident Report dated September 19, 2010 |
| 37. | DOC Investigative Report 10-1-8057 (Bates 000525-00068, in particular 00533, 00589, 00590, 595, 604) |
| 38. | Expert Report of William R. Anderson, M.D. dated October 3, 2017 |
| 39. | Cimillo Email to Attorney Andrews regarding her Daughter and Randall Jordan-Aparo |
| 40. | Death Certification of Randall Jordan-Aparo dated September 2, 2014 |
| 41. | ME District II Emails and Letter regarding release of Autopsy Report |
| 42. | Email from ME District II to Steven R. Andrews regarding response to request for release of Autopsy Report for Randall Jordan-Aparo dated February 2, 2015 |
| 43. | Email from Steven R. Andrews to ME District II regarding the Autopsy Report of Randall Jordan-Aparo |
| 44. | Karen Rhew Miller Letter to Steven Andrews dated November 1, 2016 |
| 45. | Phone message from Karen Rhew Miller to Steven Andrews Re: Closing the Aparo Case |
| 46. | Steven Andrews Letter to Peter Martin, counsel for DOC, regarding Pre-Suit Investigation dated January 25, 2015 |
| 47. | Florida Department of Transportation Letter dated October 8, 1993 Regarding R. Austin |
| 48. | FDLE Investigative Report Serial 13 (Bates 2126-2128) |

| 49. | Affidavit of Amanda Cimillo |