## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**AMANDA CIMILLO, as**
**Personal Representative of the**
**Estate of RANDALL JORDAN-APARO,**
**Deceased and MINOR CHILD APARO**
**The Natural Child of Randall Jordan-Aparo**
**By and Through Her Mother and Natural Guardian**
**Amanda Cimillo,**

Plaintiffs,

**vs.**                                    **CASE NO. 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN, et al.,**

Defendants.

_____/

## PLAINTIFF ESTATE OF RANDALL JORDAN APARO'S RESPONSE TO DEFENDANT DOC'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Estate of Randall Jordan Aparo, by and through its undersigned counsel, files this Response to Defendant DOC's Motion for Summary Judgment (Doc. 180), and in support of its Response, states as follows:

## OVERVIEW

Plaintiff, the Estate of Randall Jordan-Aparo, has sued the Florida Department of Corrections ("DOC") for violations of the Americans with Disabilities Act and the Rehabilitation Act ("ADA and RA"), alleging disability discrimination and retaliation for requesting accommodations.

Randall Jordan-Aparo ("Aparo") was an inmate who was killed while in the Department of Corrections at Franklin Correctional Institution ("FCI") on September 19, 2010. He had a rare chronic disease, Osler-Weber-Rendu disease ("OWR"), and was also perceived to have a blood disorder, a bleeding disorder, hemophilia, and Von Willibrands disease. Aparo was in DOC in 2007, and again from November 2009, to September 19, 2010, the day of his death.

The fact that Aparo had a disability, was perceived to have a disability, and received at least some accommodations for that disability months prior to his death is indisputable. DOC even gave Aparo an M-2 and W-2 health grade impairment in November of 2009, indicating that he was being followed by the chronic illness clinic for his OWR. It is also indisputable that DOC ignored its Rules related to determining whether Aparo had a disability. On the day of his death, Aparo begged for medical assistance and demanded accommodations. DOC violated policy by not calling a clinician, ignoring his requests for accommodations, retaliating against him for such requests, and interfering with his rights to make such requests. Further, DOC employees, Dr. Mohammed Choudhary ("Choudhary"), Nurse Ola Melissa Riley ("Riley"), and ARNP Pat Lemon-Watson ("Lemon"), all believed that Aparo should not be gassed. These facts are not in dispute. On the day of his death, Aparo was alleged to have caused a disturbance in confinement, however, the only thing he did was request accommodations. In fact, Aparo begged for accommodations,

crying that he was dying and couldn't breathe. He was mocked, called a "crippled bitch", told that nothing was wrong with him, and gassed for asking for accommodations. In other words, Aparo suffered retaliation by the security staff for requesting accommodations for his disability. DOC officers taunted Aparo before and after gassing him to death, asking him if they needed to "get the wheelchair," and telling him to "lay down and die."

DOC showed a deliberate indifference towards Aparo's diseases and disability by ignoring his disclosure, ignoring its equal obligation to determine if he had a disability, and generally ignoring their duties to become knowledgeable about his disease before treating him. There is ample evidence that Aparo identified himself as having OWR and other chronic diseases. On one specific occasion, Aparo was threatened by Lemon for declaring a medical emergency because of a bleed and infection. Further, DOC "lost" Aparo's original medical records, inviting the inference that they lost his ADA documentation as well. DOC Regional Medical Director, Dr. Hantz Hercule ("Hercule"), acknowledged this disease, and DOC's wholly inadequate treatment of Aparo, stating that the staff was, in his mind, grossly negligent, and that if Aparo had received the treatment he should have received, at the very least he would have died at the right place, receiving the right care.

The statute of limitations does not bar Plaintiff's claim against DOC. Applicable law is clear that the statute of limitations on an ADA and RA claim

accrues when the Plaintiff knew or should have known that the ADA and RA were violated in relation to Aparo, and who in fact violated his rights. For Plaintiff, this occurred on August 30, 2014. Further, Florida's murder and manslaughter statute of a disabled adult mandates that the statute of limitations on this claim can never run, especially since DOC is liable for the conduct of its employees under the theory of *respondeat superior*. Moreover, a dispute about when Plaintiff knew or should have known about a potential cause of action is a question of fact to be determined by the jury. Lastly, Staff at FCI knew that Aparo had been a snitch at another prison in May of 2010. After Aparo's death, employees within the DOC Inspector General's office attempted to get an inmate to change his story about Aparo's death so that it would be "more favorable to the officers." The inmate was promised food, canteen money, and other benefits.

On this record, there are certainly disputed material facts as to the matters raised by DOC, and thus its Motion for Summary Judgment must be denied.

## I.      STATEMENT OF MATERIAL DISPUTED FACTS

Plaintiff denies each and every fact alleged by DOC and alleges the following disputed material facts.

Aparo was an inmate with DOC at two separate times, once in 2007, and from November 2009 through September 19, 2010, listing his adopted Father as his contact for notification of an emergency. *See* **Exhibit 1**. In 2007, Aparo was

4

committed to DOC for a year and a day for grand theft, a non-violent crime based on the facts of the charge. *See Id*; *see* **Exhibit 2**.[1] In November of 2009, Aparo was committed for 1 year, 7 months and 24 days, for various other non-violent crimes. *See Id.* **Composite Exhibit 3**[2].  Aparo was scheduled to be released from DOC on October 24, 2010. *See* **Exhibit 4**.

From his initial incarceration with DOC in 2007 through his final incarceration ending with his death at FCI on September 19, 2010, Aparo disclosed to DOC that he suffered from, and was also perceived to have, a blood disorder and a bleeding disorder, specifically disclosing hemophilia, Von Willibrands disease, and ultimately OWR. *See* **Exhibit 5 (Bates 00001-00216).** *See* specially Bates 9, 22, 23, 27-29, 31, 61, 64, 71-75, 82, 83, 85, 90, 91, 93, 94, 98, 99, 101, 103-105 112-114, 118, 128, 130, 155, 156, 165, 167, 175, 177, 178, 180-183, 187, 191.

### Osler-Weber-Rendu disease/syndrome

OWR disease/syndrome, or hereditary hemorrhagic telangiectasia, is a chronic inherited disorder of the blood vessels that can cause excessive bleeding. *See* **Exhibit 6.**  *See also* **Exhibit 7**, Lemon Dep. Vol. I 62:19-21, 63:4-7. Symptoms associated with OWR are frequent or excessive bleeding[3], shortness of breath, and

---

[1] The total value of the clothing was $363.50.

[2] The total amount of the goods in services, food, alleged to have been stolen was $1,083.77. Plaintiff was also in possession of three Roxicodone and sold one pill to an undercover officer for $65.00.

[3] Plaintiff agreed to postpone the deposition of DOC's 30b6 witness Evelyn Garst, DOC's ADA Coordinator designee. That agreement allowed Plaintiff to file Garst's deposition in support of

anemia caused by low iron. *See Id.* Individuals with OWR are more susceptible to septicemia[4], a bloodstream infection that occurs when bacteria enters the bloodstream and is transmitted through the body, including the lungs. See **Exhibit 9**. Possible serious complications of OWR are internal bleeding and shortness of breath, amongst others. *See* **Exhibit 6**. Individuals with OWR can develop telangiectasia, or abnormal blood vessels that scab on the outside of the skin, typically the lips, tongue, and fingers. *See Id.* The abnormal blood vessels also can develop in the lungs, liver, intestines, brain and other areas. *See Id*. Aparo complained of multiple bleeding episodes while at DOC, including specifically FCI. *See* **Exhibit 5**, Bates  9, 22, 23, 27-29, 31, 61, 64, 71-75, 82, 83, 85, 90, 91, 93, 94, 98, 99, 101, 103-105 112-114, 118, 128, 130, 155, 156, 165, 167, 175, 177, 178, 180-183, 187, 191.

Aparo also complained of shortness of breath and chest pains on multiple occasions, including at least four to five times during the last five days of his life. *See* **Exhibit 5**, Bates 71.  *See also* **Exhibit 10**, E. Curry Dep. 13:19-25; 36:19-37:8; **Exhibit 11**, Martin Dep. 19:4-7; 62:3-7; **Exhibit 12**, Middleton Dep. 11:23-17:25;

---

Plaintiff's Response. The deposition was taken July 24, 2018, and it is anticipated that it will be filed July 27, 2018. DOC does not oppose the inclusion of Ms. Garst's deposition testimony in support of Plaintiff's Response. Ms. Garst testified that the symptom of hemophilia, excessive bleeding, the same symptom associated with OWR, would mean that DOC would consider an inmate patient with hemophilia to have a disability.

[4] Aparo died of sepsis, a complication that individuals with OWR are more susceptible to as a result of the blood disorder. See **Exhibit 8.**

20:16-21; 111:1-2; **Exhibit 13**, Porter Dep. 21:12-22:25; **Exhibit 14**, Stripling Dep. 127:9-12; 136:13-15; and **Exhibit 15**, Thomas Dep. 17:14-25; 22:8-11; 37:11-38: 5.

OWR causes individuals to suffer physical impairments. *See* **Exhibits 6 and 17**. OWR caused Aparo to suffer physical impairments while in the custody of DOC in 2010, and specifically while at FCI. *See* **Exhibit 5**, Bates 9, 22, 23, 27-29, 31, 61, 64, 71-75, 82, 83, 85, 90, 91, 93, 94, 98, 99, 101, 103-105 112-114, 118, 128, 130, 155, 156, 165, 167, 175, 177, 178, 180-183, 187, 191. *See* **Exhibit 16**. OWR limits, and can limit specifically, one or more major life activities of the affected individual. *See* **Exhibit 16.** OWR limited major life activities of Aparo, including, breathing, working, respiratory functions, circulatory functions and performing manual tasks. *See* **Exhibit 5**, Bates 9, 22, 23, 27-29, 31, 61, 64, 71-75, 82, 83, 85, 90, 91, 93, 94, 98, 99, 101, 103-105 112-114, 118, 128, 130, 155, 156, 165, 167, 175, 177, 178, 180-183, 187, 191. *See* **Exhibit 16**. In fact, Aparo's ability to perform work was affected, as determined by DOC Employee ARNP Lemon, for one year. *See* **Exhibit 5**, Bates 64. An individual with OWR is always at risk for a bleeding episode as a cut, dental work or wound can bleed profusely with difficulty stopping. *See* **Exhibit 5,** Bates 64, 23, 98, and **Exhibit 6**. In other words, an individual with OWR is always at risk for dangerous blood loss if they receive a cut or have internal bleeding. *See* **Exhibits 6, 16 and 17**.

### 2007 Incarceration with DOC

In 2007, Aparo entered DOC on a transfer from a jail in Hillsborough County, Florida.   *See* **Exhibit 18**. Along with the preceding documents, Aparo was transferred to DOC with a medical record discharge indicating that he had a follow up appointment with a hematologist, Dr. Hussein Saba, due to a bleeding disorder. *See* **Exhibit 5**, Bates 175. This record followed Aparo from prison to prison during his 2009-2010 incarceration. *See* **Exhibit 7**, Lemon Dep. Vol II 137:23-138:23 and **Exhibit 19**, Franklin Dep. Vol I 23:3-19. DOC should have requested the appropriate medical records from Armor Correctional Services, including the hospital Aparo was treated at only a couple weeks prior to entering DOC in 2007. *See* **Exhibit 17**. Had DOC obtained these records, they would have had a more in depth analysis of Aparo's disease and disability, including potential treatment options of OWR and his perceived hemophilia and Von Willibrands, such as a DDAVP shot, a shot he had received previously. *See* **Exhibit 17 and 20**. During the 2007 incarceration[5], DOC and its medical staff diagnosed, reported, and/or perceived Aparo as having OWR, Von Willibrands disease, hemophilia, and a bleeding disorder. (*See* **Exhibit 5**, Bates, 153, 163, 165, 167, 175, 177, 181-183, and 191). Despite knowledge that Aparo had seen a hematologist for his OWR, DOC never referred him to a specialist as a follow up. *See* **Exhibit 85**, DOC Response to

---

[5] The original medical records of Aparo have been lost. A substantial number of the copies are illegible due to copying. DOC could not produce better copies or the originals.

Plaintiffs' Request for Admissions dated April 3, 2018, Request No. 21. Even Nurse Lynda Adair ("Adair"), the Nurse Supervisor at FCI, was aware of Aparo's OWR, had done the research on it, and charted that he was born with the syndrome. *See* **Exhibit 21**.

