**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**AMANDA CIMILLO, as**
**Personal Representative of the**
**Estate of RANDALL JORDAN-APARO,**
**Deceased and MINOR CHILD APARO**
**The Natural Child of Randall Jordan-Aparo**
**By and Through Her Mother and Natural Guardian**
**Amanda Cimillo,**

      Plaintiffs,

**vs.**                    **CASE NO. 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN, et al.,**

      Defendants.
_____/

**PLAINTIFFS' RESPONSE TO SECURITY DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT, STATEMENT OF FACTS AND**
**MEMORANDUM OF LAW (DOC. 178)**

      Plaintiffs, Estate of Randall Jordan-Aparo, Deceased, by and through its

Personal Representative, Amanda Cimillo, and Minor Child Aparo natural minor

child of the deceased Randall Jordan-Aparo, by and through the undersigned

counsel, pursuant to Rule 56, Federal Rules of Civil Procedure, files this Response

to Defendants, Rollin Austin, Mitchell Brown, Patrick Burch, Chad Gillikin, James

Hamm, Kevin Hampton, Joshua Martina, and Christopher Spangler ("Security

Guard Defendants") Motion for Summary Judgment, Statement of Facts and

Memorandum of Law and states as follows:

## OVERVIEW

Plaintiffs have filed claims against, Rollin Austin ("Austin"), Mitchell Brown ("Brown"), Patrick Burch ("Burch"), Chad Gillikin ("Gillikin"), James Hamm ("Hamm"), Kevin "Big Jit" Hampton ("Hampton"), Joshua Martina ("Martina") and Christopher Spangler ("Spangler") ("Security Guard Defendants"), for Wrongful Death (Count I), Common Law Civil Conspiracy (Count II), Violation of 42 U.S.C. § 1983 (Count III, Eighth Amendment Claim), and Conspiracy to Violate 42 U.S.C. §1983 (Count VI). *See* ECF Doc. 97.

Randall Jordan-Aparo ("Aparo") was an inmate who was killed in the Department of Corrections ("DOC") at Franklin Correctional Institution ("FCI") on September 19, 2010. Aparo was in DOC in 2007, and again from November 2009 to September 19, 2010, the day of his death.  He had a rare chronic disease, Osler-Weber-Rendu disease ("OWR").

On the day of his death, Aparo was alleged to have caused a disturbance in confinement, however, the only thing he did was request accommodations and for medical help. Every single inmate testified Aparo was doing **none** of the things he was accused off. In fact, when he begged for accommodations, crying that he was dying and couldn't breathe. He was mocked, called a "crippled bitch", and was told that nothing was wrong with him, and was gassed for asking for accommodations. In other words, Aparo suffered retaliation by the security staff for requesting

2

accommodations for his disability and the medical condition he was in. DOC officers taunted Aparo before and after gassing him to death, asking him if they needed to "get the wheelchair," telling him to "lay down and die."

Gillikin, Austin, Hamm, Burch, Martina, and Spangler were present when Aparo was begging for medical attention, stating he couldn't get up off the floor. He told them he couldn't breathe and that his chest hurt. These Defendants gassed Aparo for no reason as he did not previously cause a disturbance, he was not currently causing a disturbance, and there was no risk he would cause a disturbance. In fact, the only disturbance created on September 19, 2010, is when the Security Defendants gassed Aparo for no reason other than he said he was dying and needed to go to the hospital.

Hampton, who was not present during the shift that Aparo was gassed on, was overheard approximately one day before Aparo's death harassing him for being a "snitch", indicating that the guards were going to put a hit out on him. Sure enough, approximately 24 hours later, Aparo was denied medical attention by the Security Defendants and gassed to death. None of the Security Defendants protected Aparo by preventing the first, second, or third gassing. Hampton and Austin had a reputation for torture, abuse, and civil rights violations, and were told so by DOC in the termination letters and DOC's press release and comments on the day they were fired, September 19, 2010, the fourth anniversary of Aparo's death.

Austin couldn't help himself, threatening another inmate two years after Aparo had been killed, telling him that he was going to kill him "just like Aparo" and that "fuckboys get shot", referring to being gassed for no reason.

The Plaintiffs filed these claims within the statute of limitations. First, Florida Statutes § 95.11(10) dictates that the claims against these Security Defendants never expires as they committed a murder of Aparo and/or manslaughter of a disabled adult, in that the Security Defendants were, at a minimum, culpably negligent in his death. Further, the facts establish that Plaintiff P.R. Amanda Cimillo ("Cimillo") did not know, nor should she have known that a cause of action existed concerning Aparo's death until August 30, 2014. Indeed, DOC lied to Cimillo about the circumstances of his death. Further, when comparing the statements of the inmates with the statements of the Security Defendants, a jury could determine that the inmates are more credible. If the inmates' testimony is true, that would necessarily mean that the testimony and recollection of the Security Defendants is false, as each's testimony is the opposite of the other.

On this record, Summary Judgment should be denied as to all Security Defendants.

## I.  STATEMENT OF MATERIAL DISPUTE FACTS

Plaintiffs deny each and every fact alleged by DOC and alleges the following disputed material facts.

Aparo was in inmate with DOC at two separate times, once in 2007, and from November 2009 through September 19, 2010, listing his adopted Father as his contact for notification of an emergency. *See* **Exhibit 1**[1]. In 2007, Aparo was committed to DOC for a year and a day for grand theft, a non-violent crime based on the facts of the charge. *See Id*; *see* **Exhibit 2**.[2] In November of 2009, Aparo was committed for 1 year, 7 months and 24 days, for various other non-violent crimes. *See Id.* **Composite Exhibit 3**[3].  Aparo was scheduled to be released from the DOC on October 24, 2010, S*ee* **Exhibit 4**.

From his initial incarceration with DOC in 2007, through his final incarceration ending with his death at FCI on September 19, 2010, Aparo disclosed to DOC that he suffered from, and was also perceived to have, a blood disorder and a bleeding disorder, specifically disclosing hemophilia, Von Willibrands disease, and ultimately OWR. *See* **Exhibit 5 (Bates 00001-00216).** *See* specially Bates 9, 22, 23, 27-29, 31, 61, 64, 71-75, 82, 83, 85, 90, 91, 93, 94, 98, 99, 101, 103-105 112-114, 118, 128, 130, 155, 156, 165, 167, 175, 177, 178, 180-183, 187, 191. Aparo had a disability that substantially affected his daily activities, affecting his

---

[1] Plaintiffs have utilized the same Exhibit Numbers from Plaintiff Estate' Response to DOC's Motion for Summary Judgment. To the extent that not all exhibits were also referenced in this Response, that exhibit number has been omitted.
[2] The total value of the clothing was $363.50.
[3] The total amount of the goods in services, food, alleged to have been stolen was $1,083.77. Aparo was also in possession of three Roxicodone and sold one pill to an undercover officer for $65.00.

respiratory and circulatory system. *See* **Exhibit 17.** *See also* 42 U.S.C. § 12102. As will be shown below, at least some Security Defendants were aware of his condition.

Aparo also complained of shortness of breath on multiple occasions, including in excess of five or six times during the last five days of his life. *See* **Exhibit 5**, Bates 71. *See also* **Exhibit 10**, E. Curry Dep. 13:19-25; 36:19-37:8; **Exhibit 11**, Martin Dep. 19:4-7; 62:3-7; **Exhibit 12**, Middleton Dep. 11:23-17:25; 20:16-21; 111:1-2; **Exhibit 13**, Porter Dep. 21:12-22:25; **Exhibit 14**, Stripling Dep. 127:9-12; 136:13-15; and **Exhibit 15**, Thomas Dep. 17:14-25; 22:8-11; 37:11-38: 5.

## 2009-2010 Incarceration with DOC

### Aparo transferred from Jefferson CI to Franklin CI after he informed on dirty DOC guards

On May 21, 2010, Aparo reported to the warden that there would be a drug drop at Jefferson CI ("JCI") and one in downtown Monticello. *See* **Exhibit 28**. Aparo's information was credible, as drugs were found at one location and a suspect was arrested at another. *See infra; see also* **Exhibit 29**. For fear of his safety, he and his co-informant, William Aron ("Aron"), were transferred away from JCI that night. *See* **Exhibit 30**. However, the transfer was futile, as the information made its way to FCI. *See infra*. Defendant Hampton threatened and harassed Aparo for being a snitch in the days before his death. See **Exhibit 12**, Middleton Dep. 52:3-54:19; 133:23-134:4. The snitch MINS was accessible by the wardens, inspectors, majors, colonels,

captains, and lieutenants at each of the prisons at any time prior to Aparo's death. *See* **Exhibit 31**, Hall Dep. 39:3-40:12; 49:20-51:3.

After he departed JCI, Aparo was transferred to Wakulla CI for placement at a new prison. *See* **Exhibits 4, 5,** Bates 103-107, and **Exhibit 30.** At Wakulla CI, Aparo was reevaluated medically, and was again given a W-2 Health Grade Impairment due to his OWR on May 21, 2010. *See* **Exhibit 5,** Bates 103. The W-2 Work Grade for "moderate restrictions", an Element of the Health Grade, was due to his OWR, as there are special asterisks next to "blood disorder" and "oslerwebber-rendu". *See Id*; *see also* **Exhibit 32**, pp. 2-3; *see also* **Exhibit 5**, Bates 22, 69, 81, 88.   He was subsequently transferred to FCI.

### Defendant Rollin Austin issues a Disciplinary Report ("DR") against Aparo for allegedly "cursing" in the chow line

August 18, 2010, Aparo received a DR from Austin for allegedly "cursing" in the chow line after Austin told Aparo he needed to put his food tray away, preventing Aparo from even finishing his meal. *See* **Exhibit 84**.[4] Austin had a reputation for submitting false DRs against inmates. *See* **Exhibit 12**, Middleton Dep. 16: 1-15; 149:5-21; **Exhibit 14**, Stripling Dep. 31:21-35:11; 99:6-12; and **Exhibit 15**, Thomas Dep. 121:3-122:25.

