## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**AMANDA CIMILLO, et al.,**

**Plaintiff,**

**v.**                                             **CASE NO. 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN, et al.,**

**Defendants.**
_____/

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT
## OLA MELISSA RILEY'S MOTION FOR SUMMARY JUDGMENT

Defendant, OLA MELISSA RILEY, through undersigned counsel, files this

Reply Memorandum in Support of her Motion for Summary Judgment [Doc. 174]

and in Opposition to Plaintiff's Response to Defendant Ola Melissa Riley's Motion

for Summary Judgment [Doc. 192].

## INTRODUCTION

The sole concern of this Court should properly be whether Defendant, OLA

MELISSA RILEY (hereinafter "Nurse Riley"), was deliberately indifferent to

former inmate Randall Jordan-Aparo's (hereinafter "Jordan-Aparo") medical needs

sufficient to strip away her qualified immunity.  Plaintiff's allegations of

manslaughter and conspiracy are unconvincing, as is the newly-revealed theory of

death by citric acid.  Further, the Florida Department of Law Enforcement (FDLE),

the Federal Bureau of Investigation (FBI), and the United States Attorney's Office never pursued any criminal charges against Nurse Riley or any of the other defendants in this case.[1]   There are no genuine issues of material fact to support the notion that Nurse Riley was deliberately indifferent to Jordan-Aparo's medical needs; therefore, she is entitled to qualified immunity and this Court should dismiss Plaintiff's claims against her.

## NURSE RILEY DID NOT COMMIT MANSLAUGHTER

Plaintiff posits that Nurse Riley *could be* found guilty of manslaughter through culpable negligence under Section 782.07, Florida Statutes.   To prove manslaughter by culpable negligence, one must prove (1) the fact of the death and (2) a causative link between the death and the culpable negligence of the defendant. *Jefferies v. State*, 849 So.2d 401, 403 (Fla. 2d DCA 2003).   "Culpable negligence is a 'gross and flagrant' violation of a duty of care that causes injury, a course of conduct showing 'reckless disregard of human life,' 'such wantonness or recklessness' as to equal the intentional violation of the rights of others, or an 'entire want of care' raising 'the presumption of indifference to consequences.'" *Ramos v. State*, 89 So.3d 1119, 1121 (Fla. 1st DCA 2012) (quoting *Preston v. State*, 56 So.2d 543, 544 (Fla. 1952)).

---

[1] *See* Doc. 180-21; Doc, 180-16; and Doc. 180-27.

2

Plaintiff alleges that Nurse Riley exhibited culpable negligence by (1) failing to notify Dr. Choudhary after her inability to obtain Jordan-Aparo's blood pressure reading at 3:25 p.m. on September 19, 2010; (2) by failing to demand that a correctional officer remove Aparo from his cell; and (3) by failing to call 911.

Specifically, Plaintiff criticizes Nurse Riley because she did not contact Dr. Mohammed Choudhary after she was unsuccessful a third time in obtaining Jordan-Aparo's blood pressure reading.  However, she called Dr. Choudhary at once about not getting a blood pressure reading during the pose-use-of-force examination and gave him a report on Jordan-Aparo.[2]  After the second and third failed attempt to get a blood pressure reading, Nurse Riley called her supervisor, Director of Nursing Lynda Adair:

> Q:     …you did not inform Dr. [Choudhary] that you could not get a
>          blood pressure reading.
>
> A:     Yes I did.
>
> Q:     At 3:25pm?
>
> …
> A:     I called my supervisor.
>
> Q:     That was?
>
> A:     Ms. [Adair]
>
> …

---

[2] Doc. 201-9, Page 63, lines 7-23.

