## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**AMANDA CIMILLO, et al.,**

    **Plaintiff,**

**v.**               **CASE NO. 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN, et al.,**

    **Defendants.**

_____/

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT MARTHA GREENE'S MOTION FOR SUMMARY JUDGMENT

Defendant, MARTHA GREENE, through undersigned counsel, files this Reply Memorandum in Support of her Motion for Summary Judgment [Doc. 176] and in Opposition to Plaintiff's Response to Defendant Martha Greene's Motion for Summary Judgment [Doc. 195].

## INTRODUCTION

The sole concern of this Court should properly be whether Defendant, MARTHA GREENE (hereinafter "Nurse Greene"), was deliberately indifferent to former inmate Randall Jordan-Aparo's (hereinafter "Jordan-Aparo") medical needs sufficient to strip away her qualified immunity. Plaintiff's allegations of manslaughter and conspiracy are unconvincing, as is the newly-revealed theory of death by citric acid. Further, the Florida Department of Law Enforcement (FDLE),

1

the Federal Bureau of Investigation (FBI), and the United States Attorney's Office never pursued any criminal charges against Nurse Greene or any of the other defendants in this case.[1]  There are no genuine issues of material fact to support the notion that Nurse Greene was deliberately indifferent to Jordan-Aparo's medical needs; therefore, she is entitled to qualified immunity and this Court should dismiss Plaintiff's claims against her.

**NURSE GREENE DID NOT COMMIT MANSLAUGHTER**

Plaintiff posits that Nurse Greene *could be* found guilty of manslaughter via culpable negligence under Section 782.07, Florida Statutes.  To prove manslaughter by culpable negligence, one must prove (1) the fact of the death, and (2) a causative link between the death and the defendant's culpable negligence. *Jefferies v. State*, 849 So.2d 401, 403 (Fla. 2d DCA 2003).  "Culpable negligence is a 'gross and flagrant' violation of a duty of care that causes injury, a course of conduct showing 'reckless disregard of human life,' 'such wantonness or recklessness' as to equal the intentional violation of the rights of others, or an 'entire want of care' raising 'the presumption of indifference to consequences.'" *Ramos v. State*, 89 So.3d 1119, 1121 (Fla. 1st DCA 2012) (quoting *Preston v. State*, 56 So.2d 543, 544 (Fla. 1952)).

Plaintiff alleges that Nurse Greene exhibited culpable negligence by (1) failing to call the doctor when she could not insert an IV catheter into Jordan-Aparo's

---

[1] *See* Doc. 180-21; Doc, 180-16; and Doc. 180-27.

arm; and (2) failing to provide Jordan-Aparo the care, supervision, and services that a prudent person would consider essential for the well-being of a "disabled" adult.

On September 18, 2010, at approximately 12:10 a.m., Jordan-Aparo presented to Nurse Greene in the medical unit, complaining he could not breathe or sleep.[2] Nurse Greene assessed his complaints using specific departmental printed protocols, took his vital signs, and then telephoned Dr. Nikron Arunakul with the results.[3]  Dr. Arunakul ordered her to insert an IV catheter containing lactated ringers and keep Jordan-Aparo in the infirmary for a twenty-three (23) hour observation period.[4] Nurse Greene testified:

> I made two attempts to administer the IV catheter containing lactated ringers but was unsuccessful because inmate Randall Jordan-Aparo refused to cooperate, continually moving so I could not insert the IV catheter.[5]

Nurse Greene further testified in her deposition:

> Q:   Do you have - - as you sit here today, do you recall in what ways he was being uncooperative so that you could not place the IV or keep it in there, the needle?
>
> A:   He was agitated and moving. Even with the officer standing there, he was uncooperative. Even the presence of the security person there, he was still - - he was not cooperating in a way that would allow me to complete the process.
>
> Q:   Well, the word not - - the phrase, not cooperating, suggests to me that his movements - -

---

[2] *See* Doc. 174-7.
[3] *Id.*
[4] *See* Doc. 174-8; *See also* Doc. 174-9.
[5] *See* Doc. 174-8.

Q:      - - were purposeful?

A:      Correct, sir.

Q:      Did you believe that he was intentionally trying to prevent you from being able to give him that IV?

