## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**AMANDA CIMILLO, et al.,**

     **Plaintiff,**

**v.**                             **CASE NO. 4:16-cv-00584-RH-CAS**

**ROLLIN AUSTIN, et al.,**

     **Defendants.**

_____/

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT A. JONES' (aka LUCY FRANKLIN) MOTION FOR SUMMARY JUDGMENT

Defendant, A. JONES (aka LUCY FRANKLIN), through undersigned counsel, files this Reply Memorandum in Support of her Motion for Summary Judgment [Doc. 175] and in Opposition to Plaintiff's Response to Defendant A. Jones' (aka Lucy Franklin) Motion for Summary Judgment [Doc. 197].

## INTRODUCTION

The sole concern of this Court should properly be whether Defendant, A. JONES (aka LUCY FRANKLIN) (hereinafter "Nurse Franklin"), was deliberately indifferent to former inmate Randall Jordan-Aparo's (hereinafter "Jordan-Aparo") serious medical needs sufficient to strip away her qualified immunity. Plaintiff's allegations of manslaughter and conspiracy are unconvincing, as is the newly-revealed theory of death by citric acid. Further, the Florida Department of Law

1

Enforcement (FDLE), the Federal Bureau of Investigation (FBI), and the United States Attorney's Office never pursued any criminal charges against Nurse Franklin or any of the other defendants in this case.[1]  There are no genuine issues of material fact to support the notion that Nurse Franklin was deliberately indifferent to Jordan-Aparo's medical needs; therefore, she is entitled to qualified immunity and this Court should dismiss Plaintiff's claims against her.

## NURSE FRANKLIN DID NOT COMMIT MANSLAUGHTER

Plaintiff posits that Nurse Franklin *could be* found guilty of manslaughter via culpable negligence under Section 782.07, Florida Statutes.  To prove manslaughter by culpable negligence, one must prove (1) the fact of the death, and (2) a causative link between the death and the culpable negligence of the defendant. *Jefferies v. State*, 849 So.2d 401, 403 (Fla. 2d DCA 2003).  "Culpable negligence is a 'gross and flagrant' violation of a duty of care that causes injury, a course of conduct showing 'reckless disregard of human life,' 'such wantonness or recklessness' as to equal the intentional violation of the rights of others, or an 'entire want of care' raising 'the presumption of indifference to consequences.'" *Ramos v. State*, 89 So.3d 1119, 1121 (Fla. 1st DCA 2012) (quoting *Preston v. State*, 56 So.2d 543, 544 (Fla. 1952)).

Plaintiff alleges that Nurse Franklin exhibited culpable negligence by two discrete actions: (1) signing the Risk Assessment form on September 18, 2010,

---

[1] *See* Doc. 180-21; Doc. 180-16; and Doc. 180-27.

2

indicating that Jordan-Aparo could be subjected to chemical restraint agents; and (2) failing to call 911 and transferring Jordan-Aparo to a hospital.

On September 18, 2010, at approximately 4:36 a.m., Nurse Franklin conducted a Pre-Special Housing Health Assessment Form DC4-769 ("Health Assessment") and a Risk Assessment for the Use of Chemical Restraint Agents and Electronic Immobilization Devices Form DC4-650B ("Risk Assessment") for Jordan-Aparo.[2]  Plaintiff asserts that: (1) Nurse Franklin did not "read" Jordan-Aparo's medical records before she completed the two assessments; (2) the two assessments she completed were false; and (3) she failed to take Jordan-Aparo's vital signs.

Plaintiff's first assertion regarding Nurse Franklin's review of Jordan-Aparo's medical records mischaracterizes her testimony.  She testified that an inmate's medical chart kept at the nurse's station contained the most recent medical documents needed to evaluate his condition and complaints, while the older, "historical" medical records from any previous incarcerations were kept in a vault in the medical unit, but still accessible to staff should the need arise:

Q:    Well, what chart did you look at?

A:    We had one green chart that we looked at that was -- that was kept at the nurse's station and that was it. I don't know what else was in his files.

---

[2] *See* Doc. 175-14.