**2009-2010 Incarceration with DOC**

Aparo was received by DOC again on November 10, 2009. *See* **Exhibit 5**, Bates 8, 128-129. Until Aparo was later transferred to FCI, he was always considered to be an accurate reporter of information concerning his health. *See* **Exhibit 5**, Bates 148. During the 2009-2010 incarceration, DOC diagnosed or perceived Aparo to have a blood disorder, a bleeding disorder, and OWR. *See* **Exhibit 5**, Bates 1, 8, 27-29, 31, 79, 82, 90, 91, 94, 98, 99, 101, 103, 104, 113, 114, 117, 118, 128. Indeed, Defendant Nurses Lucy Franklin ("Franklin"), Martha Greene, and Riley believed Aparo suffered from a bleeding disorder, blood disorder, and OWR while they were treating him. *See* **Exhibits 22, 23 and 24**, Franklin, Greene, and Riley First Responses to Plaintiffs' Request for Admissions dated April 4, 2018, Request Nos. 33, 35. *See also* **Exhibits 25, 26, and 27,** Franklin, Greene and Riley, Third Responses to Plaintiffs' Request for Admissions dated April 4, 2018, Requests Nos. 65-66. Aparo's condition, OWR, was initially considered very serious by DOC on November 10, 2009. *See* **Exhibit 5,** Bates 26-30. Aparo was given an M-2 Medical Grade for his OWR, an "Element of the Health Grade", meaning Aparo was an

"inmate patient" that "[i]s being followed in chronic illness clinic (CIC) but is stable and does not need to be seen in the chronic clinic more often than every six months." *See Id*. *See* **Exhibit 5,** Bates 22, 23, 30, 124.[6]

Despite having actual knowledge of his condition(s), these Nurses never conducted any research to determine what the symptoms associated with OWR were, or what major bodily functions the disease affected, prior to Aparo's death. *See* **Exhibits 22, 23 and 24**, Franklin, Green, and Riley First Responses to Plaintiffs' Request for Admissions dated April 4, 2018, Request Nos. 65-66.  In other words, while they treated Aparo, they had no knowledge about what the symptoms of OWR were, or what bodily functions it affected for Aparo. *See Id*.  Nonetheless, the Nurses still believed they were qualified to treat a disease they knew nothing about prior to Aparo's death. *See* **Exhibits 22, 23 and 24**, Franklin, Green, and Riley First Responses to Plaintiffs' Request for Admissions dated April 4, 2018, Request No. 80.

Despite knowledge that Aparo had seen a hematologist for his OWR, no one at DOC referred Aparo to a specialist who was qualified to treat his OWR. *See* **Exhibits 22, 23 and 24**, Franklin, Green, and Riley First Responses to Plaintiffs' Request for Admissions dated April 4, 2018, Request No. 77.

---

[6] Aparo was also given another elevated Element of the Health Grade due to his OWR, a W-2 impairment, indicating that Aparo was an inmate patient who had moderate work restrictions. *See infra*.

**Aparo transferred from Jefferson CI to
Franklin CI after he informed on dirty DOC guards**

On May 21, 2010, Aparo reported to the warden that there would be a drug drop at Jefferson CI ("JCI") and one in downtown Monticello. *See* **Exhibit 28**. Aparo's information was credible, as drugs were found at one location and a suspect was arrested at another. *See infra; see also* **Exhibit 29**. For fear of his safety, he and his co-informant, William Aron ("Aron"), were transferred away from JCI that night. *See* **Exhibit 30**. However, the transfer was futile, as the information made its way to FCI. *See infra*. Defendant Kevin "Big Jit" Hampton ("Hampton") threatened and harassed Aparo for being a snitch in the days before his death. See **Exhibit 12**, Middleton Dep. 52:3-54:19; 133:23-134:4. The snitch MINS was accessible by the wardens, inspectors, majors, colonels, captains, and lieutenants at each of the prisons at any time prior to Aparo's death.  *See* **Exhibit 31**, Hall Dep. 39:3-40:12; 49:20-51:3

After he departed JCI, Aparo was transferred to Wakulla CI for placement at a new prison. *See* **Exhibits 4, 5,** Bates 103-107, and **Exhibit 30.** At Wakulla CI, Aparo was reevaluated medically and was again given a W-2 Health Grade Impairment on May 21, 2010,  due to his OWR. *See* **Exhibit 5,** Bates 103. The W-2 Work Grade for "moderate restrictions", an Element of the Health Grade, was due to his OWR, as there are special asterisks next to "blood disorder" and "oslerwebber-

rendu". *See Id*; *see also* **Exhibit 32**, pp. 2-3; *see also* **Exhibit 5**, Bates 22, 69, 81, 88.   He was subsequently transferred to FCI.

### June 23, 2010, Medical Emergency

On June 23, 2010, Aparo was seen at the Bay County Work Camp ("BCWC") for a "pinhead size" cut on his right middle finger.  *See* **Exhibit 5**, Bates 99.  Aparo was "profusely bleeding" from this cut, and was evaluated by Lemon, noting that Aparo had OWR, a bleeding disorder, telangiectasias "all over finger" and his "mouth,"  and explaining that he was "prone to excessive bleeding." *See* **Exhibit 5**, Bates 98. Due to this bleeding incident caused by his OWR and symptoms of profuse bleeding, ARNP Lemon ordered Aparo back to FCI and away from the work camp. *See Id*. *See also* **Exhibit 5,** Bates 97. Further, Lemon ordered that Aparo be kept away from "sharps" and "machinery" so that he would not suffer another significant bleeding episode. *See Id*; *See also* **Exhibit 5,** Bates 64.

### June 30, 2010, Bleeding Episode through July 20, 2010

Less than seven (7) days later, Aparo went to the FCI infirmary for bleeding in his left index finger that would not stop. *See* **Exhibit 5,** Bates 94. He had paper towels around his finger and hand and was covered in blood. *See Id*. Aparo had a small 1cm open cut on the skin of his left index finger, a different finger than was bleeding the week before. *See Id*. Aparo was told by SLPN Amy Goodwin ("Goodwin") to "come to medical ASAP" if bleeding starts up again. *See Id*. Aparo

also received a pass signed by ARNP Lemon lasting from June 30, 2010, through June 30, 2011, which stated "any bleeding come to Medical ASAP." *See* **Exhibit 5,** Bates 61. An iron study was ordered and it was determined that Aparo had low iron. *See* **Exhibit 5,** Bates 91. Lemon stated that the prescription for ferritin had nothing to do with Aparo's OWR, and it was not prescribed to treat his OWR. *See* **Exhibit 7**, Lemon Dep. Vol. II at 175:20-179:1. In fact, while at FCI, neither ARNP Lemon, nor anyone else at FCI prescribed medication to Aparo to treat his OWR or its symptoms. *See* **Exhibit 7**, Lemon Dep. Vol I. at 60:7-19.

On July 9, 2010, Lemon sees Aparo again, notating his OWR, telangiectasias and his periodic uncontrollable bleeding episodes. *See* **Exhibit 5**, Bates 91. On July 16, 2010, Aparo went to the medical unit again with profuse bleeding from a third and different finger this time, his right index finger. *See* **Exhibit 5**, Bates 90. Adair was very concerned with his bleeding and scheduled a follow up with ARNP Lemon. *See Id*.

**Aparo threatened for declaring medical emergency and going to infirmary as he was told to do if he had more bleeding episodes, receives Disciplinary Report ("DR") for complaining about blood in his urine**

On July 21, 2010, Aparo declared a medical emergency for hematuria, or blood in his urine and mouth, indicating symptoms of OWR. *See* **Exhibit 5**, Bates 82-86; *see also* **Exhibit 16**, pg 7. Although Lemon wrote her note as though Aparo lied about blood in his urine and mouth, a subsequent test showed he did have blood

in his urine, and, in fact, had a urinary tract infection. *See* **Exhibit 5**, Bates 82-86; *see also* **Exhibit 33**. While Lemon stated that a review of his medical record indicated that he only had a bleeding episode once prior to June 23, 2010, that is just simply false. *See Id*; *see also supra generally*.

Lemon showed a clear and demonstrable bias against Aparo at this point based on the plain language of the note, but especially since **Lemon** herself was the one that gave Aparo a pass only twenty-two (22) days earlier telling him to come to medical ASAP if he had any bleeding episodes. *See Id*; *see also* **Exhibit 16**. ARNP Lemon threatened Aparo with a DR if "she can confirm" that there is a "manipulation game occurring." *See Id; See also* **Exhibit 5**, Bates 82-86. Lemon knew if Aparo received a DR, he would lose accrued gain time that helped reduce the length of his sentence. *See* **Exhibit 7,** Lemon Dep. Vol. I 124:4-125:16. However, Lemon suggested it wasn't a "threat," but a "promise." *See* **Exhibit 7,** Lemon Dep. Vol I 125:3-13. *See* **Exhibit 5,** Bates 84-87 and **Exhibit 93** (Aparo did get a DR for declaring a medical emergency).

### Defendant Rollin Austin issues a DR against Aparo for allegedly "cursing" in the chow line

On August 18, 2010, Aparo received a DR from Defendant Lieutenant Rollin Austin ("Austin") for allegedly "cursing" in the chow line after Austin told Aparo he needed to put his food tray away, preventing Aparo from even finishing his meal. *See* **Exhibit 84**.

### Aparo suffers two more bleeding episodes

On July 22, 2010, Aparo reports another chronic bleed from his left thumb, a symptom of OWR, and was attended to by Greene and Goodwin in his cell. *See* **Exhibit 34**. Aparo declared a medical emergency on August 29, 2010, again complaining of a chronic bleed, a symptom of OWR, from his finger. *See* **Exhibit 35**. So, when Lemon later asserts on September 14, 2010, that Aparo is having "no further events with bleeding problems…He hasn't had problems since 7/21/10," that would most charitably be described as false. *See* **Exhibit 5**, Bates 79.

### September 15, 2010, through September 18, 2010

### The entire medical staff at DOC ignores the obvious symptoms indicating that Aparo is dying, showing more deliberate indifference to his disease, disability, and health[7]

On Wednesday September 15, 2010, Aparo skipped breakfast and stayed in his bed all day until he declared a medical emergency later that day. *See* **Exhibit 36**. Aparo had been complaining of back and chest pains that day, complaints of symptoms which led to and caused his death. *See* **Exhibit 36**; *see also* **Exhibit 37**, Bates 482. When he presented with a 102.4 fever, he should have been referred for tests, given antibiotics prophylactically, had blood tests conducted, and been referred to an ARNP, PA, or physician to determine if he needed to be transferred to a

---

[7] *See also Infra*, "DOC excoriates some of its staff involved in Aparo's death, fires two, reprimands others."

hospital. *See* **Exhibit 37**, Bates 484. To be clear, Aparo should have been placed in the infirmary at that moment for consult and observation with a PA, ARNP, or physician, however, he was not. *See* **Exhibit 37**, Bates 486. Pamela Houshoulder ("Houshoulder") considered Aparo's OWR, only in part, because she knew not to give him ibuprofen because of his "blood disorder." *See* **Exhibit 37**, Bates 488. Dr. Hercule laughed at the care Houshoulder provided Aparo on September 15, 2010, when he reviewed the records from that day months later, stating that the Motrin was obviously inappropriate. *See* **Exhibit 37**, Bates 487.

On September 17, 2010, Aparo fell to the ground while playing dominos and had to be carried to medical by inmates. See **Exhibit 36**. Later that day, Aparo started complaining that his heart and chest hurt and that he was hot. *See* **Exhibit 36**. Anytime an inmate complains of chest pains, the inmate is supposed to be immediately examined by a physician. *See* **Exhibit 38**. Aparo complained of chest pains continually over a three day period. *See* **Exhibit 36** and **Exhibit 10,** E. Curry Dep. 13:19-14:2; **Exhibit 15**, Thomas Dep. 44:11-14; 66:13-16. *See also* ECF Doc. 180-10. This moment on the 17th should have triggered a 23 hour infirmary observation, however, Greene was deliberately indifferent to Aparo's medical needs and did not place him on an observation or refer him to an ARNP or physician to place him for further observation at that time. *See* **Exhibit 37**, Bates 490-491. Aparo

went through the same routine on September 16th as well. *See* **Exhibit 36**, Bates 2143-2144.

A different inmate declared a medical emergency for Aparo on the 17th before shift change, and that inmate was told he would need to wait 20 minutes for the shift change. *See* **Exhibit 36**. Aparo kept complaining that his heart was hurting and that he needed to go to the bathroom. *See* **Exhibit 37**. Aparo was carried to the bathroom by two inmates and then fell in the bathroom and was incoherent, not knowing how or why he was in the bathroom. *See* **Exhibit 36**. Forty minutes after declaring the medical emergency, Greene refused to treat Aparo or check his vitals while he was on the ground, showing a deliberate indifference to the medical emergency he had just declared and his active condition, and despite the fact that he was "crying". *See* **Exhibit 39**. In fact, Greene callously, and in a biased manner, described Aparo's crying in pain as "whining," typical of the horrendous treatment she provided to Aparo and her general lack of empathy for his physical condition, his OWR, and his disability. *See* **Exhibit 40**. Inmates tried to lift Aparo into a wheelchair as he was screaming in pain, including chest pain, with his eyes rolling in the back of his head and remained incoherent, leading Green to perform an EKG. *See* **Exhibit 36, 38, 39, 40, and 41**.

Aparo was cooperative when he was brought to the infirmary late on September 17, 2010. *See* **Exhibit 41**. Franklin knew that Aparo was in bad enough

shape on September 18, 2010, she recommended he be put in a suicidal observation cell. *See* **Exhibit 41**.