---

[4] Thus, Austin's Affidavit adopting his FDLE interview summary, that September 19, 2010, was his first confrontation with Aparo is false. *See ECF Doc. 179, Ex. 3, R. Austin Aff. and supporting attachments.*

A different inmate declared a medical emergency for Aparo on the 17th before shift change, and that inmate was told Aparo would need to wait 20 minutes for the shift change. *See* **Exhibit 36**. Aparo kept complaining of his heart hurting and that he needed to go to the bathroom. *See* **Exhibit 37**. Aparo was carried to the bathroom by two inmates, and then fell in the bathroom floor and was incoherent, not knowing how or why he was in the bathroom. *See* **Exhibit 36**. Forty minutes after declaring the medical emergency, Nurse Martha Greene ("Greene") refused to treat Aparo or check his vitals while he was on the ground, showing a deliberate indifference to the medical emergency Aparo had just declared and his active condition, and despite the fact that he was "crying". *See* **Exhibit 39**. Unable to stand, inmates tried to get Aparo into a wheelchair, but he was screaming in pain, including chest pain, with his eyes rolling in the back of his head and remained incoherent, leading Greene to perform an EKG. *See* **Exhibit 36, 38, 39, 40, and 41**. Brown was present for this incident. *See* **Exhibit 41**.

Aparo was cooperative when he was brought to the infirmary late on September 17, 2010. *See* **Exhibit 41**. Brown believed, based on what he saw and heard, that Aparo was in too bad of shape to go to confinement and needed to go to the hospital.  *See* **Exhibit 99**, Bates 688, 690-93, 696-97. Aparo even told Brown that the nurses were not helping him, asking Brown to help. *See* **Exhibit 41**. Brown never wrote a DR for Aparo for cursing at Franklin, suggesting that the allegations

of cursing were completely fabricated, as they were required to write a DR under those circumstances. *See* **Exhibit 19**, Franklin Dep. 174:19-175:24, 208:8-15; **Exhibit 25**, Interrogatory No.: 110; and **Exhibit 98**.

Whether Aparo was allegedly cursing or not on September 18, 2010, is irrelevant. *See* **Exhibit 43,** Bates 503-505. Defendant Franklin should have done a full assessment, which she failed to do, and punished him by sending him to confinement/permitting Brown to take him, against doctor's orders. *See* **Exhibit 43,** Bates 503-505.  Further, Aparo wasn't refusing treatment, he was begging for treatment. *See* **Exhibit 43,** Bates 503-505.[5]  As demonstrated herein, Franklin stated in her note that she would not send a cursing inmate to the hospital or call a doctor because she would not be talked to that way.  *See* **Exhibit 5**, Bates 72.  In other words, even though he was dying and presenting with classic symptoms of sepsis and OWR, there was no way she was going to refer him to hospital because he was cursing in pain while he begged for medical help. *See* **Exhibit 43**, Bates 503-506. *See also* **Exhibit 5**, Bates 72. "Something is not right, in anybody's judgement." *See* **Exhibit 43**, Bates 506. Moreover, after Aparo had made at the least his 6th complaint about the same medical problems, he should have been referred **automatically** to the clinician because DOC policy only requires three complaints about the same

---

[5] The only relevant part of the alleged cursing is that, if it were true and Aparo was cursing, justifying the DR, Franklin was required to issue the DR, but didn't, suggesting that Franklin fabricated the allegation. *See* **Exhibit 98**. *See also* **Exhibit 25**, Request No. 110.

medical problem. *See* **Exhibit 44**, Bates 6. See also **Exhibit 25**, Request No. 8. Again, even Brown saw that he was in such bad shape he should not go to confinement and should go to the hospital. *See* **Exhibit 99**, Bates 690, 697. Nonetheless, Brown took Aparo out of medical and to confinement, violating DOC rules, policy, and procedure, despite the 23 hour[6] hold instituted by Dr. Nikron Arunakul ("Arunakul"). *See* **Exhibit 5** Bates 130 and **Exhibit 43**, Bates 505.

### The Day of Aparo's death, September 19, 2010

From September 15, 2010, through 9:00 a.m. on September 19, 2010, Aparo declared approximately 5 to 6 medical emergencies, stating that he was in pain, could not breathe, and that he was dying and needed to go to a hospital. *See* **Exhibit 5**, Bates 69, 71, 73, 74, 75, 78. On September 19, 2010, after 9:00 a.m. Aparo declared multiple medical emergencies. *See* **Exhibit 10**, Curry Dep. 13:14-14:6; **Exhibit 11**, Martin Dep. 17:8-20:18; 127:15-18; **Exhibit 14**, Stripling Dep. 12:2-5; 14:23-16:16; 65:6-15; 123:14-124:5; 128:1-10; 130:10-16; 136:10-12; **Exhibit 15**, Thomas Dep. 11:13-14:24; 58:2-4. *See also* **Exhibits 45-50**. Aparo was not creating a disturbance in his cell on September 19th. *See* **Exhibit 10**, E. Curry Dep. 15:1-23; 19:3-23; 62:25-63:13; 162:20-163:2; **Exhibit 11**, Martin Dep. 11:11-12:24, 60:21-61:2;

---

[6] Only a member of medical staff can approve the removal of an inmate from the infirmary when they are there under doctor's orders. *See* **Exhibit 43**, Bates 505.

**Exhibit 13**, Porter Dep. 12:3-19; **Exhibit 14**, Stripling Dep. 10:20-11:25; 135:12-136:18; and **Exhibit 15**, Thomas Dep. 14:1-12; 18:10-13; 21:21-22:1.

Aparo was simply begging for medical attention, leaving nearby inmates thinking that the way Aparo was speaking and by what he was saying, Aparo was dying. *See* **Exhibit 15**, Thomas Dep. 17:21-25; 21:15-20; 24:3-11; **Exhibit 49;** *see also* **Exhibit 10** Curry Dep. 13:9-14:6.[7] Aparo was not screaming in his cell, nor was he kicking his cell door. See **Exhibit 10**, Curry Dep. 15:1-23; 19:3-23; 62:25-63:13; 162:20-163:2; **Exhibit 11**, Martin Dep. 11:11-12:24, 19:19-22 60:21-61:2; **Exhibit 13**, Porter Dep. 12:3-24; **Exhibit 14**, Stripling Dep. 10:20-12:24; 135:12-136:18; and **Exhibit 15**, Thomas Dep. 14:1-124; 18:10-17; 21:21-22:; and **Exhibit 12,** Middleton Dep. 13:12-23; 80:4-81:2. In fact, Inmate Michael Houston testified that it was a DOC officer, presumably Gillikin or Officer Gary McClain ("McClain") who kicked the door, since Gillikin was the DOC employee who notified Austin that Aparo was acting "disorderly." *See* **Exhibit 51,** Houston Interview at 21:17-22:4. *See also* **Exhibit 52**, Gillikin Dep. 47:13-17**.** Austin remembered Aparo as the little punk from before with a slick mouth that Austin had a problem with him in the chow hall. *See* **Exhibit 12,** Middleton Dep. 18:22-19:10; 28:9-29:19. Sergeant Hamm gassed Aparo. *See* **Exhibit 12,** Middleton Dep. 31:5-32:25.

---

[7] *See F.A.C Rule 33-602.210(5)(a)-(b)(2).* As Aparo did not cause a loss of control of the situation, his gassing should have been recorded by the handheld video camera as well.

While Aparo begged to go to the hospital, he called out that he was dying and needed help. See **Exhibit 15**, Thomas Dep. 17:21-25; 21:15-20; 24: 3-11 and **Exhibit 49**. When no one came to Aparo's aid after he declared multiple medical emergencies, other inmates started kicking their cell door and yelling "man down", a common practice engaged in by inmates and accepted by officers when the officers do not hear or ignore an inmate who is declaring a medical emergency. *See* **Exhibit 12,** Middleton Dep. 21:17-22:25; 148:3-149:21; **Exhibit 14**, Stripling Dep. 28:25-30:3; **Exhibit 15**, J. Thomas Dep. 14:25-15:15; 48:15-49:2. Prior to being gassed and while begging for medical attention, Aparo said he couldn't breathe, was asthmatic, and needed to go the hospital. *See* **Exhibit 50**. Austin, who called to speak to medical concerning whether Aparo could be gassed, responded, "Ain't nothing wrong with you mother f**cker, you can breathe." *See* **Exhibit 50**. Aparo responded stating that they could check his medical records, that he had a condition that prevented him from being sprayed, and that he couldn't breathe and needed medical attention. *See Id*. Another officer, McClain told Aparo that no nurses were available. *See* **Exhibit 53**. Aparo told Hamm, the guard that gassed Aparo, that he could not breathe or get up, but Hamm told Aparo no one would help him. *See* **Exhibit 53**. Neither Austin, Hamm, Gillikin, nor Martina brought medical staff to his cell in response to Aparo declaring numerous medical emergencies, despite being required to bring medical staff by DOC rules, policies, and procedures. *See* **Exhibit 10**, E.

Curry Dep. 36:19-3; 164:5-9; **Exhibit 14**, Stripling Dep. 16:6-16; and **Exhibit 15**, Thomas Dep. 13:7-19.

DOC conducted a detailed camera review of the fixed wing video on September 19, 2010, from 10:55am, through 3:42pm on September 19, 2010. *See* **Exhibit 87**. Defendants Austin, Gillikin, Martina, Burch, and Spangler were present while Aparo was declaring medical emergencies, stating he could not breath, had chest pains, and was begging to go to the hospital. *See* **Exhibit 87,** Bates 791-825. *See also* **Exhibit 10**, E. Curry Dep. 13:14:6; 36:19-37:3; **Exhibit 11**, Martin Dep. 17:8-12; 18:11-19; 19:4-7; 20: 16-18; 62:1-7; **Exhibit 12**, Middleton Dep. 11:19-13:4; 18:16-20:21; 110:20-111:2; **Exhibit 13**, Porter Dep. 21:4-23:14; **Exhibit 14**, Stripling Dep. 12:2-15:25; 65:6-15; 127:9-128:10; 136:3-18; **Exhibit 15**, Thomas Dep. 11:13-12:24;  13:7-19; 17:14-25; 22:4-11.  *See also* **Exhibits 45-50.**  Austin, Gillikin, Hamm, Martina, Burch, and Spangler were present and in the A Dorm confinement wing generally while Aparo is being sprayed with two cans of OC gas and a third administration of CS gas. *See* ECF Doc. 180-10. *See also* **Exhibit 87.**

Instead of receiving medical attention, Aparo was sprayed with OC chemical agent twice, and CS chemical agent once. *See* **Exhibit 54;** *See also* **Exhibit 10**, Curry Dep. 16:5-17:8. When the officers told Aparo that he would be gassed on September 19, 2010, Aparo told them not to because he was asthmatic. See **Exhibit 55**. Inmates present to the gassing of Aparo testified that the gassing was wholly

unjustified. *See* **Exhibit 10**, Curry Dep. 169:7-22; **Exhibit 11**, Martin Dep. 112:11-18; and **Exhibit 15**, Thomas Dep. 14-22.   Indeed, Thomas, the inmate directly next to Aparo's cell, as shown in **Exhibit 56**, testified that Aparo was on the ground begging the officers to stop gassing him, stating that he couldn't breathe. *See* **Exhibit 15,** Thomas Dep. 17:14-25; 22:8-22; 37:11-38:5. Juan Thomas told Aparo to get up off the floor so they would stop getting gassed because, sharing a wall with Aparo's cell, the gas went into Thomas' cell.  *See* **Exhibit 15**, J. Thomas Dep. 15:20-19:22.