A: She [Lynda Adair] was informed that security came and got [Jordan-Aparo] out of the infirmary. She was informed that they were going to do the post use of force on him because he had been sick in the infirmary and I was saying I don't think he should be gassed because he was supposed to have gotten the IV fluids. She said if there's nothing documented on the chart that prevents him from being gassed, he could get gas.[3]

Nurse Riley demonstrated no culpable negligence when she contacted her immediate supervisor about Jordan-Aparo, rather than Dr. Choudhary, a physician on-call for the first time and located at Gulf Correctional Institution, approximately 70 miles away.[4]

Plaintiff also blames Nurse Riley for not demanding that Jordan-Aparo be removed from his cell so she could evaluate him, as well as for not calling 911. These assertions demonstrate that Plaintiff lacks even a basic understanding of how a correctional institution and its staff functions. As a licensed practical nurse, Nurse could not demand correctional officers remove Jordan-Aparo from his cell. Correctional officers are responsible for institution's safety and the safety of all staff, security, medical, and administrative. They do so by following specific security and procedures, including the policy that an inmate cannot be removed from his cell unless he is properly restrained. Thus, Nurse Riley's inability to properly evaluate

---

[3] Doc. 201-10: Bates 000724, line 18 – Bates 000726, line 19.
[4] Doc. 192-36 (Lynda Adair testified that Dr. Choudhary "was 'brand new' to DOC, and that this was his first time being on call").

Jordan-Aparo at 3:25 p.m. on September 19, 2010, resulted solely from Jordan-Aparo's refusal to cooperate with correctional and nursing staff.

Regarding her failure to call 911, Nurse Riley testified that she could not independently transfer Jordan-Aparo to the hospital.[5]  She also testified that she did not subjectively perceive any sort of medical emergency that required Jordan-Aparo's hospitalization:

> Q:     Okay. At that time you didn't think that he was sick enough to be sent to an outside hospital?
>
> A:     No.[6]

Finally, Plaintiff attempts to unearth a predicate for culpable negligence by referring to Nurse Riley's Risk Assessment completed on July 21, 2010, more than two (2) months before Jordan-Aparo's death.[7]  Regardless of what Nurse Riley knew about Jordan-Aparo's Osler-Weber-Rendu syndrome, it does not appear on the Risk Assessment form as a condition prohibiting the use of chemical restraint agents.[8] During Jordan-Aparo's periods of incarceration, several different nurses completed Risk Assessments and none of them ever indicated he could not be subjected to chemical agents.  Also, Advanced Registered Nurse Practitioner Patricia Lemon

---

[5] Doc. 174-17: Page 52, line 24 – Page 53, line 7.
[6] Doc. 201-10: Bates 000737, line 13-16.
[7] *See* Doc. 192-28.
[8] *Id.*

Watson triaged Jordan-Aparo several times and never instructed Nurse Riley, or any other nurse, that he could not be subjected to chemical agents.

Plaintiff inexplicably posits that "there is also evidence that Aparo's citric acid allergy may have caused anaphylaxis," implying that Nurse Riley should have independently researched the ingredients of pepper spray and cross-checked them with Jordan-Aparo's list of allergies prior to completing Jordan-Aparo's Risk Assessment on July 21, 2010.  Plaintiff's contentions are nonsensical.  Dr. Flannagan was never questioned about Jordan-Aparo's citric acid allergy[9] nor was it ever alleged that this allergy was causative in Jordan-Aparo's death until Plaintiff's Response was filed.  There is no evidence that Jordan-Aparo's citric acid allergy was a factor in his death and Nurse Riley cannot be held liable for indicating that this allergy prohibited Jordan-Aparo from being subjected to chemical restraint agents.

Nurse Riley was therefore not culpably negligent, she did not exhibit "reckless disregard of human life," nor did she intentionally violate Jordan-Aparo's Eighth Amendment rights.   No reasonable jury would find Nurse Riley guilty of manslaughter.