A:      That was my thought at the time, yes sir. … [6]

Jordan-Aparo was still in the infirmary when Nurse Greene's shift ended at approximately 3:00 a.m., and she left the institution.[7]  Plaintiff claims that Nurse Greene would be guilty of manslaughter because she did not call Dr. Arunakul when she could not insert the IV catheter.  As she stated in her deposition, she did not call him because it was nearly 3:00 a.m., Dr. Arunakul was not at the institution, and she thought the nurses coming on duty at 3:00 a.m. would be more successful with the IV catheter because by then Jordan-Aparo would be calmer:

Q:      Unsuccessful in placement of IV cath. Do you see that?

A:      Yes.

Q:      Now, you did notate inmate not cooperative, correct?

A:      Correct.

Q:      Did you discuss with Dr. [Arunakul] and report to him that the inmate was being noncompliant?

---

[6] Doc. 201-13, Page 142, lines 2-20.
[7] *See* Doc. 174-8.

4

> A:    No, sir. I didn't give Dr. [Arunakul] a return call due to the
>       lateness, and I had another nurse following me who is also IV
>       certified that would be able to place it.[8]

Furthermore, Nurse Greene testified that the medical unit was understaffed:

> Q:    But you had a shorter shift on September 18tht, 2010, is
>       that correct?
>
> A:    Yes.
>
> Q:    Why was that?
>
> A:    Because of staffing. I was - -
>
> Q:    What do you mean?
>
> A:    We were filling in. We were short-staffed so we were
>       stretched. And usually - - it's unusual for one nurse to be
>       on any shift alone and it was unusual for me to be the only
>       nurse there that particular night.[9]

Therefore, Nurse Greene did not intentionally choose not to call Dr. Arunakul in some sort of effort to delay medical care to Jordan-Aparo.  It was late in the evening, Nurse Greene was the only nurse in the medical unit, Jordan-Aparo was refusing to cooperate with her efforts to treat him, and she believed that the next nurse coming in to work would be able to implement the IV catheter once Jordan-Aparo calmed down.

---

[8] Doc. 201-13, Page 133, line 16 – Page 134, line 2.
[9] Doc. 201-13, Page 134, lines 5-15.

These facts and circumstances do not demonstrate that Nurse Greene was culpably negligent, exhibited "reckless disregard of human life," or intentionally violated Jordan-Aparo's Eighth Amendment rights.  No reasonable jury would find Nurse Greene guilty of manslaughter.

## NURSE GREENE WAS NOT INVOLVED IN ANY CONSPIRACY

Plaintiff asserts that Nurse Greene participated in an on-going and institution-wide conspiracy to either cover up Jordan-Aparo's death or the circumstances leading to his death by falsifying medical records.  In order to demonstrate that the intra-corporate conspiracy doctrine does not apply here, Plaintiff asserts that Nurse Greene's alleged falsification of medical records constitutes conduct clearly outside her scope of employment.  Further, Plaintiff attempts to proffer evidence of this alleged "conspiracy" by mischaracterizing the facts and Nurse Greene's testimony.

Plaintiff first asserts that Nurse Greene falsified Jordan-Aparo's medical records because she did not document that she gave him an over-the-counter dose of Benadryl (diphenhydramine).  This new claim has for its only support the laboratory report attached to Medical Examiner Dr. Lisa Flannagan's autopsy report, showing traces of diphenhydramine in Jordan-Aparo's system.  Further, Plaintiff contends Jordan-Aparo received the Benadryl on September 18, 2010, at 10:00 p.m., without producing a single corroborative source for this allegation.  The fact that no Benadryl dosage appears anywhere in Jordan-Aparo's medical records does not suggest the

records have been falsified.  Rather, Benadryl does not appear in the medical records because the nursing staff never dispensed it to him.  Nurses at Franklin Correctional Institution were conscientious about documenting every medication administered or dispensed to Jordan-Aparo or indeed to any inmate.[10]  Further, inmates in Florida correctional institutions, including Franklin Correctional Institution, frequently share or trade their medications, including over-the-counter medications such as ibuprofen, aspirin, Motrin, and Benadryl.[11]  They also share other items such as inhalers, although not necessarily for their intended purposes.