Q:      Okay. From the 2009 incarceration or did you have the 2008 and
        the 2009?

A:      I don't know what all we have because the other that we're -- the
        older -- we only have one chart. And that's the one that we're
        dealing with at that time.

Q:      Yeah. Are they color-coded?

A:      **The older ones are, and they're kept in the vault, but I do not
        go through those charts**.[3]

Nurse Martha Greene also testified regarding the distinction between the

current medical records the nurses referred to when treating an inmate and the

historical medical records kept in the vault:

Q:      So you charted in - - the entire medical record would be - -

A:      I would chart in his current file.

Q:      Right. Okay. So there's a current file and then there was a - -

A:      Then there's past files.

Q:      Okay. And that was also kept on premises?

A:      Yes.
.
Q:      Was it down the hall or was there a special place they kept it, a
        storage room?

A:      Yes, those were kept in a vault.[4]

---

[3] Doc. 201-17, Page 198, line 12-25 (emphasis added).
[4] Doc. 201-13, Page 91, line 17 – Page 92, line 2.

Nurse Franklin also specifically testified she had reviewed Jordan-Aparo's medical records stored in the vault:

> Q:     Is there -- does an inmate have a chart in the vault, but maybe a file up at the charge station?
>
> A:     If the inmate is in -- going to be in the infirmary, we will bring the chart out the vault and keep it in the nurse's station where it's accessible to the nurse while he's in the infirmary.[5]

Plaintiff's allegation that the two assessments Nurse Franklin completed were false because (1) she "made up" Jordan-Aparo's vital signs, and (2) the assessments did not show Jordan-Aparo suffering from any acute medical conditions.

Nurse Franklin initially testified that she could not to take Jordan-Aparo's vital signs at 4:36 a.m., on September 18, 2010:

> Q:     . . . And you did an assessment on him?
>
> A:     He refused to be touched.
>
> Q:     You mean, he wants to go to the - - let me make sure I understand. He's begging you to go to the hospital, but he won't let you touch him?
>
> A:     Right.
>
> …
>
> Q:     Okay. Well, you had taken his blood pressure, right?
>
> A:     No, I didn't. He refused to be touched.
>
> Q:     Well, look at the vital signs. Did he fill those in himself?

---

[5] Doc. 201-17, Page 155, lines 5-11.

> A:    No, he didn't - - he didn't fill those in. Those there had to be some from another time because he didn't - - that wasn't - - that day, I didn't get no vital signs from him because he refused to be touched.[6]

Plaintiff conveniently omits to inform this Court that Nurse Franklin did recall that she **was indeed able to take Jordan-Aparo's vital signs** when she completed the Health Assessment at 4:36 a.m.:

> Q:    . . . So, I just wanted to note, what is an explanation, according to you, for there being vital signs on here, but your testimony is that he wouldn't give you vital signs?
>
> A:    These -- these vital signs here were taken when he was being pre-confined. They were going to take him to confinement . . . [7]

Nurse Franklin clarified that the vital signs she took at 4:36 a.m. were then auto-populated into the electronic SOAPE note she entered at 5:18 a.m. on September 18, 2010, in relation to her previous encounter with Jordan-Aparo at 4:00 a.m.:

> Q:    Okay. Would you give us your explanation so everybody can hear it, speak slowly and, when you're pointing to a document, tell us whether it's Exhibit 10 or 9.
>
> A:    Okay. The vital signs on Exhibit 10 are the vital signs that were taken when he had his pre-confinement done. And the vital signs on Exhibit 9 are the vital signs transferred from Exhibit 10 to -- from ten to nine.

---

[6] Doc. 201-17, Page 49, line 6 – Page 50, line 3.
[7] Doc. 201-17, Page 148, line 23 – Page 149, line 4.

A:      . . . I don't know how to -- how -- I didn't type the SOAP[E] note, **but these vital signs that I had from when I assessed him got transferred over to that**.[8]

Plaintiff mischaracterizes this incident to make it seem as if Nurse Franklin never assessed Jordan-Aparo during the early morning hours of September 18, 2010, and the document in question is therefore false.  The record evidence clearly shows that Nurse Franklin obtained Jordan-Aparo's vital signs between 4:00 a.m. and 4:36 a.m., although he was belligerent and non-compliant with her efforts.