Greene showed deliberate indifference towards Aparo on September 18, 2010, at 12:10am, when she registered his vitals at110 pulse and 80/50 blood pressure and ignored the fact that his health was declining and there was not much more that staff at FCI could do for him, thus delaying medical treatment. *See* **Exhibit 42**. *See also* **Exhibit 43**, Bates 495-497. Aparo's vitals had even gone down from the 98/54 blood pressure he had just a few hours earlier. *See* **Exhibit 37**, Bates 492-493. In fact, it was clear Franklin knew that gassing an inmate with a blood pressure of 80/50, placing it within the list of non-exclusive conditions that can be exacerbated by chemical agents, was against policy, procedure, and basic and common human decency. Yet Franklin still signed and approved Aparo's gassing. *See* **Exhibit 5, Bates 11.**

On the one hand, Franklin thought Aparo should be on suicide watch, and on the other, thought he also was clear to be gassed, despite his failing blood pressure, indicative of sepsis. *See* **Exhibit 5**, Bates 1. *See also* **Exhibit 17 and 41**. Dr. Nikron Arunakul ("Arunakul") instructed Greene to place an IV in Aparo on September 18, 2010, but she failed to advise him that she could not get an IV placed on him and that his vein would not accept the IV fluids. *See* **Exhibit 38**. Red lights should have been going off, all things considered by Greene and Franklin, since Aparo's blood

pressure was dropping dangerously, his vein wouldn't accept the IV fluids, and he's writhing in pain complaining about his whole body, chest, and being unable to breathe, demonstrating that Aparo needed to go to the hospital. *See* **Exhibit 43,** Bates 498-499.

Whether Aparo was allegedly cursing or not on September 18, 2010, is irrelevant. *See* **Exhibit 43,** Bates 503-505.[8] Defendant Franklin should have done a full assessment, which she failed to do, and instead callously sent him to confinement. *See* **Exhibit 43,** Bates 503-505.   Further, Aparo wasn't refusing treatment, he was begging for treatment. *See* **Exhibit 43,** Bates 503-505.   As demonstrated herein, Franklin stated in her note that she would not send a cursing inmate to the hospital because she would not be talked to that way.  *See* **Exhibit 5**, Bates 72.   In other words, even though he was dying and presenting with classic symptoms of sepsis and OWR, there was no way she was going to refer him to the hospital or call a doctor concerning his request because he was cursing in pain while he begged for medical help. *See* **Exhibit 43**, Bates 503-506.  *See also* **Exhibit 5**, Bates 72. "Something is not right, in anybody's judgement." *See* **Exhibit 43**, Bates 506. Moreover, after he had made at least his 6th complaint about the same medical problems, he should have been referred **automatically** to the clinician because DOC

---

[8] The only relevant part of the alleged cursing is that, if it were true and Aparo was cursing, justifying the DR, Franklin was required to issue the DR, but didn't, suggesting that Franklin fabricated the allegation. *See* **Exhibit 98**. *See also* **Exhibit 25**, Request No. 110.

policy only requires three complaints about the same medical problem. *See* **Exhibit 44**, Bates 6. See also **Exhibit 25**, Request No. 8.

### The Day of Aparo's death, September 19, 2010

From September 15, 2010 through 9:00 a.m. on September 19, 2010, Aparo declared approximately 5 to 6 medical emergencies, stating that he was in pain, could not breathe, and that he was dying and needed to go to a hospital. *See* **Exhibit 5**, Bates 69, 71, 73, 74, 75, 78. On September 19, 2010, after 9:00 a.m., Aparo declared multiple medical emergencies. *See* **Exhibit 10**, E. Curry Dep. 13:14-14:6; **Exhibit 11**, Martin Dep. 17:8-20:18; 127:15-18; **Exhibit 14**, Stripling Dep. 12:2-5; 14:23-16:16; 65:6-15; 123:14-124:5; 128:1-10; 130:10-16; 136:10-12; **Exhibit 15**, Thomas Dep. 11:13-14:24; 58:2-4. *See also* **Exhibits 45-50**. Aparo was not creating a disturbance in his cell on September 19th. See **Exhibit 10**, E. Curry Dep. 15:1-23; 19:3-23; 62:25-63:13; 162:20-163:2; **Exhibit 11**, Martin Dep. 11:11-12:24, 60:21-61:2; **Exhibit 13**, Porter Dep. 12:3-19; **Exhibit 14**, Stripling Dep. 10:20-11:25; 135:12-136:18; and **Exhibit 15**, Thomas Dep. 14:1-12; 18:10-13; 21:21-22:1.

Aparo was simply begging for medical attention, leaving nearby inmates thinking that the way Aparo was speaking and by what he was saying, Aparo was dying. *See* **Exhibit 15**, Thomas Dep. 17:21-25; 21:15-20; 24:3-11; **Exhibit 49;** *see*

*also* **Exhibit 10**, E. Curry Dep. 13:9-14:6.[9]  Aparo was not screaming in his cell, nor was he kicking his cell door. See **Exhibit 10**, E. Curry Dep. 15:1-23; 19:3-23; 62:25-63:13; 162:20-163:2; **Exhibit 11**, Martin Dep. 11:11-12:24, 19:19-22 60:21-61:2; **Exhibit 13**, Porter Dep. 12:3-24; **Exhibit 14**, Stripling Dep. 10:20-12:24; 135:12-136:18; and **Exhibit 15**, Thomas Dep. 14:1-124; 18:10-17; 21:21-22:; and **Exhibit 12,** Middleton Dep. 13:12-23; 80:4-81:2. In fact, Inmate Michael Houston testified that it was a DOC officer, presumably Chad Gillikin ("Gillikin") or Officer Gary McClain ( "McClain") who kicked the door, since Gillikin was the DOC employee who notified Austin that Aparo was acting "disorderly." *See* **Exhibit 51,** Houston Interview at 21:17-22:4. *See also* **Exhibit 52**, Gillikin Dep. 47:13-17**.** Austin remembered Aparo as the little punk from before with a slick mouth that Austin previously had a problem with in the chow hall. *See* **Exhibit 12,** Middleton Dep. 18:22-19:10; 28:9-29:19. Sergeant James Hamm ("Hamm") gassed Aparo. *See* **Exhibit 12,** Middleton Dep. 31:5-32:25.

While Aparo begged to go to the hospital, he called out that he was dying and needed help. See **Exhibit 15**, Thomas Dep. 17:21-25; 21:15-20; 24: 3-11 and **Exhibit 49**. When no one came to Aparo's aid after he declared multiple medical emergencies, other inmates started kicking their cell doors and yelling "man down",

---

[9] *See F.A.C. 33-602.210(5)(a)-(b)(2).* As Aparo did not cause a loss of control of the situation, his gassing should have been recorded by the handheld video camera as well.

a common practice engaged in by inmates and accepted by officers when the officers do not hear or ignore an inmate who is declaring a medical emergency. *See* **Exhibit 12,** Middleton Dep. 21:17-22:25; 148:3-149:21; **Exhibit 14**, Stripling Dep. 28:25-30:3; **Exhibit 15**, J. Thomas Dep. 14:25-15:15; 48:15-49:2. Prior to being gassed and while begging for medical attention, Aparo said he couldn't breathe and needed to go the hospital. *See* **Exhibit 50**.  Austin, who called to speak to medical concerning whether Aparo could be gassed, responded, "Ain't nothing wrong with you mother f**cker, you can breathe." *See* **Exhibit 50.** *See also* **Exhibit 104.** Aparo responded stating that they could check his medical records, that he had a condition that prevented him from being sprayed, as asthmatic, and that he couldn't breathe and needed medical attention. *See Id*. Another officer, McClain, told Aparo that no nurses were available. *See* **Exhibit 53**. Aparo told Hamm, the guard that gassed Aparo, that he could not breathe or get up, but Hamm told Aparo no one would help him. *See* **Exhibit 53**.

Instead of receiving medical attention, Aparo was sprayed with OC chemical agent twice, and CS chemical agent once. *See* **Exhibit 54;** *See also* **Exhibit 10**, E. Curry Dep. 16:5-17:8. The officers told Aparo that he would be gassed on September 19, 2010, and he told them not to because he was asthmatic. See **Exhibit 55**. Inmates present to the gassing of Aparo testified that the gassing was wholly unjustified. *See* **Exhibit 10**, E. Curry Dep. 169:7-22; **Exhibit 11**, Martin Dep. 112:11-18; and

**Exhibit 15**, Thomas Dep. 14-22. Indeed, Thomas, the inmate directly next to Aparo's cell, as shown in **Exhibit 56**, testified that Aparo was on the ground begging the officers to stop gassing him, saying he couldn't breathe. *See* **Exhibit 15,** Thomas Dep. 17:14-25; 22:8-22; 37:11-38:5. Prior to, during, and after the gassing, Aparo repeatedly requested medical care. *See* **Exhibit 55.** [10] The guards in the dorm/on duty at this moment, Gillikin, Austin, and Hamm, told medical that if Aparo could not get off the floor, then he did not need medical attention. *See* **Exhibit 55.**   Inmate Kenneth Daniels ("Daniels") testified that after Aparo was gassed the first time, he was told to get off the floor. *See* **Exhibit 46**. Further, Daniels said that Aparo replied "I can't get off the floor, my back hurts and I can't breathe." See Id.

After Aparo was gassed the second time, he was asked if he was ready to comply and get off the floor. See Id. Aparo replied, "Yes, I am ready to comply but I can't get up." *See Id*. Austin stated "Well we're not ready for you yet," and Aparo was immediately gassed again with CS chemical agent. *See Id*. In between each spray, Austin spoke with Aparo through the door. *See* **Exhibit 57**. Even when Aparo asked for a towel to be put through the door to help him pull himself up, the officers

---

[10] Gillikin stated in his interview on September 22, 2010, that Aparo was gassed because he disobeyed verbal commands to clean his cell, make his bed, and to get dressed (*See* **Exhibit 57***)*, contradicting his testimony in his deposition. *See* **Exhibit 52**, Gillikin Dep. 22:3-18, 41:5-14*; see also* **Exhibit 105,** Austin Dep. 16:17-18:6*; compared with Exhibit 58 and Exhibit 52, Gillikin Dep. 22:7-10*. Plaintiff asserts that none of Gillikin's testimony is true because it conflicts with every inmate witness who was present that day, listening and watching what was going on.

told him "no" and laughed while he continued to slowly die. *See* **Exhibit 15**, Thomas Dep. 16:21-18:5; 20:15-21; 22:12-24:11; 54:1-3. Inmate Houston testified that Aparo tried to comply prior to being gassed, but when he asked for a towel to pull himself up, the officers told Aparo he was faking. *See* **Exhibit 51**, Houston Interview at 6:2-8:24; 15:20-16:5. Aparo's gassing made other inmates afraid of being killed. *See* **Exhibit 15**, Thomas Dep. 43:17-46:24. *See also* **Exhibit 59**. It was common at FCI during this time period for inmates to be gassed for no reason. *See* **Exhibit 11**, R. Martin Dep. 14:19-15:6.

**Additional inmate eyewitness accounts of the gassing and death of Aparo**

There was only one cell between Erskine Curry and Aparo, and Curry had a view of the front of Aparo's cell door from a small viewpoint. *See* **Exhibit 10**, E. Curry Dep. 18:3-15. So much gas was sprayed that inmates all over the A-Dorm were affected by it. *See* **Exhibit 10**, E. Curry Dep. 18:16-22. While Aparo was gassed, he was still begging for help. *See* **Exhibit 10**, E. Curry Dep. 19:3-23. The guards were laughing at him, calling him a "broke dick dog." *See* **Exhibit 10**, E. Curry Dep. 158:14-19.

Aparo's cell was directly next to Juan Thomas' cell. *See* **Exhibit 56**. *See also* **Exhibit 15,** J. Thomas Dep. 9:8-23. When they came around with the insulin at 3pm, you couldn't hear Aparo anymore. *See* **Exhibit 11**, R. Martin Dep. 22:10-14. Martin was so concerned that the individuals that killed Aparo would get away with it that

he wrote a letter to DOC and the Florida Attorney General stating that Aparo was killed and he should not have been gassed. *See* **Exhibit 60**. *See also* **Exhibit 11**, R. Martin Dep. 23:15-29:8.

Between the first and second and second and third gassing, Aparo did not yell, cause a disturbance, curse or kick his door. *See* **Exhibit 12**, Middleton Dep. 35:21-37:21. Aparo was crying on the floor, trying to explain his medical problems. *See* **Exhibit 12**, Middleton Dep. 37:22-39:5. Officer Hampton was alleging that Aparo was a snitch, and inmates knew there was going to be a hit put out on Aparo. *See* **Exhibit 12**, Middleton Dep. 52:3-54:19.

DOC's employees gassed Aparo because they were mad he was asking for medical help. *See* **Exhibit 13**, E. Porter Dep. 19:16-20:8; and **Exhibit 15**, J. Thomas Dep. 25:18-26:12.[11] Aparo kept telling Austin he couldn't breathe and something was wrong with his blood. *See* **Exhibit 13**, E. Porter Dep. 21:12-22:3. Aparo was telling Hampton he couldn't breathe, was wheezing, and Hampton just walked away and left him. *See* **Exhibit 13**, E. Porter Dep. 22:5-24:4. Hampton tried to intimidate inmate witnesses by making aggressive stares and mean gestures. *See* **Exhibit 13**, E. Porter Dep. 46:15-47:13.