Prior to, during, and after the gassing, Aparo repeatedly requested medical care. *See* **Exhibit 55.** [8] The guards in the dorm/on duty at this moment, Gillikin, Austin, and Hamm, told medical that if Aparo could not get off the floor, then he did not need medical attention. *See* **Exhibit 55.**   Inmate Kenneth Daniels ("Daniels") testified that after Aparo was gassed the first time, he was told to get off the floor. *See* **Exhibit 46**. Further, Daniels said that Aparo replied "I can't get off the floor, my back hurts and I can't breathe." See Id.

After Aparo was gassed the second time, he was asked if he was ready to comply and get off the floor. *See Id*. Aparo replied, "Yes, I am ready to comply but

---

[8] Gillikin stated in his interview on September 22, 2010, that Aparo was gassed because he disobeyed verbal commands to clean his cell, make his bed, and to get dressed (*See* **Exhibit 57**), contradicting his testimony in his deposition. *See* **Exhibit 52**, Gillikin Dep. 22:3-18, 41:5-14*; see also* **Exhibit 105,** Austin Dep. 16:17-18:6 and **Exhibit 106**, compared with **Exhibit 58 and Exhibit 52,** Gillikin Dep. 22:7-10. Plaintiffs assert that none of Gillikin's testimony is true because it conflicts with every inmate witness who was present that day, listening and watching what was happening to Aparo.

I can't get up." *See Id*. Austin stated "Well we're not ready for you yet," and Aparo was immediately gassed again with CS chemical agent by Hamm. *See Id*. *See* ECF Doc. 180-9 and 180-10. *See also* **Exhibit 87.** In between each spray, Austin spoke with Aparo through the door. *See* **Exhibit 57**. Even when Aparo asked for a towel to be put through the door to help him pull himself up, the officers told him "no" and laughed while he continued to slowly die. *See* **Exhibit 15**, Thomas Dep. 16:21-18:5; 20:15-21; 22:12-24:11; 54:1-3. Inmate Houston testified that Aparo tried to comply prior to being gassed, but when he asked for a towel to pull himself up, the officers told Aparo he was faking. *See* **Exhibit 51**, Houston Interview at 6:2-8:24; 15:20-16:5.

Based on the fixed wing video review and the sequence of interaction between Aparo and the guards speaking to him while he was being gassed, the only two Defendants who would have told Aparo that they were not ready for him yet, immediately gassing him again, were Austin and Hamm. *See* **Exhibit 87,** Bates 791-825. *See* **Exhibit 46.** While Aparo was gassed he was still begging for help. *See* **Exhibit 10**, E. Curry Dep. 19:3-23. The guards were laughing at him, calling him a "broke dick dog." *See* **Exhibit 10**, E. Curry Dep. 158:14-19. Thomas testified that based on what he heard and saw on September 19, 2010, he believed Aparo was murdered by the officers**.** *See* **Exhibit 15**, Thomas Dep. 126:10-16 **and Exhibit 49**.

**After Aparo was gassed on September 19, 2010**

After Aparo was punitively and sadistically gassed for no reason other than to cause him harm, Burch grabbed a handheld video and began filming Aparo's removal from his cell, Martina and Spangler carrying Aparo to the shower by his armpits, Aparo's attempt to shower, Martina and Spangler carry Aparo to the medical unit, Aparo's post use of force exam, and Martina and Spangler carrying Aparo by his armpits back to his cell that had not been decontaminated. *See* ECF Doc. 180-10.  *See also* **Exhibit 62**, Houston's Second Interview at 14:11-23. *See also* **Exhibit 63**. The video is abhorrently shocking, showing Aparo struggling to walk, breathe, and live, however, at no time does it show Aparo as uncooperative. *See* ECF Doc. 180-10. These officers had actual, subjective knowledge, of Aparo's deteriorating condition because not only did they hear the same begging and cries for medical attention from Aparo as the inmates did, but they saw him struggling to live, as can be seen from the video. *See id*. Aparo was still orange from the chemical spray, and in the post use of force exam conducted by Riley, she can be seen commenting that Aparo still had orange all over his him from the gassing. See Handheld video, ECF Doc. 180-10 at 12:30pm and **Exhibit 63**. *See also* Fixed Wing Video, ECF Doc. 180-9 at 1:13.

Aparo was returned to the same dirty non-decontaminated cell that he was gassed in and which had not been cleaned appropriately, a violation of DOC policies, rules, and procedures. *See* **Exhibits 55 and 63**. *See also* F.A.C. 33-

602.210(11)(b)(1).  The Defendants responsible for placing Aparo, or permitting him to be placed in a cell that had not been decontaminated, are Austin, Gillikin, Burch, Martina, and Spangler.  *See* ECF Doc. 180-10.  The Defendants responsible for not removing Aparo from the decontaminated cell after they looked in and saw the cell after he had already been placed in the cell are Austin, Gillikin, Martina, and Spangler. *See* ECF Doc. 180-9.  *See also* **Exhibit 87**, Bates 848-1008**.** Defendants' Austin, Gillikin, Martina, and Spangler knew Aparo was in medical distress and failed to get him medical attention when they visited his cell door 89 times between approximately 1:30 p.m. and 3:30 p.m. *See* ECF Doc. 180-9.

After Aparo was brought back to the cell, he was laying on the floor of his cell. At some point after he was gassed, an officer said to Aparo "Do you need the wheelchair again, you cripple bitch?" and called him a "little punk ass" and "motherfucker." *See* **Exhibit 10**, E. Curry Dep. 24:13-26:24; *see also* **Exhibit 14**, Stripling Dep. 12:23-13:18; *see also* **Exhibit 45**.[9]  One guard told Aparo to "lay down and die," shortly after he was returned to his cell. See **Exhibit 10**, E. Curry Dep. 160:20-22. In comparing the testimony of Stripling and Curry with the fixed wing video and fixed wing video review, the only Defendant who was at the cell

---

[9] After Curry was interviewed by FDLE and DOC concerning the death of Aparo, he was visited by another person who stated that he was a member of the DOC Office of Inspector General. *See* **Exhibit 10**, Curry Depo at 34:7-38:25. The DOC inspector attempted to tamper with Curry's testimony, telling him that if he gave a story that was better for the guards, he would be given food and canteen privileges. See Id.  Curry's response was "F**k you." *See Id.*

during this time period when they wheelchair was brought in by Riley (1:27pm on fixed wing video), was Martina. *See* ECF Doc. 180-9. *See also* **Exhibit 87**, Bates 897-900. Aparo was in rough shape when he was placed back in his cell. When Riley came back to take his blood pressure, he fell while she was at his cell door, however, the security staff told her he was just acting out and laying on the floor. *See* **Exhibit 64**, Riley Dep. 19:20-22-14. Riley was aware of this, relaying that the security staff told her that Aparo was just acting out. *See* **Exhibit 21.**

According to multiple inmates, Aparo may have already died by 2:00 or 3:00 p.m., meaning Officer Foxworth's statement, and others, that they saw Aparo give a thumbs up would be false. *See* **Exhibit 94**. *See also* **Exhibit 11**, Martin Dep. 22:6-17; **Exhibit 12**, Middleton Dep. 45:24-47:11; **Exhibit 13**, Porter Dep. 13:7-14:22; **Exhibit 14**, Stripling Dep. 16:23-20:16; **Exhibit 15**, Thomas Dep. 30:12-31:15; 130:6-18. See also **Exhibits 47, 48, and 49.** The Medical Examiner, Lisa Flannagan, M.D., also believed Aparo's time of death was closer to 2 or 3:00 p.m. based on the rigor his body was found in later on September 19, 2010. *See* **Exhibit 61**, Flannagan Dep. 41:18-42:2. Aparo died of sepsis and infections, including complications from his OWR. *See* **Exhibits 8, 16, 17 and 96.** The punitive and sadistic gassing of Aparo contributed to his death. *See* **Exhibits 16 and 96.** *See also* **Exhibit 61**, Flannagan Dep. 46:1-17.

Officers were saying that they were going to leave Aparo for the next shift to deal with, and kept referring to him as a "body".  *See* **Exhibit 14**, Stripling Dep. 16:23-17:24. Aparo was found dead on the ground clinching his Bible under his heart. *See* **Exhibit 68**. In response to Aparo's death, Thomas started writing a novel titled "I Can't Breathe" based on and inspired by Aparo. *See* **Exhibit 15**, J. Thomas Dep. 36:24-38:22. Thomas wrote a letter to his sister the day after Aparo's death explaining everything that happened and because he was afraid that he could suffer the same fate as Aparo, being killed for no reason and describing it as "cold-blooded murder". *See* **Exhibit 15**, Thomas Dep. 39:13-47:14; 126:10-16; *See also* **Exhibit 59**.

### DOC fires Austin and Hampton

DOC even concluded, as evidenced by Austin and Hampton's "Permanent Status Career Service Extraordinary Dismissal Letter" that "on or about September 19, 2010, you inappropriately participated in a use of force incident that resulted in the death of an inmate," Aparo. *See* **Exhibits 72 and 73**. Austin and Hampton were accused of conduct unbecoming of a public employee, failure to maintain the proper security and welfare of the institution and Aparo, verbal or physical abuse of Aparo, excessive use of force on Aparo, willful violations of rules, regulations, directives, or policy statements, and engaging in conduct which would violate state statutes, rules, directives of policy statements. *See Id.* DOC, through its then Department

Secretary on September 19, 2014, stated about Austin and Hampton's termination that DOC has "zero tolerance for corruption or abuse..." and that DOC will continue "to root out any and all bad actors who do not live up to our expectations." *See* **Exhibit 74.**

Austin and Hampton were part of the "four horsemen," a group of thug DOC correctional officers who use to violate the civil rights of inmates by beating them and gassing them punitively, including putting hits out on inmates. *See* **Exhibit 12**, Middleton Dep. 50:5-51:23; **Exhibit 13**, Porter Dep. 29:21-32:4; **Exhibit 49.** *See also* **Exhibit 100.** Additionally, approximately two years after the death of Aparo, Austin and Hampton threatened a different inmate, Gary Lloyd, stating that they were "going to kill you like we did him. We're going to kill you like we did Aparo." *See* **Exhibit 75**.