## THERE WAS NO CONSPIRACY

Plaintiff asserts that Nurse Riley participated in an on-going conspiracy to either cover up Jordan-Aparo's death or the alleged circumstances leading to his

---

[9] *See* Doc. 201-11.

death by falsifying medical records.   Plaintiff contends Nurse Riley's alleged falsification of medical records constitutes conduct clearly outside her scope of employment, thus making the intra-corporate conspiracy doctrine inapplicable. Plaintiff specifically attempts to proffer evidence of this alleged conspiracy by mischaracterizing or lying about the facts and Nurse Riley's testimony.

On September 18, 2010, at approximately 4:36 a.m., Jordan-Aparo was removed from the infirmary[10], although Dr. Nikron Arunakul had ordered him to remain there for a twenty-three (23) hour observation period.[11]   Plaintiff deliberately mischaracterizes Nurse Riley's testimony to imply to this Court that she was involved in a "cover up" of "the improper release of Aparo from the infirmary."

In her sworn statement taken on September 14, 2012, Nurse Riley testified:

Q:      …We believed that the nurse went ahead and released him.

A:      She didn't.

Q:      She did not. Okay. All right. That's something that I'll get other answers to, but when you heard that, did you think about letting anybody know?

A:      We called the doctor. I think there should have been a release. I thought I documented where I called the doctor because **I knew we couldn't have a release out of an infirmary to cover us.** I think I called the doctor that morning and told him what was going on, but told him it was a security issue. They came and got him, but I don't see the documentation in here.

---

[10] *See* Doc. 174-12.
[11] *See* Doc. 174-10.

Q:     Here's the deal, though. As far as this documentation on 9/18 at 4:36, Nurse [Franklin] makes an incidental entry. Inmate released to security –

A:     Per captain [Brown].[12]

Nurse Riley's testimony clearly reveals her concern that Jordan-Aparo had been removed from the infirmary without being discharged by a physician or a nurse. She stated that "I think there should have been a release" to "cover us," meaning there should have been a medical release both authorizing and documenting Jordan-Aparo's release from the infirmary.   Plaintiff mischaracterizes this testimony by suggesting that her statement "cover us" refers to a conspiracy to "cover up" the improper release.

The facts, however, show that sometime around 4:00 a.m. on September 18, 2010, Correctional Officer Sergeant Dave Wallace contacted Captain Mitchell Brown because Jordan-Aparo had become belligerent toward Nurse Lucy Franklin cursing her and making threats that he would sue her because she would not send him to the hospital.[13]   After counseling Jordan-Aparo in the infirmary, Captain Brown decided to transfer Jordan-Aparo to confinement.[14]   Based on her testimony, Nurse Riley did not authorize Jordan-Aparo's transfer to confinement, and in fact

---

[12] Doc. 201-10: Bates 000740, line 16 – Bates 000741, line 11 (emphasis added).

[13] Doc. 174-12.

[14] Doc. 192-29 ("Jordan-Aparo started arguing with LPN Franklin and Franklin summoned Capt. Brown to the infirmary. Capt. Brown said that Jordan-Aparo started cursing and yelling at him and was stating that nobody was trying to help him (Jordan-Aparo). Capt. Brown told Jordan-Aparo that if he did not calm down then he would be placed in the Confinement Dorm. Jordan-Aparo continued yelling and Capt. Brown made the decision to place him in the Confinement Dorm.") *See also* Doc. 179-2.

she disagreed with it. However, she understood "it was a security issue." [15] Nonetheless, Plaintiff would have the Court believe that Nurse Riley was aware of and complicit in a conspiracy to improperly remove Jordan-Aparo from the infirmary. These allegations are false.