Nurse Greene testified about her suspicions that Jordan-Aparo might have been hiding his ingestion of medication not prescribed to him when he refused to comply with her request for a urine sample:

> Q:    Why would an inmate - - I mean, giving a urine sample is a pretty simple thing. Why would an inmate, in your experience, refuse to give a urine sample?
>
> …
>
> A:    It goes along with, again, I don't know his mindset definitely. However, he was not cooperative. That was more being, you know, unwilling to provide me with a urine specimen. He was - - many possibilities. **He could have ingested something, some type of contraband, and he thought that it would show up in my assessment**, in the dip stick, which is the same type of testing

---

[10] Jordan-Aparo was administered 500 mg of Cipro, twice a day from July 21 – 31, 2010. *See* Doc. 176-16. On September 15, 2010, Nurse Pamela Housholder administered Jordan-Aparo Tylenol. *See* Doc. 176-4. On September 17, 2010, Nurse Amy Goodwin administered Jordan-Aparo ibuprofen per the orders of ARNP Amy Kirkland. *See* Doc. 176-5. On September 17, 2010, Nurse Greene administered Jordan-Aparo Analgesic balm. *See* Doc. 176-6.

[11] Advanced Registered Nurse Practitioner Lemon-Watson testified in her deposition that it is common for inmates to share or sell their own prescription medications to other inmates. *See* Doc. 201-1, Page 230, line 24 - Page 231, line 1.

equipment or testing thing you dip - - you use a dip stick for, you know, if we were investigating him for illegal substance in his urine.[12]

Plaintiff then proffers yet another, conflicting theory cut from whole cloth that Jordan-Aparo was given the Benadryl on September 19, 2010, after he was gassed around 11:30 a.m., because he insisted "he could not breathe" and because the Benadryl was crucial to "reverse the anaphylaxis while he suffocated from anaphylaxis causing the petechiae detected in the autopsy." This blatant fabrication defies not only all logic but also the record evidence. For example, how could Nurse Greene dispense Benadryl at 10:00 p.m. on September 18, as Plaintiff has just alleged, in anticipation that Jordan-Aparo would be exposed to chemical restraint agents some twelve hours later on September 19, 2010?[13] Additionally, Jordan-Aparo complained he had difficulty breathing on September 18, 2010, **before** he was gassed.[14] Plaintiff's spurious explanation of how and why Diphenhydramine appeared in Jordan-Aparo's autopsy report as proof that Nurse Greene falsified his medical records as part of an alleged conspiracy is not only false but also utterly unsubstantiated.

Plaintiff continues to mischaracterize facts by asserting that Nurse Greene's "medical record for 10:15 p.m. [on September 17, 2010] is grossly incorrect to the

---

[12] Doc. 201-13, Page 143, lines 3-17 (emphasis added).
[13] *See* Complaint ¶ 29.
[14] *See* Doc. 176-7.

8

extent that Greene charted [that] [Jordan-]Aparo refused to give a urine sample."

Nurse Greene specifically testified that Jordan-Aparo refused to comply with her

instructions regarding a urine sample perhaps because he had ingested something he

was afraid would be detected in his urine sample.[15]  As she testified:

> Q:    And then he apparently refused, per your charting, to give you a urinalysis?
>
> A:    Correct.
>
> Q:    Do you know why that was? Did you ask him why? If a man's wanting to go to the hospital, asking to go to the hospital, why would he refuse - - in your mind as a nurse doing an assessment, why would he refuse a test that you had requested, that could make a difference as to whether you would have recommended to your supervisors he be admitted or not? Why would he do that?
>
> …
>
> A:    …there are many reasons why inmates don't cooperate or - - with medical. **They've ingested something they shouldn't they think the test is going to show**, whatever it is - -
>
> Q:    You mean like contraband?
>
> A:    Yes. There is that possibility.[16]

Thus, Plaintiff has again failed to produce any evidence proving that Nurse

Greene falsely charted that Jordan-Aparo refused to comply with her instructions

about the urine sample on September 17, 2010.  Even though Jordan-Aparo claimed

---

[15] *See supra* Nurse Greene's deposition testimony on p.7.
[16] Doc. 201-13, Page 20, lines 5-20 (emphasis added).

his back was "hurting too bad for him to stand" and that he "couldn't give a sample," Nurse Greene could not **force** him to urinate.  For that matter, neither could any other nurse, clinician, or doctor.