Plaintiff's contention that Nurse Franklin failed to "indicate that Aparo was suffering from any apparent acute medical conditions that would preclude his placement in special housing" is therefore a falsification itself, and untrue.  The Risk Assessment form explicitly required her—and any other nurse—to certify that "[a]t the time of this preconfinement health assessment, based on a review of the medical record, the inmate has no known medical conditions that would be exacerbated by the use of chemical restraint agents." [9]  At the time she filled out this form, Jordan-Aparo's blood pressure was 100/60, still considered normal, his temperature was 98, and he had a pulse of 100 beats per minute, at the high end of the normal range.[10] While Jordan-Aparo had complained he had difficulty breathing to Nurse Greene earlier, Nurse Greene had evaluated his complaint, found no objective signs of

---

[8] Doc. 201-17, Page 149, line 13 – Page 150, line 13.
[9] *See* Doc. 175-14.
[10] *Id.*

breathing distress, and noted this in the chart which Nurse Franklin read.[11]   Jordan-Aparo had not complained to Nurse Franklin that he had shortness of breath or indeed any "breathing problems," so her completion of the Risk Assessment on September 18, 2010, stating he did not have or did not exhibit symptoms of any of the medical conditions listed on the form that preclude application of chemical restraint agents.

Plaintiff also contends that Nurse Franklin should be found guilty of manslaughter because she refused to call 911 and transfer Jordan-Aparo to a hospital.  As did the other nurse defendants, Nurse Franklin testified that she has no authority to independently transfer Jordan-Aparo or any inmate to a hospital.  Such a decision must originate from a doctor or clinician:

Q:   Mr. Aparo -- was he demanding you put him in the hospital or transfer him to an acute-care facility?

A:   He was demanding to go to the hospital.

Q:   Okay. And you don't have that authority, do you?

A:   No, I do not.

Q:   I mean, you don't have admitting privileges to a regional hospital or anything.

A:   I don't. I have to be --

…

---

[11] *See* Doc. 201-13, Page 141, lines 7-21 (Nurse Greene testified that on September 18, 2010, at 12:10 a.m., Jordan-Aparo "did not exhibit any distress, breathing distress symptoms").

Q:      Only a doctor can order that an inmate be hospitalized, right?

A:      Yes.[12]

These facts fail to prove Nurse Franklin was culpably negligent, that she exhibited "reckless disregard of human life," or intentionally violated Jordan-Aparo's Eighth Amendment rights.   No reasonable jury would find Nurse Franklin guilty of manslaughter.

## THERE WAS NO CONSPIRACY

Plaintiff asserts that Nurse Franklin participated in an on-going and institution-wide conspiracy to either cover up Jordan-Aparo's death or the alleged circumstances leading to his death by falsifying medical records.   Plaintiff's assertion that Nurse Franklin's alleged falsification of medical records constitutes conduct clearly outside her scope of employment is an unfounded argument to defeat the intra-corporate conspiracy doctrine.  This assertion also fails.

Plaintiff states that Nurse Franklin falsified Jordan-Aparo's medical records because there was no documentation that Jordan-Aparo received an over-the-counter dose of Benadryl (diphenhydramine).   This substance was found in his system according to a laboratory report submitted with Medical Examiner Dr. Lisa Flannagan's autopsy report.   Plaintiff contends Jordan-Aparo received a dose of

---

[12] Doc. 201-17, Page 147, line 15 – Page 148, line 5.

Benadryl on September 18, 2010, at 10:00 p.m., despite there does not appear to be any credible evidence to support this contention. Nevertheless, it cannot stand with regard to Nurse Franklin, who was not even on duty at that time on that date.[13] Further, in general terms, the absence of any note in Jordan-Aparo's medical records regarding the alleged dispensing Benadryl in no way suggests the records have been falsified. Inmates in correctional institutions frequently share their medications, although not necessarily for legitimate medical reasons.[14]

Plaintiff resurrects the same allegation used to support a claim for manslaughter to now support a conspiracy theory: Nurse Franklin falsified Jordan-Aparo's medical records regarding the vital signs on the Risk Assessment form she completed on September 18, 2010. This argument failed as explained above, and fails here for the same reasons.