---

[11] Thomas testified that based on what he heard and saw on September 19, 2010, he believed Aparo was murdered by the officers. *See* **Exhibit 15**, Thomas Dep. 126:10-16 and Exhibit 49.

Juan Thomas told Aparo to get up off the floor so they would stop getting gassed, because, sharing a wall with Aparo's cell, the gas went into Thomas' cell. *See* **Exhibit 15**, J. Thomas Dep. 15:20-19:22. Aparo was gassed three times. *See* **Exhibit 54**. *See also* **Exhibit 15**, J. Thomas Dep. 18:6-9.

Riley was present on September 19, 2010, when Aparo declared a medical emergency, but she did not take him out of the cell. *See* **Exhibit 14**, Stripling Dep. 14:23-16:16. The medical examiner was clear in her testimony that Aparo was "compromised as far as his respiratory status and [the gassings] would be just another insult where he would not be getting oxygen, so, yes, I think it would contribute." *See* **Exhibit 61**, L. Flanagan Dep. 46: 1-17; 74:1-25; 85:9-25; 86:1-13.

### After Aparo was gassed on September 19, 2010

After Aparo was gassed, he was carried by his armpits to the shower. *See* Handheld video, ECF Doc. 180-10 at 12:18pm. His body was soaked from the marker dye in the chemical agents. *See Id*. Aparo was unable to walk by himself, and leaned on the shower walls to help stand up. *See Id*. From the shower cell to the medical room, Aparo winced in pain, struggling to walk, as the officers had to hold him up to carry him to the medical unit. *See* Handheld video, ECF Doc. 180-10 at 12:30pm. *See* **Exhibit 62**, Houston's Second Interview at 14:11-23. Aparo was still orange from the chemical spray, and in the post use of force exam conducted by Riley, she can be seen commenting that he is still orange from the gassing but does

nothing to protect Aparo, or ensure that he is properly cleaned before returning to a cell, ignoring his physical condition, appearance, and wheezing lung.  See Handheld video, ECF Doc. 180-10 at 12:30pm and **Exhibit 63**. *See also* Fixed Wing Video, ECF Doc. 180-9 at 1:13. Aparo was returned to the same dirty cell that he was gassed in, and which had not been cleaned appropriately. *See* **Exhibits 55 and 63**.

After Aparo was brought back to the cell, he was left laying on the floor. At some point after he was gassed, an officer said to Aparo "Do you need the wheelchair again, you cripple bitch?" and called him a "little punk ass" and "motherfucker." *See* **Exhibit 10**, E. Curry Dep. 24:13-26:24; *see also* **Exhibit 14**, Stripling Dep. 12:23-13:18; *see also* **Exhibit 45**.[12] One guard told Aparo to "lay down and die," shortly after he was returned to his cell. See **Exhibit 10**, E. Curry Dep. 160:20-22.

Riley tried to take Aparo's blood pressure three different times without a reading: 1:15 p.m. (twice), 2:00 p.m., 3:25 p.m.  *See* **Exhibit 5**, Bates 1, 4, 68. Riley falsely accused Aparo of moving in the examination room at 1:15pm, however, the handheld video shows that he was in total compliance and being very still during the examination. See Handheld video, ECF Doc. 180-10 beginning at 12:37 to 12:40pm. Riley and Franklin considered pulling Aparo out of his cell in a wheelchair, but they

---

[12] After Curry was interviewed by FDLE and DOC concerning the death of Aparo, he was visited by another person who stated that he was a member of the DOC Office of Inspector General. *See* Exhibit 10, E. Curry Depo at 34:7-38:25. The DOC inspector attempted to tamper with Curry's testimony, telling him that if he gave a story that was better for the guards, he would be given food and canteen privileges. See Id.  Curry's response was "F**k you." *See Id.*

left him to die. *See* Fixed Wing Video, ECF Doc. 180-9 at 1p.m.-1:40 p.m. Riley could not get a reading two more times, specifically at 2:00 p.m., and 3:25 p.m. *See* **Exhibit 42**, Bates 529-530, 536.  At 2:00pm, Riley could not get a blood pressure on Aparo because he could not stand up off of the floor. *See* **Exhibit 64**, Riley Dep. 19:20-25; 20:1-15. At 3:25 p.m., Riley attempted to take Aparo's blood pressure again, but the guards would not let her in. *See* **Exhibit 64**, Riley Dep. 22:9-14. Riley permitted the guards to prevent her from providing care to Aparo, demonstrating a deliberate indifference towards Aparo's medical condition and care, despite believing that he needed to be assessed. *See* **Exhibit 43**.

However, according to multiple inmates, Aparo may have already died by 2:00 or 3:00 p.m., meaning that Officer Foxworth's statement, and others, that they saw Aparo give a thumbs up would be false. *See* **Exhibit 94**. *See also* **Exhibit 11**, Martin Dep. 22:6-17; **Exhibit 12**, Middleton Dep. 45:24-47:11; **Exhibit 13**, Porter Dep. 13:7-14:22; **Exhibit 14**, Stripling Dep. 16:23-20:16; **Exhibit 15**, Thomas Dep. 30:12-31:15; 130:6-18. See also **Exhibits 47, 48, and 49.**  The Medical Examiner, Lisa Flanagan, M.D., also believed Aparo's time of death was earlier than 3pm based on the rigor his body was found in later on September 19, 2010. *See* **Exhibit 61**, Flannagan Dep. 41:18-42:2. When Riley could not get a blood pressure reading two times in the medical unit in Aparo's post use of force examination and failed to pursue any course of treatment or follow up based on his prior condition, his

disability, and his obviously failing condition, he should have been sent to a hospital immediately. *See* **Exhibit 43**, Bates 515. Defendant Riley, as a nurse, had a duty to protect and save his life. *See* **Exhibit 64**, Riley Dep. 6:16-7:11.

Riley saw Aparo was dying as she had actual knowledge that he had no blood pressure, was wheezing and she saw him fall in his cell while she tried to take his blood pressure. *See* **Exhibit 64**, Riley Dep. 19:20-20:15. Defendant Riley ignored the importance of not being able to obtain a blood pressure for Aparo on September 19, 2010, by failing to notify a doctor or clinician of her inability to get blood pressure readings. *See* **Exhibit 43,** Bates 508, 510, 515, 516. Riley ignored the importance of Greene failing to get an IV in Aparo when Riley failed to call a doctor to report the inability of Greene to get an IV in Aparo, which is especially flagrant considering Riley's knowledge and perception of Aparo on September 19, 2010, including in the infirmary in the post use of force exam. *See* **Exhibit 43**, Bates 496-501.

On September 19, 2010, prior to Aparo being gassed, Riley gave her boss, Adair, an update on Aparo's medical condition, including that he had declared several medical emergencies on the morning of September 19, 2010. *See* **Exhibit 65**, Bates 726**.** Adair told Riley that Riley needed to document in Aparo's medical records that Aparo should not be gassed because he could not take IVs earlier in the

day.[13][14] *See Id*. Riley ignored Adair's directive on September 19, 2010, prior to the gassing, and never documented in Aparo's medical records her prognosis that he should not be gassed. *See Id*. Riley also altered medical records from September 19, 2010, executing multiple versions of the same document with different information. *See* ECF Doc. 144, Exhibits F, G, I, J, L, M, N and O. Riley ignored the violation of DOC policy, rules, and procedure, by Defendant Captain Mitchell Brown ("Brown") and Franklin, when Riley failed to notify anyone, including her superiors, that Aparo was removed from the infirmary prematurely on September 18, 2010, in violation of DOC policy and rules. *See* **Exhibit 43**, Bates 505.

Riley was deliberately indifferent towards Aparo's medical condition when she failed to notify a doctor, ARNP, or Adair that Aparo had wheezing in his lungs post use of force and gassing on September 19, 2010. *See* **Exhibit 43**, Bates 507. Riley was deliberately indifferent towards Aparo's medical condition when she failed to notify a doctor, ARNP, or Adair that she believed he needed antibiotics because of a potential kidney infection. *See* **Exhibit 65**, Bates 732, 733, 737. Riley couldn't get a blood pressure on Aparo from a machine that had no problem reading his pulse. *See* **Exhibit 66**. This should have suggested to Riley that he was dying or

---

[13] *See* **Exhibit 21**.
[14] Both ARNP Lemon and Choudhary agreed that Aparo should not have been gassed on September 19, 2010. *See* **Exhibit 7**, Lemon Dep. Vol II at 216:7-23; 517:7-14, and **Exhibit 67**, Choudhary Dep. 25:8-15

may be septic, requiring immediate medical attention that could only be provided at a hospital. *See infra*. In fact, Choudhary told Riley to recheck the blood pressure, signaling the importance of his blood pressure, and the obvious expectation that he would be called back if she was again unable to obtain Aparo's blood pressure. *See* **Exhibit 18**, Bates 510, 511. Further, at that time, Riley failed to notify Choudhary that Aparo had been gassed earlier in the day. *See* **Exhibit 67**, Choudhary Dep. 42:21-43:5.

Officers were saying that they were going to leave Aparo for the next shift to deal with, and kept referring to him as a "body". *See* **Exhibit 14**, Stripling Dep. 16:23-17:24. Aparo was found dead on the ground clinching his Bible under his heart. *See* **Exhibit 68**. In response to Aparo's death, Thomas started writing a novel titled "I Can't Breathe" based on and inspired by Aparo. *See* **Exhibit 15**, J. Thomas Dep. 36:24-38:22. Thomas wrote a letter to his sister the day after Aparo's death explaining everything that happened because he was afraid that he could suffer the same fate as Aparo, being killed for no reason and describing it as "cold-blooded murder". *See* **Exhibit 15**, J. Thomas Dep. 39:13-47:14; 126:10-16; *see also* **Exhibit 59**.

### DOC excoriates some of its staff involved in Aparo's death, fires two, reprimands others[15]

---

[15] *See* **Exhibits 42**, **70-73.**

DOC, through its Inspector Kelly Martin, conducted an administrative investigation into the death of Aparo from approximately the day after his death through November 20, 2012. *See* **Exhibit 69**.

DOC's investigation resulted in sustained findings of Negligence, Failure to Safeguard an Inmate, and Substandard Quality of Work against Riley, Greene, and Franklin[16], concerning their beyond negligent treatment of Aparo. *See Id; see also* **Exhibit 42**. DOC's investigation resulted in sustained findings against Housholder and Goodwin for Negligence and Failing to Safeguard Inmates. *See* **Exhibit 69**. Their investigation resulted in the termination of Austin and Hampton for their criminal treatment of Aparo, the fourth anniversary of his death.[17] *See* **Exhibits 72 and 73**.

Dr. Hantz Hercule, MD, the then Regional Medical Executive Director for the Region where FCI was located, and the ultimate supervisor for the medical staff in question, provided examples of numerous gross mistakes made by the medical staff at FCI concerning Aparo's medical condition, including failing to address his temperature and rapidly declining blood pressure, increasing heart rate, not referring Aparo to a hospital, which Greene, Riley, and Franklin were able to do, ignoring symptoms of sepsis (which he died from, sepsis, a complication of OWR), ignoring

---

[16] Mohamed Choudhary, M.D. was also cited for these violations of DOC's rules, however, the nurse Defendants failed to provide him with any of the appropriate information. *See infra*.

[17] They were terminated on the four year anniversary of Aparo's death.

the need for a urinalysis, ignoring Aparo's pain from his OWR symptoms, ignoring his deteriorating health and vital signs (including his BP dropping to 80/50), when he was sent to confinement instead of a hospital (despite medical layman Brown knowing he shouldn't go to confinement), sending him to confinement (violating medical orders in doing so) in response to asking for an accommodation, amongst a litany of others. *See* **Exhibit 5**, Bates 72; **Exhibits**; **8 and 17, Exhibit 37**, Bates 484, 492, 493; **Exhibit 42** *generally*; **Exhibit 42,** Bates 525-539; 589, 598; **Exhibit 43,** Bates 469, 498-500, 504-506[18], 515-16; **Exhibit 44**, Bates 3; **Exhibit 44** *generally*; **Exhibit 67**, Choudhary Dep. 29:12-16; 31:4-8. *See* **Exhibit 43**, Bates 517.

DOC adopted these conclusions in its investigative findings. *See Id*; *see also* **Exhibit 42**, Bates 525-539. DOC even concluded, as evidenced by Austin and Hampton's "Permanent Status Career Service Extraordinary Dismissal Letter" that "on or about September 19, 2010, you inappropriately participated in a use of force incident that resulted in the death of an inmate," Aparo. *See* **Exhibits 72 and 73**. Austin and Hampton were accused of conduct unbecoming of a public employee, failure to maintain the proper security and welfare of the institution and Aparo, verbal or physical abuse of Aparo, excessive use of force on Aparo, willful violations

---

[18] Although Franklin sent him to confinement/permitted Brown to take him, neither she, nor any other DOC employee completed a disciplinary report for him for any conduct on September 18, 2010, or September 19, 2010. *See* **Exhibit 19**, Franklin Dep. Vol II at 208:4-12.

of rules, regulations, directives, or policy statements, and engaging in conduct which would violate state statutes, rules, directives or policy statements. *See Id.*

"Any good clinician with good judgment should be operating that way. That's common sense. I'm not going to say it's just me. Every clinician really caring, doing their job, would be watching this inmate." *See* **Exhibit 43**, Bates 515, 516. This is especially true because he was septic and presenting with classic symptoms of septicemia, sepsis, septic shock, and OWR. *See* **Exhibit 43**, Bates 515, 516. Even if they thought he was faking, as some guards told Aparo that the medical staff said, you "have to do your ABCs, have evidence that he is." *See* **Exhibit 43**, Bates 515, 516. "Without evidence that he is, you cannot say that." *See* **Exhibit 43**, Bates 515, 516.