DOC reprimanded other individuals, and, its expert and Regional Medical Director, Hantz Hercule, was especially critical of Brown when he violated DOC rules, policies, and procedures by taking Aparo from the medical unit without a release from medical staff and contrary to Dr. Arunakul's orders. *See* **Exhibits 37, 42, 43,** Bates 517, **Exhibits 44, 70, 71, 97 and 103.**

## MEMORANDUM

## II.   No Defendant is Entitled to Qualified Immunity.

Qualified immunity offers "complete protection for government officials sued in their individual capacities as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)) (additional quotations omitted). The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, *see Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987), protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001). Because qualified immunity is a defense not only from liability, but also from suit, it is "important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998) [**14]  (citation omitted).

In order to receive qualified immunity, the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)). If the defendant was not acting within his discretionary authority, he is ineligible for the

benefit of qualified immunity. In this case, there can be no doubt that Ferraro was acting in his discretionary capacity when he arrested Lee.

Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *See McMillian*, 939 F.2d 1479. The Supreme Court recently set forth a two-part test for evaluating a claim of qualified immunity. As a "threshold question," a court must ask, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). If a constitutional right would have been violated under the *plaintiff's* version of the facts, the court must then determine "whether the right was clearly established." *Saucier*, 533 U.S. 194, This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition*." Saucier*, 533 U.S. 194; *see also Marsh v. Butler County*, 268 F.3d 1014, 1031-33 (11th Cir. 2001).

The defense of qualified immunity is an unavailable defense because the use of malicious and sadistic use of force to cause harm is a clear violation of the Constitution and Supreme Court precedent. *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002). Whether a jailer's use of force is excessive, and thus violates the inmate's Fourteenth Amendment right to be free from cruel and unusual

punishment, depends on whether the jailer's act "shocks the conscience," *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007).

## A.   Austin is not entitled to qualified immunity.

First, Austin was clearly present when Aparo was begging for medical attention and declaring medical emergencies, according to every inmate who has testified in this case. Inmates testified that Aparo was not doing any of the things that Gillikin or Austin accused him of. Inmate testimony suggests that not only did Aparo not cause a disturbance to justify the first gassing, he did not engage in any conduct to justify the second or third gassing. Additionally, two inmates heard Aparo ask to have them put a towel through the door so he could pull himself off the floor. Austin was present with Hamm at this gassing and stated that they were not ready for him to comply, gassing him **immediately**, or in other words, only seconds after Aparo was told that Hamm and Austin would not help him. Further, Austin placed Aparo back into a contaminated cell, which, under this Circuit and Supreme Court's case law, violates Aparo's rights. *Danley v. Allen*, 540 F.3d 1298, 1309-13 (11th Cir. 2008).

By placing Aparo back into his contaminated cell and watching Aparo die on the floor of his cell, which Austin was aware of because he peered in the cell numerous times after Aparo was returned, Austin failed to temper the severity of his forceful response. *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986); *see also Williams*

*v. Benjamin*, 77 F.3d 756 (4th Cir. 1996); *see also Thompson v. Sikes*, No. 4:15cv253-MW/CAS, 2017 U.S. Dist. LEXIS 26385 (N.D. Fla. Jan. 25, 2017) (*stating* "Thus, while force may be used to quell a disturbance, including the use of chemical agents, *see Danley v. Allen*, 540 F.3d 1298, 1308 (11th Cir. 2008), when "a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need. **Stated more directly, if there is no disturbance, there is no need for force at all.** There is a genuine dispute between the parties as to this claim. Summary judgment cannot be granted in favor of Defendants or Plaintiff.")(Emphasis Added).  Austin was clearly sadistic and malicious, and his conduct shocks the conscience. Additionally, Austin placed Aparo back in his cell without a second shower despite Riley stating that Aparo needed to be cleaned form the chemical agent that was still on him, i.e., Aparo needed another shower.

Austin also was present when Aparo was declaring medical emergencies, begging for medical help, and requesting to go to the hospital, yet still denied Aparo medical attention. An "official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *McElligott,* 182 F.3d at 1255 (*citing Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997)); *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989).

Lastly, even if Austin asserts that he didn't know the cell was dirty or no longer contaminated, the pictures of the cell directly impeach and prove that testimony false. The orange can be seen on the walls, on Aparo, smeared on the ground, on the metal bed, etc. Austin even cursed and harassed Aparo, telling him that there wasn't anything wrong with him and that he could breathe, again denying Aparo medical care.  *See infra, III.,* Austin was Deliberately Indifferent.

**B.    Gillikin is not entitled to qualified immunity.**

For the same reasons as Austin, Gillikin is not entitled to qualified immunity, and Plaintiffs incorporate their arguments in Section II (A) above herein. The inmate testimony contradicts every one of Gillikin's changing explanations as to why Aparo needed to be gassed. Further, Gillikin peered into the cell after Aparo was returned, saw it was contaminated, and failed to temper the severity of the forceful response. Even if Gillikin asserts that he didn't know the cell was dirty or no longer contaminated, the pictures of the cell directly impeach and prove that testimony false. The orange can be seen on the walls, on Aparo, smeared on the ground, on the metal bed, etc. Gillikin also denied Aparo medical care, according to inmates, and did not get medical staff in response to Aparo declaring medical emergencies. This also violates clearly established law. *See infra*, *III*., Gillikin was Deliberately Indifferent.

**C.    Hamm is not entitled to qualified immunity.**

For the same reasons as Austin, Hamm is not entitled to qualified immunity, and Plaintiffs incorporate their arguments in Section II (A) above herein.  Hamm was the individual who gassed Aparo, was at his cell moments before he was gassed, and told Aparo they were not ready for Aparo to comply, despite Aparo stating that he wanted to comply, he just needed help pulling himself up because he was hurt. Inmates testified that Aparo was begging for medical attention in between the gassings, which would have to include times when Hamm was in A dorm confinement, and moments before he was gassed again. Inmates testified that Aparo was moaning, declaring medical emergencies in between the times he was gassed. Hamm ignored these and gassed Aparo anyway, while telling Aparo that if he couldn't get off the floor, he didn't need medical. Thus, Hamm also denied Aparo medical care, which also violates well established law. While Hamm may not have known the original allegations (false) from Gillikin which led to the order from Austin to gas Aparo, the facts of this case are unique in that important events and interactions occurred shortly before the gassings that demonstrate Hamm was gassing an inmate that was begging for medical help/requested to go to the hospital, declaring medical emergencies, and stating that he was dying, and Hamm had firsthand knowledge of it. Also, Hamm had a direct conversation with Aparo, gassing him after Aparo said he was trying to get off of the floor. *See infra*, *III.,* Hamm was Deliberately Indifferent.

**D.     Brown is not entitled to qualified immunity.**

Plaintiffs incorporate their arguments in Section II (A) above herein. Brown is not entitled to qualified immunity as he pulled Aparo out of the medical unit on September 18, 2010, knowingly in violation of doctor's order and outside the scope of his employment. Further, Brown knew that Aparo had not been released by any medical staff, thus denying Aparo the medical care he desperately needed at that time. This violated DOC rules, policy, and procedure, and was grossly negligent. Grossly inadequate measures to treat an inmate's serious medical need will not eliminate a jailer's liability for deliberate indifference. *McElligott v. Foley*, 182 F.3d 1248, 1255-56 (11th Cir. 1999). ("[P]rison officials with knowledge of [a serious] need for care may not . . . provid[e] grossly inadequate care, caus[ing] a prisoner to needlessly suffer the pain resulting from his or her illness.*"); Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). Further, Brown interfered with Aparo's medical treatment, caused it to be delayed at the very least, but ultimately resulted in Aparo being denied treatment. *See infra*, *III.,*  Additionally, how Aparo left the infirmary on the 18th, as well as how and when the Pre-Special Housing Health and Risk Assessment form was executed would permit a jury to conclude that Brown and Franklin were engaged in a conspiracy/ Brown was Deliberately Indifferent.

**E.     Burch, Spangler, and Martina are not entitled to qualified immunity.**

Plaintiffs incorporate their arguments in Section II (A) above herein.

Burch, Spangler, and Martina are not entitled to qualified immunity because they were present in the A dorm confinement when Aparo was begging for medical attention, declaring medical emergencies, stating that he needed to go to the hospital, couldn't breathe, had chest pains, and that he was dying. Burch, Spangler, and Martina denied Aparo medical care when it was subjectively obvious he needed medical attention, and in violation of DOC rule, policy, and procedure requiring medical staff be contacted and the inmate be treated immediately when an inmate declares a medical emergency. Martina and Spangler were present when Aparo was gassed and did not protect him, despite his cries for help, medical attention, and declaration of medical emergencies. Martina and Spangler carried Aparo to the shower, from the shower to medical, and from medical back to his cell. Thus, they had actual subjective knowledge of Aparo's deteriorating condition. Additionally, it would be extremely disingenuous to suggest that they were not subjectively aware of Aparo's deathly and deteriorating condition based on the handheld video.

Grossly inadequate measures to treat an inmate's serious medical need will not eliminate a jailer's liability for deliberate indifference. *McElligott v. Foley*, 182 F.3d 1248, 1255-56 (11th Cir. 1999). ("[P]rison officials with knowledge of [a serious] need for care may not . . . provid[e] grossly inadequate care, caus[ing] a prisoner to needlessly suffer the pain resulting from his or her illness.*"); Ancata v.*

28

*Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). Burch, Martina, and Spangler can also be seen present and watching Aparo be placed back into a contaminated cell, and also put him back in the cell without a second shower despite being aware of Riley's comments concerning Aparo still being covered in chemicals. Martina actually spent substantial time at Aparo's cell after he is returned, watching Aparo die in his contaminated cell. Thus, Burch failed to temper the severity of the forceful response by himself and the other guards. While Burch may not have sprayed the gas, he failed to temper the severity of the response of the other guards by permitting Aparo to be placed back in the contaminated cell.

*See infra*, *III.*, Burch, Spangler, and Martina were Deliberately Indifferent.