Plaintiff also attempts to hold Nurse Riley liable for conspiracy based on her alleged falsification of medical records. Plaintiff contends that it is "likely" that Aparo was already deceased at either 3:15 or 3:25 p.m. based on the testimony of Medical Examiner Dr. Lisa M. Flannagan and the fixed wing video. This theory directly contradicts all the record and testimonial evidence produced during the course of this case.[16] Despite this plethora of incontrovertible evidence, Plaintiff alleges that any of Nurse Riley's charting made after 3:15/3:25 p.m. thus constitutes the falsification of medical records and is therefore proof of a conspiracy. Plaintiff's absurd contentions are a poor attempt to render the intra-corporate conspiracy doctrine inapplicable. Plaintiff cannot proffer a scintilla of evidence to prove Nurse Riley intentionally misrepresented or deliberately falsified the times of her entries in Jordan-Aparo's medical records on September 19, 2010. However, Nurse Riley

---

[15] Doc. 201-10: Bates 000740, line 16 – Bates 000741, line 11.

[16] Correctional Officer George Foxworth testified that he witnessed Jordan-Aparo give a "thumbs up" at approximately 5:30 p.m., *See* Doc. 174-19; Correctional Officer Sergeant Kevin Hampton testified that at approximately 4:30 p.m. Jordan-Aparo told him he was not going to eat supper, *See* Doc. 192-37; Nurse Riley testified that at 6:30 p.m. she was notified that Jordan-Aparo was unresponsive, *See* Doc. 174-16; Nurse Franklin testified that at 6:30 p.m. she was notified that Jordan-Aparo was unresponsive, *See* Doc. 175-18; Correctional Officer Sergeant Chad Gillikin testified that at 3:40/3:45 p.m. witnessed Jordan-Aparo breathing and he appeared normal, *See* Doc. 179-4; Correctional Officer Joshua Martina testified he observed Jordan-Aparo breathing normally and cursing at him at the end of his shift at 4:00 p.m., *See* Doc. 179-7; etc.

testifies in an affidavit to clearly explain any discrepancy between medical records.[17]

Nurse Riley testified that at some point after Jordan-Aparo was found dead, Lynda

Adair asked her to:

> record the events and my actions from the time Aparo was discovered
> dead in his cell until EMS pronounced him dead. I used a blank
> 'Chronological Record of Healthcare' sheet, DC4-701, and out of habit
> filled in across the top the known drug and other allergies for Aparo,
> and then made the chronological entries of my actions at 1820, 1830,
> 1840, and 1847 during September 19, 2010. … When Ms. Adair asked
> me to write these things, she did not tell me to create a 'medical record,'
> and when I wrote these entries I was not making them in Aparo's
> medical chart. I do not know what Ms. Adair did with this record after
> I gave it back to her, but I remember her making copies of numerous
> documents that evening which I believe she then provided to an
> Inspector with the FDC Office of the Inspector General.[18]

Nurse Riley's charting is consistent with the overwhelming evidence that

Jordan-Aparo was discovered dead in his cell around 6:30 p.m.  Any alleged "late"

or "improper" entries completed by Nurse Riley were created for the purpose of

documenting what had taken place the date of Jordan-Aparo's death.  Thus, Plaintiff

cannot prove that Nurse Riley intentionally falsified medical records or participated

in any sort of conspiracy.

## **NURSE RILEY WAS NOT DELIBERATELY INDIFFERENT**

Nurse Riley was not deliberately indifferent to Jordan-Aparo's medical needs.

Plaintiff's Response lists a litany of alleged decisions and omissions by Nurse Riley

---

[17] *See* Doc. 174-25.
[18] *Id.*

that, at most, might be considered to be simple negligence.  Thus, Plaintiff's shotgun approach misses the crucial legal point.   To prove that she was deliberately indifferent, Plaintiff must show that Nurse Riley had (1) subjective knowledge of a risk of serious harm; (2) she disregarded that risk; and (3) exhibited conduct that is **more than gross negligence**. *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326-27 (11th Cir. 2007) (emphasis added).