Plaintiff alleges that Nurse Greene made false and either late or back-dated entries in Jordan-Aparo's medical records on September 18, 2010, in violation of the Department of Correction's Nursing Manual.  The record evidence shows Nurse Greene made four (4) entries in Jordan-Aparo's medical records during the early morning hours of September 18, 2010.[17]  Plaintiff contends these entries are non-compliant with the Nursing Manual because they did not properly identify: (a) the current date and time; (b) an indication that it was a late entry; (c) documentation information; and (d) a signature.  Contrary to Plaintiff's assertions, Nurse Greene's entries of September 18, 2010, have the date, time, signature, and the necessary information detailing her treatment of Jordan-Aparo.[18]  Further, Nurse Greene clearly notes on these entries that they are "*Inc Entry,*" or incidental and not late entries.[19]  Therefore, the evidence **does not** show that Nurse Greene's September 18, 2010, entries were false, back-dated, late, or in violation of departmental policy. Even if these four (4) September 18, 2010, entries did not comply with the Nursing Manual, "[a] violation of jail [or prison] policy does not itself rise to the level of

---

[17] *See* Doc. 195-18, Page 131.
[18] *Id*.
[19] Nurse Greene testified in her deposition that "Inc Entry," means incidental entry. *See* Doc. 201-13, Page 126, lines 5-7.

deliberate indifference." *Dang v. Sheriff, Seminole Cty.*, 856 F.3d 842, 852 (11th Cir. 2017) (citing *Andujar v. Rodriguez*, 486 F.3d 1199, 1204 n.5 (11th Cir. 2007).

Plaintiff has therefore failed to prove that Nurse Greene falsified medical records as part of her alleged participation in any sort of conspiracy.

## <u>NURSE GREENE WAS NOT DELIBERATELY INDIFFERENT</u>

Nurse Greene was not deliberately indifferent to Jordan-Aparo's medical needs, serious or otherwise.  Plaintiff's Response provides a litany of alleged decisions and omissions by Nurse Greene that, even if many of them were true, at most might be considered simple negligence.  Thus, Plaintiff's shotgun approach misses the crucial legal point.  To prove that she was deliberately indifferent, Plaintiff must show that Nurse Greene had (1) subjective knowledge of a risk of serious harm; (2) she disregarded that risk; and (3) exhibited conduct that is **more than gross negligence**. *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326-27 (11th Cir. 2007) (emphasis added).

Plaintiff first contends that Nurse Greene was deliberately indifferent when she conducted a Risk Assessment of Jordan-Aparo on June 24, 2010, more than three (3) months before his death.[20]  Specifically, Plaintiff alleges that Jordan-Aparo's Osler-Weber-Rendu syndrome, his citric acid allergy, and his shortness of breath

---

[20] *See* Doc. 195-53.

complaints meant that he should never be exposed to chemical restraint agents, and any Risk Assessment form should clearly indicate this restriction.

As a licensed practical nurse, Nurse Greene could not independently diagnose, prescribe medications, or treat inmates beyond basic elements such as checking vital signs and performing routine assessments based on written protocols.[21]  Thus, she had no obligation whatsoever to independently research the nature, symptomology, and treatment, if any, of Osler-Weber-Rendu syndrome, and therefore make decisions based on that research whether it precluded chemical agents.  She also had no obligation to independently research the nature of Jordan-Aparo's citric acid allergy, or whether citric acid was—or was not—a major component of pepper spray.  Such suggestions are patently ludicrous, and obviously outside Nurse Greene's statutory scope of practice.

Regardless of what Nurse Greene knew about Jordan-Aparo's Osler-Weber-Rendu syndrome and his citric acid allergy, they are not among the restrictions listed on the Risk Assessment form that prohibit using chemical restraint agents on an inmate.[22]  As a matter of record evidence, during Jordan-Aparo's periods of incarceration, different nurses at different correctional institutions also completed Risk Assessments on him and none ever indicated he could not be subjected to

---

[21] *See* Doc 176-2; Doc. 176-3; and Doc. 176-17.
[22] *See* Doc. 176-15.

chemical agents.  Further, Plaintiff contends that "Aparo's medical history prior to June 24, 2010, is replete with complaints of shortness of breath," but fails to cite to even one such complaint charted in Jordan-Aparo's medical record prior to June 24, 2010.

Plaintiff inexplicably claims that Dr. Flannagan's autopsy report suggests that Jordan-Aparo suffocated from allergy-induced anaphylaxis caused by citric acid in the pepper spray.  It is here that Plaintiff implies that Nurse Greene should have independently researched the ingredients of pepper spray and cross-checked them with Jordan-Aparo's list of allergies prior to completing Jordan-Aparo's Risk Assessment on June 24, 2010.  Not only are Plaintiff's contentions nonsensical but they also have never been raised until this Response.  Dr. Flannagan was never questioned about Jordan-Aparo's citric acid allergy[23] nor was it ever alleged that this allergy was a cause in Jordan-Aparo's death.  Further, no evidence exists to show Jordan-Aparo's citric acid allergy was a factor in his death, and Nurse Greene cannot be held liable for not saying this allergy prohibited Jordan-Aparo from being subjected to chemical restraint agents.