Plaintiff contends that Nurse Franklin "allowed" Jordan-Aparo to be removed from the infirmary at 4:36 a.m. on September 18, 2010. This contention is blatantly false. Sometime around 4:00 a.m. on September 18, 2010, Correctional Officer Sergeant Dave Wallace contacted Captain Mitchell Brown because Jordan-Aparo was belligerent and non-compliant toward Nurse Franklin.[15] After counseling him

---

[13] Nurse Franklin testified that she came to work on September 18, 2010, at approximately 3:00 a.m., and that her first relevant encounter with Jordan-Aparo was at 4:00 a.m. that morning. *See* Doc. 201-17, Page 130, line 17 - Page 132, line 5. *See also* Doc. 175-18.

[14] Advanced Registered Nurse Practitioner Lemon-Watson testified in her deposition that it is common for inmates to share or sell their own prescription medications to other inmates. *See* Doc. 201-1, Page 230, line 24 - Page 231, line 1.

[15] *See* Doc. 174-12.

in the infirmary, Captain Brown nevertheless transferred Jordan-Aparo to confinement.[16]  Nurse Franklin confirmed this fact in her deposition:

> Q:    It's the 4:36 [a.m.] entry.
>
> A:    It says: Incidental entry, inmate - - inmate released to security, per Captain Brown.
>
> Q:    Yes, ma'am. It was Captain Brown that told you to release him.
>
> A:    No. Captain Brown is the one who released him. I didn't go and do anything.
>
> Q:    Okay. Did you call the doctor and say that he had been removed per - - contrary to his order and policy?
> …
> A:    To my recollection, Mr. - - Ms. Riley notified Ms. Adair.[17]

Nurse Franklin also testified:

> Q:    I wanted to make sure the record was clear. I believe, in response to Counsel's questions, your answer to one of the questions was: I did not release him [Jordan-Aparo] from the infirmary. I don't know who released him from the infirmary. Nobody informed me. Was that your testimony?
>
> A:    Yes.[18]

For Plaintiff to contend that Nurse Franklin allowed Jordan-Aparo to be released from the infirmary is a gross mischaracterization of the facts.   Nurse

---

[16] *See* Doc. 192-29 ("Jordan-Aparo started arguing with LPN Franklin and Franklin summoned Capt. Brown to the infirmary. Capt. Brown said that Jordan-Aparo started cursing and yelling at him and was stating that nobody was trying to help him (Jordan-Aparo). Capt. Brown told Jordan-Aparo that if he did not calm down then he would be placed in the Confinement Dorm. Jordan-Aparo continued yelling and Capt. Brown made the decision to place him in the Confinement Dorm.") *See also* Doc. 179-2.
[17] Doc. 201-17, Page 104, lines 8-22.
[18] Doc. 201-17, Page 145, line 23 – Page 146, line 2.

Franklin testified in her sworn statement taken September 14, 2012, that she believed

Captain Brown had gotten approval from someone to pull Jordan-Aparo out of the

infirmary:

> Q:  It's my understanding that medical is the only one that's
> supposed to release him. Did you release him?
>
> A:  There had to be an order because I couldn't just release him.
> There has to be an order somewhere even though he's there at 23
> hour observation, we have to have an order from whoever the
> doctor is saying, "release them to confinement." Even though
> he's belligerent and doing all that, if he gets really bad they can
> take him out of there and take him but the doctor has to release
> him. The doctor has to give an order.
>
> Q:  That's just it. There's no order.
>
> A:  There's no order?
>
> Q:  Yeah. There was no order. . . . [19]

Plaintiff also asserts that the Refusal of Health Care Services form completed

at 3:25 p.m. on September 19, 2010, was falsified because Nurse Franklin signed the

form as a witness although she was not present when Jordan-Aparo refused to sign

the refusal himself.   Plaintiff has once more mischaracterized Nurse Franklin's

testimony.