Franklin and Greene received a written reprimand for her misconduct associated with the care and death of Aparo in lieu of a more serious penalty because they agreed not to contest the written reprimand or its findings. *See* **Exhibits 70 and 71**. DOC, through its then Department Secretary on September 19, 2014, stated about Austin and Hampton's termination that DOC has "zero tolerance for corruption or abuse..." and that DOC will continue "to root out any and all bad actors who do not live up to our expectations." *See* **Exhibit 74.**

Lastly, although equally as important, approximately two years after the death of Aparo, Austin and Hampton threatened a different inmate, Gary Lloyd, stating

that they were "going to kill you like we did him. We're going to kill you like we did Aparo." *See* **Exhibit 75**.

### Aparo's request to go to the hospital was a request for a reasonable accommodation

Dr. Choudhary knew of the symptoms of OWR in 2010, including that it was a serious disease, a permanent illness, could cause bleeding everywhere, seizures, unexplained strokes, shortness of breath, anemia, bacterial infections, and internal bleeding. *See* **Exhibit 67**, Choudhary Dep. 22:1-25:7. Choudhary testified that it is critically important for an individual suffering from symptoms associated with OWR to remain hydrated and have an IV. *See* **Exhibit 67**, Choudhary Dep. 33:22-34:1.

After two failed attempts to place the IV, Aparo should have been sent to the hospital immediately. *See* **Exhibit 67**, Choudhary Dep. 34:24-35-2. *See Hill v.Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994). Additionally, Choudhary stated that a request to go to the hospital for symptoms associated with OWR is a request for an accommodation, and it would be a reasonable accommodation to send them to the hospital. *See* **Exhibit 67**, Choudary Dep. 29:12-16; 31:4-8. Aparo's request was a request for reasonable accommodations. *See* **Exhibit 67**, Choudary Dep. 29:12-16; 31:4-8. An inmate with OWR who has anemia and shortness of breath should never be gassed or approved to be sprayed with pepper spray or CS gas, and the nurses at FCI are aware of that, and need to be aware of that. *See* **Exhibit 67**, Choudhary Dep. 25:8-19. Choudhary was never advised that

Aparo had been sprayed with pepper spray or CS gas when he was called on September 19, 2010. *See* **Exhibit 67**, Choudhary Dep. 42:21-43:5.

### Facts concerning when the Plaintiffs knew or should have known about a potential cause of action on behalf of Aparo, and who committed the conduct which violated the Constitution

The first date Plaintiff Amanda Cimillo or the Minor Child knew or should have known about the suspicious nature of Aparo's death was on August 30, 2014, when they read a Miami Herald article concerning individuals who filed a federal lawsuit against DOC and others alleging a cover-up of the death of Randall Jordan-Aparo. See email dated August 30, 2014 attached as **Exhibit 76**, and Miami Herald article dated August 30, 2014 attached as **Exhibit 77**. Prior to this date, Plaintiff was only told that Aparo died of an infection. *See* **Exhibit 78**; *see also* Death Certificate of Aparo, attached as **Exhibit 79.** Cimillo did not believe anything suspicious occurred when she first learned that Aparo had died, or that he died from an infection. *See* **Exhibit 78**. Further, immediately after sending the August 30, 2014, email, Plaintiff retained undersigned counsel, who in turn sent a preservation letter to DOC, a 768 letter to DOC, and a request for Aparo's medical records. Those medical records were provided on September 25, 2014. See Martin Letter dated September 25, 2014 attached as **Exhibit 80**. However, this production of medical records by DOC through its counsel in this case did not contain all of Aparo's

medical records. In fact, his medical records had already been "lost" by DOC as of that date. *See* ECF Doc. 151-1, 151-2, and 161-1.

On August 30, 2014, there was an open DOC, FDLE, and FBI investigation into the cause of death of Aparo. *See* **Exhibit 81.** Plaintiff was unable to obtain anything other than Aparo's medical records as of September 25, 2014. While the investigation into the death of Aparo had previously been closed in approximately 2012, it is immaterial to this inquiry as Plaintiff did not know, nor should she have known, in 2012, that a cause of action may lie in connection with the death of Aparo, or that an injury inflicted by another had occurred and who inflicted the injury. DOC, through its counsel in this case, Peter Martin, did not even provide a copy of Aparo's medical records prior to September 25, 2014. Even worse, in support of Plaintiffs' arguments that the facts necessary to know of a cause of action, Plaintiff has shown that two of the worst violators of Aparo's civil rights, Austin and Hampton, were fired by DOC on September 19, 2014, the four year anniversary of Aparo's death. *See* **Exhibit 77**; *see also* **Exhibit 72 and 73**. DOC attempted to cover up the death of Aparo in multiple ways, including intimidating witnesses such as Curry, threatening other inmates if they told the truth about what they saw or heard, and firing Austin and Hampton on the day they believed the statute of limitations ran on claims stemming from the death of Aparo. *See* **Exhibit 10**, E. Curry Dep. 31:7-34: 22 and **Exhibit 72 and 73**.

Lastly, but equally as important, then DOC IG Jeff Beasley told investigators who were trying to uncover what actually happened that led to Aparo's death that he (Beasley) would "have their asses" if they kept trying to investigate and discover what really happened. *See* **Exhibit 82**. When Inmate Aron tried to tell an inspector with DOC what happened to Aparo, the inspector told him to "keep [his] mouth shut" and don't talk about Aparo's death. *See* **Exhibit 83**, Aron Dep. 45:17-47:6.

## MEMORANDUM

### I.     Summary Judgment Standard

Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Tippens v. Celotex*, 805 F.2d 949, 952-53 (11th Cir. 1986).

### II.    Aparo suffered disability discrimination, retaliation, and interference with his ability to request accommodations from Defendant DOC and other medical staff.

Title II of the ADA prohibits entities from discriminating or retaliating against a qualified individual with a disability. *See 42 U.S.C. § 12132*. To state a claim under Title II, Plaintiff must show (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated or retaliated against by the public entity; and (3) that the exclusion, denial of benefit, or

discrimination or retaliation was by reason of the Plaintiff's disability. *See Bircoll v.*

*Miami—Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007); *See also* the ADA

Technical Assistance Manual, II-3.11999 stating

> "Individuals who exercise their rights under the ADA…are protected from retaliation. The prohibition against retaliation or coercion **applies broadly** to any individual or entity that seeks to prevent an individual from exercising his or her rights or to retaliate against him or her for exercising those rights. **Any form of retaliation or coercion, including threats, intimidation, or interference, is prohibited if it interferes with the exercise of rights under the Act.**" (Emphasis Added). *See also 42 U.S.C. § 12203 (a-c).*

## A. Aparo had a disability, and was perceived to have a disability

Pursuant to 42 U.S.C. § 12102, the term disability means, with respect to an

individual, (A) a physical or mental impairment that substantially limits one or major

life activities of such individual; (B) a record of such impairment; or (C) being

regarded as having such an impairment. *See 42 U.S.C. § 12102(1)(a-c).* Major life

activities include eating, sleeping, breathing, working, and performing manual tasks,

amongst others. *See 42 U.S.C. § 12102(2)(A-C).* Major life activities also include

the operation of major bodily functions, including respiratory, normal cell growth,

and circulatory functions, amongst others. *See 42 U.S.C. § 12102(2)(B).*

First, it's clear that Aparo had OWR. Plaintiff's expert, Dr. Donald Kern, as

well as all medical journals describing OWR, indicate that OWR is a chronic

bleeding disorder. *See* **Exhibits 22, 23 and 24**, Franklin, Green, and Riley First

Responses to Plaintiffs' Request for Admissions dated April 4, 2018, Request Nos. 33, 35. *See also* **Exhibits 25, 26, and 27** Franklin, Greene and Riley, Third Responses to Plaintiffs' Request for Admissions dated April 4, 2018, Requests Nos. 65-66. Kern also provided in his expert report that OWR creates a disability in an individual because it causes a physical impairment and substantially limits major life activities and bodily functions. *See* **Exhibit 16**. Moreover, Aparo's disease caused him to suffer respiratory, circulatory, an/or bleeding episodes frequently while in DOC, especially in the last 5 days of his life. *See supra generally*. Further, the record is replete with citations to W-2 restrictions, and Aparo was told he couldn't work at BCWC because he was too far from emergent medical attention should he need it again for excessive bleeds and bleeding episodes. It is clear from the medical records, Medline article cited by DOC and Plaintiff, other referenced medical journals, as well as Dr. Kern's expert report, that OWR also affects the respiratory system, and that it did affect the respiratory system of Aparo.

Further, Aparo was perceived to have hemophilia and Von Willibrands disease, conditions which mirror and mimic the same complications as OWR and affect the same major life activities and major bodily functions. *See* **Exhibit 5**, Bates 9, 22, 23, 27-29, 31, 61, 64, 71-75, 82, 83, 85, 90, 91, 93, 94, 98, 99, 101, 103-105 112-114, 118, 128, 130, 155, 156, 165, 167, 175, 177, 178, 180-183, 187, 191.

"The ADA's revised regulations provide that the 'term substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the ADA." *Lonergan v. Jones*, 2017 U.S. Dist. LEXIS 48106 at *24 (N.D. Fla. Feb. 28, 2017) *report and recommendation adopted sub nom. Lonergan v. Jones*, U.S. Dist. LEXIS 48100, (N.D. Fla. Mar. 30, 2017) (citations omitted). "'[A]s long as an impairment substantially limits one major life activity, such as normal cell growth [or circulatory functions or respiratory functions], it need not limit other major life activities, such as working, in order to be considered a disability.'"[19] *See Id. at *23.* Indeed, the regulation directs that "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." *See Id. at *24.*

Aparo was also given clippers so that he would not cut himself while shaving, leading to excessive and profuse bleeding. *See* **Exhibit 5**, Bates 10, 65-67. Aparo was given a bottom bunk while at DOC so that he would not bump or cut himself getting on the top bunk. *See* **Exhibit 5**, Bates 10, 67. It is clear that DOC believed that Aparo had a condition that affected his major life activities by virtue of the health passes they issued him, his Element of Health Grade M-2 rating, as well as the numerous W-2 grades he received stating that he had certain work limitations. Indeed, DOC's own W-2 work grade designation states he has up to moderate

---

[19] Defendant DOC ignores this case and law in its Motion. *See ECF Doc. 180, pp.32-33.*

restrictions on his ability to work. *See* **Exhibit 32**. So, to suggest now that Aparo's OWR did not affect his ability to work is disingenuous and offensive. DOC overlooks and mischaracterizes the nature of Aparo's W-2 work grade while at DOC. During the relevant time period, and specifically on June 30, 2010, and continuously until his death, Aparo is given a W-2 health grade for the excessive bleeding he suffered while at BCWC. To suggest Aparo only received a W-2 work grade at intake and for a shaving pass is, again, incredibly disingenuous. *See* **Exhibit 5**, Bates 22, 81, 69, 88. Not only are these facts alleged by DOC disputed by Plaintiff, these specific facts alleged by DOC are so partially accurate that they are almost false. *See fn. 19, infra.*

DOC alleges in its Answer and Affirmative Defenses that Aparo was given iron for his OWR. *See* ECF Doc. 126, at p. 20. However, ARNP Lemon, the prescribing clinician of the iron supplement, explicitly states that the iron pills she prescribed to Aparo were not because of his OWR and were not correlated to his OWR. *See* **Exhibit 7**, Lemon Dep. Vol II 175:20-179:1.[20] Lastly, contrary to DOC's argument, whether Aparo likes to work has no bearing on the analysis of whether he has a disability, and thus should be disregarded by this Court.

### B. Aparo requested accommodations from DOC, and such accommodations were reasonable.

---

[20] Thus, Defendant DOC's reference to the iron pills and argument that ARNP Lemon gave them to Aparo as correlated by his OWR, seemingly lacks a good faith basis.

First, it is clear Aparo requested reasonable accommodations from DOC. Even Choudhary, the doctor who treated Aparo on September 19, 2010, stated that Aparo's declaration of a medical emergency, and request to go to the hospital, was a request for accommodations, and sending him to the hospital would have been a reasonable accommodation. *See* **Exhibit 67,** Choudhary Dep. 29:12-16; 31:4-8. Riley admitted that she could have sent him to the hospital. *See* **Exhibit 64**, Riley Dep. 26:1-4 and **Exhibit 43**, Bates 499. Hercule concurred, stating that the nurses had the ability to grant the accommodation and send Aparo to the hospital. This is not a case about whether the requested accommodation was reasonable or there was a less onerous accommodation. It is clear that this was a reasonable accommodation generally, and under the specific circumstances. *See Gaston v. Bellingrath Garden & Home, Inc.,* 167 F.3d 1361 (11th Cir. 1999). It is clear that this was also the most effective accommodation under the circumstances. *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).