**F.     Hampton is not entitled to qualified immunity.**

Although Hampton did not begin work on September 19, 2010, until 4:00 p.m., Hampton is not entitled to qualified immunity because he threatened Aparo on September 18, 2010, the day before he was gassed to death, accusing Aparo of being a snitch. It was clear to those that heard (inmate Middleton) that Hampton had a hit out on Aparo. *See supra*. Obviously, Hampton cannot have qualified immunity if he put a hit out on Aparo, and there is at least some evidence that would enable a jury to conclude that he put a hit out on Aparo, and the next day the hit was executed, resulting in Aparo's death. It was well known that Hampton had a penchant for assaulting inmates and violating their civil rights, including another witness, Juan

29

Thomas. *See* **Exhibit 15**, Thomas Dep. 32:11-36:6.  Conspiring or deciding to kill Aparo because he was a snitch is clearly conduct Hampton cannot engage in because it is sadistic and malicious force that has no purpose and shocks the conscience.

Lastly, Hampton saw Aparo in his cell when he passed out the dinner trays, tried to talk to Aparo, and saw Aparo's orange cell. *See* **Exhibit 46.** Hampton failed to temper the severity of the force used by removing Aparo from the cell at that point and move him to a decontaminated cell.

### III.   The Defendants were deliberately indifferent to Aparo and his medical needs, gassing him punitively, sadistically, and purely for the purpose of causing harm.

The Eighth Amendment prohibits cruel and unusual punishment; prison officials violate that amendment when they are deliberately indifferent to a substantial risk of serious harm to inmates. *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1027 (11th Cir. 2001). As we have explained, *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 1977, 1982-83, 128 L. Ed. 2d 811 (1994), sets out objective and subjective elements that must be shown to establish an Eighth Amendment violation. About the objective elements, a prisoner must first show that an objectively substantial risk of serious harm existed; and once it is shown that an official is aware of this objectively substantial risk, the official must respond to this risk in an objectively unreasonable manner. *See Marsh*, 268 F.3d at 1028-29. About the subjective elements, "the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 114 S.Ct. at 1979.

Use of chemical agents without a penological justification can constitute a violation of the Eighth Amendment. *See Williams v. Tucker*, No. 5:13-cv-9-RS-GRJ, 2014 U.S. Dist. LEXIS 179466 (N.D. Fla. Dec. 15, 2014) *citing Thomas v. Bryant*, 614 F.3d 1288 (11th Cir. 2010)(pepper spraying an inmate who had no capacity to comply was without penological justification and satisfied the Eighth Amendment's objective harm requirement); *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)(using chemical agents solely for punishment or infliction of pain is an Eighth Amendment violation). The threshold question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986).

The "core judicial inquiry" for an excessive-force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010) (internal citation and quotation omitted). In the Eleventh Circuit, to find deliberate indifference on the part of a prison official, a plaintiff inmate must show: [*16]  (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence. *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010); see also *Chandler v.*

31

*Crosby*, 379 F.3d 1278, 1290, n. 21 (11th Cir. 2004). That is, the evidence must demonstrate that "with knowledge of the infirm conditions, [the official] knowingly or recklessly declined to take actions that would have improved the conditions." *LaMarca v. Turner*, 995 F.2d 1526, 1537 (11th Cir. 1993). A prison official's deliberate indifference is a question of fact. *See Farmer v. Brennan,* 511 U.S. 825, 842 (1994); *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007). "Whether a prison official had the requisite knowledge of a substantial risk is . . . subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citations omitted).

The Eleventh Circuit has identified five factors to help evaluate whether force was applied maliciously or sadistically. *Danley v. Allen*, 540 F.3d 1298, 1306-07 (11th Cir. 2008), *overruled in part on other grounds by Iqbal*, 556 U.S. 662, *as recognized in Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). Those five factors include: (1) the need for force; (2) the relationship between that need and the amount of force used; (3) the extent of the resulting injury; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible official on the basis of facts known to that official; and (5) any efforts made to temper the

severity of the use of force. Id. (*citing Whitley*, 475 U.S. at 320-21); *see also Fennell v. Gilstrap*, 559 F.3d 1212, 1218-20 (11th Cir. 2009) (applying these factors).

An "official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." McElligott, 182 F.3d at 1255 (citing Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997)); Mandel v. Doe, 888 F.2d 783, 788 (11th Cir. 1989). "When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005).

"An official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997); accord Hill v. Dekalb Regional [*1274] Youth Detention Center, 40 F.3d 1176, 1187 (11th Cir. 1994); Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990); Thomas v. Town of Davie, 847 F.2d 771, 772 (11th Cir. 1988); Aldridge v. Montgomery, 753 F.2d 970, 972-73 (11th Cir. 1985).

**A.     Austin was deliberately indifferent.**

The evidence in this case establishes that Austin was deliberately indifferent towards Aparo when Austin (1) ordered the gassing of Aparo despite Aparo not creating a disturbance, (2) denied Aparo medical attention when he begged to go to the hospital and declared a medical emergency, (3) ordered Aparo be gassed after Aparo asked for help to get off the ground with a towel through the food flap, (4) returned Aparo to a contaminated cell, (5) did not take Aparo for a second shower after Riley commented that he was not properly decontaminated, (6) permitted Aparo to be gassed even though he had missed at least the three previous meals leading up to the gassing,  and (7) continued gassing Aparo even after he was still declaring medical emergencies after the first and second gassing.

All of this conduct is clearly deliberately indifferent based on the case law cited herein. The evidence suggests that Aparo was gassed solely for demanding medical attention, and in fact caused no disturbance prior to Austin arriving in the dorm, and still was not causing a disturbance after the first or second gassing, or which Austin was present and had actual knowledge of. This conduct establishes and meets all of the *Danley* factors.

**B.     Gillikin was deliberately indifferent.**

The evidence in this case establishes that Gillikin was deliberately indifferent towards Aparo when Gillikin (1) reported Aparo was causing a disturbance, causing Aparo to be gassed, even though such report was false and Aparo was not creating a

disturbance, (2) denied Aparo medical attention when he begged to go to the hospital and declared a medical emergency, (3) saw Aparo in his contaminated cell, failing to temper the severity of the force used, and (4) did not take Aparo for a second decontamination shower when he saw that Aparo was still orange and covered in chemical agents.

Moreover, Gillikin told a litany of stories, all different than the others, as to why Aparo needed to be gassed. The only witnesses who's stories remained the same are the inmates who testified consistently that Aparo was not creating a disturbance or causing any problems, only declaring medical emergencies and begging to go to the hospital. Gillikin's conduct is abhorrent in that he falsely reported that Aparo was causing a disturbance when all he was doing was begging for medical attention. Gillikin failed to stop what he knew was an unlawful gassing based on his false report to Austin.

This sadistic and malicious conduct establishes and meets all of the *Danley* factors.

### C.    Hamm was deliberately indifferent.

The evidence in this case establishes that Hamm was deliberately indifferent towards Aparo when Hamm (1) gassed Aparo even after he was still declaring medical emergencies after the first and second gassing, (2) told Aparo with Austin that they were not ready for him to comply yet, gassing him again, and (3) gassing

Aparo even after Aparo told him he couldn't breathe, his chest hurt, requested to go to the hospital, and he still needed medical attention. The inmate witnesses testified that Aparo did nothing in between the first gassing and the final gassing to warrant the continued application of chemical agents, yet Hamm, who was in the Dorm for the gassings according to the fixed wing videos, continued to pummel Aparo to death with gas.

This sadistic and malicious conduct establishes and meets all of the *Danley* factors.

**D.    Brown was deliberately indifferent.**

The evidence in this case establishes that Brown was deliberately indifferent towards Aparo when Brown (1) removed Aparo from the medical unit, without a release from medical staff, violating DOC rules, policies, and procedures, and (2) removed Aparo from the medical unit and took him to confinement despite knowing Aparo was in too bad of shape and that his health was deteriorating.

Brown violated longstanding DOC policies, rules, and procedures when he removed Aparo from the medical unit on September 18, 2010, without a medical professional signing off on his release and causing Aparo to not receive the medical care he so desperately needed, as was determined by Arunakul. This grossly negligent conduct was deliberately indifferent to Aparo, and a jury could conclude that Brown's actions contributed to Aparo's death. Such a determination is a

question of fact, and there are facts that a jury could evaluate and conclude that Brown violated Aparo's Eighth Amendment rights.

This conduct establishes and meets all of the *Danley* factors, and is gross negligence resulting in the denial of medical care that had been previously ordered by Dr. Arunakul.

## E. Burch, Spangler, and Martina were deliberately indifferent.

The evidence in this case establishes that Burch, Spangler, and Martina were deliberately indifferent towards Aparo when they (1) denied Aparo medical attention when he begged to go to the hospital and declared a medical emergency, (2) failed to stop and protect Aparo from the continued gassing Aparo even after he was still declaring medical emergencies after the first and second gassing, (3) returned Aparo to a contaminated cell, and (4) did not take Aparo to the shower for a second decontamination shower despite Riley's comments that he was still covered in orange and chemical agent and needed to be cleaned.

Burch, Spangler, and Martina were in a position to help get medical attention to Aparo or get him to the medical unit, yet didn't do it. Burch, Spangler, and Martina were each in a position to stop the sadistic and malicious gassing of Aparo, yet none of the three stopped the gassing they knew was unlawful as they were in the dorm when Aparo was not causing a disturbance, but only begging for medical attention and declaring medical emergencies. Lastly, Burch, Spangler, and Martina

each had the ability to take or direct Aparo to a clean, decontaminated cell, however, they placed Aparo back in the same cell he was gassed in and which had not been decontaminated. Further, they did not take Aparo to the showers to fully decontaminate his skin from the chemical agents, failing to temper the severity of the force used. Spangler and Martina each went up to the cell door for substantial periods of time after Aparo was returned. The pictures make clear that Aparo's cell was anything but clean. The pictures also show that Aparo was anything but clean or decontaminated.

This sadistic and malicious conduct establishes and meets all of the *Danley* factors.

**F.    Hampton was deliberately indifferent.**

The evidence in this case establishes that Hampton was deliberately indifferent towards Aparo when Hampton threatened Aparo for being a snitch the day before he was gassed to death, permitting the jury to infer and conclude that Hampton participated in the death of Aparo by conspiring and/or acting in concert with Austin, Gillikin, Hamm, Burch, Spangler, Martina, and Brown to kill Aparo. But for Middleton testifying about the conversation and threat he heard between Hampton and Aparo the night before his death, Hampton's unlawful conduct and involvement in Aparo's killing may have gone completely unknown. Further, Hampton stopped at Aparo's cell around 4pm with dinner. *See* **Exhibit 46.**  Daniels

told Hampton Aparo may be dead because he was gassed earlier, and Hampton still left him in his contaminated cell, which Hampton obviously saw as he stopped at the cell for a lengthy period of time to try to give Aparo his dinner. Further, if Aparo was dead between 2:00 or 3:00 p.m. as some witnesses have testified to, then Hampton furthered the conspiracy by falsely stating that Aparo denied his 4:30 p.m. meal on September 19th.