Plaintiff first posits that Nurse Riley allowed Jordan-Aparo to be returned to a barely cleaned and decontaminated cell.  Such a contention again demonstrates Plaintiff's complete failure to grasp the well documented and readily accessible information regarding the specific staff functions in a correctional institution.  Nurse Riley had no authority whatsoever to decide where in confinement Jordan-Aparo would be housed.  That decision belongs solely to security staff.  Further, Plaintiff admits that Jordan-Aparo's cell in confinement was cleaned by inmate orderlies for at least twenty (20) minutes.[19]  Although Nurse Riley had been told that Jordan-Aparo's cell was cleaned out; Plaintiff would nevertheless have this Court believe she was deliberately indifferent because she failed to check the orderlies' work herself, or failed to assign him another cell.  As Nurse Riley testified, none of that was her responsibility:

Q:     Did you see whether or not there was a spray of orange --

---

[19] *See* Doc. 180-9 at 12:12 p.m. to 12:33 p.m.

A:     I --

Q:     -- over it?

A:     I don't recall any --

Q:     Okay.

A:     I mean…

Q:     What's your duty or what's the policy after the use of force, like, say pepper spray or CS gas occurs -- how often do you have to go back and check on him.

A:     I do the post-use-of-force physical. That's it.

…

Q:     And is it routine for nurses to go back and check even after that?

A:     No.[20]

Plaintiff then asserts that Nurse Riley engaged in deliberate indifference by failing to notify either an ARNP or physician that she tried and failed to take Jordan-Aparo's blood pressure because he adamantly refused to cooperate, as the record evidence clearly shows.

For example, at approximately 1:15 p.m., Nurse Riley could not obtain Jordan-Aparo's blood pressure during the post-use-of-force evaluation because he

---

[20] *See* Doc. 201-9, Page 18, lines 4-21.

12

was damp, cold and shaking from his decontamination shower.[21]   She then

telephoned the on-call physician Dr. Choudhary:

> Q:     So, it looks to me like, by your charting, Exhibit 19, you would have
>
>        spoken to Choudhary at 2:00 [p.m.], right?
>
> A:     Yes.[22]

After conferring with Dr. Choudhary, Nurse Riley returned to Jordan-Aparo's

confinement cell at approximately 2:00 p.m. in a second attempt to take his blood

pressure:

> Q:     Okay. And then is it fair to say, 45 minutes later, at 14:00 [2:00
>        p.m.], you, Nurse Riley, have made another entry, correct?
>
> A:     Correct.
>
> Q:     And can you read for the record what your handwriting says?
>
> A:     Incidental entry: Dr. Choudhary notified by tele - -- I guess is
>        spelled telephone -- with report given from 9/17/10, 22:15 until
>        present. I guess it was -- I was charting from – reported return to
>        cell door and confinement to assess and retake blood pressure.
>        Inmate stood up and fell to the floor. Unable to assess due to
>        refusing to cuff up for security. Dr. Choudhary stated if any
>        outbursts or continued behavior, may place on SHOS until seen
>        by medical provider in the morning -- a.m.[23]

Nurse Riley was unable to take Jordan-Aparo's blood pressure at 2:00 p.m.

because he was being uncooperative and refused to cuff up so security could remove

---

[21] *See* Doc. 174-16. *See also* Doc. 174-17, Page 75, line 17 – Page 76, line 5.
[22] Doc. 201-9, Page 32, lines 4-7. *See also* Doc. 174-14.
[23] Doc. 201-9, Page 63, lines 1-17.

him from his cell so Nurse Riley could manually take his blood pressure and evaluate him.[24]

Plaintiff then alleges Nurse Riley "intentionally delayed taking his [Jordan-Aparo's] blood pressure a third time." This is a blatant lie. The record evidence reveals that from 2:00 p.m. to 3:25 p.m., Nurse Riley had to treat other inmates who had requested medical assistance.