Plaintiff also alleges as an example of deliberate indifference that on September 17, 2010, at approximately 10:15 p.m., Nurse Greene "callously would not treat [Jordan-]Aparo while he was on the floor [of the bathroom]."  This

---

[23] *See* Doc. 201-11.

statement mischaracterizes the facts. Quite logically, Nurse Greene needed to get Jordan-Aparo into a wheel chair so she could transport him to the infirmary where she could properly evaluate and assess his complaints. An unsanitary and cramped bathroom floor was not conducive to a proper medical examination, nor, in Nurse Greene's opinion, was Jordan-Aparo's condition so dire that he could not be transported to the medical unit.

Next, Plaintiff alleges that "Greene ignored the need to perform a urinalysis and failed to admit Aparo to the infirmary. Also, Greene ignored the need to notify a doctor of Aparo's deteriorating condition." These assertions are false. At 10:15 p.m., on September 17, 2010, Nurse Greene conducted a Back Pain Assessment of Jordan-Aparo,[24] and she did not "ignore the need to perform a urinalysis."

> Q:   Do you remember that independently that at the time on November - - excuse me - - on September 17, 2010, Jordan-Aparo, the inmate, refused a urine specimen?
>
> A:   Yes, sir.
>
> Q:   And you notated that?
>
> A:   Yes.[25]
>
> Q:   … The blood pressure, 98/54. Do you see that?
>
> A:   Yes, sir.
>
> Q:   That's normal, isn't it?

---

[24] *See* Doc. 176-6.
[25] Doc. 201-13, Page 117, lines 9-15.

A:      Correct.

Q:      That's not an indication to send a patient to a hospital by itself, is it?

A:      No. sir.

Q:      And then the temperature of the patient, Inmate Jordan-Aparo, was 98,7, is that correct?

A:      Yes.

Q:      And that's normal correct?

A:      Yes.[26]

Nurse Greene admitted that his pulse was a bit high at 120 beats per minute, but testified that an elevated pulse alone was not indicative of an emergency:

Q:      And within the scope of your licensed practical nurse license, based on your education, training and experience, the only elevated sign was the pulse, correct?

A:      Yes.

Q:      And at the time as a LPN, that's not reason by itself to believe the patient has sepsis, is it?

A:      True. That is not an indication.[27]

After completing the Back Pain Assessment at 10:15 p.m. on September 17, 2010, Nurse Greene reported directly to her supervisor:

---

[26] Doc. 201-13, Page 118, lines 5-16.
[27] Doc. 201-13, Page 120, lines 6-13.

Q:     And so is it fair to assume on September 17tht, 2010 when you're examining Jordan-Aparo, as far as chain of command at the time, ARNP Nurse Amy Kirkland was your superior?

A:     Correct. Yes, sir.

Q:     And when you say [ARNP Kirkland] reviewed his record and did not order that, period, you mean did not order a shot [for pain]?

A:     Yes, sir, that's what I'm indicating.

…

A:     . . . I explained to her - - I went to her. She was in her office. I stopped at her door and said - - and gave her a quick report of this, Aparo's vital signs and his complaint. And she did not give me any orders.

…

Q:     She didn't order a transfer to a hospital?

A:     No, sir.[28]

Thus, at this point on September 17, 2010, neither Nurse Greene or ARNP Amy Kirkland perceived the situation as an emergency requiring Jordan-Aparo's transfer to a hospital.  Nurse Greene listened to Jordan-Aparo's complaints, assessed and documented his vital signs, and reported them to her chain of command.  ARNP Kirkland never instructed Nurse Greene to give him a shot or medicine for pain, nor did she instruct Nurse Greene to conduct a Chest Pain Assessment or a Respiratory Assessment.

---

[28] Doc. 201-13, Page 121, line 10 – Page 122, line 25.