The real facts are these:  At approximately 3:25 p.m. on September 19, 2010,

Nurse Ola Melissa Riley and Nurse Franklin went to Jordan-Aparo's cell in

---

[19] Doc. 201-18, Page 8, line 13 – Page 9, line 2.

12

confinement to obtain his blood pressure reading because Nurse Riley had been unable to do so twice previously since he was demonstrably non-compliant.[20] Jordan-Aparo refused this time as well to be evaluated or treated, so Nurse Riley completed a Refusal of Health Care Services Form, duly witnessed as required by Officers Joshua Martina and Chad Gillikin at Jordan-Aparo's confinement cell, and later by Nurse Franklin.[21]   During her deposition testimony, Plaintiff's counsel confused Nurse Franklin, deliberately or not, by his questions and references to a fixed-wing video to create an impression that she never witnessed Jordan-Aparo refuse treatment at that time:

> Q:     All right. I'm showing Exhibit 14. It's a refusal of healthcare service signed by you as a witness and also signed by some COs and Ms. Riley. Take a look at that. First, is that your signature?
>
> A:     Yes.
>
> Q:     All right. It says you were a witness to his refusal, doesn't it?
>
> A:     I'm a witness to - - a witness to Ms. Riley. I witnessed her - - see, you have to have two nurses. She signed that because she saw that. I didn't see that.
>
> …
>
> Q:     Yeah, but you signed it - - you - - under - -
>
> A:     Above their - -
>
> Q:     Under "signature," read what it says.

---

[20] *See* Doc. 174-14.
[21] *See* Doc. 197-28.

A:    Yeah, I see what you're saying.

Q:    So, you never saw Riley on the video. So, therefore, you couldn't have seen Riley or Aparo refuse to take a BP, correct?

A:    I didn't see Riley on the - - on the video.

Q:    And you didn't see Riley go up and try to get a BP, did you?

A:    Not on that - - not on that, I didn't.[22]

Upon cross-examination, Nurse Franklin recalled being present when Jordan-Aparo refused to allow the nurses to take his blood pressure.  Despite Plaintiff's incredible theories, Nurses Riley and Franklin came to Jordan-Aparo's confinement cell for a blood pressure reading and he refused to cooperate.  Both nurses left confinement, and Nurse Riley went to get the Refusal of Health Care Services Form. Nurse Riley returned to confinement with Officers Martina and Gillikin, but not with Nurse Franklin.

Q:    Well, if this affidavit says you were at the cell with Ms. Riley -- you see that? I'll show it to you right here. This affidavit says: He refused to have his blood pressure taken when Nurse Riley and I were at his cell. That would be a lie, right?

…

A:    No, he -- he did refuse the vitals, but Ms. Riley had to take the file -- this refusal back later because she didn't have it [on her person].

Q:    But you weren't there at the time of the refusal?

---

[22] Doc. 201-17, Page 111, line 7 – Page 113, line 2.

14

A:   **I was there when he was refused I, but I wasn't there when the signing was done**.

Q:   But I just asked you if you were there and you said no.

A:   I was there when he refused it, but I wasn't at the signing. That's what I'm ref- -- talking about. **I was there when he was refused his blood pressure. I was not there when the paper was signed. She did not have one. She had to come back and get one, but I was there when he refused to have it taken.**[23]

Plaintiff also inexplicably suggests that Nurse Franklin falsified medical records based on a number of "late" medical record entries made on September 18, 2010.  Plaintiff then cites to a document containing one (1) entry made by Nurse Franklin at 0400 (4:00 a.m.) on September 18, 2010.[24]  This entry reads:

**I/M [inmate] VERY NONCOMPLIAN[T]** SAYS HE NEEDS TO GO TO THE HOSPITAL AND WE [WILL NOT] SEND HIM[,] USING PROFANITY[.] I INSTRUCTED THAT THIS NURSE [Franklin] WILL NOT BE TALKED TO THIS WAY. CAPT[A]IN CALL[ED] BY C.O. TO SPEAK WITH THIS I/M AND **HE GOT DISRESPECTFUL TO THE CAPT[A]IN**.[25]

Nurse Franklin made another entry on the early morning of September 18, 2010.  At approximately 4:36 a.m., she charted: *Inc Entry: I/M [inmate] released to security per confinement, per captain*.[26]

---

[23] Doc. 201-17, Page 213, line 14 – Page 214, line 10 (emphasis added).
[24] *See* Doc. 197-18, Page 131. *See also* Doc. 175-7.
[25] *See* Doc. 175-7 (emphasis added).
[26] *See* Doc. 175-13.