Aparo also requested a specific shot, for which there was no follow up by medical staff. *See* **Exhibit 5**, Bates 76. This shot, a DDAVP shot, is typically used on individuals with hemophilia, but works to help clotting. *See* **Exhibit 20**. DOC argues that it has no documentation of a reported disability for Aparo (which is not accurate based on this record), however, DOC also "lost" all of Aparo's original medical records, including those associated with his 7/22 and 8/29 bleeding

episodes. Further, there is no evidence that DOC, through its staff, supplied Aparo with a DC2-530 Form, which they are **required** to do, when Aparo requests accommodations. *See F.A.C. 33-210-201(3)(b)*.

### C. DOC and its employees demonstrated a deliberate indifference to Aparo's medical condition and requests for medical care when they discriminated/retaliated/interfered with his rights under the ADA and RA.

Even if Aparo didn't request specific accommodations, which he did, the record is replete with evidence that Gillikin, Austin, and Hamm interfered with Aparo's ability to request more or other accommodations for his medical condition because they would not get medical on the morning of the 19th. Instead of reporting his medical emergency to the medical staff, these Defendants ignored Aparo, against DOC policy and procedure, and caused him to be gassed (Gillikin), gassed him (Hamm/Austin), or participated in the gassing by video recording the events post gassing and not reporting to medical that he had declared multiple medical emergencies (Burch). *See Frakes v. Peoria Sch. Dist. No. 150, 872 F.3d 545 (7th Cir. 2017);* s*ee also 42 U.S.C. § 12203 (a-c).* "When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005); *see also Danley v. Allen*, 540 F.3d 1298 (11th Cir. 2008).

While Gillikin states that Aparo was causing a disturbance, numerous other witnesses say that is false. Further, these witnesses say that the only thing Aparo was

doing was declaring medical emergencies, begging for medical attention, and telling the officers that he had a condition, could not be gassed, and couldn't breathe. *Adams v. Poag*, 61 F.3d 1537 (11th Cir. 1995). If the jury accepts the testimony of the inmate witnesses, it follows that Aparo would have been gassed for declaring medical emergencies and begging for medical attention. The inmates testified that the officers heard and responded when Aparo declared medical emergencies and told them that he (Aparo) couldn't be gassed. *See supra generally. See* **Exhibit 97**.

There is a genuine issue of fact as to whether these officers interfered with Aparo's ability to seek accommodations for his disability, and availed himself of the ADA's protections. Aparo was never provided a DC2-530 form by the medical staff or correctional officers on September 19, 2010, or any other time, in response to his request for accommodations. Indeed, the nurses knew that Aparo's health was deteriorating, knew that he had OWR, and still failed to accommodate him and take him to the hospital on September 18, 2010. DOC Procedure 604.101 dictates that "both the Department's staff and the inmate share responsibility to verify an inmate's disability to determine placement in an appropriate institution." *See **Exhibit 86**, Specific Procedures, (1), p. 6).* It is clear that Aparo had a documented disability in that it was well documented that he had OWR, and that he previously received accommodations as it relates to his work in prison. *See* **Exhibit 5**, Bates 22, 23, 64, 69, 81, 88.

Further, Aparo's medical records verify that he has a disability, in that it is documented that he has OWR, he has excessive bleeding due to the bleeding disorder, cannot shave with a razor, cannot sleep on a top bunk, cannot work at the BCWC, and cannot work with sharp objects or machinery. *See supra generally, including M-2 and W-2 designations)*. DOC had already verified Aparo's disability in that he identified himself as having OWR (as well as other conditions), he was observed having such a severe disability and condition that he was cut off from working at BCWC, and his medical file and departmental classification file contained information showing that he had a medical transfer away from the work camp and was not to go back. *See* **Exhibit 5**, Bates 22, 23. *Specific Procedures, (1)(a-e), p. 6.*

Moreover, even Brown testified that on September 18, 2010, Aparo was "cursing" that h he needed to go to the hospital and stating that nobody in the medical staff was trying to help him. *See* **Exhibit 41**. Other than the Defendants, no one else has testified that Aparo denied medical care from September 15, 2010, through September 19, 2010. Indeed, it would be counterintuitive that Aparo, on the one hand, who numerous witnesses have testified was declaring medical emergencies and begging for medical help, on the other hand was denying and refusing medical care. This is clearly a dispute of material facts that cannot be addressed at summary judgment.

Aparo begged for his life and declared multiple medical emergencies prior to being gassed on September 19, 2010. Competent testimony suggests he was not causing a disturbance whatsoever, and that force was not applied in good faith to maintain or restore discipline, but was malicious, sadistic, and for the purpose of causing harm. *See supra generally*. *See Whitley v. Albers*, 475. U.S. 312, 320-21. (1986). Aparo was told that he was fine, that medical said he was fine, and he was denied what he was entitled to by DOC policy and rule after he declared a medical emergency, an immediate visit with a clinician. Gillikin, Austin, Hamm, Spangler, Burch, and Martina were all present when Aparo was declaring his medical emergencies on September 19, 2010, let none helped him. *See* **Exhibit 87,** Detailed Camera Memo generally. *See also* **Exhibits 44-50**.

Further, DOC's argument that the correctional officers didn't know that Aparo had a disease, OWR, or a disability is rebutted by the fact that two separate witnesses say they heard Aparo called a crippled bitch and asked if he needed the wheelchair again in a mocking manner by DOC employees. *See Bozeman v. Orum*, 422 F.3d 1265, 1272, n.11 (11th Cir. 2005)(noting that threatening language "can be relevant to . . . the determination of reasonable inferences about the Officers' subjective state of mind"); *see also Thompson v. Sikes*, No. 4:15cv253-MW/CAS, 2017 U.S. Dist. LEXIS 26385 (N.D. Fla. Jan. 25, 2017). Although there are facts that would suggest that these officers knew he had OWR specifically, they clearly

knew he had a disease and disability. Moreover, Aparo told Austin and Hamm that he had asthma and could not be gassed, and that he had something wrong with his blood and could not be gassed. *See* **Exhibit 50**. Multiple inmates testified to hearing this on September 19, 2010. Brown believed, based on what he saw and heard, that Aparo was in too bad of shape to go to confinement and needed to go to the hospital. *See* **Exhibit 99**, Bates 688, 690-693, 696-697. Nonetheless, Brown took Aparo out of medical and to confinement, violating DOC rules, policy, and procedure, despite the 23 hour[21] hold instituted by Arunakul. *See* **Exhibit 5** Bates 130 and **Exhibit 43**, Bates 505.

DOC showed a conscious and deliberate indifference towards Aparo, his OWR, and disability from June 30, 2010, through September 19, 2010. *See supra generally*. Franklin charted in Aparo's medical records, what can reasonably interpreted as, that she would not transfer Aparo to the hospital because he was cursing when he was begging to go to the hospital. *See* **Exhibit 5,** Bates 72. Franklin sent Aparo to confinement/did not stop Brown from removing him and approved him to be gassed simply because he asked to go to the hospital and cursed as he did it. Dr. Hercule made clear that cursing did not alleviate her required duty to treat Aparo, assess him, and refer him to the hospital. *See* **Exhibit 43**, Bates 505.

---

[21] Only a member of medical staff can approve the removal of an inmate from the infirmary when they are there under doctor's orders. *See* **Exhibit 43**, Bates 505.

A jury could conclude that Franklin was mad that Aparo wanted to go to the hospital and cursed when asking, and retributively stopped her assessment and treatment of him, instead referring him to confinement and simultaneously sanctioning the use of chemical agents on him, and that such conduct was deliberately indifferent. This is especially flagrant considering Franklin and Riley state they had no clue what the symptoms with OWR were, or what bodily functions it affected, when they were treating Aparo. It follows that they were absolutely reckless on the 18th and 19th, especially considering Franklin knew that there are a list of conditions and bodily functions that are exacerbated by gassing, and thus require additional assessment to determine whether the inmate can be gassed at all. *See Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016) (noting that "[a] defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference."). An "official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). (*citing Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997)); *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989).

A jury should not be prevented from determining if Franklin, a nurse who is supposed to take care of her patient and treat his illnesses, was deliberately indifferent to Aparo when, instead of referring him to the hospital to save his life, she signed his death warrant on September 18, 2010. *See* **Exhibit 5**, Bates 11. Flanagan stated in her deposition that the gassing contributed to the death of Aparo. *See* **Exhibit 61**, Flannagan Dep. 46:1-17. *See also* **Exhibit 96**. After Aparo was gassed and returned to his cell, Riley testified that she saw Aparo fall to the floor and unable to get up when she tried to follow up a third time and obtain Aparo's blood pressure. *See* **Exhibit 21**. Instead of showing any concern for Aparo, despite believing only a couple hours earlier he should not be gassed, apparently Riley was satisfied with the explanation from the correctional officers that Aparo was simply laying on the floor and "acting out," when in reality, he was less than 60 minutes from being dead. *See* **Exhibit 21**.

DOC showed a deliberate indifference dating back to 2007 when they did not send him to a follow up hematologist for his blood disorder, and through 2009 and 2010 when he had bleeding episodes and was only given a paper towel to hold it until it stopped bleeding. DOC continued its deliberate indifference through 2010 when Aparo presented with life threatening medical conditions, and DOC was still deliberately indifferent. Based on the facts recited in this Response, a jury could conclude that DOC, through its employees, was deliberately indifferent to the

serious medical condition and disease/disability Aparo presented with. Plaintiff has submitted numerous facts in dispute and has demonstrated that a jury could conclude that Defendant DOC failed to treat Aparo's disability in the days leading up to his death, September 15-19, 2010.

Thus, a jury could conclude based on this record that Aparo had a disability[22], requested accommodations, his ability and right to request other, more, or the same accommodations was interfered with by the officers identified *supra*, and that he was gassed for declaring an inmate medical emergency due to his condition. *See Farmer v. Brennan,* 511 U.S. 825, 842 (1994); *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007)(deliberate indifference is a question of fact).

## III.   Plaintiff's ADA and RA Claim is not barred by the statute of limitations.

### A. The statute of limitations for Plaintiff's Claim is subject to Florida Statutes, § 95.11(10)

The limitations period for a Florida wrongful-death claim is ordinarily two years. *See* Fla. Stat. § 95.11(4)(d). But when the decedent is a "disabled adult," a claim asserting murder or manslaughter may be brought at any time; there is no statute of limitations. *See Id*. § 95.11(10). This statute cites to 782.05, and 782.07, manslaughter or aggravated manslaughter of a disabled person, "a person who causes the death of any elderly person or disabled adult by culpable negligence…"

---

[22] Although not required, the disability was documented with DOC.

*See Fla. Stat. § 782.07(2)*. The element of culpable negligence is defined in Section 784.05, Florida Statutes, as "an act which a reasonable person would know is likely to result in death or great bodily harm to another person, even though done without any intent to injure anyone but with utter disregard for the safety of another." *See J.C. v. State*, 233 So. 3d 519, 521 (Fla. 2d DCA 2018).

DOC argues that 95.11(10) cannot apply to DOC because DOC is not a "natural person," however, this argument is flawed. A Plaintiff is allowed to proceed under 95.11(10) if seeking the damages authorized in Florida Statutes § 768.21, which Plaintiff is. Further, Plaintiff is not permitted to sue individuals, or the individual Defendants, under color of state law, for violations of Title II of the ADA. *See Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996) ("We hold that the Disabilities Act does not provide for individual liability, only for employer liability.") "The ADA imposes respondeat superior liability on the employer for the discriminatory acts of its employees*." Rylee v. Chapman*, 316 F. App'x 901, 905 (11th Cir. 2009).

A jury could conclude that a DOC employee or one of the Defendants committed a murder, or manslaughter of a disabled adult (which on the statutory culpable negligence standard would not be difficult on this record). Interpreting 95.11(10) as excluding a claim against DOC, when DOC is responsible for a murder or manslaughter of a disabled adult if the acts of its employees also violated the

ADA, would result in a grievous injustice for the Plaintiff in this matter, forever foreclosing Aparo and other individuals who were murdered or disabled and died via culpable negligence of employees of DOC. DOC seeks an interpretation that limits its liability and the timeframe by which it can be sued for violations of the ADA in the cases of murder and manslaughter of a disabled adult, and permitting DOC to not be subject to 95.11(10) by virtue of its employees conduct would be inequitable, unjust, and violate the United States Constitution's Due Process Clause of the Fifth and Fourteenth Amendments, as well as deny Plaintiff's access to courts. There are not many statutes where employers such as DOC are expressly liable for the deliberately indifferent conduct of its employees, even conduct rising to the level of murder or manslaughter of a disabled adult, but the ADA and RA are two of those statutes. The Court can easily find that Aparo was disabled by virtue of his OWR based on the facts cited herein, but also based on simply watching the entirety of the handheld video. See ECF Doc. 180-10.