Hampton had a penchant and reputation for inmate abuse, and luckily for Aparo, another inmate heard Hampton threaten him and bring to light the hit Hampton put or was going to put out on Aparo. Hampton, like Austin, was fired specifically for his unlawful, sadistic, malicious, and despicable conduct towards Aparo. Hampton knew that DOC was right and apparently didn't even appeal the termination.

## IV.    The Security Defendants engaged in a common law conspiracy and a conspiracy to violated 42 U.S.C. §1983.

The evidence of the conspiracy is clear. First, Aparo was brought to confinement by Brown in violation of DOC rules, policies, and procedures, as well as Dr. Arunakul's orders. Second, Hampton threatened Aparo for being a snitch, making clear that a hit was being put out on Aparo's life. Third, while the inmates generally tell the same story about September 19th, and specifically that Aparo did not cause any disturbance, Gillikin's rendition of the events of that day support a conspiracy to assault and kill Aparo because only the guards alleged to be in the

conspiracy support Gillikin's multiple, evolving and changing versions of what Aparo was allegedly doing wrong on September 19, 2010. Further, a jury may conclude that Hampton attempted to have an inmate kill Aparo, Hampton's historical way of having hits against inmates completed.

A conspiracy is further supported by DOC's actions in that the final act of the conspiracy was completed on September 19, 2014, when DOC fired Austin and Hampton. Alternatively, the final act of the conspiracy could be when Austin challenged his termination at PERC resulting in DOC permitting Austin to come back to work on June 26, 2015 without actually contesting his PERC challenge. *See* **Exhibits 101 and 102.**

These individuals had a particular power of coercion against Aparo as they were senior DOC and FCI officials against an inmate. These individuals were clearly operating outside the scope of their employment when the sadistically and maliciously threatened Aparo for being a snitch and gassed him to death the next day, refusing to get medical staff each time he declared a medical emergency.

**V.     Plaintiff's claims are within the statute of limitations.**

   **A. The statute of limitations for Plaintiff's Claim is subject to Florida Statutes, § 95.11(10)**

The limitations period for a Florida wrongful-death claim is ordinarily two years. *See* Fla. Stat. § 95.11(4)(d). But when the decedent is a "disabled adult," a claim asserting murder or manslaughter may be brought at any time; there is no

statute of limitations. *See Id*. § 95.11(10). This statute cites to 782.05, and 782.07, manslaughter or aggravated manslaughter of a disabled person, "a person who causes the death of any elderly person or disabled adult by culpable negligence…" *See Fla. Stat. § 782.07(2)*. The element of culpable negligence is defined in Section 784.05, Florida Statutes, as "an act which a reasonable person would know is likely to result in death or great bodily harm to another person, even though done without any intent to injure anyone but with utter disregard for the safety of another." *See J.C. v. State*, 233 So. 3d 519, 521 (Fla. 2d DCA 2018).

A jury could conclude that the Security Defendants committed a murder, or manslaughter of a disabled adult (which on the statutory culpable negligence standard would not be difficult on this record). Further, a jury could easily conclude that Aparo was disabled by virtue of his OWR based on the facts cited herein, including watching the entirety of the handheld video. See ECF Doc. 180-10.

Thus, this Court should find that, because a jury could conclude that the individual Defendants and other DOC employees committed murder or manslaughter of a disabled adult (Aparo) vis a vis culpable negligence, the statute of limitations applicable to those individuals for the damages listed in Florida Statutes § 768.21 are being sought against those individuals, the statute of limitations contained in Florida Statutes § 95.11(10) should apply to the Security Defendants as it relates to Plaintiffs' claims against the Security Defendants.

**B. Plaintiffs' claims are not barred by the statute of limitations because Cimillo did not know, nor should she have known of the potential for the cause of action until August 30, 2014.**

There is no *federal* statute of limitations for § 1983 claims arising under the Constitution or under statutes enacted before December 1, 1990. *See Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). Instead, such § 1983 claims "are subject to the statute of limitations period governing personal injury actions in the state where the action is brought." *Wellons v. Comm'r, Ga. Dep't of Corrs.*, 754 F.3d 1260, 1263 (11th Cir. 2014) (citing *Crowe v. Donald*, 528 F.3d 1290, 1292 (11th Cir. 2008)). Florida's limitations period for personal-injury actions is four years. *See* Fla. Stat. § 95.11(3)(p); *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003)); *City of Hialeah, Fla. v. Rojas*, 311 F.3d 1096, 1103 n.2 (11th Cir. 2002).

The Supreme Court and the Eleventh Circuit have both stated that "[I]n *Section 1983* actions '[o]nly the length of the limitations period, and the closely related questions of tolling and application, are to be governed by state law.'" *Wilson v. Garcia*, 471 U.S. 261, 269 (1985); *see also McGinley v. Mauriello*, 682 F. App'x 868 871 (11th Cir. 2017). As noted in *Jones v. Childers*, 18 F.3d 899, 906 (11th Cir. 1994), Florida courts have relied on the reasoning in *Urie v. Thompson, 337 U.S. 163, 69S.Ct. 1018 (1949), holding in a variety of legal contexts that "the* statute of limitations begins to run when a person has been put on notice of his right to a cause of action" and "under Florida law, a party is held to have been put on notice when

he discovers, or reasonably should have discovered, facts alerting him of the existence of his cause of action." *Jones*, 18 F.3d at 906. When a Plaintiff should have discovered the cause of action is a question of fact for a jury. *Jones*, 18 F.3d at 907 (11th Cir. 1994) ("Whether the plaintiff discovered, or by due diligence should have discovered the existence of the cause of action . . . was a question of fact . . . and it has been held that genuine issues relating to such question of fact are to be determined by the trier of fact").

Even so, the limitations period for a *§ 1983* claim arising from the death of an adult who is not disabled is four years. *See Chappell*, 340 F.3d at 1283. Under *Chappell*, the limitations period for a § 1983 claim arising in Florida is four years, even when the claim arises from a death. A § 1983 claim "will not accrue, and thereby set the limitations clock running, until the plaintiffs know or should know (1) that they have suffered the injury that forms the basis of their complaint and (2) who has inflicted the injury." *Chappell*, 340 F.3d at 1283 (citing *Mullinax v. McElhenny*, 817 F.2d 711, 716 (11th Cir. 1987)).

The first date Cimillo knew or should have known about the suspicious nature of Aparo's death was on August 30, 2014, when she read a Miami Herald article concerning individuals who filed a federal lawsuit against DOC and others alleging a cover-up of the death of Randall Jordan-Aparo. See **Exhibits 76 and 77**. Prior to this date, Plaintiff was only told that Aparo died of an infection, which she was told

was not uncommon in prison. *See* **Exhibit 78**; *see also* **Exhibit 79**. Notification of

death as a result of an infection, in and of itself, cannot put a reasonable person on

notice of their rights as it relates to Aparo's death. Further, immediately after sending

the August 30, 2014, email, Plaintiffs retained undersigned counsel, who in turn sent

a preservation letter to DOC, a 768 letter to DOC, and a request for Aparo's medical

records. Those medical records were provided on September 25, 2014. *See* **Exhibit**

**80**. DOC did not fully disclose the nature of Aparo's death or even mention the

investigation into his death to Cimillo, and possibly intentionally misled her so that

she could never find out the truth. There is no shortage of witness testimony in this

case supporting the argument that DOC and its staff attempted to cover up the

circumstances of Aparo's death, impeded the investigation and reopening of the

investigation, and intimidated witnesses to alter their story to better benefit DOC and

its staff.

On August 30, 2014, there was an open DOC, FDLE, and FBI investigation

into the cause of death of Aparo. See emails from DOC discussing open

investigation. *See* **Exhibit 81**. Plaintiffs were unable to obtain anything other than

Aparo's medical records (partial copy as some were misplaced and lost) as of

September 25, 2014, which DOC was unable to produce prior to September 19,

2014. While the investigation into the death of Aparo had previously been closed in

approximately 2012, it is immaterial to this inquiry as Cimillo did not know, nor

should she have known, in 2012, that a cause of action may lie in connection with the death of Aparo, or that an injury inflicted by another had occurred and who inflicted the injury. See *Chappell*, 340 F.3d at 1283 (citing *Mullinax v. McElhenny*, 817 F.2d 711, 716 (11th Cir. 1987)). Cimillo could not receive any of that information until after the investigation was closed, which, occurred approximately in November of 2016. Moreover, Cimillo did not communicate with Tom Aparo, decedent Aparo's listed next of kin, except for exchanging holiday or birthday cards sent from Tom Aparo to the minor child.

A death in a prison, in and of itself, is simply not enough to put an inmate's representatives or family on notice of potential claims, including *Section 1983* claims. If this were not the case, the converse would mean that every death in a prison would be presumed to be the result of nefarious, unlawful, and possibly criminal conduct by DOC employees, until proven otherwise, which is simply not always the case.

### C. Application of Florida's delayed discovery doctrine, the principle of equitable tolling, and the principle of equitable estoppel demonstrates that Plaintiffs' claims should be considered timely.

Even if Plaintiffs' claims are not governed by Florida Statutes 95.11(10), and even if Plaintiffs' claim began accruing on September 19, 2010, the principles of the delayed discovery doctrine, equitable tolling, and equitable estoppel apply to toll the statute of limitations, resulting in Plaintiffs' claims being filed timely in this action.

Plaintiff incorporates her arguments made in the preceding section by reference. Plaintiffs have shown that two of the worst violators of Aparo's civil rights, Rollin Austin and Kevin "Big Jit" Hampton, were fired by DOC on September 19, 2014, the four year anniversary of Aparo's death. *See* **Exhibits 72, 73 and 74**.