> Q:    . . . All right, so between 2:00 [p.m.] and 3:25 [p.m.] did you ever attempt to retake - [Jordan-Aparo's blood pressure]
>
> A:    No. We worked on call out.[25]

At 3:25 p.m., Nurse Riley once again returned to Jordan-Aparo's cell to take his blood pressure.[26] Jordan-Aparo refused to be evaluated or treated by Nurse Riley. As required, she completed a Refusal of Health Care Services form witnessed by Officers Joshua Martina and Chad Gillikin.[27] After this encounter, Nurse Riley called her supervisor, Lynda Adair.[28] Thus, Plaintiff's assertion that "Riley engaged in deliberate indifference by failing to notify either an ARNP or physician," is not just a mischaracterization of the record evicende but a lie. Nurse Riley communicated with both the on-call physician Dr. Choudhary and her direct supervisor Lynda Adair. On the other hand, here as in virtually every other

---

[24] See Doc. 174-17, Page 28, lines 13-17.
[25] Doc. 201-10: Bates 00074, lines 5-8.
[26] See Doc. 174-14.
[27] See Doc. 174-18.
[28] See discussion supra, Nurse Riley Did Not Commit Manslaughter Section (Nurse Riley testifies that she called her supervisor Lynda Adair after her encounter with Jordan-Aparo at 3:25 p.m.).

allegation in the Response, Plaintiff provides absolutely no evidence of any kind in support of these allegations.

Additionally, Plaintiff asserts that Nurse Riley was deliberately indifferent because she did not conduct a Respiratory Assessment, a Chest Pain Assessment, or a Skin Protocol. Nurse Riley performed a mandatory post-use-of-force evaluation and, in accordance to written policy, documented her findings on the DC4-701C form[29], noted Jordan-Aparo's symptoms in the pose-use-of-force assessment[30] and charted that he would be seen by a medical provider the next day for evaluation.[31] No credible evidence exists, and no procedures required that Nurse Riley conduct a Respiratory Assessment, a Chest Pain Assessment, or a Skin Protocol under these circumstances.

Plaintiff asserts Nurse Riley was deliberately indifferent because she did not call 911 or obtain immediate outside medical treatment for Jordan-Aparo. However, Nurse Riley has consistently testified that she did not subjectively perceive Jordan-Aparo's stated medical condition as an emergency. Thus, Plaintiff's inquiry into whether Nurse Riley was deliberately indifferent does not focus on serious medical needs that she should have perceived but did not, Nurse Riley must have **actually perceived a serious medical need and then disregarded that need**. *See Presley v.*

---

[29] *See* Doc. 192-85, Page 9, subsection 5.
[30] *See* Doc. 174-15.
[31] *See* Doc. 174-14. *See also* Doc. 174-17, Page 64, line 25 – Page 65, line 14.

*City of Blackshear*, 650 F.Supp.2d 1307, 1315 (S.D.Ga. 2008), aff'd , 340 Fed.Appx. 567 (11th Cir. 2009) (emphasis added).

> In her sworn statement on September 14, 2012, Nurse Riley testified:
>
> A:      . . . I knew he was sick, but I didn't know how severe he was sick. I just wanted a clinician to see him and that's normally what we did.
>
> Q:      Okay. At that time you didn't think that he was sick enough to be sent to an outside hospital?
>
> A:      No.[32]
>
> In her deposition on October 20, 2017, Nurse Riley testified similarly:
>
> Q:      The fact that you were unable to get a blood pressure reading -- did that mean he had no blood pressure?
>
> A:      … I wasn't concerned that he -- I never thought he -- his health was in danger at the time of not being able to get the blood pressure [reading].[33]

"Medical treatment violates the Constitution only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Nam Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)).   Jordan-Aparo's symptoms were not "so obvious that even a lay person would easily recognize the necessity for a doctor's attention," *Goebert*, 510 F.3d at

---

[32] Doc. 201-10, Bates 000737, line 9-16.
[33] Doc. 201-9, Page 75, line 17 – Page 76, line 5.

1326, and his treatment was confounded by a previously reported back injury and his refusal to cooperate. Nurse Riley did not perceive the situation as a medical emergency and therefore could not have disregarded Jordan-Aparo's medical needs.