About two (2) hours later at 12:10 a.m., on September 18, 2010, Jordan-Aparo again presented to Nurse Greene in the medical unit complaining of chest pains and that he could not breathe or sleep.[29]   Nurse Greene again assessed Jordan-Aparo's vitals:

> Q:    Were his vital signs normal?
>
> A:    80/50 is low. His pulse rate was 110, which is tachycardia, which is high. His temperature was normal.[30]

Plaintiff admits that Nurse Greene also conducted an electrocardiogram (EKG) to assess Jordan Aparo's complaints of chest pain.   Nurse Greene also evaluated his breathing complaints:

> Q:    Did you - - I don't see anything in here. Do you recall whether you observed Inmate Aparo having any breathing problems during this approximate two-and-a-half-hour period?
>
> A:    Yes, I recall that he did not exhibit any distress, breathing distress symptoms.
>
> Q:    If he had, what kinds of language would you typically - - or words would you use if an inmate you were observing an inmate that was having a difficulty breathing?
>
> A:    Using accessory muscles to breathe, huffing. He would be stressed.
>
> Q:    Those [words] are not in …here [the medical records], correct, those words?
>
> A:    No, sir.[31]

---

[29] *See* Doc. 176-7.
[30] Doc. 201-13, Page 123, lines 18-21.
[31] Doc. 201-13, Page 141, lines 7-21.

Therefore, while Jordan-Aparo was subjectively complaining of breathing problems, Nurse Greene's evaluation of him revealed no distress or difficulty breathing.  Jordan-Aparo again refused to give Nurse Greene a urine specimen at 12:10 a.m. on September 18, 2010.

> Q:   So the day following September 17, 2010, on September 18, 2010, Inmate Jordan-Aparo is still refusing a urinalysis test, correct?
>
> A:   Yes, sir.[32]

As discussed above, Nurse Greene then telephoned Dr. Arunakul who ordered a twenty-three-hour observation period and an IV catheter containing lactated ringers for Jordan-Aparo.  From 12:10 a.m. to 12:30 a.m., Nurse Greene made two unsuccessful attempts to insert an IV catheter containing lactated ringers.[33]  She testified that she thought he was dehydrated:

> Q:   And he's also possibly dehydrated, according to your progress note, correct?
>
> A:   Yes, sir, that's my assessment.
>
> Q:   Would it be important to have a UA [urinalysis test] with a patient that presented with symptoms of dehydration?
>
> A:   Yes, sir. That's one of the things that the test that is included in the UA dip stick is an indication of, his specific gravity, which is an indication of the fluid content within intake, the level.[34]

---

[32] Doc. 201-10, Page 124, lines 12-15.
[33] *See* Doc. 176-7.
[34] Doc. 201-10, Page 124, lines 16-25.

Nurse Greene acknowledged she did not call the doctor back after she could not insert the IV catheter, but she testified to her reasons at the time, as well as the fact that she did not perceive Jordan-Aparo to be in danger:

Q:    No, that's exactly what I want is your mindset.

A:    My mindset at the time was to take care of his immediate symptoms right then. I gave him - - I placed him in a bed, to wait until the other nurse would come on. I gave him fluids. He drank two cups of water in front of me. Okay. I placed him in a bed. Comfortable. In the big room, the big - - the outer pharmacy.

…

A:    An open bay. Made him comfortable. He was laying there quiet and I returned every 15 minutes to observe him and each time he said, I'm drinking, or use some expletives because, of course, he was not happy with being placed there.

Q:    He wanted to go to the hospital?

A:    Yes. However, he did understand, stated to me that he understood what I was saying also, but it was not what he wanted, but his immediate - - he was breathing fine. His 02 [saturation] was normal, his oxygen level was 98 percent. He made no further complaints. **I saw no stress that would, you know, indicate that I needed to dial 911 for him or do anything else other than observe him and drinking.** And still I - - that's how I felt about the situation with the young man. He was in my care and we were waiting for the next nurse to come and give him - - see we would have the Lactated Ringer's, everything for when she got there to do it.[35]

---

[35] Doc 201-10, Page 25, line 19 – Page 26, line 23 (emphasis added).

Plaintiff asserts Nurse Greene was deliberately indifferent because she did not call 911 or obtain immediate outside medical treatment for Jordan-Aparo.  Nurse Greene testified that she did not subjectively perceive Jordan-Aparo's stated medical condition as an emergency.  Thus, Plaintiff's claim that she was deliberately indifferent does not address the salient and determinative point that Nurse Greene must have **actually perceived a serious medical need and then disregarded that need**. *See Presley v. City of Blackshear*, 650 F.Supp.2d 1307, 1315 (S.D.Ga. 2008), aff'd, 340 Fed.Appx.567 (11th Cir. 2009) (emphasis added).