Plaintiff contends these entries are non-compliant with the FDOC Nursing Manual because they didn't properly enumerate: (a) the current date and time; (b) an indication that it was a late entry; (c) documentation information; and (d) a signature. However, these entries includes date, time, relevant information, and Nurse Franklin's signature stamp.  Further, Nurse Franklin's notes read "*Inc Entry,*" the accepted abbreviation "incidental entry.[27]  It was in no way an alleged "late entry." Not only is there no evidence that Nurse Franklin's entries somehow violated policy or the nursing manual but also even if it did not comply with standard procedures, "[a] violation of jail [or prison] policy does not itself rise to the level of deliberate indifference." *Dang v. Sheriff, Seminole Cty.*, 856 F.3d 842, 852 (11th Cir. 2017) (citing *Andujar v. Rodriguez*, 486 F.3d 1199, 1204 n.5 (11th Cir. 2007).

Plaintiff has not and cannot show that Nurse Franklin falsified medical records or participated in any sort of conspiracy.

### <u>NURSE FRANKLIN WAS NOT DELIBERATELY INDIFFERENT</u>

Nurse Franklin was not deliberately indifferent to Jordan-Aparo's medical needs.  Plaintiff's Response's litany of alleged decisions and omissions by Nurse Franklin at most **might** be considered nothing more than simple negligence.  By using an imperfect and generally false shotgun approach, Plaintiff misses the crucial

---

[27] Nurse Franklin testified in her deposition that "*Inc Entry*" meant incidental entry. *See* Doc. 201-17, Page 184, lines 13-16.

16

legal point of the deliberate indifference argument.  Plaintiff must show that Nurse Franklin had (1) subjective knowledge of a risk of serious harm; (2) she disregarded that risk; and (3) exhibited conduct that is **more than gross negligence**. *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326-27 (11th Cir. 2007) (emphasis added).

Plaintiff first asserts that Nurse Franklin "would not send Aparo to the hospital out of spite because Franklin claimed Aparo was using profanity."  This is another one of the many lies populating Plaintiff's Response.  Nurse Franklin specifically testified that she did not have authority to independently transfer Jordan-Aparo to a hospital.

> Q:     . . . You have the authority under DOC rules, as well as under the Board of Nursing rules, to declare an emergency and call an ambulance and send an inmate to the hospital, don't you, ma'am?
>
> A:     No.
>
> Q:     Okay. And what – what makes you think that you don't have that authority?
>
> A:     You can't do anything without a doctor.
>
> Q:     And that's the way you were trained at DOC?
>
> A:     Yes. We have to have a doctor's order at that time to do anything.[28]

---

[28] Doc. 201-17, Page 39, lines 14 – Page 40, line 1.

Further, Nurse Franklin testified that she wanted to evaluate and help Jordan-Aparo, but his continued non-compliance and belligerence deterred her from doing so:

> Q:   When you were there with Mr. Aparo -- and there are notes here, if you need to refer to them, but if you can -- I mean, as you sit here today, can you remember what Mr. Aparo was saying and -- and how he was saying them when he was -- when he was using profanity and -- and whatever else he did?
>
> A:   Okay. When I -- when I entered the infirmary, I said: Good morning. I'm Nurse Franklin. I'll be your nurse today. And I'm going to check on everybody individually, so -- and I asked Mr. Aparo -- I said, well, how are you doing. And he immediately said, I need to go to the hospital. And he was very, very adamant, you know, very loud about it. And I was like, okay. **I'll need to do an assessment and see how you are because I'll need to make a report for the doctor to be able to tell him what's going on with you.** And he said, no, you need to send me to the hospital and send me now. I said, I can't send you to the hospital. I have to talk to the doctor this morning and tell him what you're saying and how you're feeling. And he -- so, he said, well, I need to go now. I know what I need. I know when I need to go to the hospital. You need to send me now. **I said, I can't send you, but I can assess you and tell the doctor.** He said, you're not going to ever touch me. I'm not -- I'm not -- you're not going to touch me. And I said, well, I can't assess you -- I can't assess you if you don't let me touch you. I'm not letting you touch me -- and he just started using a lot of profanity. …[29]