Thus, this Court should find that, because a jury could conclude that the individual Defendants and other DOC employees committed murder or manslaughter of a disabled adult (Aparo) vis a vis culpable negligence, the statute of limitations applicable to those individuals for the damages listed in Florida Statutes § 768.21 are being sought against those individuals and DOC,  that DOC is liable for the discriminatory conduct of its employees under the ADA and RA, and

because Plaintiff cannot seek relief under the ADA and RA against the individual Defendants, the statute of limitations contained in Florida Statutes § 95.11(10) should apply to DOC as it relates to Plaintiff's ADA and RA claims.

**B. Plaintiff's ADA and RA claim is not barred by the statute of limitations because Plaintiff did not know, nor should she have known of the potential for the cause of action until August 30, 2014.**

There is no *federal* statute of limitations for § 1983 claims arising under the Constitution or under statutes enacted before December 1, 1990. *See Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). Instead, such § 1983 claims "are subject to the statute of limitations period governing personal injury actions in the state where the action is brought." *Wellons v. Comm'r, Ga. Dep't of Corrs.*, 754 F.3d 1260, 1263 (11th Cir. 2014) (citing *Crowe v. Donald*, 528 F.3d 1290, 1292 (11th Cir. 2008)). Florida's limitations period for personal-injury actions is four years. *See* Fla. Stat. § 95.11(3)(p); *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003)); *City of Hialeah, Fla. v. Rojas*, 311 F.3d 1096, 1103 n.2 (11th Cir. 2002).

The Supreme Court and the Eleventh Circuit have both stated that "[I]n *Section 1983* actions '[o]nly the length of the limitations period, and the closely related questions of tolling and application, are to be governed by state law.'" *Wilson v. Garcia*, 471 U.S. 261, 269 (1985); *see also McGinley v. Mauriello*, 682 F. App'x 868 871 (11th Cir. 2017). As noted in *Jones v. Childers*, 18 F.3d 899, 906 (11th Cir. 1994), Florida courts have relied on the reasoning in *Urie v. Thompson, 337 U.S.*

*163, 69 S.Ct. 1018 (1949), holding in a variety of legal contexts that "the* statute of limitations begins to run when a person has been put on notice of his right to a cause of action" and "under Florida law, a party is held to have been put on notice when he discovers, or reasonably should have discovered, facts alerting him of the existence of his cause of action." *Jones*, 18 F.3d at 906. When a Plaintiff should have discovered the cause of action is a question of fact for a jury. *Jones*, 18 F.3d at 907 (11th Cir. 1994) ("Whether the plaintiff discovered, or by due diligence should have discovered the existence of the cause of action . . . was a question of fact . . . and it has been held that genuine issues relating to such question of fact are to be determined by the trier of fact").

Even so, the limitations period for a *§ 1983* claim arising from the death of an adult who is not disabled is four years. *See Chappell*, 340 F.3d at 1283. Under *Chappell*, the limitations period for a § 1983 claim arising in Florida is four years, even when the claim arises from a death. A § 1983 claim "will not accrue, and thereby set the limitations clock running, until the plaintiffs know or should know (1) that they have suffered the injury that forms the basis of their complaint and (2) who has inflicted the injury." *Chappell*, 340 F.3d at 1283 (citing *Mullinax v. McElhenny*, 817 F.2d 711, 716 (11th Cir. 1987)).

The first date Cimillo knew or should have known about the suspicious nature of Aparo's death was on August 30, 2014, when she read a Miami Herald article

concerning individuals who filed a federal lawsuit against DOC and others alleging a cover-up of the death of Randall Jordan-Aparo. See **Exhibits 76 and 77**. Prior to this date, Plaintiff was only told that Aparo died of an infection, which she was told was not uncommon in prison. *See* **Exhibit 78**; *see also* **Exhibit 79**. Notification of death as a result of an infection, in and of itself, cannot put a reasonable person on notice of their rights as it relates to Aparo's death. Further, immediately after sending the August 30, 2014, email, Plaintiff retained undersigned counsel, who in turn sent a preservation letter to DOC, a 768 letter to DOC, and a request for Aparo's medical records. Those medical records were provided on September 25, 2014. *See* **Exhibit 80**. DOC did not fully disclose the nature of Aparo's death or even mention the investigation into his death to Cimillo, and possibly intentionally misled her so that she could never find out the truth. There is no shortage of witness testimony in this case supporting the argument that DOC and its staff attempted to cover up the circumstances of Aparo's death, impede the investigation and reopening of the investigation, and intimidated witnesses to alter their story to better benefit DOC and its staff.

On August 30, 2014, there was an open DOC, FDLE, and FBI investigation into the cause of death of Aparo. See emails from DOC discussing the open investigation. *See* **Exhibit 81**. Plaintiff was unable to obtain anything other than Aparo's medical records as of September 25, 2014, which DOC was unable to

produce prior to September 19, 2014. While the investigation into the death of Aparo had previously been closed in approximately 2012, it is immaterial to this inquiry as Plaintiff did not know, nor should she have known, in 2012, that a cause of action may lie in connection with the death of Aparo, or that an injury inflicted by another had occurred and who inflicted the injury. See *Chappell*, 340 F.3d at 1283 (citing *Mullinax v. McElhenny*, 817 F.2d 711, 716 (11th Cir. 1987)). Plaintiff could not receive any of that information until after the investigation was closed, which, occurred approximately in November of 2016. Moreover, Cimillo did not communicate with Tom Aparo, decedent Aparo's listed next of kin, except for exchanging holiday or birthday cards sent from Tom Aparo to the minor child.

A death in a prison, in and of itself, is simply not enough to put an inmate's representatives or family on notice of potential claims, including *Section 1983* claims. If this were not the case, the converse would mean that every death in a prison would be presumed to be the result of nefarious, unlawful, and possibly criminal conduct by DOC employees, until proven otherwise.

### C. Application of Florida's delayed discovery doctrine, the principle of equitable tolling, and the principle of equitable estoppel demonstrates that Plaintiffs' claims should be considered timely.

Even if Plaintiff's claim under the ADA and RA is not governed by Florida Statutes 95.11(10), and even if Plaintiffs' claim began accruing on September 19, 2010, the principles of the delayed discovery doctrine, equitable tolling, and

equitable estoppel apply to toll the statute of limitations, resulting in Plaintiffs' claims being filed timely in this action.

Plaintiff incorporates her arguments made in the preceding section by reference. Plaintiff has shown that two of the worst violators of Aparo's civil rights, Austin and Hampton, were fired by DOC on September 19, 2014, the four year anniversary of Aparo's death. *See* **Exhibits 72, 73 and 74**.

Further, DOC engaged in a systematic retaliation scheme to punish the individual whistleblowers who disclosed that Aparo's death had been covered up in the first investigation, and that, even in 2013, through the reopening of the Aparo death investigation, the DOC IG Jeffrey Beasley was **still** trying to intimidate Aubrey Land, John Ulm, Doug Glisson, and others, into letting the Aparo investigation remain closed.  *See* **Exhibit 88**. This is especially important as numerous documents which describe how Aparo died, the statements he made, that evidence did not exist prior to the filing of this action, and in some instances, were recorded after the filing of this action. For example, Juan Thomas, an inmate sharing a wall with Aparo's cell, provided damning testimony against DOC as it relates to the ADA and RA claim, but was never interviewed by FDLE or DOC in the death investigation. *See also supra* and **Exhibit 89.**

Additionally, when Plaintiff started requesting records in writing through her counsel, she could not receive any as the FBI and Department of Justice had an open

criminal investigation into Aparo's death. See **Exhibits 90 and 95**. This investigation began in 2013, well before Plaintiff first became aware that there may be a cause of action against certain individuals, as well as DOC. Plaintiff named multiple Defendants that were ultimately dismissed by Plaintiff because, prior to discovery in this case, Plaintiff was unable to obtain the necessary information to determine if a cause of action lied against those individuals.[23]

Lastly, it's disingenuous for DOC to argue that Plaintiff Cimillo should have done more after being told that Aparo died of an infection, something common at DOC. In other words, Aparo made the mistake of trusting DOC with his care, and now Cimillo made the mistake of trusting DOC that it would tell the truth and the whole truth about Aparo's death, including that there was a criminal investigation. There has been no evidence to suggest that DOC told Plaintiff that Aparo begged for his life, was gassed to death for requesting accommodations, complained about his disability and the symptoms associated with it, and was denied accommodations, including going to the hospital. Even DOC concedes that the accrual date of the cause of action can come after the date of injury. *See ECF Doc. 180, p. 42.* Cimillo stated that she called Defendant DOC and they told her his death was not suspicious. *See* **Exhibits 78 and 91**. As the Plaintiff was not aware of the cause of action, and

---

[23] While a cause of action may have existed against those individuals, they were dismissed based on the evidence procured from DOC once the investigation into Aparo's death was closed.

DOC is not prejudiced by this claim, Plaintiff should be allowed to proceed under this doctrine. *Rowland v. Conyers*, 2013 LEXIS 26356, No. 4:10cv64 (N.D. Fla. Feb. 26, 2013).

DOC is simply trying to escape liability based on its own misconduct of misleading Cimillo. Lastly, DOC argues that Cimillo knew of the causes of action she had on September 2, 2014, however, noticeably absent from that letter is any mention of a claim against DOC for violations of the ADA and RA. *See* **Exhibit 92**. Moreover, the letter lists 47 individuals, which essentially is a list of the people who were working at FCI or DOC during the last few days of Aparo's life, however, as it turns out, most were not involved.

This inquiry must be submitted to a jury to determine if Cimillo knew, or should have known, prior to August 30, 2014, that a cause of action may exist against Defendant DOC and certain individuals, and who those individuals were.

### D. The Middle District of Florida case cited by DOC is neither binding on this Court, and is still subject to a Motion for Reconsideration.

*Walton v. Fla. Dep't of Corr.*, 2018 U.S. Dist. Lexis 45339 (M.D. Fla. March 20, 2018), is a supplemental case cited in support of its argument that Plaintiff's claim is barred by the statute of limitations. *See* ECF Doc. 174 at p.27. First, the Middle District's reliance on two Eleventh Circuit cases is misplaced and the analysis is inapplicable. For example, in *Baker v. City of Hollywood*, 391 F. App'x 819 (11th Cir. 2010), "it was apparent from the face of the complaint that the plaintiff

knew of the facts underlying his claims." *Id*. at 821. The plaintiff inmate was allegedly beaten at a holding facility, did not die, and did not file his claim until five years after the alleged beating.

Here, unlike the plaintiff in *Baker*, Aparo did not have the luxury of being able to identify the offending medical staff and correctional guards because Aparo was incoherent and in the throes of death from September 15-19th, the date of his death, which is understandable when reviewing the full handheld video. As can be seen from the handheld video, ECF Doc. 180-10, Aparo appears almost lifeless, minutes from death, as the blood pressure monitor fails to obtain a blood pressure reading on Aparo three times. *See Id*. Aparo is whimpering, soaked in chemical spray, cannot walk, and states that he is in horrible pain, and that he had been that way for three days. Riley stated in her deposition that she could not get a blood pressure because Aparo was moving too much. *See* **Exhibit 64**, Riley Dep. 20:3-12. However, in watching the handheld video of her examination of Aparo, her statement that he is moving too much is obviously false.

This examination occurred at approximately 12:41pm on September 19th, 75-90 minutes from the time that inmates in the dorm, including those sharing a wall with Aparo's cell, state that he died. *See* **Exhibit 11**, Martin Dep. 22:6-17; **Exhibit 12**, Middleton Dep. 45:24-47:11; **Exhibit 13**, Porter Dep. 13:7-14:22; **Exhibit 14**, Stripling Dep. 20:2-16; **Exhibit 15**, Thomas Dep. 30:12-31:15; 130:6-18. See also

**Exhibits 47, 48, and 49.**   Further, Kern and Flanagan both agree that based on the condition of Aparo's body when he was "found" dead by DOC employees, he had died closer to 2:00 or 3:00 p.m. than 6:00 p.m., suggesting that any testimony or documentary evidence suggesting he was alive after 2:00 or 3:00 p.m., is simply false. Assuming *arguendo* that Aparo was aware of who was violating his civil rights, Aparo had been declaring medical emergencies all day, stating that he was dying, begging for help, and begging to go to the hospital. It would be incredibly disingenuous to assert that Aparo knew who violated his rights, how they caused his injuries, and that he could have done anything about it, i.e., started the grievance process or any other act towards making a complaint.

Lastly, to say that Aparo, in the last hour of his life, which includes deliberately indifferent acts and conduct by Riley, Franklin, Greene, and several security staff, should have known that these individuals engaged in deliberately indifferent conduct is even more disingenuous considering the expert's in this case dispute whether there was any deliberately indifferent conduct anyways, let alone a violation of the ADA. DOC has failed to come even relatively close of showing factually that there is no dispute that DOC and its employee's conduct did not rise to the level of deliberate indifference. However, Aparo begged for medical attention and begged to go to the hospital, and mentioned his "blood" to the officers and staff on the 19th. *See supra*. There is no evidence in the record that Aparo knew or should

have known that his ADA and RA rights were violated on September 19, 2010, hours and minutes before his death. The handheld video shows a man who is struggling to live, focused on that sole mission and determination.

In closing, as to when the statute of limitations began to accrue, and on what date the cause of action could no longer be brought, if such a date did exist, that inquiry, based on this record, is a question of fact, and must be submitted to the jury.