Further, DOC engaged in a systematic retaliation scheme to punish the individual whistleblowers who disclosed that Aparo's death had been covered up in the first investigation, including a cover-up by the Security Defendants, and that even in 2013, through the reopening of the Aparo death investigation, the DOC IG Jeffrey Beasley was **still** trying to intimidate Aubrey Land, John Ulm, Doug Glisson, and others, into letting the Aparo investigation remain closed.  *See* **Exhibit 88**. This is especially important as numerous documents which describe how Aparo died, the statements he made, that evidence did not exist prior to the filing of this action, and in some instances, were recorded after the filing of this action. For example, Juan Thomas, an inmate sharing a wall with Aparo's cell, provided damning testimony against DOC and the Security Defendants, but was never interviewed by FDLE or DOC in the death investigation. *See also supra* and **Exhibit 89.**

Additionally, when Plaintiffs started requesting records in writing and via telephone through undersigned counsel, they could not receive any as the FBI and Department of Justice had an open criminal investigation into Aparo's death. See

**Exhibits 90 and 95**. This investigation began in 2013, well before Plaintiff first became aware that there may be a cause of action against the Security Defendants, as well as DOC. Plaintiffs named multiple Defendants that Plaintiffs ultimately dismissed because prior to discovery in this case because they were unable to obtain the necessary information to determine if a cause of action lied against those individuals.[10]

Lastly, it's disingenuous for DOC to argue that Plaintiff Cimillo should have done more after being told that Aparo died of an infection, something common at DOC. In other words, Aparo made the mistake of trusting DOC with his care, and now Cimillo made the mistake of trusting DOC that it would tell the truth and the whole truth about Aparo's death, including that there was a criminal investigation. There has been no evidence to suggest that DOC told Plaintiff that Aparo begged for his life, was gassed to death for requesting accommodations, complained about his disability and the symptoms associated with it, and was denied accommodations, including going to the hospital. Even DOC concedes that the accrual date of the cause of action can come after the date of injury. *See ECF Doc. 180, p. 42*. Cimillo stated that she called Defendant DOC, and an individual at DOC told her his death was not suspicious. *See* **Exhibits 78 and 91**. As Cimillo was not aware of the cause

---

[10] While a cause of action may have existed against those individuals, they were dismissed based on the evidence procured from DOC once the investigation into Aparo's death was closed.

of action until August 30, 2014, and DOC is not prejudiced by this claim, Plaintiff should be allowed to proceed under this doctrine. *Rowland v. Conyers*, 2013 LEXIS 26356, No. 4:10cv64 (N.D. Fla. Feb. 26, 2013).

Cimillo has certainly raised material disputed facts as to when she knew or should have known prior to August 30, 2014, that a cause of action may exist against certain individuals, and who those individuals were, including the Security Defendants.

### D. The Middle District of Florida case cited by the Security Defendants is neither binding on this Court, and is still subject to a Motion for Reconsideration.

*Walton v. Fla. Dep't of Corr.*, 2018 U.S. Dist. Lexis 45339 (M.D. Fla. March 20, 2018), is a supplemental case cited in support of its argument that Plaintiffs' claim is barred by the statute of limitations. *See* ECF Doc. 174 at p.27. First, the Middle District's reliance on two Eleventh Circuit cases is misplaced and the analysis is inapplicable. For example, in *Baker v. City of Hollywood*, 391 F. App'x 819 (11th Cir. 2010), "it was apparent from the face of the complaint that the plaintiff knew of the facts underlying his claims." *Id*. at 821. The plaintiff inmate was allegedly beaten at a holding facility, did not die, and did not file his claim until five years after the alleged beating. Here, unlike the plaintiff in *Baker*, Aparo did not have the luxury of being able to identify the offending medical staff and correctional guards because Aparo was incoherent and in the throes of death from September 15-

19th, the day Aparo died, which is understandable when reviewing the full handheld video. As can be seen from the handheld video, ECF Doc. 180-10, Aparo appears almost lifeless, approximately ninety minutes from death, as the blood pressure monitor fails to obtain a blood pressure on Aparo two times. *See Id*. Aparo is whimpering, soaked in chemical spray, cannot walk, and states that he is in horrible pain, and that he had been that way for three days. Riley stated in her deposition that she could not get a blood pressure because Aparo was moving too much. *See* **Exhibit 64**, Riley Dep. 20:3-12.

However, in watching the handheld video of her examination of Aparo, her statement that he is moving too much is obviously false. This examination occurred at approximately 12:41pm on September 19th, approximately ninety minutes from the time that inmates in the dorm, including those sharing a wall with Aparo's cell, state that he died. *See* **Exhibit 11**, Martin Dep. 22:6-17; **Exhibit 12**, Middleton Dep. 45:24-47:11; **Exhibit 13**, Porter Dep. 13:7-14:22; **Exhibit 14**, Stripling Dep. 20:2-16; **Exhibit 15**, Thomas Dep. 30:12-31:15; 130:6-18. See also **Exhibits 47, 48, and 49.** Further, Kern and Flanagan both agree that based on the condition of Aparo's body when he was "found" dead by DOC employees, he had died closer to 2:00 or 3:00 p.m. than 6:00 p.m., suggesting that any testimony or documentary evidence suggesting he was alive after 2:00 or 3:00 p.m., is simply false. Assuming *arguendo* that Aparo was aware of who was violating his civil rights, Aparo had been declaring

medical emergencies all day, stating that he was dying, begging for help, and begging to go to the hospital. It would be incredibly disingenuous to assert that Aparo knew who violated his rights, how they caused his injuries, and that he could have done anything about it, i.e., started the grievance process or any other act towards making a complaint.

Lastly, to say that Aparo, in the last hours of his life, which includes deliberately indifferent acts and conduct by Riley, Franklin, Greene, and several of the Security Defendants, should have known that these individuals engaged in deliberately indifferent conduct even more disingenuous considering the expert's in this case dispute whether there was any deliberately indifferent conduct anyways, let alone a violation of the ADA or his Eighth Amendment rights protecting him from cruel and unusual punishment. DOC has failed to come even relatively close of showing factually that there is no dispute that DOC and its employee's conduct did not rise to the level of deliberate indifference. However, Aparo begged for medical attention, begged to go to the hospital, and also mentioned his "blood" to the officers and staff on the 19th. *See supra*. There is no evidence in the record that Aparo knew or should have known that his ADA and RA rights, or his Eighth Amendment rights were violated on September 19, 2010, hours and minutes before his death. The handheld video shows a man who is struggling to live, focused on that sole mission and determination.

In closing, as to when the statute of limitations began to accrue, and on what date the cause of action could no longer be brought, if such a date did exist, that inquiry, based on this record, is a question of fact, and must be submitted to the jury.

## VI.   PLAINTIFFS RESPONSE TO MOTION FOR SUMMARY JUDGMENT AS TO ASSERTING DAMAGES

The Security Defendants argue that *Sharbaugh v. Beaudry*, 267 F. Supp. 3d 1326 (N.D. Fla. Jul 14, 2017) applies to all damages sought by the Plaintiff. Judge Casey Rogers, in an exhausted opinion[11], citing *Capone v. Philip Morris United States*, 116 So. 3d 363 (Fla. 2013) stated that the Florida Supreme Court has explained that there is a transfer of pain and suffering from the decedent to his survivor under Florida's Wrongful Death Act, Fla. Stat. 768.21 (FWDA) in the event that the 1983 Claim is deemed to have caused the plaintiffs death.  Judge Rogers ruling on that point merely codifies long standing 11th Circuit Law that in the event of a 1983 death claim the damages of the decedent are determined by the FWDA. FWDA does not contemplate or address that pre-death survivor claims be governed by FWDA.  However, Judge Rogers is incorrect when she stated that:

> "As discussed above, before the enactment of the FWDA in 1972, Florida's general survival statute applied in full when a personal injury resulted in death, like Georgia's. If that were still the case today, Gilmere would be binding in this instance, and the Court would apply federal common law to compensate for Martin's pre-death pain and suffering. But as the law currently stands the Court's analysis is constrained by the Florida

---

[11] Although the Plaintiff counsel believes the case is incorrectly decided.

> Legislature's determination that **personal injury**[12] claims do not survive when death results except to the extent economic damages are expressly provided for in the state's wrongful death statute." (Emphasis added) *Sharbaugh* at 1340.

Judge Rogers wanted to be clear that she believed that the Florida Wrongful Death Statute did not include pre-death claims as set for in footnote 21 of the *Sharbaugh* opinion.

> "The precise question in Sharbaugh's case- determining the proper measure of damages where the state law does not allow survival of the decedent's cause of action for pre-death pain and suffering when the wrongdoing causes death-was not contemplated, and in any event, the note is *dicta."*

Footnote 21 in *Sharbaugh* seems to overlook Fla. Stat. 46.021. *See Lohr v. Byrd,* 522 So. 2d 845 (Fla. 1988). If footnote 21 of *Sharbaugh* means what it says and says what it means, and does away with pre-death claims, that is a big change in the law.

Plaintiff asserts that if *Sharbaugh* is followed, then there is a gaping hole in a plaintiffs' ability to claim damages for a survival claim. If that's the case, there is a "gap to fill". It would seem that *Gilmere v. Atlanta* 864 Fed. 2d 734 (11th Cir. 1989) would fill the gap as to any pre-death claim. *See also, Torres v. Orange Cty.*, 2000 U.S. Dist. LEXIS 22854 (M.D. Fla. May 16, 2000), *Wright v. Sheppard*,

---

[12] Death?  Pre-death?

919 F.2d 665 (11th Cir. 1990), *ATM Express, Inc. v. Montgomery*, 516 F. Supp. 2d 1242 (M.D. Ala. 2007).

## CERTIFICATE OF COMPLIANCE

Plaintiff has exceeded the word limit permitted by Rule 7.l(F) of the N.D. Fla. Loc. R. Plaintiff has sought relief via a Motion to Exceed Word Limit, which is unopposed by Defendant DOC.  I certify that this memorandum contains 13,076 words, as counted by Microsoft Word, excluding the items that may be excluded under Rule 7.1(F), the font used in this motion is Times New Roman 14-point font.