Plaintiff cannot prove that Nurse Riley's alleged deliberate indifference on September 19, 2010, was the ultimate cause of Jordan-Aparo's death. Dr. Flannagan testified that Jordan-Aparo's death was not caused by his Osler-Weber-Rendu syndrome, by any physical trauma to his body, or from exposure to chemical agents, based on the absence of any chemical agents on his lips or tongue, in his throat, larynx, esophagus or trachea.[34] Jordan-Aparo had developed fatal bacterial abscesses in his heart and lungs prior to September 19, 2010, and even if Nurse Riley had called 911 or obtained the requisite order from a doctor to transfer him to a hospital after he first encounter with him on September 19, 2010, at 1:15 p.m., such actions might have extended his life for a few hours or days only.[35]

Plaintiff has not and cannot demonstrate or prove that Nurse Riley was deliberately indifferent to Jordan-Aparo's alleged serious medical needs. Plaintiff has also failed to prove through any valid or certifiable evidence, whether documentary or through sworn testimony, that Nurse Riley either committed manslaughter or participated in any sort of conspiracy. Plaintiff has therefore failed

---

[34] *See* Doc. 201-11, Page 59, line 20 – Page 60, line 12.
[35] *See* Doc. 201-11, Page 82, line 11 – Page 83, line 4.

to meet her burden of stripping away Nurse Riley's qualified immunity.  Nurse Riley remains entitled to qualified immunity, and Plaintiff's claims against her should be dismissed.

## <u>CONCLUSION</u>

Plaintiff has failed to show any genuine issues of material facts.  Therefore, this Court should grant Defendant Ola Melissa Riley's Motion for Summary Judgment.

Respectfully submitted this 27th day of July, 2018.

/s/ ***Jeffrey S. Howell***
JEFFREY S. HOWELL
Florida Bar No. 0793840
Phipps & Howell
Post Office Box 1351
Tallahassee Florida 32302-1351
(850) 222-7000
jeff@phipps-howell.com
Attorney for Defendants
*JONES, RILEY* and *GREENE*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

Undersigned counsel for Defendant OLA MELISSA RILEY hereby certifies that this motion and incorporated memorandum of law contains 3,899 words, excluding the case style, signature block, and certificate of service, in compliance with N.D. Fla. Loc. R. 7.1(F). The foregoing word count has been calculated utilizing Microsoft Word, the word processing software used to prepare this motion and incorporated memorandum of law.

/s/ *Jeffrey S. Howell*　　　　　　
JEFFREY S. HOWELL

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

served by electronic transmission this 27th day of July, 2018, to:

| | |
|---|---|
| W. Peter Martin, Esq.<br>Dennis, Jackson, Martin & Fontela, PA<br>1591 Summit Lake Drive, Suite 200<br>Tallahassee, Florida 32317<br>peter@djmf-law.com<br>jmauer@djmf-law.com<br>jennifer@djmf-law.com<br>*Counsel for FDOC & Andrews* | Brian C. Keri, Esq.<br>The Law Offices of Brian C. Keri, PA<br>3375-H Capital Circle NW, Suite 4<br>Tallahassee, Florida 32308<br>brianckeri@earthlink.net<br>michellemsmith@earthlink.net<br>*Counsel for Austin, Brown, Burch*<br>*Gillikin, Hamm, Hampton, Martina*<br>*and Spangler* |

Steven R. Andrews, Esq.
Ryan Andrews, Esq.
Brian O. Finnerty, Esq.
The Law Offices of Steven R. Andrews, PA
822 North Monroe Street
Tallahassee, FL 32303
service@andrewslawoffice.com
steve@andewslawoffice.com
ryan@andrewslawoffice.com
bfinnerty@andrewslawoffice.com
*Counsel for Plaintiffs*

/s/ ***Jeffrey S. Howell***
JEFFREY S. HOWELL