"Medical treatment violates the Constitution only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Nam Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)).  Jordan-Aparo's symptoms were not "so obvious that even a lay person would easily recognize the necessity for a doctor's attention," *Goebert*, 510 F.3d at 1326, and his treatment was confounded by a previously reported back injury and his continued refusal to cooperate.  Nurse Greene did not perceive the situation as a medical emergency and therefore could not have disregarded Jordan-Aparo's medical needs.

Plaintiff cannot prove that Nurse Greene's alleged deliberate indifference on September 17 and 18, 2010, was the ultimate cause of Jordan-Aparo's death.  Dr.

Flannagan testified that Jordan-Aparo's death was not caused by his Osler-Weber-Rendu syndrome, by anaphylactic shock caused by his citric acid allergy, any physical trauma to his body, or from exposure to chemical agents, which were absent from his lips or tongue, in his throat, larynx, esophagus, or trachea.[36] Jordan-Aparo had developed fatal bacterial abscesses in his heart and lungs prior to September 17 and 18, 2010, and even if Nurse Greene had called 911 or obtained the requisite order from a doctor to transfer him to a hospital after her first encounter with him on September 17, 2010, at 10:15 p.m., such actions might have extended his life for a few hours or days only.[37]

Plaintiff has not and cannot demonstrate or prove that Nurse Greene was deliberately indifferent to Jordan-Aparo's alleged serious medical needs. Plaintiff has also failed to prove through any valid or certifiable evidence, whether documentary or through sworn testimony, that Nurse Greene either committed manslaughter or participated in any sort of conspiracy. Plaintiff has therefore failed to meet her burden of stripping away Nurse Greene's qualified immunity. Nurse Greene remains entitled to qualified immunity, and Plaintiff's claims against her should be dismissed.

---

[36] *See* Doc. 201-11, Page 59, line 20 – Page 60, line 12.
[37] *See* Doc. 201-11, Page 82, line 11 – Page 83, line 4.

## <u>CONCLUSION</u>

Plaintiff has failed to show any genuine issues of material facts.  Therefore, this Court should grant Defendant Martha Greene's Motion for Summary Judgment. Respectfully submitted this 27th day of July, 2018.


/s/ ***Jeffrey S. Howell***
JEFFREY S. HOWELL
Florida Bar No. 0793840
Phipps & Howell
Post Office Box 1351
Tallahassee Florida 32302-1351
(850) 222-7000
jeff@phipps-howell.com
Attorney for Defendants
*JONES, RILEY* and *GREENE*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

Undersigned counsel for Defendant MARTHA GREENE hereby certifies that this motion and incorporated memorandum of law contains 4,639 words, excluding the case style, signature block, and certificate of service, in compliance with N.D. Fla. Loc. R. 7.1(F). The foregoing word count has been calculated utilizing Microsoft Word, the word processing software used to prepare this motion and incorporated memorandum of law.


/s/ ***Jeffrey S. Howell***
JEFFREY S. HOWELL

22

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

served by electronic transmission this 27th day of July, 2018, to:


W. Peter Martin, Esq.
Dennis, Jackson, Martin & Fontela, PA
1591 Summit Lake Drive, Suite 200
Tallahassee, Florida 32317
peter@djmf-law.com
jmauer@djmf-law.com
jennifer@djmf-law.com
*Counsel for FDOC & Andrews*

Brian C. Keri, Esq.
The Law Offices of Brian C. Keri, PA
3375-H Capital Circle NW, Suite 4
Tallahassee, Florida 32308
brianckeri@earthlink.net
michellemsmith@earthlink.net
*Counsel for Austin, Brown, Burch
Gillikin, Hamm, Hampton, Martina
and Spangler*


Steven R. Andrews, Esq.
Ryan Andrews, Esq.
Brian O. Finnerty, Esq.
The Law Offices of Steven R. Andrews, PA
822 North Monroe Street
Tallahassee, FL 32303
service@andrewslawoffice.com
steve@andewslawoffice.com
ryan@andrewslawoffice.com
bfinnerty@andrewslawoffice.com
*Counsel for Plaintiffs*


/s/ ***Jeffrey S. Howell***
JEFFREY S. HOWELL