There is no evidence anywhere that Nurse Franklin consciously chose not to transfer Jordan-Aparo to the hospital because he used profanity. Not only was Jordan-Aparo non-compliant, but a doctor or clinician also did not order the transfer.

---

[29] Doc. 201-17, Page 169, line 2 - Page 170, line 7 (emphasis added).

Plaintiff alleges that at 11:05 a.m. on September 19, 2010, Nurse Franklin received a phone call from Lieutenant Rollin Austin who asked about Jordan-Aparo's medical history and whether he could be exposed to chemical agents.  At this point, Plaintiff contends that Nurse Franklin was aware Jordan-Aparo suffered from Osler-Weber-Rendu syndrome; severe dehydration; chest pain; shortness of breath; unstable hypertension; a citric acid allergy; and unspecified pain.  Therefore she should have told Lieutenant Austin not to use the chemical agents.

Nurse Franklin testified she was not aware of Osler-Weber-Rendu syndrome and its alleged symptoms at that time.[30]  She stated that objective medical evidence did not support Jordan-Aparo's complaints about respiratory issues, particularly struggling to breathe.  The citric acid allergy was irrelevant. It is absurd to expect Nurse Franklin to ascertain and then independently investigate the remote possibility that citric acid might be a component of oleoresin capsicum.  Jordan-Aparo's complaint of pain originated from falling on September 15, 2010, when playing basketball.[31]  Also, in order for Nurse Franklin to indicate Jordan-Aparo could not be subjected to chemical restraint agents he would have had to present with unstable hypertension.  According to the Risk Assessment, "Inmate is considered stable if B/P has been [less than] 160/110 at last visit."[32]  Jordan-Aparo's most recent blood

---

[30] Doc. 201-17, Page 69, line 23 – Page 70, line 1.
[31] *See* Doc. 175-5. *See also* Doc. 175-6.
[32] *See* Doc. 175-14.

pressure was 100/60, which is considered stable.[33]   None of these complaints

provided any justification for Nurse Franklin to tell Lieutenant Austin that Jordan-

Aparo could not be subjected to chemical agents based on his repeated outbursts,

non-compliance with medical directives, and disciplinary problems.

Plaintiff also alleges Nurse Franklin was deliberately indifferent when she

allowed Jordan-Aparo to return to a cell still contaminated by remnants of chemical

restraint agents.   Such a contention again demonstrates Plaintiff's complete failure

to grasp the well documented and readily accessible information regarding the

specific staff functions in a correctional institution.   Nurse Franklin had no authority

whatsoever to decide where in confinement Jordan-Aparo would be housed.   That

decision belonged solely to security staff.   Further, Plaintiff admits that Jordan-

Aparo's confinement cell had been cleaned by inmate orderlies for at least twenty

(20) minutes, a fact documented by the same fixed-wing video of which Plaintiff

seems so fond.[34]   Although Nurse Franklin had been told that the cell had been

cleaned Plaintiff would nevertheless have this Court believe she was deliberately

indifferent because she failed to check the orderlies' work herself, or failed to assign

him to another cell, both of which were either her responsibilities as a nurse or within

her cope of practice or authority.

---

[33] *See* Doc. 175-14 (Jordan-Aparo's most recent blood pressure reading at the time was taken at 4:36 a.m. on September 18, 2010, as part of Nurse Franklin's Pre-Special Housing Health Assessment).
[34] *See* Doc. 180-9 at 12:12 p.m. to 12:33 p.m.