## <u>CERTIFICATE OF COMPLIANCE</u>

Plaintiff has exceeded the word limit permitted by Rule 7.l(F) of the N.D. Fla. Loc. R. Plaintiff has sought relief via a Motion to Exceed Word Limit, which is unopposed by Defendant DOC.  I certify that this memorandum contains 15,923 words, as counted by Microsoft Word, excluding the items that may be excluded under Rule 7.1(F), the font used in this motion is Times New Roman 14-point font.

Respectfully Submitted,

The Law Offices of
STEVEN R. ANDREWS, P.A.
822 Monroe Street
Tallahassee, Florida 32303
Tel:  (850) 681-6416 / Fax: (850) 681-6984

*/s/ Ryan J. Andrews*_____
STEVEN R. ANDREWS (FBN 0263680)
BRIAN O. FINNERTY (FBN 0094647)
RYAN J. ANDREWS (FBN 104703)
SERVICE: service@andrewslawoffice.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

served by electronic transmission this 24th day of July, 2018, to:

| | |
|---|---|
| W. Peter Martin, Esq.<br>Dennis, Jackson, Martin & Fontela, P.A.<br>1591 Summit Lake Drive, Suite 200<br>Tallahassee, Florida  32317<br>peter@djmf-law.com<br>jmauer@djmf-law.com<br>jennifer@djmf-law.com<br>*Attorney for FDOC* | Jeffrey S. Howell, Esq.<br>Phipps & Howell<br>201 South Monroe Street, 4th Floor (32301)<br>Post Office Box 1351<br>Tallahassee, Florida  32302<br>jeff@phipps-howell.com<br>Margaret@phipps-howell.com<br>*Attorney for Jones a/k/a Franklin, Riley & Greene* |

Brian C. Keri, Esq.
The Law Offices of Brian C. Keri, PA
3375-H Capital Circle NW, Suite 4
Tallahassee FL 32308
brianckeri@earthlink.net
michellemsmith@earthlink.net
*Attorney for Austin, Brown, Burch, Gillikin, Hamm, Hampton, Martina & Spangler*

/s/  **Ryan J. Andrews**
RYAN J. ANDREWS

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**AMANDA CIMILLO, as**
**Personal Representative of the**
**Estate of RANDALL JORDAN-APARO,**
**Deceased and MINOR CHILD APARO**
**The Natural Child of Randall Jordan-Aparo**
**By and Through Her Mother and Natural Guardian**
**Amanda Cimillo,**

       Plaintiffs,

**vs.**                              **CASE NO. 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN, et al.,**

       Defendants.

_____/

### EXHIBITS TO PLAINTIFFS' RESPONSE TO DEFENDANT DOC'S
### MOTION FOR SUMMARY JUDGMENT[1]

| No. | Document |
| --- | --- |
| 1. | DOC Photo Identification Card (DOC Bates 1479, 1478, 1477 and 1476) |
| 2. | Partial Judgment and Arrest Affidavit for Grand Theft which lead to 2007 Incarceration with DOC (DOC Bates 1485, 1486, 1500) |
| 3. | Partial Judgments and Arrest Affidavits which lead to 2009 Incarceration with DOC (DOC Bates 1606, 1613, 1594, 1600, 1566, 1568, 1572, 1580, 1587, 1538, 1545, 1525, 1531, 1620, 1630) |
| 4. | DOC Internal Movement (DOC Bates 3869-3874) |
| 5. | DOC Medical Records (DOC Bates 00001-00216) |
| 6. | National Institutes of Health / US National Library of Medicine / Medline Plus – Hereditary Hemorrhagic Telangiectasia |
| 7. | Deposition Transcripts of Patricia Lemon with Exhibits taken on April 10, 2018 (Vol. I) and June 12, 2018 (Vol. II) |
| 8. | Medical Examiner's Report (DOC Bates 1124-1130) |
| 9. | Oxford Academic article - Hemorrhagic Hereditary Telangiectasia (Rendu-Osler Disease) and Infectious Diseases: An Underestimated Association |
| 10. | Deposition Transcript of Erskine Curry with Exhibits taken on May 7, 2018 |
| 11. | Deposition Transcript of Richard Martin with Exhibits taken on May 1, 2018 |
| 12. | Deposition Transcript of Craig Middleton with Exhibits taken on May 8, 2018 |

---

[1] Counsel for Plaintiff has omitted Exhibits referenced in the Security Defendants' Response to Motion for Summary Judgment and not used in the Response to DOC's Motion for Summary Judgment.

| 13. | Deposition Transcript of Earl Porter with Exhibits taken on April 9, 2018 |
|-----|---|
| 14. | Deposition Transcript of Angelo Stripling with Exhibits taken on May 2, 2018 |
| 15. | Deposition Transcript of Juan Thomas with Exhibits taken on May 8, 2018 |
| 16. | Plaintiffs' Amended Rule 26(a)(2) Report of Donald C. Kern, MD dated May 31, 2018 |
| 17. | Affidavit of Donald C. Kern, MD |
| 18. | Classification and Admissions Summary for 2007 Incarceration (DOC Bates 1742) |
| 19. | Deposition Transcripts of Lucy Franklin with Exhibits taken April 12, 2018 (Vol. I and II) |
| 20. | Tampa General Hospital Bates 91-92 |
| 21. | FDLE Investigative Report Serial 21 (DOC Bates 2141-2142) (Lynda Adair) |
| 22. | Defendant Franklin's Responses to Plaintiffs' First Requests for Admissions dated April 4, 2018 |
| 23. | Defendant Greene's Responses to Plaintiffs' First Requests for Admissions dated April 4, 2018 |
| 24. | Defendant Riley's Responses to Plaintiffs' First Requests for Admissions dated April 4, 2018 |
| 25. | Defendant Franklin's Responses to Plaintiffs' Third Requests for Admissions dated April 4, 2018 |
| 26. | Defendant Greene's Responses to Plaintiffs' Third Requests for Admissions dated April 4, 2018 |
| 27. | Defendant Riley's Responses to Plaintiffs' Third Requests for Admissions dated April 4, 2018 |
| 28. | Bureau of State Investigations Case Summary Case No.: 10-1-4683 (DOC Bates 2245, 2243) |
| 29. | MINS dated May 25, 2010 and MPD Report re Drug Drop (DOC Bates 27504 and MPD Recs) |
| 30. | Transfer from JCI (DOC Bates 3794-3797) |
| 31. | Deposition Transcript of Rita Hall with Exhibits taken in *Hickman v. DOC* on March 13, 2018 |
| 32. | DOC Office of Health Services, Technical Instruction No. 15.03.13 re Assignment of Health Classification Grades to Inmates |
| 33. | Report of Administrative Confinement dated July 21, 2010 (DOC Bates 1937) |
| 34. | DOC Daily Record of Special Housing (DOC Bates 1942) |
| 35. | DOC Daily Record of Special Housing (DOC Bates 1912) |
| 36. | FDLE Investigative Report Serial 22 (DOC Bates 2143-2145) (Harold Baker) |
| 37. | Interview Transcript of Dr. Hanz Hercule (First Interview, Part I, August 30, 2012) (DOC Bates 478-493) |
| 38. | FDLE Investigative Report Serial 34 (DOC Bates 2166-2167) (Dr. Nikorn Arunakul) |
| 39. | FDLE Investigative Report Serial 19 (DOC Bates 2137-2138) (Patricia Cicirello) |
| 40. | FDLE Investigative Report Serial 20 (DOC Bates 2139-2140) (Martha Greene) |
| 41. | FDLE Investigative Report Serial 17 (DOC Bates 2133-2134) (Mitchell Brown) |
| 42. | DOC Report of Investigation 10-1-8057 (DOC Bates 525-683) |
| 43. | Interview Transcript of Dr. Hanz Hercule (First Interview, Part II, August 30, 2012) (DOC Bates 494-517) |

| 44. | Interview Transcript of Dr. Hanz Hercule (Second Interview, Part I, September 25, 2012) (DOC Bates 1-9) |
|---|---|
| 45. | Sworn Statement of Erskine Curry |
| 46. | Sworn Statement of Kenneth Daniels |
| 47. | Sworn Statement of Richard Martin |
| 48. | Sworn Statement of Angelo Stripling |
| 49. | Sworn Statement of Juan Thomas |
| 50. | Sworn Statement of Samuel Wooden |
| 51. | Interview of Michael Houston (First Interview, Part I) |
| 52. | Deposition Transcript of Chad Gillikin with Exhibits taken on April 16, 2018 |
| 53. | FDLE Investigative Report Serial 46 (DOC Bates 2187-2188) (Jeffrey Highsmith) |
| 54. | Use of Force Report (DOC Bates 1390-1408) |
| 55. | FDLE Investigative Report Serial 44 (DOC Bates 2180-2183) (James Angel) |
| 56. | Dorm Layout (DOC Bates 1110, 1111) |
| 57. | FDLE Investigative Report Serial 3 (DOC Bates 2107-2108) (Chad Gillikin) |
| 58. | MINS Incident Report dated September 20, 2010 (DOC Bates 683) |
| 59. | Juan Thomas letter to his sister, Jacquillia Trigg, mailed on September 24, 2010 |
| 60. | Richard Martin letter to Inspector Attorney General |
| 61. | Deposition Transcript of Lisa Flannagan with Exhibits taken on February 9, 2018 |
| 62. | Interview of Michael Houston (Second Interview, Part I) |
| 63. | Photos of Aparo's Cell |
| 64. | Deposition Transcript of Ola Melissa Riley with Exhibits taken on October 20, 2017 |
| 65. | Interview of Ola Melissa Riley by Kelley Martin (DOC Bates 708-746) |
| 66. | FDLE Investigative Report Serial 5 (DOC Bates 2111-2112) (Ola Melissa Riley) |
| 67. | Deposition Transcript of Mohommad Choudhary, MD with Exhibits taken on March 27, 2018 |
| 68. | FDLE Investigative Report Serial 2 (DOC Bates 2105-2106) |
| 69. | Case Summary 10-1-8057 (DOC Bates 24-25) |
| 70. | Lucy Franklin's Written Reprimand (DOC Bates 1960-2022) |
| 71. | Martha Greene's Written Reprimand (DOC Bates 2023-2096) |
| 72. | DOC Letter to Rollin Austin dated September 19, 2014 re Permanent Status Career Service Extraordinary Dismissal (DOC Bates 8943-8944) |
| 73. | DOC Letter to Kevin Hampton dated September 19, 2014 re Permanent Status Career Service Extraordinary Dismissal (DOC Bates 7876-7877) |
| 74. | *Florida Prison Boss Fires 32 over Inmate Deaths* article dated September 19, 2014 |
| 75. | Deposition Excerpt of Gary Lloyd |
| 76. | Amanda Cimillo email to SRA dated August 30, 2014 |
| 77. | *After Florida inmate's lethal gassing, claims of cover-up* article dated August 30, 2014 |
| 78. | Affidavit of Amanda Cimillo |
| 79. | Death Certificate of Randall Jordan-Aparo |
| 80. | Peter Martin letter to SRA dated September 25, 2014, enclosing medical records |
| 81. | Flannagan Response to request for Autopsy – Still under investigation |
| 82. | Chief Inspector General Interview of Aubrey Land on March 4, 2014 |
| 83. | Deposition of William Aron taken on March 2, 2018 |

| 84. | Disciplinary Report and Report of Administrative Confinement dated August 18, 2010 (DOC Bates 1441-1452, 1907) |
|---|---|
| 85. | Defendant DOC Response to Plaintiffs' Requests for Admissions dated April 3, 2018 |
| 86. | DOC Procedure 604.101 (DOC Bates 27511-27528) |
| 87. | Review of Fixed Wing Video (DOC Bates 790-1008) |
| 88. | *Land, et al. v. DOC. et al.* Complaint, USDC Case No.: 4:14-cv-00347-WS-CAS |
| 89. | *Lloyd v. DOC* Complaint, USCD Case No.: 4:12-cv-367-RH-CAS |
| 90. | Inmate Mortality for FCI (DOC Bates 2255) |
| 91. | Plaintiffs' Responses to Defendant DOC Interrogatories dated October 16, 2017 |
| 92. | Notice of Intent/Medical Records Request dated September 2, 2014 |
| 93. | Disciplinary Report and Report of Administrative Confinement dated July 21, 2010 (1429-1440,1937) |
| 94. | FDLE Investigative Report Serial 8 (DOC Bates 2117-2118) (George Foxworth) |
| 95. | SRA letter to Peter Martin dated January 25, 2015 |
| 96. | Plaintiffs' Amended Rule 26(a)(2) Report of William Anderson, MD dated October 3, 2017 |
| 97. | Plaintiffs' Rule 26(a)(2) Report of Ron McAndrew dated September 21, 2017 |
| 98. | Disciplinary Record Log (DOC Bates 1849) |
| 99. | Interview of Mitchell Brown (DOC Bates 684-700) |
| 100. | Omitted |
| 101. | Omitted |
| 102. | Omitted |
| 103. | Omitted |
| 104. | FDLE Investigative Report Serial 12 (DOC Bates 2124-2125) (Lucy Franklin) |
| 105. | Deposition Transcript of Rollin Austin taken April 18, 2018 (Vol. I & II) |