Respectfully submitted,

The Law Offices of
STEVEN R. ANDREWS, P.A.
822 Monroe Street
Tallahassee, Florida 32303
T:  (850) 681-6416 / F: (850) 681-6984

*/s/ Ryan J. Andrews*
STEVEN R. ANDREWS (FBN 0263680)
BRIAN O. FINNERTY (FBN 0094647)
bfinnerty@andrewslawoffice.com
RYAN J. ANDREWS (FBN 0104703)
ryan@andrewslawoffice.com
service@andrewslawoffice.com
*Attorney for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

served by electronic transmission this 24th day of July, 2018, to:

W. Peter Martin, Esq.
Dennis, Jackson, Martin & Fontela, P.A.
1591 Summit Lake Drive, Suite 200
Tallahassee, Florida  32317
peter@djmf-law.com
jmauer@djmf-law.com
jennifer@djmf-law.com
*Atty for FDOC*

Jeffrey S. Howell, Esq.
Phipps & Howell
201 South Monroe Street, 4th Floor (32301)
Post Office Box 1351
Tallahassee, Florida  32302
jeff@phipps-howell.com
Margaret@phipps-howell.com
*Atty for Jones a/k/a Franklin, Riley & Greene*

Brian C. Keri, Esq.
The Law Offices of Brian C. Keri, PA
3375-H Capital Circle NW, Suite 4
Tallahassee FL 32308
brianckeri@earthlink.net
michellemsmith@earthlink.net
*Atty for Austin, Brown, Burch, Gillikin, Hamm, Hampton, Martina & Spangler*

/s/ ***Ryan J. Andrews***
RYAN J. ANDREWS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AMANDA CIMILLO, as
Personal Representative of the
Estate of RANDALL JORDAN-APARO,
Deceased and MINOR CHILD APARO
The Natural Child of Randall Jordan-Aparo
By and Through Her Mother and Natural Guardian
Amanda Cimillo,

   Plaintiffs,

vs.         CASE NO. 4:16-cv-00584-RH-CAS

ROLLIN AUSTIN, et al.,

   Defendants.

_____/

**EXHIBITS TO PLAINTIFFS' RESPONSE TO SECURITY DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT[1]**

| No. | Document |
|---|---|
| 1. | DOC Photo Identification Card (DOC Bates 1479, 1478, 1477 and 1476) |
| 2. | Partial Judgment and Arrest Affidavit for Grand Theft which lead to 2007 Incarceration with DOC (DOC Bates 1485, 1486, 1500) |
| 3. | Partial Judgments and Arrest Affidavits which lead to 2009 Incarceration with DOC (DOC Bates 1606, 1613, 1594, 1600, 1566, 1568, 1572, 1580, 1587, 1538, 1545, 1525, 1531, 1620, 1630) |
| 4. | DOC Internal Movement (DOC Bates 3869-3874) |
| 5. | DOC Medical Records (DOC Bates 00001-00216) |
| 6. | Omitted |
| 7. | Omitted |
| 8. | Medical Examiner's Report (DOC Bates 1124-1130) |
| 9. | Omitted |
| 10. | Deposition Transcript of Erskine Curry with Exhibits taken on May 7, 2018 |
| 11. | Deposition Transcript of Richard Martin with Exhibits taken on May 1, 2018 |
| 12. | Deposition Transcript of Craig Middleton with Exhibits taken on May 8, 2018 |
| 13. | Deposition Transcript of Earl Porter with Exhibits taken on April 9, 2018 |
| 14. | Deposition Transcript of Angelo Stripling with Exhibits taken on May 2, 2018 |
| 15. | Deposition Transcript of Juan Thomas with Exhibits taken on May 8, 2018 |

---

[1] Counsel for Plaintiff has omitted Exhibits referenced in the Response to DOC's Motion for Summary Judgment and not used in Response to the Security Defendants' Motion for Summary Judgment.

| 16. | Plaintiffs' Amended Rule 26(a)(2) Report of Donald C. Kern, MD dated May 31, 2018 |
| 17. | Affidavit of Donald C. Kern, MD |
| 18. | Omitted |
| 19. | Deposition Transcripts of Lucy Franklin with Exhibits taken April 12, 2018 (Vol. I and II) |
| 20. | Omitted |
| 21. | FDLE Investigative Report Serial 21 (DOC Bates 2141-2142) (Lynda Adair) |
| 22. | Omitted |
| 23. | Omitted |
| 24. | Omitted |
| 25. | Defendant Franklin's Responses to Plaintiffs' Third Requests for Admissions dated April 4, 2018 |
| 26. | Omitted |
| 27. | Omitted |
| 28. | Bureau of State Investigations Case Summary Case No.: 10-1-4683 (DOC Bates 2245, 2243) |
| 29. | MINS dated May 25, 2010 and MPD Report re Drug Drop (DOC Bates 27504 and MPD Recs) |
| 30. | Transfer from JCI (DOC Bates 3794-3797) |
| 31. | Deposition Transcript of Rita Hall with Exhibits taken in *Hickman v. DOC* on March 13, 2018 |
| 32. | DOC Office of Health Services, Technical Instruction No. 15.03.13 re Assignment of Health Classification Grades to Inmates |
| 33. | Omitted |
| 34. | Omitted |
| 35. | Omitted |
| 36. | FDLE Investigative Report Serial 22 (DOC Bates 2143-2145) (Harold Baker) |
| 37. | Interview Transcript of Dr. Hanz Hercule (First Interview, Part I, August 30, 2012) (DOC Bates 478-493) |
| 38. | FDLE Investigative Report Serial 34 (DOC Bates 2166-2167) (Dr. Nikorn Arunakul) |
| 39. | FDLE Investigative Report Serial 19 (DOC Bates 2137-2138) (Patricia Cicirello) |
| 40. | FDLE Investigative Report Serial 20 (DOC Bates 2139-2140) (Martha Greene) |
| 41. | FDLE Investigative Report Serial 17 (DOC Bates 2133-2134) (Mitchell Brown) |
| 42. | DOC Report of Investigation 10-1-8057 (DOC Bates 525-683) |
| 43. | Interview Transcript of Dr. Hanz Hercule (First Interview, Part II, August 30, 2012) (DOC Bates 494-517) |
| 44. | Interview Transcript of Dr. Hanz Hercule (Second Interview, Part I, September 25, 2012) (DOC Bates 1-9) |
| 45. | Sworn Statement of Erskine Curry |
| 46. | Sworn Statement of Kenneth Daniels |
| 47. | Sworn Statement of Richard Martin |
| 48. | Sworn Statement of Angelo Stripling |
| 49. | Sworn Statement of Juan Thomas |
| 50. | Sworn Statement of Samuel Wooden |
| 51. | Interview of Michael Houston (First Interview, Part I) |

| 52. | Deposition Transcript of Chad Gillikin with Exhibits taken on April 16, 2018 |
| 53. | FDLE Investigative Report Serial 46 (DOC Bates 2187-2188) (Jeffrey Highsmith) |
| 54. | Use of Force Report (DOC Bates 1390-1408) |
| 55. | FDLE Investigative Report Serial 44 (DOC Bates 2180-2183) (James Angel) |
| 56. | Dorm Layout (DOC Bates 1110, 1111) |
| 57. | FDLE Investigative Report Serial 3 (DOC Bates 2107-2108) (Chad Gillikin) |
| 58. | MINS Incident Report dated September 20, 2010 (DOC Bates 683) |
| 59. | Juan Thomas letter to his sister, Jacquillia Trigg, mailed on September 24, 2010 |
| 60. | Omitted |
| 61. | Deposition Transcript of Lisa Flannagan with Exhibits taken on February 9, 2018 |
| 62. | Interview of Michael Houston (Second Interview, Part I) |
| 63. | Photos of Aparo's Cell |
| 64. | Deposition Transcript of Ola Melissa Riley with Exhibits taken on October 20, 2017 |
| 65. | Omitted |
| 66. | Omitted |
| 67. | Omitted |
| 68. | FDLE Investigative Report Serial 2 (DOC Bates 2105-2106) |
| 69. | Omitted |
| 70. | Lucy Franklin's Written Reprimand (DOC Bates 1960-2022) |
| 71. | Martha Greene's Written Reprimand (DOC Bates 2023-2096) |
| 72. | DOC Letter to Rollin Austin dated September 19, 2014 re Permanent Status Career Service Extraordinary Dismissal (DOC Bates 8943-8944) |
| 73. | DOC Letter to Kevin Hampton dated September 19, 2014 re Permanent Status Career Service Extraordinary Dismissal (DOC Bates 7876-7877) |
| 74. | *Florida Prison Boss Fires 32 over Inmate Deaths* article dated September 19, 2014 |
| 75. | Deposition Excerpt of Gary Lloyd |
| 76. | Amanda Cimillo email to SRA dated August 30, 2014 |
| 77. | *After Florida inmate's lethal gassing, claims of cover-up* article dated August 30, 2014 |
| 78. | Affidavit of Amanda Cimillo |
| 79. | Death Certificate of Randall Jordan-Aparo |
| 80. | Peter Martin letter to SRA dated September 25, 2014, enclosing medical records |
| 81. | Flannagan Response to request for Autopsy – Still under investigation |
| 82. | Omitted |
| 83. | Omitted |
| 84. | Disciplinary Report and Report of Administrative Confinement dated August 18, 2010 (DOC Bates 1441-1452, 1907) |
| 85. | Omitted |
| 86. | Omitted |
| 87. | Review of Fixed Wing Video (DOC Bates 790-1008) |
| 88. | *Land, et al. v. DOC. et al.* Complaint, USDC Case No.: 4:14-cv-00347-WS-CAS |
| 89. | *Lloyd v. DOC* Complaint, USCD Case No.: 4:12-cv-367-RH-CAS |
| 90. | Inmate Mortality for FCI (DOC Bates 2255) |
| 91. | Plaintiffs' Responses to Defendant DOC Interrogatories dated October 16, 2017 |
| 92. | Omitted |
| 93. | Omitted |

| 94. | FDLE Investigative Report Serial 8 (DOC Bates 2117-2118) (George Foxworth) |
|---|---|
| 95. | SRA letter to Peter Martin dated January 25, 2015 |
| 96. | Plaintiffs' Amended Rule 26(a)(2) Report of William Anderson, MD dated October 3, 2017 |
| 97. | Plaintiffs' Rule 26(a)(2) Report of Ron McAndrew dated September 21, 2017 |
| 98. | Disciplinary Record Log (DOC Bates 1849) |
| 99. | Interview of Mitchell Brown (DOC Bates 684-700) |
| 100. | Case Briefing for Case No.: 13-7092 |
| 101. | *Austin v. DOC*, PERC Case No.: 14-30587, Decision and Award |
| 102. | DOC Letter to Austin dated June 18, 2015 re Reinstatement |
| 103. | Affidavit of Lisa Flannagan, M.D. dated August 2, 2012 (DOC Bates 582) |
| 104. | Omitted |
| 105. | Deposition Transcript of Rollin Austin taken April 18, 2018 (Vol. I & II) |
| 106. | FDLE Investigative Report Serial 13 (DOC Bates 2126-2127) (Rollin Austin) |