"Medical treatment violates the Constitution only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Nam Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)).  Jordan-Aparo's symptoms were not "so obvious that even a lay person would easily recognize the necessity for a doctor's attention," *Goebert*, 510 F.3d at 1326, and his treatment was confounded by a previously reported back injury and his continued non-compliance.  In her brief interaction with him on the early morning of September 18, 2010, Nurse Franklin did not perceive the situation as a medical emergency and therefore could not have disregarded Jordan-Aparo's medical needs.

Plaintiff cannot prove that Nurse Franklin's alleged deliberate indifference on September 18, 2010, was the ultimate cause of Jordan-Aparo's death, or even a contributing factor.  Dr. Flannagan testified that Jordan-Aparo's death was not caused by his Osler-Weber-Rendu syndrome, by any physical trauma to his body, or from exposure to chemical agents, based on the absence of any chemical agents on his lips or tongue, in his throat, larynx, esophagus or trachea.[35]  Jordan-Aparo had developed fatal bacterial abscesses in his heart and lungs prior to September 18 and 19, 2010, and even if Nurse Franklin had called 911 or obtained the requisite order

---

[35] *See* Doc. 201-11, Page 59, line 20 – Page 60, line 12.

from a doctor to transfer him to a hospital after he first encounter with him on September 18, 2010, at 4:00 a.m., such actions might have extended his life for a few hours or days only.[36]

Plaintiff has not and cannot demonstrate or prove that Nurse Franklin was deliberately indifferent to Jordan-Aparo's alleged serious medical needs.  Plaintiff has also failed to prove through any valid or certifiable evidence, whether documentary or through sworn testimony, that Nurse Franklin either committed manslaughter or participated in any sort of conspiracy.  Plaintiff has therefore failed to meet her burden of stripping away Nurse Franklin's qualified immunity.  Nurse Franklin remains entitled to qualified immunity, and Plaintiff's claims against her should be dismissed.

## CONCLUSION

Plaintiff has failed to show any genuine issues of material facts.  Therefore, this Court should grant Defendant A. Jones' (aka Lucy Franklin) Motion for Summary Judgment.

---

[36] *See* Doc. 201-11, Page 82, line 11 – Page 83, line 4.

Respectfully submitted this 27th day of July, 2018.

/s/ *Jeffrey S. Howell*
JEFFREY S. HOWELL
Florida Bar No. 0793840
Phipps & Howell
Post Office Box 1351
Tallahassee Florida 32302-1351
(850) 222-7000
jeff@phipps-howell.com
Attorney for Defendants
*JONES, RILEY* and *GREENE*


## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Undersigned counsel for Defendant A. Jones (aka LUCY FRANKLIN) hereby certifies that this motion and incorporated memorandum of law contains 5,112 words, excluding the case style, signature block, and certificate of service, in compliance with N.D. Fla. Loc. R. 7.1(F). The foregoing word count has been calculated utilizing Microsoft Word, the word processing software used to prepare this motion and incorporated memorandum of law.

/s/ *Jeffrey S. Howell*
JEFFREY S. HOWELL

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

served by electronic transmission this 27th day of July, 2018, to:


W. Peter Martin, Esq.
Dennis, Jackson, Martin & Fontela, PA
1591 Summit Lake Drive, Suite 200
Tallahassee, Florida 32317
peter@djmf-law.com
jmauer@djmf-law.com
jennifer@djmf-law.com
*Counsel for FDOC & Andrews*

Brian C. Keri, Esq.
The Law Offices of Brian C. Keri, PA
3375-H Capital Circle NW, Suite 4
Tallahassee, Florida 32308
brianckeri@earthlink.net
michellemsmith@earthlink.net
*Counsel for Austin, Brown, Burch*
*Gillikin, Hamm, Hampton, Martina*
*and Spangler*


Steven R. Andrews, Esq.
Ryan Andrews, Esq.
Brian O. Finnerty, Esq.
The Law Offices of Steven R. Andrews, PA
822 North Monroe Street
Tallahassee, FL 32303
service@andrewslawoffice.com
steve@andewslawoffice.com
ryan@andrewslawoffice.com
bfinnerty@andrewslawoffice.com
*Counsel for Plaintiffs*


/s/ ***Jeffrey S. Howell***
JEFFREY S. HOWELL